# EXHIBIT K

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| DENNIS MACDOUGALL, RAY SEOW, PRABHANJAN KAVURI, RICHARD FRICK, JOSEPH RYAN PARKER AND BRYAN LENTS, individually an on behalf of all other similarly situated,<br><br>        Plaintiffs,<br><br>v.<br><br>AMERICAN HONDA MOTOR CO., INC., AND HONDA NORTH AMERICA, INC.,<br><br>        Defendants. | Case No.: 17-cv-1079 |

# EXPERT REPORT OF STEFAN BOEDEKER

## IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

January 15, 2019

# Table of Contents

1   Introduction ................................................................................................................. 1

   1.1   Qualifications ...................................................................................................... 1

   1.2   Case Background.................................................................................................. 2

   1.3   Assignment .......................................................................................................... 3

   1.4   Materials Considered........................................................................................... 4

2   Theoretical Framework of Economic Loss .................................................................. 4

   2.1   Demand and Supply in a Competitive Market ..................................................... 4

      2.1.1   Willingness-to-Pay.................................................................................... 4

      2.1.2   Willingness-to-Accept .............................................................................. 6

      2.1.3   Market Equilibrium................................................................................... 7

   2.2   Shifting Demand Curves and Changes in Equilibrium Price ................................ 9

   2.3   A Model of Economic Loss ................................................................................ 16

   2.4   Consideration of the Supply Side in the Economic Loss Model.......................... 18

3   Choice Based Conjoint Analysis ............................................................................... 19

   3.1   Introduction of Conjoint Analysis...................................................................... 19

   3.2   Choosing Attributes and Levels in Conjoint Analysis ........................................ 22

   3.3   Statistical Estimation Techniques Applied in Conjoint Analysis ........................ 24

   3.4   Hedonic Pricing Analysis as a Potential Alternative to Conjoint Analysis ......... 26

4   Empirical Study ........................................................................................................ 27

   4.1   General Survey Methodology ............................................................................. 27

   5.2   Surveys/Empirical Studies Using Internet Panels .............................................. 29

   4.3   Pre-Test Survey .................................................................................................. 32

   4.4   Choice Based Conjoint Survey ........................................................................... 44

5   Economic Loss Calculation ....................................................................................... 52

   5.1   Four-Step Estimation Process ............................................................................. 52

   5.2   Market Simulations in Conjoint Analyses .......................................................... 58

   5.3   Study Results...................................................................................................... 59

6   Summary and Conclusion.......................................................................................... 62

7   References ................................................................................................................. 65

8   Appendix ................................................................................................................... 67

**EXPERT REPORT OF STEFAN BOEDEKER**

## Table of Figures

Figure 1: Willingness-to-Pay and Demand ................................................................................ 6

Figure 2: Willingness-to-Accept and Supply ............................................................................ 7

Figure 3: Supply & Demand ........................................................................................................ 8

Figure 4: Shift in the Demand Curve and the Effect on the Equilibrium Price .......................... 11

Figure 5: Consumers' Surplus for Automobile without Transmission Defect ............................ 13

Figure 6: Consumers' Surplus for Automobile with Transmission Defect .................................. 14

Figure 7: Producers' Surplus for Automobiles with and Without Transmission Defect .............. 16

Figure 8: Economic Loss to the Consumer When Buying Automobile with Transmission Defect ........................................................................................................................... 17

Figure 9:  Vehicle as Mean of Transportation ............................................................................ 35

Figure 10:     Vehicle as Mean of Pleasure .................................................................................. 35

Figure 11:     Number of Vehicles Purchased or Leased by Respondents ................................... 36

Figure 12:     Decision Role of Respondents .............................................................................. 37

Figure 13:     Vehicle Makes Purchased or Leased by Respondents ........................................... 38

Figure 14:     Honda Models Purchased or Leased by Respondents ........................................... 39

Figure 15:     Model Year of Vehicles Purchased or Leased by Respondents ............................ 40

Figure 16:     Purchased or Leased ............................................................................................. 41

Figure 17:     Unweighted Attributes, Potential Class Members vs Other Honda Owners and Lessees ..................................................................................................................... 42

Figure 18:     Quantity Weighted Attributes, Potential Class Members vs Other Honda Owners and Lessees .............................................................................................................. 43

Figure 19:     Example of a CBC Choice Menu ........................................................................... 49

Figure 20:     Example of a CBC Choice Menu ........................................................................... 50

Figure 21:     Attribute Confidence Intervals with Monotonicity Constraint .............................. 55

Figure 22:     Confidence Interval for Part-Worths By Attribute-Level with Monotonicity Constraint ................................................................................................................. 56

Figure 23:     Goodness of Fit with Monotonicity Constraint ..................................................... 57

Figure 24:     Actual and But-For Demand for a Specific Package – "Defect manifests with probability of 5%, repaired after 18 months", With Monotonicity Constraint ............ 60

**EXPERT REPORT OF STEFAN BOEDEKER**

Figure 25:    Distribution of Simulation Results for Scenario "Defect manifests with probability of 5%, repaired after 18 months", With Monotonicity Constraint ............................... 61

Figure 26:    Confidence Interval of Economic Value, With Monotonicity Constraint ............. 62

Figure 27:    Attribute Confidence Intervals, Without Monotonicity Constraint ....................... 67

Figure 28:    Confidence Interval for Part-Worths By Attribute-Level, Without Monotonicity Constraint ................................................................................................................ 68

Figure 29:    Distribution of Simulation Results for Scenario "Defect manifests with probability of 5%, repaired after 18 months", Without Monotonicity Constraint ......................... 68

Figure 30:    Confidence Interval of Economic Value, Without Monotonicity Constraint ......... 69

**EXPERT REPORT OF STEFAN BOEDEKER**

# 1   Introduction

## 1.1   Qualifications

1.      I am a Statistician and Economist. I received a Bachelor of Science degree in Statistics and a Bachelor of Arts degree in Business Administration from the University of Dortmund in Germany in 1988. I received a Master of Science degree in Statistics from the University of Dortmund in Germany in 1988, and I received a Master of Arts degree in Economics from the University of California, San Diego in 1992. I also completed Ph.D. requirements (except dissertation) in Economics at the University of California, San Diego.

2.      I am a Managing Director at the Berkeley Research Group ("BRG") based at 550 South Hope Street, Suite 2150, Los Angeles, CA, 90071. Prior to joining BRG, I was a Partner at Resolution Economics. I also held Managing Director positions at Alvarez & Marsala, Navigant Consulting, and LECG. I held partner-level positions at Deloitte & Touché LLP, PricewaterhouseCoopers LLP, and Arthur Andersen LLP. At the three latter firms, I was responsible for the Economic and Statistical Consulting group on the West Coast. Before moving to the United States to attend graduate school, I worked as a statistician for the German Government from 1986 to 1989.

3.      For over 25 years, my work has focused on the application of economic, statistical, and financial models to a variety of areas, such as providing solutions to business problems, supporting complex litigation in a consulting and expert witness role, and conducting economic impact studies in a large variety of industries including, but not limited to, healthcare, retail, grocery manufacturing, technology, entertainment, manufacturing, automotive, energy and utilities, hospitality, and federal, state, and local government agencies.

4.      I have extensive experience designing and conducting surveys and conjoint studies as well as statistically analyzing results from surveys in both the litigation context as a consultant and/or designated expert and the non-litigation context as a statistical or economic consultant. I have issued numerous expert and rebuttal reports dealing with surveys, conjoint analysis, and statistical sampling related issues. I have been deposed on numerous occasions and have also testified in court regarding surveys, conjoint studies, and statistical sampling-related issues.

**EXPERT REPORT OF STEFAN BOEDEKER**

5.      More specifically, several courts have accepted my use of conjoint analysis to measure economic losses associated with alleged product defects, misleading and false advertising, and products with attributes that demand a price premium.[1]

6.      I am not an expert on manufacturing or marketing of automobiles. I do not have an opinion one way or the other about the allegations in this case. Instead, I have relied on my experience and expertise in designing surveys and conjoint studies and applying economic theory and statistical methodologies based on the assumptions provided herein as to the alleged false and/or deceptive statements and omissions at issue in this litigation.

7.      All the facts and circumstances set forth in this report are known to me personally and I am prepared to testify to them if called upon to do so. My *curriculum vitae* which includes matters in which I have testified is attached to this report as Exhibit A. BRG is being compensated for its work on this matter based on an agreed upon hourly billing rate schedule. My hourly billing rate for professional services related to this case is $725 and the billing rates of BRG staff supporting me on this engagement range from $150 to $550. BRG's payment in this matter is not contingent upon my opinions or the outcome of this litigation.

## 1.2   Case Background[2]

8.      It is my understanding that Plaintiffs allege that Defendants American Honda Motor Co., Inc., and Honda North America, Inc., admitted inability to repair defective transmissions it installed in all model year 2011-2016 Honda Odyssey  sold or leased to consumers, including Plaintiffs, throughout the United States.[3]

9.      The Plaintiffs allege that the transmissions in all of the Honda Odyssey vehicles are defective in materials and/or workmanship. The transmissions allegedly cause sudden, unexpected juddering (i.e. shaking and violent jerking), as well as hesitating before responding to a driver's

---

[1]    See for example, *Broomfield v. Craft Brew Alliance, Inc.*; *In re MyFord Touch Consumer Litig.*; *Davidson v. Apple, Inc.*; *In re Dial Complete Mkting. & Sales Prac. Litig.*
[2]    For all paragraphs in this Section, see Class Action Complaint.
[3]    See Class Action Complaint.

**EXPERT REPORT OF STEFAN BOEDEKER**

input on the accelerator pedal. Collectively, these occurrences will be referred to as the "Transmission Defect" in the remainder of this report.[4]

10.    It is further my understanding that Plaintiffs allege that:

    a.  American Honda Motor Co., Inc., and Honda North America, Inc., have been aware of the defective transmission that can result from regular use of the automobile.

    b.  Based on discovery in the case, American Honda Motor Co., Inc., and Honda North America, Inc., have known of the defect since at least September 2010 – *over eight years*.[5]

    c.  American Honda Motor Co., Inc., and Honda North America, Inc., did not, and do not, disclose or provide any information to consumers regarding the defect.[6]

    d.  American Honda Motor Co., Inc., and Honda North America, Inc., failed to warn Class members of the defect. That information was withheld from Plaintiffs and similarly situated purchasers of American Honda Motor Co., Inc., and Honda North America, Inc.[7]

## 1.3  Assignment

11.    I was retained by counsel for Plaintiffs to:

    a.  Outline and develop a theory of economic loss to the members of the putative class attributable to the non-disclosed defective transmissions and, if such a loss exists, to provide a framework for the computation of class-wide damages.

    b.  Outline and develop an empirical study to assess consumers' changes in choices and preferences if they knew that the Honda Odyssey they are about to purchase has problems due to a transmission defect that Honda is admittedly unable to repair at the time of sale compared to their actual purchase experience where they did not know about the defect at the point of purchase.

---

[4]    Class Action Complaint, ¶ 5.
[5]    Ibid., ¶ 26.
[6]    Ibid., ¶ 41.
[7]    Ibid., ¶ 51.

**EXPERT REPORT OF STEFAN BOEDEKER**

      c.   Outline and develop a statistical methodology to quantify class-wide damages if the knowledge of the defect at the point of purchase leads to a drop in consumers' demand which results in a lower price consumers would pay for the automobile.[8]

## 1.4    Materials Considered

12.    In forming my opinions for this report, I have considered documents provided to me by Plaintiffs' counsel. A list of the documents I considered and that formulated my opinions contained herein is attached hereto as Exhibit B.

13.    In addition, I have considered all materials cited in the text and in the footnotes to this report.

# 2   Theoretical Framework of Economic Loss

14.    In this section, I describe the theory behind the economic loss model I propose to utilize to quantify damages in this case. I use a generic example to describe in basic economic terms how prices are set for products based upon a consumer's willingness-to-pay and a manufacturer's willingness to accept and how economic loss can be tested if the demand for a product changes if one or more of the products attribute change. Finally, I will discuss how shifts in the demand curve, if they do exist, can be utilized to quantify class-wide economic losses.

## 2.1  Demand and Supply in a Competitive Market

### 2.1.1   Willingness-to-Pay

15.    In economic theory, willingness-to-pay is derived from "utility" and the consumers' budget. Utility describes a consumer's preferences and it is a measure of the value or usefulness of a good or service to that consumer.[9] To explain the concept, let us assume that it is known how much benefit or utility each consumer in a given market derives from a product or service and how much budget the consumer has available. The willingness-to-pay is the highest price a consumer

---

[8]   It has to be pointed out that the economic loss I will measure derives from the fact that consumers will likely view the automobile with the defective transmission as inferior compared to the same automobile without the defect. In that sense, the economic loss model I propose in this Report measures the price premium for an automobile with a defect-free transmission over an otherwise identical automobile with the transmission defect.

[9]   Hal R. Varian, Intermediate Microeconomics, 8th Edition, 2010, Page 54.

**EXPERT REPORT OF STEFAN BOEDEKER**

is willing to pay for the product, which is based on the perceived utility derived from the product and the consumer's budget. The consumer will purchase the product if the market price of the product is lower than or equal to the consumer's willingness-to-pay, but the consumer will not purchase the product if the price is higher than the willingness-to-pay.

16.     Therefore, the individual willingness-to-pay for a product differentiates the consumers who are in the market for a certain product into buyers and non-buyers. There is no correlation between the individual willingness-to-pay and the market price other than a buyer's willingness-to-pay is equal to or greater than the market price and a non-buyer's willingness-to-pay is smaller than the market price. In this context, the marginal consumer is defined as the consumer whose willingness-to-pay equals the market price.

17.     With this knowledge, it is possible to rank the consumers by their willingness-to-pay. As an illustrative example, let us assume that the consumer with the highest willingness-to-pay is willing to spend $40,000 for an automobile. If the price of the automobile were $40,000, this consumer would purchase the automobile but nobody else would. This consumer would also buy the automobile for any price less than $40,000.[10] If there is an additional consumer with the next highest willingness-to-pay of $35,000, then this consumer and the consumer with the willingness-to-pay of $40,000 would purchase the automobile for a price of $35,000 and so forth. Each consumer would buy the automobile at a price that is equal to or less than his or her respective willingness-to-pay. If a consumer's willingness-to-pay is less than the price for the automobile, then this consumer will not buy the automobile.

18.     Based on the ranking of consumers by their willingness-to-pay, a demand curve can be constructed in the following way: In a diagram that depicts the amount of the willingness-to-pay for each individual consumer on the vertical axis and the number of consumers on the horizontal axis, the demand curve will begin in the top left corner at the intersection of one consumer and a willingness-to-pay of $40,000. The next data point is at the intersection of two consumers and a willingness-to-pay of $35,000, and so forth.

---

[10]     This is an important difference between the individual willingness-to-pay and the price actually paid. The actual monetary amount of the individual willingness-to-pay is irrelevant – only its relation to the price of the product matters: if the individual buys the product for a specific price then it can be concluded that the willingness-to-pay is at or above the price; if a consumer's willingness-to-pay is below that price then he or she will not buy.

**EXPERT REPORT OF STEFAN BOEDEKER**

19.     The demand curve would look like a downward facing set of stairs. For simplicity, textbooks typically stylize the demand curve as a smooth downward sloping line or curve. Figure 1 below illustrates this concept.

*Figure 1: Willingness-to-Pay and Demand*



*Source: Illustrative Example Based on Hypothetical Data*

### 2.1.2   Willingness-to-Accept

20.     Following the same principle as in the example of developing the demand curve, we can also determine the minimum price at which each manufacturer is willing to sell the automobile. This is called the willingness-to-accept.

21.     Like the consumers on the demand side, the manufacturers can be ranked by their willingness-to-accept a price for their product. In a diagram with volume on the horizontal axis and prices and willingness-to-accept on the vertical axis, the manufacturer with the smallest willingness-to-accept, let's say $15,000, will be positioned on the left. If the price of the automobile were to be just above $15,000, only this manufacturer would be willing to accept the

**EXPERT REPORT OF STEFAN BOEDEKER**

price. If the next manufacturer offers one unit for $17,500, then at the price of $17,500 two units would be offered in the market and so on. When connecting all ranked monetary amounts of willingness-to-accept, we get the supply curve. It typically slopes upwards from left to right. The supply curve would look like an upward facing set of stairs. For simplicity, textbooks stylize the supply curve as an upward sloping smooth line or curve. Figure 2 below illustrates the concept.

### *Figure 2: Willingness-to-Accept and Supply*



*Source: Illustrative Example Based on Hypothetical Data*

### 2.1.3   Market Equilibrium

22.    The market balances supply and demand. At a price of $15,000, almost all consumers in the illustrative example would purchase the product but the manufacturers would offer only one unit. Conversely, at a price of $40,000, only one consumer would be willing to purchase the product while all manufacturers would be willing to sell the product. In the generic example, the market clears at a price of $22,521. At this point, not all consumers will buy and not all manufacturers will sell but the largest possible number of consumers and manufacturers will be brought together. In the graphical representation, the supply and demand curves intersect (Figure

**EXPERT REPORT OF STEFAN BOEDEKER**

3) at the price of $22,521. If the price exceeds $22,521, more manufacturers would offer their product but fewer consumers would be willing to purchase the product. If the price drops below $22,521, more consumers would be willing to purchase the product but fewer manufacturers would be willing to sell the product. The market equilibrium price of $22,521 is the price at which every individual in the market for the product with a willingness-to-pay of $22,521 or higher will buy. At the same time, the market equilibrium price of $22,521 is the price at which every manufacturer of the product with a willingness-to-accept of $22,521 or lower will sell.

*Figure 3: Supply & Demand*



*Source: Illustrative Example Based on Hypothetical Data*

23.     The equilibrium price is not the simple average of all consumers' willingness-to-pay. Rather, the equilibrium price depends on both supply and demand. The equilibrium price is the price where the supply curve and the demand curve intersect. Every consumer to the left of the marginal consumer has a willingness-to-pay that exceeds the equilibrium price, and therefore, will purchase the product.

**EXPERT REPORT OF STEFAN BOEDEKER**

24.     The difference between the willingness-to-pay and the market price can also be illustrated with a real-world example: In an eBay auction, I may have put my eye on an item. I put an upper limit for my bids for a specific item at $50. This upper limit signals my willingness-to-pay. Given my willingness-to-pay of $50, I will buy the item when I see it offered with a "Buy it Now" price tag of $25. What happened in this example? Did my utility from purchasing the item suddenly change? Did my willingness-to-pay change? Obviously not. However, what has changed is that the projected amount that I would pay going through the bidding process is different than the price I will pay when a competing offer with a lower price for the identical item is presented to me. In other words, the willingness-to-pay does not necessarily reflect the actual price that a consumer ends up paying for a product. Instead, the resulting market price is a function of the willingness-to-pay of all consumers in the market for a product and the individual customer's willingness-to-pay signals who will buy the product and who will not. This is an important concept in my derivation of damages because the economic loss measure introduced further below in this report is based on prices and not on individual willingness-to-pay.

25.     In this case, each time a consumer purchased a Honda Odyssey and the Transmission Defect was not known to the consumer (i.e., the Transmission Defect was concealed or the information about the Transmission Defect was omitted) at the point of purchase, demand and supply for a Honda Odyssey without the defective transmission met and a market equilibrium resulted. Therefore, all the consumers who purchased a Honda Odyssey for which the Transmission Defect was not disclosed at the point of purchase represent the demand side of the market equilibrium and the sold units of Honda Odysseys for which the Transmission Defect was not disclosed at the point of purchase represent the supply side of the market equilibrium.

## 2.2  Shifting Demand Curves and Changes in Equilibrium Price

26.     Based on Lancaster's theory of utility,[11] the utility a consumer derives from a product and, therefore, the consumer's willingness-to-pay for the product is aggregated from the willingness-to-pay for each of the product's characteristics, attributes, and features. In this case, the product is

---

[11]     Lancaster, Kelvin J. (1966), "A New Approach to Consumer Theory," Journal of Political Economy 74 (2): Pages 132-157.

**EXPERT REPORT OF STEFAN BOEDEKER**

a Honda Odyssey and the examples of the characteristics of the automobile may include safety features, power vs. manual seat adjustment, entertainment systems, price, and other features.[12]

27.     The price a consumer pays for an automobile is the weighted sum of the value of each of the automobile's characteristics to the consumer. Changes in the composition of the characteristics may lead to a shift of the demand curve for the automobile. The characteristics or attributes of an automobile are not limited to physical or tangible attributes. They can also relate to statements about the automobile and advertised features of the automobile that are used to market the automobile to the consumers such as reliability, safety, or design.

28.     In the case where statements used for marketing purposes are alleged to be false and/or misleading or where important features like the defect are omitted or concealed at the point of purchase,[13] it must be determined if and by how much the demand curve shifts when the truth about the Transmission Defect is revealed at the point of purchase. If, based on the now-complete information at the point of purchase, the demand curve shifts downward because the consumers find the product with the complete information less desirable, both the price and the number of units sold may decrease – i.e., fewer consumers will buy at a lower price. Figure 4 below illustrates a possible demand curve shift downward for this scenario:

**[The space below was left blank to accommodate Figure 4.]**

---

[12]    See the detailed discussion in Section 4.3.
[13]    In the following, I will refer to situations where statements used for marketing purposes are alleged to be false and/or misleading or where important features like design flaws are omitted or concealed at the point of purchase as situations where the consumer has incomplete information at the point of purchase.

**EXPERT REPORT OF STEFAN BOEDEKER**

**Figure 4: Shift in the Demand Curve and the Effect on the Equilibrium Price**



*Source: Illustrative Example Based on Hypothetical Data*

29.     In the following paragraphs, I will refer to the situation where the consumer bought a product with incomplete information as the "actual world" and the situation where the consumer had full information about the product at the point of purchase as the "but-for world." In this case, the actual world is the world where consumers bought the automobile with the defect without knowing about the defect; and the but-for world is the hypothetical world where consumers are informed at the point of purchase about the defect.

30.     In the but-for world, where consumers find out about the Transmission Defect at the point of purchase, consumers' demand for the automobile may change. If the disclosure of the Transmission Defect at the point of purchase in the but-for world makes the automobile less attractive or desirable to the consumer, then they may be willing to pay less for the automobile, which would result in a downward shift of the demand curve. Figure 4 above illustrates such a demand shift.

11

**EXPERT REPORT OF STEFAN BOEDEKER**

31.     The new demand curve may have a different shape than the demand curve for the product in the actual world where the consumer does not know about the defect. All else equal, the shift of the demand curve results in a new market equilibrium, where the price and the transaction volume are lower. This is the new market equilibrium in the but-for world. However, the new market equilibrium occurs at a lower price and at a lower volume. Considering that the horizontal volume axis represents the members of the putative class, this new market equilibrium is not the relevant measure for the economic loss.

32.     Before I derive the correct measure for economic loss based on the economic principles discussed in this Section, I will present an economic argument that proves that the manufacturer gains at the cost of the consumer in cases when a product is sold and certain information is not disclosed to the consumer at the point of purchase and when the previously undisclosed information makes the product less attractive and desirable to the consumer such that the demand curve shifts downward.

33.     In economic theory, the consumer's surplus purchasing a given product is the difference between the willingness-to-pay and the price paid. Aggregated across all consumers in a market, this is defined as the consumers' surplus.[14] It is equal to the area under the demand curve and above the price line (the green area in Figure 5). If the disclosure of complete information for a product at the point of purchase makes the product less desirable for the consumer, then the demand curve will shift downwards (the light blue line in Figure 5 and Figure 6). The new consumer surplus after the shift in the demand curve due to the false claim is equal to the area under the new demand curve and above the new price line (orange area in Figure 6).

**[The space below was left blank to accommodate Figure 5.]**

---

[14]    Hal R. Varian, Intermediate Microeconomics, 8th Edition, 2010, Page 255.

**EXPERT REPORT OF STEFAN BOEDEKER**

**Figure 5: Consumers' Surplus for Automobile without Transmission Defect**



*Source: Illustrative Example Based on Hypothetical Data*

**[The space below was left blank to accommodate Figure 6.]**

**EXPERT REPORT OF STEFAN BOEDEKER**

*Figure 6: Consumers' Surplus for Automobile with Transmission Defect*



*Source: Illustrative Example Based on Hypothetical Data*

34.     If the demand curve for the product with full information in the but-for world is below the demand curve for the product where some information has not been disclosed in the actual world (the demand curve labeled "Demand for Product without Transmission Defect" is above the demand curve labeled "Demand for Product with Transmission Defect" in Figure 5 and in Figure 6), the consumer's surplus for the product in the but-for world will be smaller than the consumer surplus in the actual world. This can be seen by comparing the green area in Figure 5 to the orange area in Figure 6). Therefore, the consumers will have suffered economic losses.

35.     Another way of looking at the economic loss to the consumer focuses on the manufacturer. Generally, a manufacturer's surplus is the difference between the willingness-to-accept and the price obtained in the market. Aggregated over all manufacturers, the producers' surplus is the area below the price line and above the supply curve.

**EXPERT REPORT OF STEFAN BOEDEKER**

36.     Corresponding to the consumers' surplus, we can also derive the producers' surplus. For each unit, the manufacturer's surplus[15] is the difference between the price received and the marginal costs of producing the unit. A shift in the demand curve results in a change in the manufacturer's surplus. In Figure 7 below, the grey area represents the producers' surplus in the but-for world where no information is concealed. The yellow area represents the additional producers' surplus gained when certain information is concealed at the point of purchase as occurs in the actual world. Recall, that in the hypothetical example, the equilibrium between supply and the demand for the product with incomplete information in the actual world resulted in four consumers paying $22,521 (see Figure 3). In the market equilibrium depicted in Figure 6, for the product in the but-for world with full information at the point of purchase, two consumers (instead of four) would have paid $17,507 instead of $22,521. The yellow area in Figure 7 depicts the additional manufacturers' surplus obtained by not disclosing that the claim was false. Therefore, the manufacturer gains at the cost of the consumer.

**[The space below was left blank to accommodate Figure 7.]**

---

15     Ibid., Page 313.

**EXPERT REPORT OF STEFAN BOEDEKER**

*Figure 7: Producers' Surplus for Automobiles with and Without Transmission Defect*



*Source: Illustrative Example Based on Hypothetical Data*

## 2.3     A Model of Economic Loss

37.     Figure 5, Figure 6, and Figure 7 clearly show how the concealment of information that would change the demand for a product increases the manufacturer's gross profits at the expense of consumers. In the example above, at the new equilibrium price of $17,507 the volume sold drops to 2 units. The fact that only two instead of four consumers would have bought the automobile at the new market equilibrium price of $17,507 implies that the new market equilibrium price is not an adequate measure to compensate for the economic loss.

38.     In the illustrative example in Figure 8 below, the new market equilibrium (i.e., where demand and supply for the automobile with all information disclosed at the time of purchase intersect) occurs at a lower price ($17,507 instead of $22,521) and at a lower number of units sold (2 instead of 4). However, the price of $17,507 does not compensate all purchasers who bought the automobile in the actual world not having the information about the defect when making their purchase decision.

**EXPERT REPORT OF STEFAN BOEDEKER**

39.     To fully compensate all consumers for their economic loss, it is necessary to find the price point on the demand curve that ensures that the same number of units that were sold in the actual world would also be sold in the but-for world. This can easily be done by moving down the demand curve in the but-for world to the point of the volume sold in the actual world. As can be seen in Figure 8, the difference between the two price points at the volume of units sold in the actual world (four) fully compensates each member of the putative class.[16]

### Figure 8: Economic Loss to the Consumer When Buying Automobile with Transmission Defect



Source: Illustrative Example Based on Hypothetical Data

---

[16]    In Sections 4 to 6, I will describe a methodology to calculate the shift of the demand curve and assess the economic loss based on an empirical study.

**EXPERT REPORT OF STEFAN BOEDEKER**

40.     In the example illustrated in Figure 8 above, the equilibrium price is $22,521 for the product with incomplete information in the actual world, but the four consumers who purchased in the actual world would have paid only $10,051 with full information at the point of purchase in the but-for-world. The difference between the prices of $12,470 ($22,521 minus $10,051) is the amount that will compensate all consumers who bought the automobile with incomplete information.

41.     Each buyer of the automobile with the known defect has to be compensated because they overpaid for the automobile. The price that compensates for the economic loss suffered by consumers is the price where the new demand curve for the but-for world intersects the volume point of the market equilibrium in the actual world.

42.     All else equal and depending on the shape of the supply curve and the demand curve before and after the disclosure of the information about the allegedly false and/or misleading claim at the point of purchase, the economic loss may differ.

## 2.4   Consideration of the Supply Side in the Economic Loss Model

43.     The supply curve in the economic loss model is identical for the actual world (no disclosure of the defect) and the but-for world (the same automobiles are now offered with full disclosure of the Transmission Defect at the point of purchase in the but-for world). In the actual world, the supply of automobiles is defined by the number of automobiles sold for which the defect had not been disclosed at the point of purchase. This supply is relevant to the economic loss computation. If consumers' preferences changes once the defects are disclosed at the point of purchase, then the number of sold automobiles with the previously undisclosed defects are the supply in the but-for world where the defect was disclosed at the point of purchase. The shift in the attribute level (i.e., previously undisclosed defects are now disclosed at the point of purchase) has no impact on the marginal costs of the supplier, and therefore, the supply curve remains the same. Consequently, only the changes in the demand curve are relevant for the assessment of an economic loss to the consumers, if any.

44.     Because the economic loss model must find the price for the volume of Honda Odysseys supplied in the actual world (i.e., the number of automobiles sold without disclosing the defect) that consumers would have paid for in the but-for world (i.e., now the consumers know about the

**EXPERT REPORT OF STEFAN BOEDEKER**

defect) the supply in the actual and the but-for world are identical. Therefore, the only relevant question is if the disclosure of the defect at the point of purchase makes the automobiles actually sold inferior to the automobiles as advertised in the eyes of the consumer.

45.     If consumers' perception changes such that the automobiles with the defect are viewed as inferior, then the demand curve will shift downwards. This implies that for an upward sloped supply curve, the downward shift of the demand curve is associated with a drop in the price that consumers would pay if they knew at the point of purchase that the automobile had defects.

# 3   Choice Based Conjoint Analysis

## 3.1   Introduction of Conjoint Analysis

46.     An economic model that applies the theory discussed above is conjoint analysis. Conjoint analysis is widely used in market research and is discussed in depth in  market research literature.[17] For example, Vithala Rao's book, *Applied Conjoint Analysis*, provides numerous examples of the widespread use of Conjoint Analysis including, but not limited to, several high-profile applications by large corporations and large public agencies such as (i) Microsoft for pricing newly released software products, (ii) Proctor & Gamble for consumer-goods pricing and new product development, (iii) Marriott Corporation for the development of the Courtyard hotel brand, and (iv) T-Mobile for developing optimal cellular plans. Conjoint Analysis was also integral to the development of the EZPass electronic toll collection system by regional transit agencies in New York and New Jersey in the 1990s.[18]

47.     Bryan Orme, the founder of Sawtooth software for conjoint analysis, estimates that over 18,000 commercial applications of Conjoint Analysis take place each year.[19] In this book, ten individuals from corporate research and marketing departments, academics, and governmental agencies including among others Bing, General Motors, Lifetime Products, Microsoft, Proctor and Gamble, Yale University, University of Michigan, and a branch of the Canadian Department of

---

[17]   See, for example: Rao, Vithala, Applied Conjoint Analysis, Springer-Verlag, 2014.
[18]   Ibid., Chapters 6.4 and 6.5.
[19]   Orme, Bryan K, Getting Started with Conjoint Analysis: Strategies for Pricing Research, 3rd ed., Madison: Research Publishers, 2014, Page 143.

**EXPERT REPORT OF STEFAN BOEDEKER**

Fisheries and Oceans contributed their experiences in applying Conjoint Analysis to answer a diverse range of questions including among many others interaction of product attributes, product pricing, new product development, strategic market planning, choice of complex medical treatments, pricing of product bundles, and how changes in attributes affect prices.[20]

48.     In addition to simply reporting the use of Conjoint Analysis, the contributors to the Orme book also praise the success of applying Conjoint Analysis: "… the vast majority of conjoint conclusions have proven correct over time…"[21], "In the fall of 2004, McMaster University introduced the new Compass Curriculum – an approach to medical education consistent with the results of this conjoint experiment."[22], and "Conjoint has helped the company to maintain growth in mature markets and provide better products at the best possible prices. We look forward to expanding our use of conjoint analysis as an effective management-information tool."[23]

49.     The general idea behind Conjoint Analysis is that consumers' preferences for a particular product are driven by attributes, features, or descriptions/advertisements of attributes/features embodied in that product. Using survey data, Conjoint Analysis is a set of econometric and statistical techniques that have been developed to study consumers' decision-making processes, determining trade-offs between products, features, and price, as well as quantifying consumers' gains and/or losses of utility when choosing between different alternatives. By simulating real world and/or hypothetical choices between product features and prices under different levels of information, Conjoint Analysis is ideally suited to model the impact of different choice scenarios on a consumer's utility function.

50.     The data required for a Conjoint Analysis are collected in the setting of a survey where survey participants are shown several product profiles with different levels of each attribute. The survey participants are consumers who currently are or recently have been in the market for the product of interest – in this case, automobiles. After reviewing a set of choice menus of product attributes and their levels, survey participants are then asked to indicate their preferences for those

---

[20]   Ibid., Chapter 14.
[21]   Ibid., Page 146.
[22]   Ibid., Page 150.
[23]   Ibid., Page 157.

**EXPERT REPORT OF STEFAN BOEDEKER**

profiles. The product profiles include choice options for different price points for each set of features on the choice menu.

51.     After the completion of the survey, the Conjoint Analysis uses data from the survey on the attribute levels of the product profiles shown, and the resulting preferences or choices of respondents, to decompose the respondents' preferences for a product into the partial contribution of these attribute levels ("part-worths") using appropriate statistical methods. The statistical models used in my analysis – Mixed Logit models and Hierarchical Bayesian Estimation – will be discussed in more detail in Section 3.3 below. These statistical estimation techniques quantify the part-worths for feature levels such that the resulting estimated part-worths best predict respondents' preferences or choices from the survey. By adding up the part-worths by respondent for different attribute levels, one can determine the share of respondents that would have purchased the product made up of the different levels of each attribute and a given price.

52.     The price reduction needed to compensate for the loss of a feature, or the additional price customers would pay for the inclusion of a feature, can then be calculated and a variety of choice situations and trade-offs between choices can be modeled and their outcomes can be precisely quantified. The precision, and thus the reliability, of the resulting estimations depends on the number of survey participants. The more respondents that take part in the survey, the more precise the resulting predictions are.

53.     For this assignment, I applied a form of Conjoint Analysis known as Choice-Based Conjoint Analysis ("CBC"). In CBC studies participants are shown sets of product profiles (called "choice sets" or "choice menus") and are asked to choose the profile that they would prefer to purchase if the choice menu offered would describe the only products that were available to them. CBC survey methods closely mimic real-world purchase processes.[24] Conjoint Analysis allows for the prediction of the probability that a respondent will choose any product profile that is described by the part-worths and can do so for any competitive set of products.[25] Based on the estimations, it is also possible to simulate how choice shares would change in a market based on a change in

---

[24]   Orme, Bryan K, Getting Started with Conjoint Analysis: Strategies for Pricing Research, 3rd ed., Madison: Research Publishers, 2014.

[25]   Allenby, Greg M & Peter E Rossi, "Hierarchical Bayes Models," in Grover, Rajiv & Marco Vriens, eds., The Handbook of Marketing Research, Thousand Oaks: Sage Publications, Inc., 2006.

**EXPERT REPORT OF STEFAN BOEDEKER**

overall price. CBC enables us to determine the difference in value (measured in dollars or as a percentage of the purchase price in the actual world) that customers place on an automobile without the Transmission Defect compared to an otherwise identical automobile with the Transmission Defect.

### 3.2   Choosing Attributes and Levels in Conjoint Analysis

54.     The choice of attributes and their respective levels is an important aspect of proper conjoint study design. An attribute is a characteristic of a product which is comprised of different levels. There must be at least two levels. In its simplest form an attribute is binary and may indicate that a product has a certain characteristic or not (e.g., an automobile may have power seats or not). As discussed in Section 2, economic theory holds that buyers view products as composed of various attributes and levels. Buyers place a certain utility (value) on each of those attributes and levels, and the overall utility of any product is the weighted sum of the value of its attributes and levels.[26]

55.     In statistical data analysis, there are typically four scales that measure the levels of attributes:

      a.   Nominal scales,

      b.   Ordinal scales,

      c.   Interval scales, and

      d.   Ratio scales.

Interval scales and ratio scales are often summarized as quantitative scales.

56.     Nominal scales are used for labeling variables where the labels have no quantitative meaning (e.g., the color of the interior of a Honda Odyssey). When using attributes measured on a nominal scale the levels of these attributes are mutually exclusive (no overlap) and none of them have any numerical significance.

57.     When using ordinal scales, the order of the values has importance and significance, but the differences between the values is meaningless. For example, when automobile purchasers are asked how satisfied they were with their product and the answer choices are on a scale from 1 to

---

[26]   Orme, Bryan K., *Formulating Attributes and Levels in Conjoint Analysis*, Sawtooth Software Research Paper Series, 2002.

**EXPERT REPORT OF STEFAN BOEDEKER**

5 where 5 means "very satisfied," 4 means "satisfied," 3 means "neither satisfied nor dissatisfied," 2 means "dissatisfied," and 1 means "very dissatisfied," there is a clear order, but the values from 1 to 5 have no quantitative meaning (e.g., the difference between 5 and 3 is the same as between 4 and 2 but does not translate into the difference between "very satisfied" and "neither satisfied nor dissatisfied" to be the same as the one between "satisfied" and "dissatisfied"). All that can be concluded from an ordinal scale is whether a choice is better (4 is better than 2 and 5 is better than 3 when measuring customer satisfaction); how much better it is cannot be quantified.

58.     Interval scales provide the order of values and the ability to quantify the difference between each one. An example of an interval scale is temperature measured in Fahrenheit, because the same quantitative difference between each set of values is the same.  For example, when the temperature is 60 degrees, it is 10 degrees warmer than when the temperature is 50 degrees, and when the temperature is 80 degrees, it is also 10 degrees warmer than when the temperature is 70 degrees. However, it cannot be concluded that 80 degrees is twice as a warm as 40 degrees or 10 degrees is five times colder than 50 degrees because an objective zero point is not defined.

59.     Ratio scales are identical to interval scales with the additional characteristic that an objective zero point can be defined. Price data are on a ratio scale – a product with a price of $100 is twice as expensive as a product with a price of $50 and a product with a price of $50 is twice as expensive as a product with a price of $25. For measurements on a ratio scale, it can now be concluded that the product with a price of $100 is 2x2=4 times as expensive as the product with a price of $25. These calculations are not possible on the measurements on the other scales.

60.     The literature recommends that Choice Based Conjoint studies involve six or fewer attributes, each comprised of two to five levels, to address issues of fatigue and the general ability of respondents to process information. In his seminal publication on conjoint analysis, Rao discusses the number of choices represented on one choice menu. He states that some authors believe that the number of cells on a choice menu (number of columns times number of rows) should not exceed twenty, while others tend to favor the notion that respondents are not hard pressed to process more pieces of information.[27]

---

[27]    Rao, Vithala, Applied Conjoint Analysis, Springer-Verlag, 2014, Pages 132-133.

**EXPERT REPORT OF STEFAN BOEDEKER**

61.     It is further recommended to conduct a pre-test survey before the actual conjoint study to elicit consumers' preferences with respect to attributes and the importance of those attributes in the process of purchasing a product. The results from the pre-test survey will then guide the choice of attributes for the conjoint study. Following this approach, I first conducted a pre-test survey as a precursor to a conjoint study. I discuss this pre-test survey in detail in Section 4.3.

### 3.3  Statistical Estimation Techniques Applied in Conjoint Analysis

62.     The underlying econometric and statistical estimation techniques of the Conjoint Analysis are based on Mixed Logit models and Hierarchical Bayesian Estimation techniques, which are widely employed in economics and marketing research to analyze preferences over a discrete set of choices.[28]

63.     Mixed Logit models are based on the idea that each consumer assigns a utility to each choice, and this utility measures the attractiveness of each choice. These utility values are correlated with the attributes of the actual choice (for example, a properly working transmission in an automobile) and the price associated with that choice. The utilities can be correlated with observable characteristics of the consumers making the choice (such as their age or income).

64.     The utility of each product consists of two components: a deterministic component and a random component. The deterministic component can be modeled by observable factors such as socio-economic and demographic characteristics of the consumers, product features, and market conditions. In general terms, the random component summarizes all the unobservable factors in the individual consumer's choice process. In Mixed Logit models, the random component is expressed through a logistic distribution function. Together with the observable factors, this distribution function is used to predict the probability that a particular choice is made.[29]

65.     Once shown a menu of choices of different levels of attributes and different price alternatives, the consumer then chooses the one choice in the menu that yields the highest utility

---

[28]   Underlying the Mixed Logit is a model of random utility. University of California, Berkeley, economics professor Daniel McFadden developed the random utility model in the 1970s while working as a consultant on the design of the Bay Area Rapid Transit (BART) system in California. This work won McFadden the Nobel Prize in 2000. *See* Hal Varian, Intermediate Microeconomics, 8th Ed, 2010, Page 68.

[29]   *See*, for example: Rao, Vithala, Applied Conjoint Analysis, Springer-Verlag, 2014, Chapter 4, for a detailed discussion of the use of mixed multinomial logit models in choice based conjoint studies.

**EXPERT REPORT OF STEFAN BOEDEKER**

from that menu of choices.[30] Observing consumers' choices from various choice menus enables one to estimate the relative value consumers place on one attribute over another as well as the relative value of levels of a given attribute. With the inclusion of price as an attribute the part-worths of all attributes and their levels can now be expressed as monetary values (for example, it can now be tested how much value consumers place on an automobile with properly working transmission compared to an automobile with the Transmission Defect alleged in the Complaint).

66.     Bayesian statistics is a field of statistics where the underlying model parameters are assumed to be random variables rather than fixed quantities. Bayesian modelling is based on assigning prior probability distributions to any unknown parameters. In this case, the unknown parameters to be estimated are the part-worths of the attributes of a composite product derived from the choice sets in the conjoint analysis. These parameters are estimated by a technique referred to in the literature as Hierarchical Bayesian Estimation.[31]

67.     In Hierarchical Bayes Estimation ("HBE"), the parameter estimates are derived in a two-step hierarchical approach. At the higher level, the individual consumers' part-worths are assumed to follow a specified distribution (like multivariate normal distribution or log-normal distribution). At the lower level, it is assumed that the individual consumers' choice probabilities can be described by a model, such as a Mixed Logit model. Initial estimates of part-worths are estimated for each study respondent to use as a starting point. New estimates are updated using an iterative process called Gibbs Sampling and Metropolis Hastings Algorithms.[32] This process is typically repeated thousands of times whereby, in each iteration, an estimate is made for each parameter conditional on current estimates of the others. After many iterations, this process converges to the correct estimates for each of the parameters.

68.     The HBE method combines random effect specifications at the aggregate level to account for variation across individuals and specific modelling of choice probabilities at the individual level. With market simulations, the performance of competing alternatives can be evaluated.

---

[30]   *See* Figures 19 and 20 for an example of what a choice menu might look like where a respondent is presented a menu with five choices of combinations of features. Afterwards, respondents are asked whether they would purchase the preferred option.

[31]   *See*, for example: Rao, Vithala, Applied Conjoint Analysis, Springer-Verlag, 2014, Chapter 4.11, for a detailed discussion of the use of Hierarchical Bayesian Estimation in choice based conjoint studies.

[32]   Rao, Vithala, Applied Conjoint Analysis, Springer-Verlag, 2014, Page 168.

**EXPERT REPORT OF STEFAN BOEDEKER**

### 3.4     Hedonic Pricing Analysis as a Potential Alternative to Conjoint Analysis

69.     Hedonic Pricing Analysis could be a potential alternative to conjoint analysis. In the following I describe this approach.

70.     In economics, revealed preference-based approaches observe actual purchases by consumers or published prices and infer from that information the decomposition of the overall price of the composite product into its constituent attributes. This is most often accomplished by using hedonic pricing models where the actual transaction prices of the composite product with varying attributes is regressed on the specifications of the composite product. The regression coefficients are then interpreted as the implicit market prices of each attribute. Hedonic Pricing Analysis was developed by Andrew Court[33] and expanded by Zvi Griliches[34, 35], Sherwin Rosen[36], Jack Triplett[37 38], Robert Feenstra[39] and many others.

71.     The Hedonic Pricing Approach also assumes a utility function as first described by Lancaster, in which the utility derived from a certain product is a function of its attributes. When consumers can choose the level of each attribute they will consume more of a specific attribute until the marginal utility equals the marginal increase in the price of the product, which is also called the implicit price of the attribute.

---

[33]   Court, Andrew T. (1939), "Hedonic Price Indexes with Automotive Examples", in: The Dynamics of Automobile Demand, New York, NY: General Motors Corporation, pp. 99-117.

[34]   Griliches, Zvi (1961), "Hedonic Price Indexes for Automobiles: An Econometric Analysis of Quality Change", in: Price Statistics Review Committee, National Bureau of Economic Research, The Price Statistics of the Federal Government: Review, Appraisal, and Recommendations, General Series No. 73. New York, NY: National Bureau of Economic Research, pp. 173-96, reprinted in Zvi Griliches, Technology, Education, and Productivity, Oxford: Basil Blackwell, 1988, pp. 76-104.

[35]   Griliches, Zvi (1991), "Hedonic Price Indexes and the Measurement of Capital and Productivity: Some Historical References", in: Ernst R. Berndt and Jack E. Triplett (eds.), Fifty Years of Economic Measurement: The Jubilee of the Conference on Research in Income and Wealth, National Bureau of Economic Research Studies in Income and Wealth, Vol. 54. Chicago: University of Chicago Press, pp. 185-202.

[36]   Rosen, Sherwin (1974), "Hedonic Prices and Implicit Markets: Product Differentiation in Pure Competition", Journal of Political Economy, 82(1) (January-February), pp. 34-55.

[37]   Triplett, Jack E. (1969), "Automobiles and Hedonic Quality Measurement", Journal of Political Economy, 77(3) (May-June), pp. 408-17.

[38]   Triplett, Jack (2006), Handbook on Hedonic Indexes and Quality Adjustments in Price Indexes: Special Application to Information Technology Products, OECD Publishing, Paris. DOI: http://dx.doi.org/10.1787/9789264028159-en

[39]   Feenstra, Robert C. (1995), "Exact Hedonic Price Indexes", Review of Economics and Statistics, 77(4) (November), pp. 634-53.

**EXPERT REPORT OF STEFAN BOEDEKER**

72.     On the supply side, it is assumed that the production cost function is also dependent on the various attributes. Under perfect competition, the manufacturer will increase the level of each attribute until the marginal cost of the attribute is equal to the marginal increase in price that the manufacturer can achieve in the market.

73.     In market equilibrium with perfect competition, the marginal cost of the attribute is equal to the marginal utility and the implicit price of the attribute. This relationship can be used to extract from observable market prices and attribute levels the implicit price of a specific attribute. The implicit price of the attribute is equal to the partial derivative of the hedonic price function to the attribute. Various authors have shown that the assumption of perfect competition can be relaxed without invalidating the Hedonic Pricing Approach.

74.     The Hedonic Pricing Approach requires information about descriptive attributes of the product, information on the prices paid by consumers for the products and information on volumes sold. Often, this information is derived from transactional data. The hedonic equation can be estimated from market data, where the observed price of the composite product is a function of the vector of the descriptive attributes and the implicit price vector.

75.     I reserve the right to apply the Hedonic Pricing Approach as may be appropriate at a later point in this case.

# 4   Empirical Study

## 4.1   General Survey Methodology

76.     Unlike in accounting where "Generally Accepted Accounting Principles" (GAAP) include the standards, conventions, and rules that accountants follow in recording and summarizing financial data in an audit for the preparation of financial statements, there is not one authoritative list of such generally accepted principles for survey methodology and its proper application. In survey sampling there is no one-size-fits-all solution. However, various authors[40] and different

---

[40]   There is voluminous literature about survey research defining the relevant steps in proper survey research.  The following two books are excellent resources:
  a.   Handbook of Survey Research, J. Wright, P. Marsden, 2nd Edition, 2010.

**EXPERT REPORT OF STEFAN BOEDEKER**

professional organizations[41] have agreed on what is necessary to properly design and implement surveys and then statistically analyze their results such that reliable and valid conclusions can be drawn and applied to the broader target population of interest.

77.     In the following I will give an overview of general survey methodology. Obtaining data through surveys is a frequently used data collection tool. In general, survey research has to go through the following three steps to yield meaningful and reliable results:

    a.  Survey Design;

    b.  Survey Implementation; and

    c.  Statistical Analysis and Presentation of survey results.

78.     Each survey must be designed properly, implemented correctly, and the data obtained through the survey must be analyzed using the appropriate and correct statistical methodology. The proper design of a survey requires the following steps:

    a.  State goal/purpose of survey;

    b.  Define universe;

    c.  Identify sampling frame;

    d.  Determine survey methodology (mail, telephone, internet, etc.) and selection of survey respondents;

    e.  Determine adequate sample size;

    f.  Develop questionnaire/survey questions; and

    g.  Conduct a pre-test/pilot or perform research to obtain information from a sample of consumers about their preferences and which product attributes they perceive as important.

79.     Once the design process has been completed, the chosen design has to be correctly implemented. In this phase the following items have to be considered:

    a.  Approach selected survey respondents;

---

    b.  Survey Methodology (Wiley Series in Survey Methodology), Robert M. Groves, Floyd J. Fowler Jr., Mick P. Couper, James M. Lepkowski, Eleanor Singer, Roger Tourangeau, 2nd Edition, 2009.

[41]   See, e.g., American Association for Public Opinion Research ("AAPOR") – www.aapor.org; American Statistical Association ("ASA") – www.amstat.org.

**EXPERT REPORT OF STEFAN BOEDEKER**

    b.  Conduct actual interviews; and

    c.  Record and tabulate collected data.

80.    Finally, the purpose of each survey is to collect data to answer certain questions or, in more statistical terms, test certain hypotheses. Once the survey has been conducted, it is of utmost importance to prepare the data for further statistical analysis and then apply the correct statistical methodology to ensure that the survey results are reliable. In particular, the following steps have to be performed:

    a.  Check raw data for errors and inconsistencies;

    b.  Identify erroneous responses;

    c.  Conduct a statistical summary of cleansed raw data;

    d.  Answer questions/test hypotheses; and

    e.  Compile a summary of results and report.

## 5.2   Surveys/Empirical Studies Using Internet Panels

81.    Current research suggests that the increased use of internet surveys has great advantages over other traditional methods. For instance, studies have found that computer data collection yields higher concurrent validity, with smaller probability of participants framing answers to attempt to please the questioner, and less random measurement error when compared to mall intercept studies and telephone surveys.[42] Internet surveys also allow for broad geographic reach to areas where surveying via mall intercept or other face-to-face methods would not be feasible.[43] Well-executed internet survey research is regularly accepted by courts.[44]

82.    Moreover, internet surveys have become a fixture in the corporate world. According to the Global Research Business Network, internet surveys now account for more than a quarter of global

---

[42]  Yeager, D., Krosnick, J., Chang, L., Javitz, H., Levindusky, M. S., Simpser, A., & Wang, R. (2011). Comparing the accuracy of RDD telephone surveys and Internet surveys conducted with probability and non-probability samples. The Public Opinion Quarterly, 4(1), 709-747.

[43]  *See* "Reference Guide on Survey Research," S.S. Diamond, *Reference Manual on Scientific Evidence*, Third Edition, Federal Judicial Center, 2011, Page 401. Additionally, online surveys have advantages in terms of efficiency and cost.

[44]  B. Isaacson et al., "Why Online Surveys Can Be a Smart Choice in Intellectual Property Litigation," IPL Newsletter (ABA Section of Intellectual Property Law) Vol. 26, No. 3, 2008.

**EXPERT REPORT OF STEFAN BOEDEKER**

market and social research revenues. In many of the world's top research markets, internet surveys are now the primary means of research.[45]

83.     The efficacy of internet-based surveys benefits from large internet panels by specialized market research firms. These firms employ trained professionals who program, administer, and quality control the surveys to increase the quality of the results.

84.     Advanced statistical methods can be applied to compute model-based approximate confidence intervals for well-designed and well-balanced non-probability samples. In 2016, the American Association of Public Opinion Research ("AAPOR") issued a guidance paper on "Reporting Precision for Nonprobability Samples"[46] which details approaches and reporting guidelines when precision calculations are performed for non-probability samples. For the statistical analysis of the data obtained through the CBC Study, I will apply one of the recommended methods to obtain precision estimates and approximate confidence intervals at the customary 95% level for the results from my study. The bootstrapping methodology and the use of non-parametric percentile-based approaches have been endorsed as valid approaches by AAPOR.[47] Furthermore, the aforementioned Sawtooth Software allows for a non-parametric approach to compute confidence intervals.

85.     As described above, the empirical study will include a CBC module which is designed to quantify the value that consumers assign to attributes of minivans. The attributes will be derived from the pre-test survey. The conjoint study will be administered via an online panel. The vendor selected to conduct the conjoint study follows accepted standards regarding:

    a.  Survey panelist recruiting;

    b.  Strategic partnerships with other market research firms;

    c.  Use of advanced software and technology;

    d.  Use of proprietary survey completion time tracker;

---

[45]   http://fortune.com/2015/09/16/online-survey-companies-law-firms/.
[46]   AAPOR Guidance on Reporting Precision for Nonprobability Samples - https://www.aapor.org/getattachment/Education-Resources/For-Researchers/AAPOR_Guidance_Nonprob_Precision_042216.pdf.aspx.
[47]   Ibid.

**EXPERT REPORT OF STEFAN BOEDEKER**

    e.   High quality filtering system to track respondent information and respondent behavior to deliver the highest quality sample;

    f.   Best practices of quality control, including removal of sign-ups who provide inconsistent demographic information, GeoIP lookups at time of registration and, most importantly, periodic use of mailed survey awards for U.S. panelists to verify street addresses;

    g.   Data tabulation and recording; and,

    h.   Survey participation validation.

86.    As is standard survey practice for surveys used in litigation proceedings, the surveys were conducted in a "double-blind" fashion[48] – that is, neither the vendor nor the respondents are aware of the survey sponsor or the ultimate intention of the survey. Additionally, the data collection and initial tabulation will be automated and concurrent with answering the online questionnaire.

87.    To ensure that the data generated by the survey are of the highest quality, additional quality control measures will be implemented:

    a.   Respondents are required to enter their gender and age at the outset of the survey and if these data conflicted with the respondent information on file with the online panel operator, the respondent is excluded.

    b.   Respondents who indicate that they did not understand or were unwilling to adhere to the survey instructions are also screened out of the survey.

    c.   The selected online panel members will receive a link containing an embedded identification number to ensure that only invited respondents can answer the survey and that each respondent can only complete the survey once, and that only one member per household can complete the survey.

    d.   The survey also includes a control measure to evaluate the extent to which respondents were involved in completing the survey such as a review of each respondent's survey completion time, review of text field responses, straight-line testing, and other filtering

---

[48]  Diamond, Shari, S. (2012) "Reference Guide on Survey Research," *Reference Manual on Scientific Evidence*, Committee on the Development of the Third Edition of the Reference Manual on Scientific Evidence; Federal Judicial Center; National Research Council, pp. 410-411.

**EXPERT REPORT OF STEFAN BOEDEKER**

techniques that filter automated responses and result in superior data as well as higher quality feedback.

88.     In summary, properly designed and well-executed internet-based surveys can be used to draw valid statistical inferences about the target population, can provide reliable results, and have advantages over other recruiting methodologies. Over the last decade, internet surveys have increasingly gained popularity and acceptance, including in litigation.

89.     I have commissioned a survey company called Amplitude Research ("Amplitude")[49] to program and host a pre-test survey and a conjoint survey I designed as an internet panel and then provide me with the raw data to analyze the preferences and choices of consumers.

## 4.3   Pre-Test Survey

90.     I designed the pre-test survey to gain an understanding of how certain attributes impact preferences and choice behaviors of consumers and how consumers rank the importance of such attributes. The pre-test survey was conducted by Amplitude. Neither the respondents nor the survey vendor had any information on the context of the study or who commissioned it, and they were not informed that the data would be used in litigation, or more specifically, in this particular matter.

91.     Using Amplitude's access to large online consumer panels, I targeted a demographically diverse group of respondents who have been recent purchasers of Honda branded vehicles. When recruiting survey participants, Amplitude employed a method of balancing the survey participants based on demographics and socio-economic factors such as gender, age, income, and geographical region.

92.     Respondents were only included in the survey if they met the following criteria:

     a.   Respondent is 18 years or older;

---

[49] Founded in 2002, Amplitude Research is one of the leading mail, telephone, and online survey companies serving clients throughout the United States, Canada, South America, and Asia. Clients include commercial, educational and governmental organizations. Amplitude Research is a member of the American Marketing Association (AMA), Marketing Research Association (MRA), Interactive Marketing Research Organization (IMRO), and Marketing Research Association of South Florida, and adheres to the professional guidelines for survey companies applied by these organizations. Amplitude Research is also A+ Rated by the Better Business Bureau. – see http://www.amplituderesearch.com/survey-company.shtml for more info.

**EXPERT REPORT OF STEFAN BOEDEKER**

    b.   Respondent resides in the United States

    c.   Respondent has purchased Honda branded automobile(s) in the past 10 years;

    d.   Respondent is not working in manufacturing, retail and repair of automobiles.

    e.   Respondent was actively involved in the decision making process for the purchase of automobiles.

93.    Amplitude invited panel members based on the screening filters above. After qualifying for the survey, the participants responded to questions designed to elicit their thoughts on attributes important to them when they are in the market to purchase an automobile. 500 respondents completed the survey.

94.    Table 1 shows the demographic distribution of the 500 respondents. 48.8% of respondents are male and 51.2% are female. 35.8% of respondents fall in the age group 60 years or older, followed by 26.6% in the age group between 30-44 years. 22.2% of respondents have a household income of $100 to $150 thousand followed by 20.2% in the income bracket between $200 to $250 thousand. 25.2% of the respondents live in the Northeast Region followed by 22.4% in the Southeast Region. Most respondents (67.2%) had a bachelor's degree or higher.

**[The space below was left blank to accommodate Table 1.]**

**EXPERT REPORT OF STEFAN BOEDEKER**

*Table 1:*        ***Demographics of Participants in the Pre-Test Survey***

| Demographics | Group | Count | Share (in %) |
|---|---|---|---|
| Gender | Male | 244 | 48.8 |
| | Female | 256 | 51.2 |
| Age | 25-29 | 63 | 12.6 |
| | 30-44 | 133 | 26.6 |
| | 45-59 | 125 | 25 |
| | 60 or older | 179 | 35.8 |
| Household Income | Less than $50,000 | 27 | 5.4 |
| | $50,000 to $74,999 | 30 | 6 |
| | $75,000 to $99,999 | 62 | 12.4 |
| | $100,000 to $149,999 | 111 | 22.2 |
| | $150,000 or $199,999 | 92 | 18.4 |
| | $200,000 to $249,999 | 101 | 20.2 |
| | $250,000 or more | 53 | 10.6 |
| | Prefer not to answer | 24 | 4.8 |
| Location | Midwest | 109 | 21.8 |
| | Northeast | 126 | 25.2 |
| | Southeast | 112 | 22.4 |
| | Southwest | 51 | 10.2 |
| | West | 102 | 20.4 |
| Educational Attainment | Less than high school | 1 | 0.2 |
| | High school | 44 | 8.8 |
| | Some college | 119 | 23.8 |
| | Bachelor's degree or higher | 336 | 67.2 |

*Source: Amplitude Pre-Test Survey*

95.    Figure 9 and Figure 10 below show distributions of responses to questions that were asked from the participants as a distraction so that the participants would not know the reason for the survey.

**EXPERT REPORT OF STEFAN BOEDEKER**

*Figure 9:*      *Vehicle as Mean of Transportation*



*Source: Pre-test Survey Results*

*Figure 10:*      *Vehicle as Mean of Pleasure*

*Source: Pre-test Survey Results*

96.      Figure 11 below summarizes the number of vehicles that the respondents purchased or leased. 202, or 40.4% of the respondents had purchased or leased one vehicle, 181 or 36.2% of the respondents had purchased or leased two vehicles, 63 or 12.6% of the respondents purchased or leased three vehicles.

**EXPERT REPORT OF STEFAN BOEDEKER**

*Figure 11:    Number of Vehicles Purchased or Leased by Respondents*



*Source: Pre-test Survey Results*

97.    The next question in the pre-test survey elicited information about the decision-making role of the respondents. Respondents could choose multiple responses. Figure 12 below shows that 344 respondents were present at the point of purchase or lease, 264 respondents primarily made the purchase decision, 138 respondents helped make the purchase decision and only 1 respondent did not make the purchase decision for at least one of multiple vehicles. Since respondents had the option to select multiple answers, the percentages correspond to selections made across all participants e.g., 46.1% of all selections indicated that the respondent was present at the point of purchase or lease.

**[The space below was left blank to accommodate Figure 12.]**

36

**EXPERT REPORT OF STEFAN BOEDEKER**

*Figure 12:    Decision Role of Respondents*



*Source: Pre-test Survey Results*

98.    Figure 13 below shows the make of the vehicle that was purchased or leased by the respondents. In this question again, the respondents had the option to select more than one answers, thus, the percentages represent the fraction of choices that each vehicle make represented. The results indicate that all 500 respondents purchased or leased a Honda vehicle and this represented 64.9% of all choices that were made by the respondents.

**[The space below was left blank to accommodate Figure 13.]**

**EXPERT REPORT OF STEFAN BOEDEKER**

***Figure 13:     Vehicle Makes Purchased or Leased by Respondents***



| Make | Value |
|------|-------|
| Honda | 500. – 64.9% |
| Toyota | 55. – 7.1% |
| Nissan | 35. – 4.5% |
| Ford | 32. – 4.2% |
| Chevrolet | 17. – 2.2% |
| Volkswagen | 14. – 1.8% |
| Hyundai | 12. – 1.6% |
| Acura | 11. – 1.4% |
| Mazda | 10. – 1.3% |
| Kia | 8. – 1% |
| Lexus | 7. – 0.9% |
| Jeep | 7. – 0.9% |
| Chrysler | 6. – 0.8% |
| Saturn | 5. – 0.6% |
| Pontiac | 5. – 0.6% |
| GMC | 5. – 0.6% |
| Mercury | 4. – 0.5% |
| Infiniti | 4. – 0.5% |
| Dodge / Ram | 4. – 0.5% |
| BMW | 4. – 0.5% |
| Subaru | 3. – 0.4% |
| Lincoln | 3. – 0.4% |
| Cadillac | 3. – 0.4% |
| Buick | 3. – 0.4% |
| Oldsmobile | 2. – 0.3% |
| Mitsubishi | 2. – 0.3% |
| Mini | 2. – 0.3% |
| Audi | 2. – 0.3% |
| SmartCar | 1. – 0.1% |
| Scion | 1. – 0.1% |
| Porsche | 1. – 0.1% |
| Jaguar | 1. – 0.1% |
| Hummer | 1. – 0.1% |

*Source: Pre-test Survey Results*

99.     The next question in the pre-test survey pertained to the specific model of the Honda vehicles purchased or leased by the respondents. In this question too, respondents selected more than one response so the percentages presented are a fraction of the choices across all respondents. Figure 14 below shows that 206 respondents purchased or leased a Honda Accord, which accounted for 28.1% of all selections made across all respondents. At 23.9%, the Honda CR-V or CR-V S was the second-most frequent selection chosen by 175 respondents. The third most frequent selection, accounting for 22.4% of the selections was the Honda Civic/ Civic Tourer or Civic Type R. The rest of the 8 choices of Honda models, including an "Other" choice, collectively accounted for 25.5% of the selections.

**EXPERT REPORT OF STEFAN BOEDEKER**

***Figure 14:    Honda Models Purchased or Leased by Respondents***



| Model | Count – Percent |
|---|---|
| Accord | 206. – 28.1% |
| CR–V or CR–V S | 175. – 23.9% |
| Civic / Civic Tourer / Civic Type R | 164. – 22.4% |
| Odyssey | 58. – 7.9% |
| Pilot | 43. – 5.9% |
| Fit / Jazz / Fit Hybrid / Fit Shuttle / Jazz RS | 37. – 5.1% |
| Other | 23. – 3.1% |
| HR–V | 14. – 1.9% |
| Ridgeline | 5. – 0.7% |
| Insight | 4. – 0.5% |
| Clarity | 3. – 0.4% |

*Source: Pre-test Survey Results*

100.    The next pre-test survey question was about the model year of the Honda vehicles purchased or leased by the respondents. Figure 15 shows the results as a comparison between the responses of Honda Odyssey owners/lessees and owners or lessees of other Honda models. The figure shows that the most frequent model year selections for "Other Honda Models were model years 2016 (10.7%), 2015 (10.4%) 2012 (9.8%) and 2014 (9.5%). For the Honda Odyssey, the most frequent model year selections were 2012 (15.5%), 2013 and 2014 (both 10.3%) followed by 2016 (8.6%).

**[The space below was left blank to accommodate Figure 15.]**

39

**EXPERT REPORT OF STEFAN BOEDEKER**

**Figure 15:    *Model Year of Vehicles Purchased or Leased by Respondents***



*Source: Pre-test Survey Results*

101.    Figure 16 shows how many Honda automobiles survey participants had purchased or leased in the past 10 years. 56 or 96% of all Honda Odysseys had been purchased, while 583 or 86.5% of all other models had been purchased rather than leased.

**[The space below was left blank to accommodate Figure 16.]**

**EXPERT REPORT OF STEFAN BOEDEKER**

*Figure 16:    Purchased or Leased*



*Source: Pre-test Survey Results*

102.    The next question in the pre-test survey elicited information from the participants about attributes that are important to them when they are shopping for an automobile. Figure 17 below shows the results of the answers to this question. Again, the numbers on the left of the left column of blue bars and the numbers on the right of the right column shows which attributes were listed to be important to the purchasers of Honda Odysseys with model years 2011 to 2016 and other Honda automobiles respectively, and the percentages show the share of that number relative to all attributes mentioned as important across all respondents. For example, 25 potential class members mention that a rear view camera is important to them in their purchasing decision. Fuel efficiency gets 20 mentions from potential class members and automatic transmission 17.

**EXPERT REPORT OF STEFAN BOEDEKER**

*Figure 17:  Unweighted Attributes, Potential Class Members vs Other Honda Owners and Lessees*



*Source: Pre-test Survey Results*

103.    The next question in the pre-test survey was about the importance of attributes while making a purchase or lease decision. The results from the previous question were further refined to obtain a quantitative importance scale. The participants were presented with the list of all the attributes they had selected as important and then they were asked to allocate 100 points across these attributes. When aggregated across all respondents, this methodology yields a quantitative importance scale that is more reliable than a simple rank based importance scale. For example, two participants may rank "Heated Seats", "Rearview Camera", and "Fuel Efficiency" as 1st, 2nd, and 3rd important attributes, but Participant A may assign 45, 30, and 25 points respectively while Participant B may assign 75, 15, and 10 points. Even though the rank based importance is the same, Participants A and B express different preferences for those attributes which will not be captured in a pure rank based importance scale.

104.    In addition, the quantitative scale I utilized is standardized such that all attributes mentioned end up with an importance score larger than 0 and smaller than 100 and the sum of the

**EXPERT REPORT OF STEFAN BOEDEKER**

importance scores across all attributes mentioned as important adds up to 100 allowing a comparison of importance across attributes.[50] Figure 18 below shows the comparison of the weighted results for potential class members and purchasers of other Honda models. It can be seen that for potential class members, the attributes with the largest importance score were Rearview Camera (17%), Fuel Efficiency (15.4%), Automatic Transmission (11.7%), and Trunk Space (9.4%). For purchasers of other Honda models, the attributes with the largest importance score were Fuel Efficiency (23.2%), Automatic Transmission (18.8%), Rearview Camera (7%), Four-Wheel Drive (5.4%) closely followed by Trunk Space (5.3%).

***Figure 18:   Quantity Weighted Attributes, Potential Class Members vs Other Honda Owners and Lessees***



*Source: Pre-test Survey Results*

---

[50]   It has to be pointed out that the importance scores calculated using this approach are not yet associated with a monetary value. In the following Section 5, I will explain how a choice based conjoint approach can be utilized to calculate a monetary value to attributes.

**EXPERT REPORT OF STEFAN BOEDEKER**

### 4.4   Choice Based Conjoint Survey

105.   Following the pre-test survey, Amplitude fielded a nationwide choice based conjoint survey with 500 participants.

106.   Using the survey vendor's access to large online consumer panels, I targeted a demographically diverse group of respondents who had purchased a Honda Odyssey within the last ten years.

107.   Following accepted Best Practices of Survey Methodology, the CBC Study was conducted in a double-blind fashion where neither the respondents nor the survey vendor had any information on the context of the study or who commissioned it, and they were not informed that the data would be used in litigation, or more specifically, in these legal proceedings.

108.   Respondents were only included in the survey if they met the following criteria:

   a.   Respondents are 18 years or older;
   b.   Respondents are not working in market research;
   c.   Respondents have to reside within the US.
   d.   Respondents have purchased a Honda Odyssey within the last 10 years;
   e.   Respondents have been involved in the decision making process of the Honda Odyssey purchase.

109.   After qualifying for the survey, respondents provided information on demographics and socio-economic variables, like their age, gender, household income, and educational background. Table 2 shows the demographic distribution of the 500 respondents. 39.2% of respondents are male and 60.8% are female. 39% of respondents fall in the age group between 30 and 44 years old, followed by 29.8% in the age group between 45-59 years. 23.2% of respondents have a household income of $100 to $150 thousand followed by 18.8% in the income bracket between $50 to $75 thousand. 27.6% of the respondents live in the Midwest Region followed by 24.4% in the Southeast Region. Most respondents (68.6%) had a bachelor degree or higher.

**EXPERT REPORT OF STEFAN BOEDEKER**

***Table 2:***      ***Demographics of Participants in Choice Based Conjoint Study***

| Demographics | Group | Count | Share in % |
|---|---|---|---|
| Gender | Male | 196 | 39.2 |
| | Female | 304 | 60.8 |
| Age | 18 – 29 | 27 | 5.4 |
| | 30 – 44 | 195 | 39 |
| | 45 – 59 | 149 | 29.8 |
| | 60 or older | 129 | 25.8 |
| Household Income | Less than $25,000 | 24 | 4.8 |
| | $25,000 to $34,999 | 18 | 3.6 |
| | $35,000 to $49,999 | 46 | 9.2 |
| | $50,000 to $74,999 | 94 | 18.8 |
| | $75,000 to $99,999 | 91 | 18.2 |
| | $100,000 to $149,999 | 116 | 23.2 |
| | $150,000 or more | 85 | 17 |
| | Prefer not to answer | 26 | 5.2 |
| Educational Attainment | Some schooling completed but no high school diploma | 2 | 0.4 |
| | High school graduate or equivalent (i.e., GED) | 33 | 6.6 |
| | Some college credit, no degree | 85 | 17 |
| | Associate degree | 37 | 7.4 |
| | Bachelor's degree or higher | 343 | 68.6 |
| Location | Southeast | 122 | 24.4 |
| | Southwest | 51 | 10.2 |
| | West | 81 | 16.2 |
| | Northeast | 108 | 21.6 |
| | Midwest | 138 | 27.6 |

*Source: CBC Survey Results*

110.    The next section of the survey was comprised of the actual CBC exercise itself. During this exercise, respondents were introduced into a hypothetical purchase situation where they viewed a selection of choice sets, each containing option packages with a combination of attributes, information about the Transmission Defect plus a price. The purchase situation was described as follows:

> *"Next, we have a brief hypothetical exercise to help us learn about your interests and priorities related to optional features on motor vehicles.  We hope you find this exercise interesting.  There are no "right" or "wrong" answers.  We are very interested in your honest opinions.*

**EXPERT REPORT OF STEFAN BOEDEKER**

*[DISPLAY IF HONDA ODYSSEY ACQUIRED NEW:  Please imagine that you are considering purchasing or leasing a new vehicle for [INSERT MIDPOINT FROM PRICE QUESTION], and you have figured out which specific vehicle you intend to purchase or lease.*

*The only remaining question is which additional features you want for the vehicle that are currently not part of the package you had decided on. In the exercise, we will show you options of features that you could add to your vehicle and the cost for adding the features.]*

*[DISPLAY IF HONDA ODYSSEY ACQUIRED USED: Please imagine that you are considering purchasing or leasing a used vehicle for [INSERT MIDPOINT FROM PRICE QUESTION], and you have figured out which specific vehicle you intend to purchase or lease.*

*In this exercise you will be shown sets of five vehicles that differ only in some aspects to the one you intend on purchasing or leasing.]*

*However, at the point of purchase or lease you are given some additional information about the vehicle, indicating that there may or may not be a defect.*

*You will see five packages that combine features with the additional information that is disclosed to you at the point of purchase / lease. At the bottom of each package there is also a change in price relative to the original vehicle you wanted to purchase or lease. Please select the package which is your most preferred combination of safety features and price, along with the additional information that you receive at the point of purchase.*

*Once you have made your selection of your most preferred package, you will be asked if you would actually purchase that option.*

*Below is a list of features and terms with definitions to review before starting the exercise.  After you begin the exercise, if you want to see the information again, you can use your mouse to hover over the feature and a pop-up box will provide more information."*

111.    In preparation for the conjoint survey, I analyzed pricing data for Honda Odyssey option packages from the Honda website.

**EXPERT REPORT OF STEFAN BOEDEKER**

*Table 3:*        *Price Range of Honda Odyssey Option Packages [update]*

| Version | LX | EX | EX-L | Touring | Elite |
|---|---|---|---|---|---|
| Year | 2019 | 2019 | 2019 | 2019 | 2019 |
| MSRP ($) | $   30,190 | $   34,160 | $   37,710 | $   44,760 | $   47,070 |
| Engine Size (L) | 3.50 | 3.50 | 3.50 | 3.50 | 3.50 |
| Horsepower | 280.00 | 280.00 | 280.00 | 280.00 | 280.00 |
| Fuel Tank Capacity (gal) | 19.50 | 19.50 | 19.50 | 19.50 | 19.50 |
| MPG - City | 19.00 | 19.00 | 19.00 | 19.00 | 19.00 |
| MPG - Hwy | 28.00 | 28.00 | 28.00 | 28.00 | 28.00 |
| Leather Interior | No | No | Yes | Yes | Yes |
| Lane Departure Warning | No | Yes | Yes | Yes | Yes |
| Blind Spot Information System | No | Yes | Yes | Yes | Yes |
| Ventilated Front Seats | No | No | No | No | Yes |
| Heated Front Seats | No | Yes | Yes | Yes | Yes |
| Auto High-Beam | No | Yes | Yes | Yes | Yes |
| Adaptive Cruise Control | No | Yes | Yes | Yes | Yes |
| Rear Parking Assist | No | No | No | No | No |

*Source: https://automobiles.honda.com/odyssey#*

112.    Based on the data in Table 3:

      a.   $500;

      b.   $1,000;

      c.   $1,500;

      d.   $2,000; and

      e.   $2,500.

113.    These prices were chosen as representative prices for an option package similar to the one offered in the CBC. Three considerations determined this price range:

**EXPERT REPORT OF STEFAN BOEDEKER**

a. Generally, the price range should cover realistic prices for the product. For example, a price of $100 would not be realistic as the typical retail price for the offered option package is far higher. Similarly, a price of $10,000 would also not be realistic for the offered option packages.

b. Prices can be slightly higher or lower than the prices of currently offered option packages as conjoint analysis is designed to also attribute combinations that might not yet be available in the market.

c. In the case where the impact of a concealed defect has to be assessed, the price for a product where the defect is disclosed has to be determined. However, such product is currently not available in the market. Hence, in order to estimate a demand curve for the Honda Odyssey with the disclosed Transmission Defect, prices both below and above the price points common in the market have to be included.

114.    In my opinion, the price ranges from $500 to $2,500 complies with these considerations.

115.    The CBC employed in the survey randomly assigned choices from all possible choice permutations[51] with equal likelihood and with uniform frequency of each level of each attribute and each pair of attribute/level permutations. That is, the CBC design is *balanced* and *orthogonal*. Balanced and orthogonal surveys are commonly employed in CBC.[52] The importance of an orthogonal and balanced design lies in the fact that designs of this type are 100% efficient. Efficiency implies that the resulting estimations have the smallest mean squared error out of all possible designs.[53] The mean squared error measures the level of variation and, as such, the precision of the resulting estimates. The smaller the mean squared error of an estimate the more precise it is. As such, efficiency of a design is a measure of the information obtained from a design. Therefore, more efficient designs imply more reliable results.[54]

---

[51]    There are three attributes with two levels, one attribute with 7 levels, and 5 levels for the price. This yields 2x2x2x7x5 (or 280) different possibilities of combining the different levels of the attributes in the study.

[52]    Bakken, David & Curtis L Frazier, "Conjoint Analysis: Understanding Consumer Decision Making," in Grover, Rajiv & Marco Vriens, eds., The Handbook of Marketing Research, Thousand Oaks: Sage Publications, Inc., 2006, Chapter 15.

[53]    The mean squared error (MSE) is calculated as the average of the squared distances between the estimator and what is estimated, or the "errors." Efficient designs are ones that minimize the MSE.

[54]    The standard error is the standard deviation of the sampling distribution of a statistic. A smaller standard error implies a smaller margin of error, which results in a tighter confidence interval around an estimate.

48

**EXPERT REPORT OF STEFAN BOEDEKER**

116.    Each choice set consists of five choices with various combinations of product attributes and prices as described above. After respondents choose their preferred option, they answer the question whether they would actually purchase that preferred option. The following Figure 19 and Figure 20 below show examples of choice menus. Each participant went through 12 such screens. Each screen shows randomly selected levels for each attribute. Therefore, Figure 19 and Figure 20 do not necessarily show all levels for each attribute. Figure 19 also shows the additional information that respondents can see when they hover over the exclamation mark next to the attribute "Blind Spot Warning System". Respondents can see similar information for the other attributes which can be seen in Table 4. Figure 20 shows what happens after the respondent has chosen Option 1: An additional question asks for confirmation whether the participant would have purchased the preferred option. This additional question provides additional information because it is possible that the respondent would not want to buy any of the five options but prefers Option 1 over Option 2.

*Figure 19:    Example of a CBC Choice Menu*



Please indicate which of the options you would select.

| | Option 1 | Option 2 | Option 3 | Option 4 | Option 5 |
|---|---|---|---|---|---|
| ⓘ Blind Spot Warning System | Yes | Yes | Yes | No | Yes |
| ⓘ Transmission defect? | Eight out of 100 vehicles impacted by defect. Attempts at repairs remain unsuccessful after 18 months. | Five out of 100 vehicles impacted by defect. Vehicle repaired after 18 months. | Five out of 100 vehicles impacted by defect. Vehicle repaired after 6 months. | Eight out of 100 vehicles impacted by defect. Vehicle repaired after 6 months. | Eight out of 100 vehicles impacted by defect. Vehicle repaired after 18 months. |
| ⓘ Heated and ventilated front seats | Yes | No | No | No | No |
| ⓘ Fuel Injection system | New fuel injection system with 10% improvement in fuel efficiency | New fuel injection system with 10% improvement in fuel efficiency | Standard fuel injection system with no improvement in fuel efficiency | New fuel injection system with 10% improvement in fuel efficiency | New fuel injection system with 10% improvement in fuel efficiency |
| ⓘ Price for package | $500 | $1,000 | $2,000 | $2,000 | $500 |
| Which option would you prefer? | ○ | ○ | ○ | ○ | ○ |

*Source: Screen Shot of BRG CBC Study Provided by Amplitude Research*

**EXPERT REPORT OF STEFAN BOEDEKER**

*Figure 20:    Example of a CBC Choice Menu*

| Please indicate which of the options you would select. | | | | | |
|---|---|---|---|---|---|
| | Option 1 | Option 2 | Option 3 | Option 4 | Option 5 |
| ⓘ Blind Spot Warning System | No | No | Yes | Yes | Yes |
| ⓘ Transmission defect? | Five out of 100 vehicles impacted by defect. Attempts at repairs remain unsuccessful after 18 months. | Five out of 100 vehicles impacted by defect. Attempts at repairs remain unsuccessful after 18 months. | Eight out of 100 vehicles impacted by defect. Attempts at repairs remain unsuccessful after 18 months. | Five out of 100 vehicles impacted by defect. Attempts at repairs remain unsuccessful after 18 months. | Five out of 100 vehicles impacted by defect. Vehicle repaired after 6 months. |
| ⓘ Heated and ventilated front seats | Yes | Yes | No | Yes | No |
| ⓘ Fuel injection system | New fuel injection system with 10% improvement in fuel efficiency | Standard fuel injection system with no improvement in fuel efficiency | Standard fuel injection system with no improvement in fuel efficiency | New fuel injection system with 10% improvement in fuel efficiency | New fuel injection system with 10% improvement in fuel efficiency |
| ⓘ Price for package | $1,000 | $1,500 | $1,500 | $2,000 | $2,500 |
| Which option would you prefer? | ○ | ○ | ○ | ○ | ○ |

*Source: Screen Shot of BRG CBC Study Provided by Amplitude Research*

117.    The following Table 4 shows the information that the participants can retrieve by hovering their mouse over a specific attribute in the CBC menu:

**[The space below was left blank to accommodate Table 4.]**

**EXPERT REPORT OF STEFAN BOEDEKER**

***Table 4:      Description of Attributes Presented to Survey Respondents***

| Attribute | Description |
|---|---|
| Fuel injection system | The type of fuel injection system in the vehicle can impact fuel efficiency.  A newer type of fuel injection system can improve fuel efficiency by 10%.  Improving fuel efficiency means that you can get better gas mileage. |
| Heated seats | If equipped, when it is cold outside, the vehicle can warm the seats in the vehicle. |
| Blind Spot Warning System | A blind spot warning system has a vehicle-based sensor device that detects other vehicles located to the driver's side and rear. A warning is given if the driver begins to move toward the vehicle in the driver's blind spot. |
| Transmission defect | Imagine that, if there is a design defect, the automatic transmission fluid (ATF) may overheat and deteriorate. You may experience an intermittent shudder, judder, vibration, hesitation, or surge when the gears are shifting between 20-60 mph. If so, you may have to make two or more trips to the dealer for service to diagnose the problem and perform repairs. However, imagine that the manufacturer is currently unable to provide a repair that resolves the problem for all vehicles and driving conditions.  At the point of purchase / lease you are told if there is a defect, how many vehicles out of 100 will be impacted if the defect exists in the vehicle, and how long it might take before it can be repaired. |
| Price for package | This is the additional price for the features in the package. |

*Source: BRG CBC Study Provided by Amplitude Research*

118.    It is a known phenomenon that choices presented earlier in a list of choices in a questionnaire are disproportionately likely to be selected.[55] This phenomenon is known as order bias. To avoid order bias in my study, the attributes were shown in a different order, chosen at random, to each respondent – except for price, which is always shown last. The reason for showing price last lies in the fact that the respondents have to see the attributes of the product first to be able to decide for or against the purchase of a particular option.

---

[55]    Krosnick, Jon and Duane Alwin (1987), "An evaluation of a cognitive theory of response order effects in survey measurement," Oxford Journals Social Sciences Public Opinion Quarterly Volume 51, Issue 2, Pages. 201-219.

**EXPERT REPORT OF STEFAN BOEDEKER**

119.    I limited the number of attributes and choice options to address issues of fatigue and general ability of respondents to process information. In his seminal publication on conjoint analysis, Rao discusses the number of choices represented on one choice menu. He states that some authors believe that the number of cells on a choice menu (number of columns times number of rows) should not exceed twenty while others tend to favor the notion that respondents are not hard pressed to process more pieces of information. [56]

# 5   Economic Loss Calculation

## 5.1   Four-Step Estimation Process

120.    As described above, a CBC study was utilized to assess if giving consumers the information at the point of purchase that Honda Odysseys have the Transmission Defect as alleged by Plaintiffs would lead to a downward shift of the demand curve for Honda Odysseys and, if so, by how much the demand will shift downwards.

121.    I utilized the following four-step estimation process to determine the economic loss associated with purchasing a Honda Odyssey that has the Transmission Defect:

a.   Step 1: Based on the results from the CBC analysis, compute individual part-worth estimates for each respondent for each attribute and each level in the study that will be utilized to compute the probability that consumers purchase a specific bundle of attributes and their levels.

b.   Step 2: Construct the demand curves for the product in the actual world (i.e., the Transmission Defect is not known to the consumers at the point of purchase) and the but-for world (i.e., the Transmission Defect is now known at the point of purchase).

c.   Step 3: Test if consumer demand shifts downward when the consumer knows about the Transmission Defect at the point of purchase, and quantify the drop if the tests show a downward shift of the demand curve.

---

[56]    Rao, Vithala, Applied Conjoint Analysis, Springer-Verlag, 2014, pp. 132-133.

**EXPERT REPORT OF STEFAN BOEDEKER**

  d.  Step 4: Conduct market simulations to assess the economic loss associated with the drop in demand when the consumers know about the Transmission Defect at the point of purchase.

122.    In Step 1, I utilized a software program called Sawtooth[57] to compute part-worths for the attributes and the levels for each attribute in the study. The Sawtooth software applies the Hierarchical Bayesian Estimation technique explained above to compute individual part-worths for each respondent and aggregate part-worths for all levels and attributes in the study. The Sawtooth software allows the researcher to test different model specifications. For example, Sawtooth allows the researcher to implement the constraint that each respondent will always prefer lower to higher prices.

123.    This so-called monotonicity constraint refers to a property of the part-worth estimates. Without the monotonicity constraint, the individual part-worth estimates may yield higher numerical values for levels that seem to be lower in utility for some individuals, and thus seemingly indicate "illogical" consumer choices.

124.    However, this behavior can be explained by the fact that the "rational economic consumer" is only a postulate or an assumption in theoretical economics while in the "real" world not all variables affecting consumer choices can be measured and, therefore, consumers often do exhibit seemingly irrational behavior. For example, I may stop at a gas station that charges $0.20 more per gallon because I am already running late on my way to work and this particular gas station is the one I can get to easily without detour. While it may seem irrational to pay more for gas, the convenience factor in this example cannot be measured or quantified.

125.    The Sawtooth software allows the researcher to "smoothen" the utility estimates in a way that higher price levels for a specific attribute combination are always associated with a lower utility value. This feature ensures that not only aggregated consumer choices, but also individual consumer choices are always associated with decreasing utility values for increasing prices. This

---

[57]  Sawtooth software is a world leader in market research for conjoint analysis providing powerful tools for measuring how consumers value features of a product or service. For more information, see www.sawtoothsoftware.com/.

**EXPERT REPORT OF STEFAN BOEDEKER**

can be accomplished by building a so-called monotonicity constraint into the model. When using a monotonicity constraint, the demand curves are smoother, and therefore, the resulting market simulations have fewer extreme data points making the damages estimates on average lower.[58]

126.    The part-worths estimated in Step 1 can be analyzed to evaluate the quality of the estimation model. Figure 21 shows the confidence interval for the distance between the highest and lowest level of each attribute. This distance is computed for all respondents in a draw. I obtained the confidence interval by applying the distance calculation to 10,000 draws after convergence of the HBC model.[59] The higher the point estimate presented in Figure 21, the more important is the attribute relative to the other attributes. The confidence interval is represented by the blue rectangle, with the median represented by the vertical line. If two confidence intervals overlap, the two attributes are not significantly different from each other.

127.    Figure 21 shows that the Attribute "Transmission Defect" has the highest average distance between the least and most desired level (i.e., the loss in part-worths when purchasing a Honda Odyssey with no Transmission Defect is largest when compared to purchasing a Honda Odyssey with a Transmission Defect that cannot be fixed after 18 months). Price has the second highest loss when going from the lowest price to the highest price.

**[The space below was left blank to accommodate Figure 21.]**

---

[58]    I performed the economic loss calculations with and without using the monotonicity constraint. The results for the models with monotonicity constraint are presented in the body of the report while the results for the models without the monotonicity constraint are presented in the Appendix to this Report. The results are very similar. The percentage difference between the model with and without the monotonicity constraint is just under 2% ($(3496.48 - 3401.4)/3469.48 = 1.96\%$).

[59]    Orme, B., & Chrzan, K. (2017). Becoming an expert in conjoint analysis: Choice modeling for pros: Orem, UT: Sawtooth Software. Page 183.

**EXPERT REPORT OF STEFAN BOEDEKER**

**Figure 21: Attribute Confidence Intervals with Monotonicity Constraint**



*Source: BRG Calculations Based on CBC Study*

128.    Figure 22 shows the average part-worths by attribute level. For a given attribute, the level part-worths are normalized to add up to zero. Figure 22 is constructed similarly to Figure 21. After convergence of the HBC model, I used the Sawtooth Software to output 10,000 additional draws with an observation for each respondent, resulting in 5 million records. I obtained the confidence interval around each point estimate by calculating the average part-worth for the 1000 respondents per draw. I then utilized the 2.5% percentile and the 97.5% percentile to construct the confidence interval. The results in Figure 22 demonstrate that the attribute level "No Transmission Defect" has the highest part-worths while a Transmission Defect with an 8% manifestation rate that cannot be repaired has the lowest part-worths.

**EXPERT REPORT OF STEFAN BOEDEKER**

***Figure 22:    Confidence Interval for Part-Worths by Attribute-Level with Monotonicity
Constraint***



*Source: BRG Calculations Based on CBC Study*

129.    Figure 23 shows the goodness of fit measure for the underlying logit model. A prediction
not better than a coin toss would result in a root likelihood of 0.2. For 96.6% of all respondents the
root likelihood is greater than 0.2, which means that the logit model predicts the results for these
respondents better than a random toss. The average and median root likelihoods are 0.52 and 0.55
and marked by orange and red dots in Figure 23 respectively.

**EXPERT REPORT OF STEFAN BOEDEKER**

*Figure 23:    Goodness of Fit with Monotonicity Constraint*



*Source: BRG Calculations Based on CBC Study*

130.    In Step 2, the part-worth estimates were applied to construct the demand curve for the product when the Transmission Defect is not disclosed to the consumer at the point of purchase. Further, I constructed the demand curves for the other levels for an attribute of interest.

131.    In Step 3, I quantified the drop in consumer demand and – all else equal – the new price consumers would pay after the disclosure of the Transmission Defect at the point of purchase. Based on the extend of the downward shift of the demand curve, I was able to calculate economic damages to the members of the putative class based on their purchase of the product with the undisclosed Transmission Defect.

132.    In Step 4, I conducted market simulations to assess the economic loss associated with the drop in demand after the disclosure of the Transmission Defect at the point of purchase that will be utilized in the quantification of class-wide economic losses.

**EXPERT REPORT OF STEFAN BOEDEKER**

## 5.2     Market Simulations in Conjoint Analyses

133.     To assess the robustness of the demand curve estimation under a variety of market
conditions, I will perform a comprehensive market simulation study using the individual part-
worths which will be estimated from the conjoint study using the Hierarchical Bayesian Estimation
methodology. In my market simulations, I use all variations of the attributes and levels defined in
the conjoint study to not misrepresent certain attribute combinations.

134.     Market simulations are an important tool to convert the part-worths from the conjoint study
into monetary measures reflecting consumer preferences and choices. Part-worth estimates do not
reflect monetary values. Rather, they quantify respondents' preferences for each level of each
attribute. These part-worths can be analyzed to assess how the respondents react to changes in the
product attributes at different price points. Ultimately, the choice probabilities are used to construct
demand curves which relate price and quantity. A comparison of the demand curve for the scenario
where the Transmission Defect is not known to the consumers at the point of purchase and the
demand curve for the scenario where the Transmission Defect is known to the consumers at the
point of purchase will reveal if a drop in the demand curve has occurred and, if so, the degree of
the drop in demand then quantifies the economic loss.

135.     Further tests will be utilized to quantify if and how changes in an attribute will affect the
value that consumers put on that attribute (e.g., in general, different permutations of product
attributes and levels of those product attributes are applied in a market simulation to assess the
respondents' choice probabilities for different combinations of product attributes and the resulting
economic loss). The market simulation consolidates the preferences and choices for all
respondents, which enables us to answer questions about preference and likelihood of choice when
attributes and levels of product attributes are changed.

136.     By using the individual part-worths, it is possible to determine the demand curve for any
specific combination of product attributes and their levels for different price points. When the
question needs to be answered if and how the change in the level of a particular attribute changes
the demand curve, then two demand curves can be calculated: the first one for a specific set of
levels and attributes and a given price and the second one where the product attributes and price
are identical but one level of one attribute is different.

**EXPERT REPORT OF STEFAN BOEDEKER**

137.    The measured shift in the demand curve, if any, can then be attributed to the changed level. Based on the difference in demand curves, if any was found, it is then possible to determine the change in price that would be necessary to reach the same demand for the product where a level in one of the attributes was changed.

138.    Market simulations can then be applied to determine the economic loss under various scenarios. To be clear, the economic loss derived from the market simulations is *not* an average value that would be different for all class members – rather, it is the difference in estimated market demand based on consumers' responses to varying choice menus in the Conjoint Analysis designed to derive one numerical figure to quantify the loss in value due to the Transmission Defect that was not known to the consumers at the point of purchase. The interpretation of this figure is the amount consumers overpaid when purchasing a Honda Odyssey with the Transmission Defect without knowing about it at the point of purchase compared to the amount they would have paid if the Transmission Defect had been known to them at the point of purchase.

### 5.3    Study Results

139.    As discussed above, the HBE methodology yields estimates for the part-worths of the levels for each attribute in the CBC study as shown in Figure 20. The part-worths estimates by level and attribute for each respondent allow us to estimate the share of all respondents who would purchase a product constructed from a permutation of all attribute levels for a given price. By varying the price, I can then construct a demand curve for that product.

140.    Based on the results of the conjoint survey, the blue dots in Figure 24 show the demand for a Honda Odyssey with no Transmission Defect on the horizontal axis and the price levels in descending order on the vertical axis. The dark gray line is the demand curve fit through the price-volume combinations obtained from the results of the CBC model. The orange dots in Figure 24 show the demand for the same product specification for the case that it is known that the Honda Odyssey has the Transmission Defect. The fact that the demand curve connecting the orange dots has shifted downwards proves that Honda Odyssey becomes less desirable when it is disclosed that it has the Transmission Defect.

**EXPERT REPORT OF STEFAN BOEDEKER**

***Figure 24:    Actual and But-For Demand for a Specific Package – "Defect manifests with probability of 5%, repaired after 18 months", With Monotonicity Constraint***



*Source: BRG Calculations Based on CBC Study.*

141.    The box-plot in Figure 25 shows the distribution of the economic loss for 8 different specifications of the Honda Odyssey in the conjoint. For example, a Honda Odyssey could have a more efficient fuel injection system, no heated & ventilated seats and no blind spot warning system (first bar in Figure 25). The bars on the thin line show the minimum and maximum economic loss for each configuration, while the solid blue box represents the inner quartile range. The black dots show outliers. The number in the center of each solid blue box shows the respective median economic loss. The minimum loss in all simulated scenarios shown in Figure 25 is greater than zero.

**[The space below was left blank to accommodate Figure 25.]**

**EXPERT REPORT OF STEFAN BOEDEKER**

***Figure 25:    Distribution of Simulation Results for Scenario "Defect manifests with
probability of 5%, repaired after 18 months", With Monotonicity Constraint***



*Source: Conjoint Survey Results*

142.    Figure 26 shows the economic loss incurred per respondent for the different defect
scenarios covered in the conjoint analysis. For example, if the transmission defect with a
probability of manifestation of 8% is not repaired after 18 months, the median economic loss per
respondent is $3,041 across all 800,000 market simulations.[60] This represents 12.4% of the median
price for a vehicle of $27,500 presented to respondents in the conjoint survey.

**[The space below was left blank to accommodate Figure 26.]**

---

[60]    2 levels for Attribute 1 * 2 levels for Attribute 2 * 2 levels for Attribute 3 * 10 price points * 10,000 draws equals
800,000.

**EXPERT REPORT OF STEFAN BOEDEKER**

*Figure 26:*    *Confidence Interval of Economic Value, With Monotonicity Constraint*



*Source: Conjoint Survey Results*

# 6   Summary and Conclusion

143.    I conclude that the conjoint analysis proposed and described in this report can empirically measure what respondents would have paid for a product with and without the alleged Transmission Defect. This value can be used to determine if consumers suffered an economic loss and, if so, to calculate the economic damages if the Court decides to move forward with such an analysis. In essence, the theoretical model proposed in this report measures the difference between the price paid and the price paid if customers had been told at the time and point of purchase about the Transmission Defect. Sometimes this difference is also referred to as a price premium.

144.    Further, the method proposed in this report utilizes a theoretical economic model that is based on microeconomic principles that show how the demand for a product changes when attributes and levels of attributes for that product change. To quantify the change in demand when the attributes of the product change (e.g., when the previously concealed Transmission Defect will be disclosed at the point of purchase), it is possible to design a choice-based conjoint study that elicits survey respondents to reveal their preferences for products with and without the Transmission Defect as described to respondents.

**EXPERT REPORT OF STEFAN BOEDEKER**

145.     Further, I conclude that the method proposed and described in this report can be used to expand the results of the conjoint study to a complete model to calculate class-wide damages in the merits phase of this case by multiplying the percentage economic loss per unit as established above with the price and number of units purchased by class members during the class period. It has to be pointed out that the computation of economic losses as a percentage of the purchase price has the advantage that variations in the purchase price do not prevent the calculation of class-wide damages because any such variations are captured in the sales data.

146.     Counsel asked me to apply the results from my economic loss model to a sales figure of approximately 475,000. Using my estimate of median economic loss per customer of $3,041 if the transmission defect with a probability of manifestation of 8% is not repaired after 18 months, this results in class-wide economic losses in excess of $1.6 billion (475,000 *$3,401.4 = $ 1,615,665,000). Alternatively, using my estimate of median economic loss per customer of $1570.5 if the transmission defect with a probability of manifestation of 5% is repaired after 6 months, this results in class-wide economic losses in excess of $700 million (475,000 *$1,570.5 = $ 745,98,500). Based on the median economic losses, class-wide economic losses can be calculated as shown in Table 5.

*Table 5: Class-wide Median Economic Loss by Scenario*

| Scenario | Economic loss |
|---|---|
| Defect, 8% probability, not repaired after 18 months | $ 1,615,665,000 |
| Defect, 5% probability, not repaired after 18 months | $ 1,437,160,000 |
| Defect, 8% probability, repaired after 18 months | $ 1,170,210,000 |
| Defect, 5% probability, repaired after 18 months | $ 991,182,500 |
| Defect, 8% probability, repaired after 6 months | $ 938,837,500 |
| Defect, 5% probability, repaired after 6 months | $ 745,987,500 |

*Source: Own calculations based on information provided by counsel.*

147.     As can be seen from the table of economic losses, the expected time to repair and the manifestation rate of the defect are both positively correlated to the economic loss - the longer the time to repair and the larger the manifestation rate, the higher the economic loss. Moreover, as can be seen from the results above, the time to repair has a larger impact than the manifestation rate as the economic loss is more similar across different manifestation rates, i.e., the difference in economic loss for the same time to repair is fairly homogeneous:

**EXPERT REPORT OF STEFAN BOEDEKER**

    a.   Not Repaired after 18 Months: $1,615,665,000 at 8% manifestation compared to $1,437,160,000 at 5% manifestation rate – difference: $178,505,000.

    b.   Repaired after 18 Months: $1,170,210,000 at 8% manifestation compared to $991,182,500 at 5% manifestation rate – difference: $179,027,500.

    c.   Repaired after 6 Months: $938,837,500 at 8% manifestation compared to $745,987,500 at 5% manifestation rate – difference: $192,850,000.

148.    Lastly, I conclude that the model described in this report to compute class-wide economic losses can be expanded in the merits phase of this case to incorporate additional aspects if the Court deems this necessary. For example, economic loss calculations can be performed on a class-wide basis for a different range of manifestation rates of the defect, but also across different geographies (e.g., specific states) or for different time periods by obtaining the specific sales data for such geographies and time periods.

149.    The analysis and opinions contained in this report are based on information available as of the date of this report. I reserve the right to supplement or amend this report in the event additional information becomes available.

150.    I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this 15 day of January 2019, in Los Angeles, CA.

_____

Stefan Boedeker

**EXPERT REPORT OF STEFAN BOEDEKER**

# 7   References

Allenby, G., & Rossi, P. (2006). Hierarchical Bayes models: a practitioners guide *The Handbook of Marketing Research*,  (pp. 607-670).

B. Isaacson et al. (2008), "Why Online Surveys Can Be a Smart Choice in Intellectual Property Litigation," IPL Newsletter (ABA Section of Intellectual Property Law) Vol. 26, No. 3.

Bakken, D., & Frazier, C. L. (2006). Conjoint analysis: Understanding consumer decision making *The Handbook of Marketing Research*,  (pp. 607-670).

Diamond, S. S. (2011). *Reference guide on survey research* (3rd ed. Vol. 221).

Feenstra, Robert C. (1995), "Exact Hedonic Price Indexes", Review of Economics and Statistics, 77(4) (November), pp. 634-53.

Griliches, Zvi (1961), "Hedonic Price Indexes for Automobiles: An Econometric Analysis of Quality Change", in: Price Statistics Review Committee, National Bureau of Economic Research, The Price Statistics of the Federal Government: Review, Appraisal, and Recommendations, General Series No. 73. New York, NY: National Bureau of Economic Research, pp. 173-96, reprinted in Zvi Griliches, Technology, Education, and Productivity, Oxford: Basil Blackwell, 1988, pp. 76-104.

Griliches, Zvi (1991), "Hedonic Price Indexes and the Measurement of Capital and Productivity: Some Historical References", in: Ernst R. Berndt and Jack E. Triplett (eds.), Fifty Years of Economic Measurement: The Jubilee of the Conference on Research in Income and Wealth, National Bureau of Economic Research Studies in Income and Wealth, Vol. 54. Chicago: University of Chicago Press, pp. 185-202.

Krosnick, Jon and Duane Alwin. (1987), "An evaluation of a cognitive theory of response order effects in survey measurement," Oxford Journals Social Sciences Public Opinion Quarterly Volume 51, Issue 2, pp. 201-219.

Kuhfeld, W. F. et al (2006). Construction of efficient designs for discrete-choice-experiments *The handbook of marketing research, Uses, misuses, and future advances, Sage Publ., Thousand Oaks, Calif* (pp. 312-363).

Lancaster, K. J. (1966). A new approach to consumer theory. *Journal of political economy, 74*(2), 132-157.

Lisa Cameron, Michael Cragg, & Daniel McFadden, "The Role of Conjoint Surveys in Reasonable Royalty Cases," LAW360 (Oct. 16, 2013), https://www.law360.com/articles/475390/the-role-of-conjoint-surveys-in-reasonable-royalty-cases, last visited January 15, 2019.

Orme, B. K. (2014). *Getting started with conjoint analysis: strategies for product design and pricing research* (3rd ed.): Research Publishers.

Orme, B., & Chrzan, K. (2017). Becoming an expert in conjoint analysis: Choice modeling for pros: Orem, UT: Sawtooth Software. Page 183.

Orme, Bryan K. (2002), Formulating Attributes and Levels in Conjoint Analysis, Sawtooth Software Research Paper Series.

**EXPERT REPORT OF STEFAN BOEDEKER**

Rao, V. R. (2014). *Applied conjoint analysis*: Springer Science & Business Media.

Rosen, Sherwin (1974), "Hedonic Prices and Implicit Markets: Product Differentiation in Pure Competition", Journal of Political Economy, 82(1) (January-February), pp. 34-55.

Train, K. E. (2009). *Discrete choice methods with simulation*: Cambridge university press.

Triplett, Jack (2006), Handbook on Hedonic Indexes and Quality Adjustments in Price Indexes: Special Application to Information Technology Products, OECD Publishing, Paris. DOI: http://dx.doi.org/10.1787/9789264028159-en.

Triplett, Jack E. (1969), "Automobiles and Hedonic Quality Measurement", Journal of Political Economy, 77(3) (May-June), pp. 408-17.

Varian, H. R. (2010). *Intermediate Microeconomics: a Modern Approach* (8th ed.): WW Norton & Company New York.

Yeager, D., Krosnick, J., Chang, L., Javitz, H., Levindusky, M. S., Simpser, A., & Wang, R. (2011). Comparing the accuracy of RDD telephone surveys and Internet surveys conducted with probability and non-probability samples. The Public Opinion Quarterly, 4(1), 709-747.

**EXPERT REPORT OF STEFAN BOEDEKER**

# 8   Appendix

*Figure 27: Attribute Confidence Intervals, Without Monotonicity Constraint*



*Source: BRG Calculations Based on CBC Study*

**EXPERT REPORT OF STEFAN BOEDEKER**

**Figure 28: Confidence Interval for Part-Worths By Attribute-Level, Without Monotonicity Constraint**



*Source: BRG Calculations Based on CBC Study*

**Figure 29:    Distribution of Simulation Results for Scenario "Defect manifests with probability of 5%, repaired after 18 months", Without Monotonicity Constraint**



*Source: Conjoint Survey Results*

68

**Figure 30:**    *Confidence Interval of Economic Value, Without Monotonicity Constraint*



*Source: Conjoint Survey Results*

**EXPERT REPORT OF STEFAN BOEDEKER**

Exhibit A



# STEFAN BOEDEKER

**Managing Director**
**Berkeley Research Group**

550 South Hope Street
Suite #2150
Los Angeles, CA 90071
Tel: (310) 499-4924
Cell: (213) 705-1324
Email: sboedeker@thinkbrg.com

## *Education*

- BS in Statistics,
  University of Dortmund, Germany
- BA in Business Administration
  University of Dortmund, Germany
- MS in Statistics
  University of Dortmund, Germany
- MA in Economics
  University of California, San Diego
- Met Ph.D. requirements except dissertation in Economics,
  University of California, San Diego

## *Professional Associations*

- Member of the American Economic Association (AEA)
- Member of the American Statistical Association (ASA)
- Member of the Econometric Society
- Member of the Mathematical Association of America (MAA)
- Member of the American Association for Public Opinion Research (AAPOR)
- Member of the Insights Association (FKA MRA)
- In 2001 Stefan was a member of an AICPA task force dealing with Corporate Integrity Agreements (CIA). Stefan was responsible for issues related to statistical methodology utilized in CIA's.

# Background

Stefan is a Managing Director at Berkeley Research Group where he focuses on the application of economic, statistical, and financial models to a variety of areas such as solutions to business issues, complex litigation cases, and economic impact studies. He has extensive experience applying economic and statistical theories and methodologies to a wide variety of cases where But-for-scenarios have to be developed based on probabilistic methods and where statistical predictive modeling has to be applied to assess liability and damages.

Stefan has applied these techniques in business disputes, single-plaintiff cases, multi-plaintiff cases, and class action proceedings in the areas of class certification, liability assessment, developing damages scenarios, and post settlement or judgment distributions.

# Professional and Business Experience

## Representative Engagements

## Litigation

> » In a class action alleging misleading advertising practices, Stefan performed statistical analyses in the class certification stage.

> » For a major healthcare provider involved in a dispute with a potential class of more than 3,000 other providers over allegedly excessive outlier payments Stefan performed economic and statistical analyses. Ultimately, class certification was denied in that case.

> » In a class action alleging discriminatory allocation of public funds by a large metropolitan transportation authority, Stefan performed statistical analyses of transportation data.

> » In a multi-plaintiff case against a state authority on improper funding of special education programs, Stefan performed statistical analyses of funding related ledger data.

> » In a class action alleging improper practices of charges for gym memberships, Stefan performed statistical analyses in the class certification analysis. Based on the analysis, the ultimately certified class was significant smaller than initially defined. In this case, Stefan also developed statistical models to assess damages.



» In a class action alleging losses to consumers due to faulty window regulators in automobiles, Stefan utilized statistical models to assess economic damages.

» In a class action against a large financial institution alleging fee overcharges for personal trust accounts, Stefan utilized statistical analyses to segment the account holders and ultimately reduce the size of the class.

» In a class action case where a provider of a used car evaluation model was ordered by the court to test if their model did not significantly undervalued cars, Stefan performed statistical analyses.

» In a class action case over fee overcharges in the payment process of car insurance, Stefan developed a distribution model of repayments to class members after a settlement had been reached.

» In a class action of home owners over alleged diminution of property values due to proximity to a plume of contaminated soil, Stefan performed statistical analysis to assist counsel in a motion against class certification.

» In a natural resource damage class action case, Stefan provided econometric analysis of property value loss due to proximity to a solid waste site utilizing hedonic regression models.

» For a class action case involving potential damage from a landfill in a state park, Stefan analyzed data about travel, tourism and park attendance. Stefan specified and estimated linear regression models and time series models to predict park attendance.

» In a class action case involving alleged diminution of property values due to ground-water contamination, Stefan specified and estimated hedonic regression models to show that other factors than the contamination contributed significantly to the loss in property value.

» In a class action against a large financial institution alleging non-payment of coupon payments for bearer bonds Stefan designed and administered large-scale databases to reconstruct accounting records of a large financial institution's Corporate Trust Department. He developed statistical models to analyze bondholders' presentment behavior of Bearer bonds.

» In a class action dispute between the Department of Interior and individual Native Americans over mismanagement of individual trust accounts, Stefan performed a statistical analysis of an electronic database with approximately 60 million records in order to draw a statistically valid sample of accounts for further analysis.

» In a trademark infringement case of video equipment, Stefan calculated damages based on the defendant's unjust enrichment utilizing statistical time trend models.

» For a shareholder derivative action against a leading publicly-traded health care provider, employed an econometric approach to quantify potential damages per share due to alleged section 10b-5 violations and other claims. For the same matter, developed a multi-trader model to estimate the number of shares potentially damaged.

» In a dispute between a major health care provider and private payor groups, Stefan developed statistical stratified sampling models to assess exposure across different contract types.



» For a large financial institution's personal trust department involved in a consumer class action, Stefan designed a random sample to estimate the potential exposure due to fee overcharges.

» For a computer equipment leasing company involved in an employee class action, Stefan utilized statistical models to estimate exposure due to alleged forfeiture of unpaid vacation time in a class action of former and current employees.

» For a limousine company involved in a wage and hour class action, Stefan developed a statistical sampling based exposure model to quantify the impact of alleged unpaid overtime and missed meal breaks.

» In several cases involving 12 hour shift workers at hospitals Stefan performed rebuttal analyses of plaintiff's damages computations.

» For a large electronic retail chain Stefan calculated exposure based on the failure of paying overtime for store managers.

» For a major department store Stefan performed a statistical analysis of manager surveys where he found significant differences in the managers' allocation of time across department and stores.  Ultimately, due to these differences a class was not certified.

» For a large sporting goods retail chain Stefan assisted in defining the size of the potential class and in estimating the potential exposure which led to a favorable, early settlement of the case.

» For a women's shoes retail chain Stefan designed and statistically analyzed an observational study to quantify the amount of time spent on exempt versus non-exempt tasks.

» For a video rental store chain Stefan developed sampling algorithms based on in-store security cameras to analyze time spent by assistant managers on exempt versus non-exempt activities.

» For a large fast food chain Stefan directed a team collecting employee work information from restaurant locations in order to monitor and gain compliance in response to litigation

» For a large mass merchandiser Stefan developed a document and data reconciliation tool and he developed a statistical sampling mechanism to proof compliance with a court ordered document retention procedures in the course of a wage and hour litigation.

» Stefan worked with a Fortune 500 bank in a class action suit to review the claims of managers that were misclassified and should have been paid overtime.  To compute damages, Stefan reviewed the overtime records of employees in this position prior to a job classification change and, in the absence of overtime data after the job classification change, Stefan reviewed sign in and sign out times of the office building.

» For a long-term care provider Stefan used data from timesheets, payroll, and other scheduling records to create comprehensive reports showing potential exposure for each of the claimed areas:  timely wage payment, overtime wage payment, adequate daily meal and rest break periods, and travel time compensation.



» For a maternity clothing store chain Stefan performed analyses related to exempt/non-exempt status issues for managers and assistant managers.  Stefan also conducted a break time analysis for all employees.

» For a commercial flooring contractor Stefan assessed the job duties and responsibilities of a group of supervisors.  During the engagement, the scope of work expanded to include an analysis of misclassification and back-pay exposure for additional groups of employees.

» For a software developer Stefan analyzed how department and project specific characteristics impacted the work flow and the correlation of that impact to certain exemptions.

» For a large meatpacker Stefan conducted a time and motion study to properly assess the duration of certain separately compensated activities to rebut allegations of violation of minimum wage laws.

» For a public university housing department Stefan conducted an extensive time and motion study to identify the tasks (and associated time range to perform each task) related to processing a contract cancellation.

» For a large drugstore chain Stefan used in-store cameras for the smaller stores and actual in-store observations for the larger stores to conduct a time motion study and quantify the time spent by assistant managers on certain pre-defined tasks.

» For a large public storage company Stefan conducted a detailed time and motion study to determine the cost of collection and administration of late payments.  Using both self-logging and independent review techniques, Stefan defined each step in the late payment process, calculated the cost to the company for such activities, and compared this cost to the late fees under dispute.

» For a large retail store chain Stefan performed statistical analyses of regularly conducted employee activity surveys.

» For a mass merchandiser, Stefan conducted an observational study of activities of all individuals classified as managers to show significant differences in daily activities.

» For a department store, Stefan conducted an in-store observational study of managers and assistance managers to assess the percentage of time spent on managerial tasks.

» For a state ferry system in the Pacific Northwest, Stefan conducted an observational study of engine room personnel during shift changes to quantify potentially unpaid time worked.

» For a large retail chain Stefan conducted an extensive analysis of the company's compliance with break time rules and regulations and also the employees' usage and potential abuse of break time.

» For a large mass merchandise retailer Stefan compiled a comprehensive database of punch clock data, payroll data, point of sales data, hardcopy information about manual edits of time entries, store security system data, etc. to analyze allegations of inserting breaks, deleting time and forcing employees to work after they clocked out.



» For a large electronic retail chain Stefan analyzed time card data, point of sales data and other store specific attributes to quantify potentially missed meal and rest breaks.

» In a gender discrimination case involving a client in the food processing industry, Stefan analyzed the impact of the implementation of an Affirmative Action Plan on the allegedly discriminatory employment practices.

» In a class action case alleging age discrimination for a vegetable seed company, Stefan performed rebuttal work of the plaintiff's expert's liability and damages analysis.

» In a class action case alleging age discrimination for a major aerospace company, Stefan performed statistical analyses to rebut allegations of age discrimination.

» In a class action race discrimination suit against the Alabama Department of Transportation, Stefan developed statistical regression models and tests to analyze the alleged discrimination.

» In a class action gender discrimination case against a large real estate brokerage firm, Stefan provided deposition testimony to class certification issues.

» In a gender discrimination case against a temporary employment agency, Stefan performed econometric analyses to disprove salary discrimination against two former female employees.  Stefan addressed plaintiffs' expert's damages calculations and developed alternative scenarios.

» For a large meat processing plant, Stefan performed statistical analyses of employment data to address allegations of discriminatory hiring practices.

» For a leading publicly-traded developer of enterprise management software, Stefan employed a statistical approach to demonstrate the diversity of investment styles among proposed lead plaintiffs for a securities class action lawsuit alleging section 10b-5 violations and other claims. For the same matter, Stefan employed an econometric approach to estimate potential damages for each lead plaintiff.

» For a leading publicly-traded developer of enterprise management software, Stefan employed an econometric time-series model to analyze allegations of insider trading and the timing of certain stock transactions relative to information available to officers in the company.

» For a shareholder derivative action against a leading publicly-traded health care provider, employed an econometric approach to quantify potential damages per share due to alleged section 10b-5 violations and other claims. For the same matter, developed a multi-trader model to estimate the number of shares potentially damaged.

» For a publicly-traded manufacturer of office supplies, developed a Black-Scholes application and utilized a binomial distribution probability methodology to evaluate the appropriateness of the size of a loan loss reserve related to a loan collateralized by the assets of an employee stock purchase plan.

» For a large software developer, Stefan performed statistical modeling to assist in a securities class action litigation involving allegations of improper revenue recognition, reserve allocations, financial statement disclosures and other accounting irregularities



» For a failed computer hardware company in defense of a 10b-5 securities litigation action, Stefan performed statistical analyses of accounting transactions, inventory and receivable reserves and the auditor's work papers in its evaluation of the allegations.

» In several Rule 10b(5) class actions, Stefan used the event study approach to calculate the value line of a security.  In these cases Stefan applied complex and advanced one, two, and multi-trader models.

## <u>Non-Litigation</u>

» For large grocery store chains, Stefan analyzed the effectiveness of a frequent shopper card program utilizing data mining techniques.  He also analyzed customer data to facilitate the introduction of one-to-one marketing tools.

» For a grocery store chain, Stefan utilized econometric elasticity models to recommend pricing strategies for in-store promotions.

» For a grocery store chain, Stefan developed customer segmentation models to design segment specific marketing campaigns.

» For the American Film Marketing Association, Stefan performed an economic impact study of the influence of the independent film producers and distributors on the U.S. economy in general, and the California economy in particular.

» For a large entertainment client, Stefan developed statistical models to predict the return of video cassettes and DVDs.

» For several clients in the retail industry, Stefan developed statistical models to estimate the liability of unredeemed gift certificates.

» For a client in the restaurant business, Stefan developed statistical models to quantify the dollar amount of outstanding unredeemed gift certificates.

» For a major hotel chain, Stefan developed statistical models to forecast the redemption of frequent traveler program points for tax purposes.

» For a high profile e-commerce company, Stefan's team produced an interactive business decision tool to forecast company growth and profitability. The interactive model allows the client, through the choice of a few fundamental inputs, to measure the simultaneous impact on all cost and revenue dimensions of the company, including real estate and equity participation.

» For the Nevada Resort Association, Stefan quantified the economic impact of the gaming industry with special emphasis on the accelerated population growth in greater Las Vegas.

» For the Los Angeles Unified School District, Stefan performed an economic study about the impact of different recycling programs.



» For the Los Angeles County Department of Health Services, Stefan conducted a time and motion study to determine the time required to complete specific Medi-Cal eligibility and provider forms.

» For the Arizona Tax Research Association, Stefan developed economic models to quantify the revenue impact of a proposed change of taxation in the construction sector in Arizona.

» For a hotel property management company, Stefan analyzed customer data, and used data mining methods to develop predictive models for customer acquisition, retention, and attrition.

» For a project analyzing the extent of competition in the market segments of a pipeline company, Stefan estimated regression and Tobit-models to determine optimal bidding behavior for gas storage demand. He prepared testimony given in filings before the Federal Energy Regulatory Commission (FERC).

» For a hotel property management company, Stefan developed a demand driven yield management system.

» For a company providing self-storage space, Stefan developed a demand driven price-setting strategy utilizing own- and cross-price elasticity regression models.

» For a high-tech start-up with a unique service offering of new products, Stefan recommended product-pricing scenarios.

» For a large international conglomerate, Stefan developed customized data mining techniques for the implementation within a customer knowledge management system.

» For a large law firm, Stefan performed a comprehensive statistical analysis of Los Angeles Superior Court jury verdicts over the last decade. The project tested the hypothesis of systematic bias in particular courthouses with respect to plaintiff-win probability, length of trial, length of deliberation, and dollar amounts awarded.


# Depositions & Testimony

## Depositions

1. MRO Communications, Inc vs. American Telephone and Telegraph Company, United States District Court District of Nevada, Case. No. -5-95-903-PMP, Deposition Testimony, September 26, 1996

2. Yolanda Aiello Harris, individually and on behalf of all others similarly situated; Jennifer Hopkins, individually and on behalf of others similarly situated; Shannon L. Bradley, individually and on behalf of others similarly situated, Plaintiffs, vs. CB Richard Ellis, Inc., a California corporation; CB Commercial INC., a California corporation; Defendants, Superior Court of California, County of San Diego, Case No. GIC 745044, Deposition Testimony, January 5, 2001.



3. State of Tennessee, ex rel., Douglas Sizemore, Petitioner vs. Xantus Healthplan of Tennessee, Inc., Chancery Court of Davidson County, Tennessee at Nashville, Case No 99-917-II, Deposition Testimony, October 11, 2001.

4. Howard Wright, Inc., a California corporation doing business as AppleOne Employment Services, Plaintiffs, vs. Olsen Staffing Services, Inc., a Delaware Corporation, Dagney Smith, an individual, Vicky Riechers, an individual, and Linda Shiftman, an individual, Defendants, Superior Court of the State of California for the County of Los Angeles, Case No. BC 200657, Deposition Testimony, December 7, 2001.

5. Sacred Heart Medical Center, et al., Plaintiffs, -vs- Department of Social and Health Services, and Dennis Braddock, the Secretary of the Department of Social and Health Services, Defendants, Superior Court of the State of Washington in and for the County of Thurston, No. 00-2-01898-1, Deposition Testimony, January 23, 2003.

6. Patrick Bjorkquist individually and on behalf of all others similarly situated, Plaintiff, vs. Farmers Insurance Company of Washington, Defendant, in the Superior Court of the State of Washington for King County, Case No.: 02-2-11684-1 SEA, Deposition Testimony, November 3, 2003.

7. Diversified Property, a general partnership, Dora Saikhon Family Trust, and Nancy Saikhon Borrelli, an individual, Plaintiffs vs. Manufacturers Life Insurance (U.S.A.), a Michigan corporation, erroneously sued as Manufacturers Life Insurance Company, Inc., Defendants in the Superior Court of California, County of San Diego, Case No.: GIC 815128, Deposition Testimony on July 21, 2004.

8. Alan Powers, Plaintiff, vs. Laramar Group et al., Defendants in the United States District Court, Northern District of California, No. C-02-3755 SBA, Deposition Testimony on August 27, 2004.

9. Group Anesthesia Services, A Medical Group, Inc., Claimant, vs. American Medical Partners of North Carolina, Inc., etc., et al., Respondents, JAMS Arbitration, Reference No. 1100040919, Deposition Testimony on February 9, 2005.

10. Group Anesthesia Services, A Medical Group, Inc., Claimant, vs. American Medical Partners of North Carolina, Inc., etc., et al., Respondents, JAMS Arbitration, Reference No. 1100040919, Deposition Testimony on March 11, 2005.

11. Fujitsu v. Cirrus Logic et al., United States District Court, Northern District of California, San Jose Division, Case No. 02CV01627. Deposition Testimony on April 21 and 22, 2005.

12. Goldman et al. v. RadioShack Corporation, United States District Court, Eastern District of Pennsylvania, Case No. 03 CV 0032, Deposition Testimony on May 18, 2005.

13. Perez et al. v. RadioShack Corporation, United States District Court, Northern District of Illinois, Eastern Division, Case No. 02-CV-7884, Deposition Testimony on December 13, 2005.

14. United States of America ex rel. A. Scott Pogue v. American Healthcorp Inc., Diabetes Treatment Centers of America Inc., et al., United States District Court, Middle District of Tennessee at Nashville, Civil No. 3-94-0515, Deposition Testimony on May 12, 2006.

15. School Districts' Alliance v. State of Washington, United States District Court, Eastern District of Thurston, Case No. 04-2-02000-7, Deposition Testimony on July 20, 2006.



16. Boca Raton Community Hospital, Inc., a Florida not-for-profit corporation d/b/a Boca Raton Community Hospital, on behalf of itself and on behalf of Class of all others similarly situated v. Tenet Healthcare Corp., a Nevada Corporation, United States District Court, Southern District of Florida, Miami Division, Case No. 05-80183-CIV-SEITZ/MCALILEY, Deposition Testimony on July 25, 2006.

17. Boca Raton Community Hospital, Inc., a Florida not-for-profit corporation d/b/a Boca Raton Community Hospital, on behalf of itself and on behalf of Class of all others similarly situated v. Tenet Healthcare Corp., a Nevada Corporation, United States District Court, Southern District of Florida, Miami Division, Case No. 05-80183-CIV-SEITZ/MCALILEY, Deposition Testimony on October 13, 2006.

18. Louise Ogborn v. McDonald's Corporation et al., Commonwealth of Kentucky 55th Judicial District, Bullitt County Circuit Court, Case No. 04-CI-00769, Deposition Testimony on October 19, 2006.

19. Elise Davis v. Kohl's Department Stores, Inc. consolidated with Rosie Grindstaff v. Kohl's Department Stores, Inc., Superior Court of the State of California for County of Los Angeles Central District, Case No. BC 327426 (lead case) consolidated with Case No. BC 341954, Deposition Testimony on April 25, 2007.

20. Norman Utley, et al., v. MCI, Inc., MCI Worldcom Communications, Inc., and MCI Network Services, Inc., formerly known as MCI Worldcom Network Services, Inc., United States District Court, Northern District of Texas, Dallas Division, Civil Action No. 3:05 - CV- 0046 - K, Deposition Testimony on May 30, 2007.

21. Ramon Moreno and Ernesto Morailo, on behalf of themselves and all others similarly situated v. Guerrero Mexican Food Products Inc., a division of Gruma Corporation; and Gruma Corporation, a Nevada Corporation, United States District Court, Central District of California, Case No. CV05-773RSWL(PLAx), Deposition Testimony on August 10, 2007.

22. Darensburg et al. v. Metropolitan Transportation Commission, U.S. District Court, Northern District of California, Case No. C-05-1597-EDL, Deposition Testimony on March 18, 2008.

23. In Re: King Pharmaceuticals, INC, Derivative Litigation, Lead Case No: BOO19077(M), The Chancery Court, Sullivan County at Bristol, Tennessee, Deposition Testimony on April 4, 2008.

24. P. Ansley et al. v. Lewis Homes of California, a California General Partnership, et al., Superior Court of the State of California, For the County of Solano, Case No. FCS02445, Deposition Testimony on April 10, 2008.

25. Personnel Plus v. Ashish Wahi et al., Superior Court of the State of California, County of Orange, Case No. 07CC08363, Deposition Testimony on August 13, 2008.

26. First Capitol Consulting Inc. v. LVX, Inc. et al., Superior Court of the State of California for the County of Los Angeles, Case No. BC378202, Deposition Testimony on October 27, 2008.

27. R. Molina et al. v. Lexmark International, Inc., Superior Court of the State of California for the County of Los Angeles, Case No. BC339177, Deposition Testimony on November 19, 2008.



28. In re National Century Financial Enterprises, Inc. Investment Litigation, No. 2:03-MD-1565-JLG-MRA (S.D.Ohio), Deposition Testimony on January 22, 2009.

29. New York City Employees' Retirement System, et al. v. Bank One, N.A., et al., Case No. 03-cv-09973 (LAK) (S.D.N.Y.), Deposition Testimony on January 22, 2009.

30. Dole Fresh Fruit International, Ltd, Hyundai Precision America, Inc., JAMS Arbitration, ADRS Case #05-1138-RTA, Deposition Testimony on December 21, 2009.

31. D. Berry, L. Hedges et al. v. Volkswagen of America, Inc. In The Circuit Court of Jackson County, Missouri, at Independence, No. 0516-CV01171 Division 2, Deposition Testimony on February 18, 2010.

32. D. Aberle et al. v. Davidson Builders, Inc., et al., Superior Court of the State of California, County of Orange, Case No.: 37-2008-00083718-CU-CD-CTL, Deposition Testimony on March 24, 2010.

33. Urga, et al. v. Redlands Community Hospital, Superior Court of the State of California, County of San Bernardino, Case No. SCVSS 123769, Deposition Testimony on May 17, 2010.

34. Oberschlake, et al v. St. Joseph Hospital of Orange, et al, Superior Court of the State of California, County of Orange, Case No. 05CC00301, Deposition Testimony on August 12, 2010.

35. J. Morrison v. The Vons Companies, Inc., Superior Court of State of California, County of San Diego, Case No. 37-2009-00081026-CU-BT-CTL, Deposition Testimony on December 7, 2010

36. R. Pate, et al. v. Children's Hospital of Orange County, Superior Court of California, County of Orange, Case No. 05CC00303, Deposition Testimony on April 13, 2011.

37. M. St. Croix, et al. v. Cedar Fair, L.P., et al., Superior Court of California, County of Orange,     Case No. 30-2008-0214500, Deposition Testimony on August 22, 2011.

38. Steven Domalewski, a minor v. Hillerich and Bradsby Co., et al., Superior Court of New Jersey, Passaic County, Docket No.: PAS-L-2119-08, Deposition Testimony on January 5, 2012.

39. Cathleen McDonough, et al., v. Horizon Blue Cross/Blue Shield of New Jersey, United States District Court, District of New Jersey, Civil Action No. 09-cv-00571-(SRC) (PC), Deposition Testimony on January 10, 2012.

40. Daniel Ordonez, et al., v. Radio Shack, United States District Court, Central District of California, Case No. CV 10-07060 CAS (JCGx), Deposition Testimony on October 24, 2012.

41. Ameritox, Ltd., v. Millennium Laboratories, Inc., United States District Court, Middle District of Florida, Case No. 8:11-cv-00775-SCB-TBM, Deposition Testimony on December 20, 2013.

42. United States of America, ex rel. Glenda Martin v. Life Care Centers of America, Inc., United States District Court Eastern District of Tennessee at Chattanooga, Civ. Action No. 1:08-CV-251, Deposition Testimony on January 15, 2014.



43. United States of America, ex rel. Tammie Taylor v. Life Care Centers of America, Inc., United States District Court Eastern District of Tennessee at Chattanooga, Civ. Action No. 1:12-CV-64, Deposition Testimony on January 15, 2014.

44. Darren Smith, et al., v. Panera Bread Company, Superior Court of California, County of San Diego, Case No. 37-201-00084077 CU-BT-CTL, Deposition Testimony on April 30, 2014.

45. Joseph Hummel et al., v. Castle Principles, LLC et al., Superior Court of California, County of Santa Clara, Case No. 112CV223170, Deposition Testimony on June 19, 2014.

46. Sherman Way Oil, Inc. (Bijan Pouldar), American Pacific Enterprises Group (Sherwin Louie), Bahman Kohanteb, Hamid Kalhor , Claimants, Vs. Circle K Stores, Inc., Respondent, Alternative Dispute Resolution Case No's 13-7103-DSC through 13-7106-DSC, Deposition Testimony on September 25, 2014.

47. In re: ExxonMobil Oil Corporation, et al., Southern California Bulk Sale Litigation, Case No. CV12-04689-PA (VBKx), Deposition Testimony on September 25, 2014.

48. Oracle Wage and Hour Cases, Raghunandam Matam et al., v. Oracle Corporation, Superior Court of California, County of Alameda, No. RG-09480164, Deposition Testimony, October 21, 2014.

49. G. Taylor et al. v. Shippers Transport Express, Inc., et al., United States District Court, Central District of California, Case No.: CV13-02092-BRO (PLAx), Deposition Testimony on October 24, 2014.

50. Denise Mays et al. v. Children's Hospital of Los Angeles, Superior Court of California, County of Los Angeles, Case No. BC477830, Deposition Testimony on March 17, 2015.

51. Direct General Insurance Company v. Indian Harbor Insurance Company et al., United States District Court, Southern District of Florida, Miami Division, Case No. 14-20050-CIV-Cooke/Torres, Deposition Testimony on March 27, 2015.

52. Dennis Dickman v. Gerdau Reinforcing Steel, et al., Superior Court of California, County of San Bernardino, Case No. CIV-DS-1406231, Deposition Testimony on July 7, 2015.

53. Fred Devries, et al. v. Morgan Stanley & Co. LLC, et al., United States District Court, Southern District of Florida, Case No. 9:12-cv-81223-KAM, Deposition Testimony on July 31, 2015.

54. Dennis Dickman v. Gerdau Reinforcing Steel, et al., Superior Court of California, County of San Bernardino, Case No. CIV-DS-1406231, Deposition Testimony on September 11, 2015

55. Leah Davis, and Amy Krajec, et al. v. St. Jude Hospital, Superior Court of California, County of Orange, Case No. 30-2012-00602596-CU-OE-CXC, Deposition Testimony on January 19, 2016.

56. In re MyFord Touch Consumer Litigation, Whalen, et al. vs. Ford Motor Company, United States District Court Northern District of California San Francisco Division, Case No. 13-cv-3072-EMC, Deposition Testimony on February 23, 2016.



57. United States of America, ex rel. Glenda Martin v. Life Care Centers of America, Inc., United States District court Eastern District of Tennessee at Chattanooga, Civ. Action No. 1:08-CV-251 & United States of America, ex rel. Tammie Taylor v. Life Care Centers of America, Inc., United States District court Eastern District of Tennessee at Chattanooga, Civ. Action No. 1:12-CV-64, Deposition Testimony on March 4, 2016.

58. The United States of America and the State of Florida ex rel. Angela Ruckh v. CMC II LLC, United States District court for the Middle District of Florida Tampa Division, Civil Action No. 8:11 CV 1303 SDM-TBM, Deposition Testimony on March 16, 2016.

59. Bertha Sanchez, et al. v. St. Mary Medical Center, et al., Superior Court of the State of California for the County of San Bernardino, Case No. CIVDS 1304898, Deposition Testimony on July 13, 2016.

60. Christian Juarez, et al v. Dignity Health, a California corporation, et al., Superior Court of the State of California, County of Los Angeles, Central Civil West District, Case No. BC550950, Deposition Testimony on August 15, 2016.

61. In Re Dial Complete Marketing and Sales Practices Litigation, United States District Court, District of New Hampshire, Case No. 11-md-2263-SM (MDL Docket No. 2263), Deposition Testimony on August 30, 2016.

62. In Re: Myford Touch Consumer Litigation, United States District Court, Northern District of California, San Francisco Division, Case No. 13-cv-3072-EMC, Deposition Testimony on September 16, 2016.

63. United Healthcare Insurance Company v. Lincare Inc., Case Improvement Plus of Texas Insurance Company: Care Improvement Plus South Central Insurance Company: Care Improvement Plus of Maryland, Inc. v. Lincare Inc., In An Arbitration Before the American Arbitration Association, Case No. 01-15-0003-4095, Deposition Testimony on December 21, 2016.

64. The Moses H. Cone Memorial Hospital Operating Corporation d/b/a Cone Health v. Springfield Service Corporation d/b/a SPI Healthcare, United States District Court for the Middle District of North Carolina, Civil Action No. 1:13-cv-651, Deposition Testimony on January 17, 2017.

65. The People of the State of California, acting by and through Orange County District Attorney Tony Rackauckas v. General Motors LLC, Superior Court of the State of California in and for the County of Orange Complex Litigation Division, Case No. 30-2014-00731038-CU-BT-CX, Deposition Testimony on April 20 and 21, 2017.

66. In Re: Emerson Electric Co. Wet/Dry Vac Marketing And Sales Litigation, United States District Court for the Eastern District of Missouri, MDL No. 2382, Civil Action No. 4:12-md-2382-HEA, Deposition Testimony on May 17, 2017.

67. The People of the State of California, acting by and through Orange County District Attorney Tony Rackauckas v. General Motors LLC, Superior Court of the State of California in and for the County of Orange Complex Litigation Division, Case No. 30-2014-00731038-CU-BT-CX, Rebuttal Deposition Testimony on June 13, 2017.



68. Clayton Dezan, et al. v. Dignity Health, a California Corporation; Community Hospital of San Bernardino, et al, Superior Court of The State of California for the County of San Bernardino, Case No. CIVDS1516658, Deposition Testimony on August 22, 2017.

69. Millennium Health, LLC v. Blue Shield of California, Counterclaim, Blue Shields of California v. Millennium Health, LLC, American Arbitration Association, Case No. 01-15-0005-5926, Deposition Testimony on August 24, 2017.

70. Matthew Townsend, et al. v. Monster Beverage Corporation and Monster Energy Company, United States District Court Central District of California, Case No. 5:12-cv-02188 VAP (KKx), Deposition Testimony on September 20, 2017.

71. Welltower Inc., v. Scott M. Brinker, In the Court of Common Pleas Lucas County, Ohio, Case No. CI-17-2692, Deposition Testimony on October 4th, 2017.

72. In Re Seagate Technology LLC Litigation, United States District Court, Northern District of California San Jose Division, Case No. 5:16-cv00523-RMW, Deposition Testimony on December 12th, 2017.

73. Joanne Hart and Sandra Bueno v. BHH, LLC d/b/a Bell + Howell and Van Hauser LLC, United States District Court for the Southern District of New York, Case No. 1:15-CV-04804-WHP, Deposition Testimony on January 26th, 2018.

74. Thomas Davidson, et al v. Apple Inc., United States District Court Northern District of California San Jose Division, Case No. 5:16-cv-04942-LHK, Deposition Testimony on January 29, 2018.

75. In Re: General Motors, LLC Ignition Switch Litigation, United States District Court Southern District Of New York, Case No. 14-MD-2543 (JMF), Deposition Testimony on February 6th and 7th, 2018.

76. Bertha Sanchez, et al. v. St. Mary Medical Center, Superior Court of the State of California for the County of San Bernardino, Case No. CIVDS 1304898, Deposition Testimony on March 29, 2018.

77. The State of Texas v. Xerox Corporation, et al., The District Court 53rd Judicial District Travis County, Texas, Cause No. D-1-GV-14-000581, Deposition Testimony on April 12, 2018.

78. Wendy Manemeit, et al. v. Gerber Products Co., The United States District Court for the Eastern District of New York, No. 2:17-cv00093, Deposition Testimony on May 10, 2018.

79. Theodore Broomfield, et al., v. Craft Brew Alliance, Inc., et al., United Stated District Court, Northern District of California, San Jose Division, Case No. 5:17-cv-01027-BLF, Deposition Testimony on June 20, 2018.

80. In RE: General Motors, LLC Ignition Switch Litigation, United States District Court, Southern District of New York, Case No. 14-MD-2543 (JMF), Deposition Testimony on July 5, 2018 and July 6, 2018.

81. Brendan C. Haney v. Costa Del Mar Inc., In The Circuit Court, Fourth Judicial Circuit, in and for Duval County, Florida, Case No. 16-2017-CA-004797-XXXX-MA, Deposition Testimony on November 27, 2018.



82. Patricia Weeks, et al. v. Google LLC, United States District Court Northern District of California San Jose Division, Case No. 5:18-cv-00801-NC, Deposition Testimony on December 21, 2018.

83. Frederick Sharp v. Wolf Appliance, Inc., The United States District court for the Eastern District of New York, Civil Action No. 1:18-CV-01723-JS-GRB, Deposition Testimony on January 3, 2019.

84. Kellie Loeb, et al. v. Champion Petfoods USA Inc. and Champion Petfoods LP, United States District Court Eastern District of Wisconsin Milwaukee Division, Case No. 2:18-cv-00484-JPS, Deposition Testimony on January 8, 2019.


## Testimony

1. State of Tennessee, ex rel., Douglas Sizemore, Petitioner vs. Xantus Healthplan of Tennessee, Inc., Chancery Court of Davidson County, Tennessee at Nashville, Case No 99-917-II, Trial Testimony, October 16, 2001.

2. State of Tennessee, ex rel., Douglas Sizemore, Petitioner vs. Xantus Healthplan of Tennessee, Inc., Chancery Court of Davidson County, Tennessee at Nashville, Case No 99-917-II, Rebuttal Testimony, October 26, 2001.

3. Howard Wright, Inc., a California corporation doing business as AppleOne Employment Services, Plaintiffs, vs. Olsen Staffing Services, Inc., a Delaware Corporation, Dagney Smith, an individual, Vicky Riechers, an individual, and Linda Shiftman, an individual, Defendants, Superior Court of the State of California for the County of Los Angeles, Case No. BC 200657, Trial Testimony, March 4, 2002.

4. Columbia/HCA Healthcare Corporation - Billing Practices Litigation, United States District Court, Middle District of Tennessee, Nashville Division, Case No. 3-98-MDL-1227 on June 28, 2002.

5. Sacred Heart Medical Center, et al., Plaintiffs v. Department of Social and Health Services, and Dennis Braddock, the Secretary of the Department of Social and Health Services, Defendants, Superior Court of the State of Washington in and for the County of Thurston, No. 00-2-01898-1, Testimony in Liability Trial, April 14, 2003.

6. Diversified Property, a general partnership, Dora Saikhon Family Trust, and Nancy Saikhon Borrelli, an individual, Plaintiffs v. Manufacturers Life Insurance (U.S.A.), a Michigan corporation, erroneously sued as Manufacturers Life Insurance Company, Inc., Defendants in the Superior Court of California, County of San Diego, Case No.: GIC 815128, Trial Testimony on October 25, 2004.

7. Bridgestone/Firestone North American Tire v. Sompo Japan Ins. Co. of America, United States District Court for the Middle District of Tennessee Nashville Division Civil Action NO. 3-02-1117, March 7, 2005

8. Group Anesthesia Services, A Medical Group, Inc., Claimant, vs. American Medical Partners of North Carolina, Inc., etc., et al., Respondents, JAMS Arbitration, Reference No. 1100040919, Arbitration Testimony on March 23, 2005.



9.  Goldman et al. v. RadioShack Corporation, United States District Court, Eastern District of Pennsylvania, Case No. 03 CV 0032, Testimony in Liability Trial, on June 28 and 29, 2005.

10. Goldman et al. v. RadioShack Corporation, United States District Court, Eastern District of Pennsylvania, Case No. 03 CV 0032, Rebuttal Testimony in Liability Trial, on July 5, 2005.

11.  Mauna Loa Vacation Ownership LLP v. Accelerated Assets, LLP. United States District Court, District of Arizona, Case No. CIV 03-0846 PCT DGC.  Trial Testimony, on February 22, 2006.

12. School Districts' Alliance v. State of Washington, United States District Court, Eastern District of Thurston, Case No. 04-2-02000-7, Trial Testimony on November 13, 2006.

13. In the Matter of Premier Medical Group, PC, Appellant – Department of Health and Human Services, Office of Medicare Hearings and Appeals, Southern Field Office, ALJ Appeal No. 1-221579701, Medicare Appeal No. 1-18761858, Provider No. 3706654, AR No. 9406352171039, Judge Zaring Robertson, US Administrative Law Judge, Testimony on April 1, 2008.

14. Darensburg et al. v. Metropolitan Transportation Commission, U.S. District Court, Northern District of California, Case No. C-05-1597-EDL, Trial Testimony on October 9, 2008.

15. R. Molina et al. v. Lexmark International, Inc., Superior Court of the State of California for the County of Los Angeles, Case No. BC339177, Trial Testimony on October 22 and 26, 2009.

16. Dole Fresh Fruit International, Ltd, Hyundai Precision America, Inc., ADRS Case #05-1138-RTA, Trial Testimony on February 19, 2010.

17. In the matter of University of Tennessee Cancer Institute, ALJ Appeal No. 1-446 575 318, Office of Medicare Hearings & Appeals, Judge Z. Robertson, US Administrative Law Judge, Testimony on April 20, 2010.

18. Urga, et al. v. Redlands Community Hospital, Superior Court of the State of California, County of San Bernardino, Case No. SCVSS 123769, Trial Testimony on July 20, 2010.

19. Marine Engineers' Beneficial Association v. Department of Transportation, Ferries Division Federal Mediation & Conciliation Service Cause No. 110105-52404-6 AGO Matter No. 10499471, July 19, 2011.

20. Richard Robinson v. County of Los Angeles, et. al., United States District Court of California, Central District, Case No. CV06-2409 GAF (VBKx), Trial Testimony on December 1, 2011.

21. In the matter of American Home Patient, ALJ Hearing, Appeal No. 1-982137828, Office of Medicare Hearings & Appeals,  Miami Office Southern Field Division, Testimony on October 29, 2012.

22. In the matter of American Home Patient, ALJ Hearing, Appeal No. 1-924297238, Office of Medicare Hearings & Appeals,  Irvine Office Western Field Division, Hearing Testimony on February 28, 2013.

23. TaylorMade Golf Company Challenge to Callaway Golf Company's Final Response, National Advertising Division, New York, Testimony on March 13, 2013.



24. United States of America, ex rel. Tammie Taylor v. Life Care Centers of America, Inc., United States District Court Eastern District of Tennessee at Chattanooga, Civ. Action No. 1:12-CV-64, Testimony on May 13, 2014.

25. United States of America v. Houshang Pavehzadeh, United States District Court for the Central District of California, No. CR 13-0320-R, Testimony on May 19, 2014.

26. Sherman Way Oil, Inc. (Bijan Pouldar), American Pacific Enterprises Group (Sherwin Louie), Bahman Kohanteb, Hamid Kalhor , Claimants, Vs. Circle K Stores, Inc., Respondent, Alternative Dispute Resolution Case No's 13-7103-DSC through 13-7106-DSC, Arbitration Testimony on October 10, 2014.

27. Heidi's Children Dental Center (DC14-0813-204-LM) vs. Denti-Cal, Testimony at Administrative Law Judge Hearing, Judge Lewis Munoz, in Los Angeles on November 5, 2014.

28. AdvanceMed Audit of Altercare of Wadsworth, Medicare Appeal, Medicare Appeal No. 1-912446681, Bertha Sanchez, et al. v. St. Mary Medical Center, et al., Superior Court of the State of California for the County of San Bernardino, Case No. CIVDS 1304898, Certification Hearing Testimony on October 21, 2016.

29. Michael Bozsik v. Livingston International Inc., Ontario Superior Court of Justice, Court File No. 5270/14, Cross Examination Testimony on May 12, 2016.

30. Bertha Sanchez, et al. v. St. Mary Medical Center, et al., Superior Court of the State of California for the County of San Bernardino, Case No. CIVDS 1304898, Certification Hearing Testimony on October 21, 2016.

31. In Re Dial complete Marketing and Sales Practice Litigation, United States District Court, District of New Hampshire, Case No. 11-md-2263-SM (MDL Docket No. 2263), Hearing Testimony on November 16, 2016.

32. United Healthcare Insurance Company v. Lincare Inc., Case Improvement Plus of Texas Insurance Company: Care Improvement Plus South Central Insurance Company: Care Improvement Plus of Maryland, Inc. v. Lincare Inc., In An Arbitration Before the American Arbitration Association, Case No. 01-15-0003-4095, Arbitration Testimony on February 6, 2017.

33. The United States of America and The State of Florida ex rel. Angela Ruckh v. CMC II, LLC, United States District Court for the Middle District of Florida Tampa Division, Civil Action No. 8:11 CV 1303 SDM-TBM, Trial Testimony on February 8, 2017.

34. Federal Government of Germany v. A Consortium of Publicly Traded Companies in an arbitration under the laws of Germany, Arbitration Testimony on March 21 and 22, 2017.

35. In Re Determination of Royalty Rates and Terms for Transmission of Sound Recordings by Satellite Radio and "Preexisting" Subscription Services (SDARS III), United States Copyright Royalty Judges The Library of Congress Washington, D.C., Docket No. 16-CRB-0001-SR/PSSR (2018-2022), Trial Testimony on May 9, 2017.

36. ZPIC Audit Appeal of Providence Health System Southern California, Office of Medicare Hearings and Appeals, OMHA Appeal Number 1-1823418684, Hearing Testimony on October 16, 2017.



37. New Beacon Healthcare Group, LLC, Medicare Appeal Number 1-1269788965, Hearing Testimony on December 1, 2017.

38. Arriva Medical LLC, Office of Medicare Hearing and Appeals, ALJ appeal No. 1-1874414073, Post Pre-Hearing Conference Testimony on March 23, 2018.

39. Christopher Corbin, et al. v. Indus Investment, Inc., Superior Court of the State of California for the County of Los Angeles, Case No. BC565881, Trial testimony on April 6, 2018.

40. Toll Collect GmbH v. Federal Republic of Germany, Hearing Testimony on April 16, 2018.

41. Arriva Medical, LLC, ALJ Appeal No: 1-1945149644 (Sub-Universe August 2013), Appellant's Hearing Testimony on April 18, 2018.

42. Arriva Medical, LLC, ALJ Appeal No: 1-2049326076 (Sub-Universe September 2013), Telephonic Hearing Testimony on September 11, 2018.

43. Arriva Medical, LLC, ALJ Appeal No: 1-1572478459 (Sub-Universe January to June 2013), Telephonic Hearing Testimony on September 20, 2018.

44. Brendan C. Haney v. Costa Del Mar Inc., In The Circuit Court, Fourth Judicial Circuit, in and for Duval County, Florida, Case No. 16-2017-CA-004797-XXXX-MA, Hearing Testimony on December 5, 2018.


## Speaking Engagements

1. Washington Health Care Conference, May 2016.

2. 4th Advanced Forum on False Claims & Qui Tam Enforcement Conference, January 2017.

3. False Claims Act/Qui Tam Whistleblowers Litigation: Hot Buttons in 2017 Live Webcast, March 2017.

4. Fraud & Abuse: Part II – Understanding Statistical Sampling, Live Webcast, September 2017.

5. American Hospital Association Chief Compliance Officers Roundtable: Defending against audits using statistical sampling and extrapolation, April 2018.

6. How to Effectively Use Statistical Sampling in Class Action Litigation: Tips and Strategies in 2019 Live Webcast, December 2018.


## Publications



Boedeker, Stefan and Goetz Trenkler (2001) - "A Comparison of the Ridge and Iteration Estimator" - in: Econometric Studies: A Festschrift in Honour of Joachim Frohn (ed. by Ralph Friedmann, Lothar Knueppel, and Helmut Luetkepohl), New Brunswick

## Professional and Business History

» Berkeley Research Group, 2010 - Present, Managing Director

» Resolution Economics, 2008 - 2010, Partner

» Alvarez & Marsal, 2007 - 2008, Managing Director

» LECG LLC, 2005 - 2007, Director

» Navigant Consulting Inc., 2004 -2005, Managing Director in Litigation and Investigation Practice

» Deloitte & Touche LLP, 2003 - 2004, Leader of the Economic and Statistical Consulting Practice in the West Region

» PricewaterhouseCoopers LLP, 2002 - 2003, Leader of the Litigation Consulting Group in Los Angeles, Leader of the Economic and Statistical Consulting Practice in the West Region

» Andersen LLP, 1992 - 2002, Partner (since 2000), last position held: Director of Economic and Statistical Consulting practice in the Pacific Region

» University of California, San Diego, 1989 - 1991, Teaching Assistant, Department of Economics

» German Government, 1986 - 1989, Economic Research Assistant

# Exhibit B: List of Documents Considered

Legal Documents

1. Davidson v. Apple Inc., United Stated District Court, Northern District of California, Case No. 5:16-cv-4942-LHK, *Fourth Amended Class Action Complaint*, filed January 3, 2018.

2. Macdougall v. American Honda Motor Co., Inc., and Honda North America, Inc., United States District Court, Central District of California, Case no.: 17-cv-1079, Class Action Complaint, filed June 21, 2017.

3. In re: Dial Complete Marketing & Sales Practice Litigation, United States District Court, District of New Hampshire, Case No. 11-md-2263-SM, Consolidated Amended Class Action Complaint, filed January 23, 2012.

4. In re: MyFord Touch Consumer Litigation, United States District Court, Northern District of California, Case No. 13-cv-03072-EMC, filed October 13, 2015.

5. Theodore Broomfield v. Craft Brew Alliance, Inc., United Stated District Court, Northern District of California, San Jose Division, Case No. 5:17-cv-01027-BLF, *Consolidated Class Action Complaint*, filed September 28, 2017.

Third Party Documents

1. "AAPOR Guidance on Reporting Precision for Nonprobability Samples", available at https://www.aapor.org/ getattachment/Education-Resources/For-Researchers/AAPOR_Guidance_Nonprob_Precision_042216.pdf.aspx.

2. "American Association for Public Opinion Research", ("AAPOR") available at www.aapor.org; American Statistical Association ("ASA") – www.amstat.org.

3. "Amplitude Research", available at http://www.amplituderesearch.com/survey-company.shtml.

4. "Fortune", available at http://fortune.com/2015/09/16/online-survey-companies-law-firms/.

5. "Sawtooth Software", available at www.sawtoothsoftware.com/.

6. Allenby, Greg M & Peter E Rossi (2006), "Hierarchical Bayes Models," in Grover, Rajiv & Marco Vriens, eds., The Handbook of Marketing Research, Thousand Oaks: Sage Publications, Inc.

7. B. Isaacson et al. (2008), "Why Online Surveys Can Be a Smart Choice in Intellectual Property Litigation," IPL Newsletter (ABA Section of Intellectual Property Law) Vol. 26, No. 3.

8. Bakken, David & Curtis L Frazier (2006), "Conjoint Analysis: Understanding Consumer Decision Making," in Grover, Rajiv & Marco Vriens, eds., The Handbook of Marketing Research, Thousand Oaks: Sage Publications, Inc., Chapter 15.

9. Court, Andrew T. (1939), "Hedonic Price Indexes with Automotive Examples", in: The Dynamics of Automobile Demand, New York, NY: General Motors Corporation, pp. 99-117.

10. Diamond, Shari, S. (2011), Reference Manual on Scientific Evidence (3d ed.), "Reference Guide on Survey Research," Federal Judicial Center.

11. Feenstra, Robert C. (1995), "Exact Hedonic Price Indexes", Review of Economics and Statistics, 77(4) (November), pp. 634-53.
12. Griliches, Zvi (1961), "Hedonic Price Indexes for Automobiles: An Econometric Analysis of Quality Change", in: Price Statistics Review Committee, National Bureau of Economic Research, The Price Statistics of the Federal Government: Review, Appraisal, and Recommendations, General Series No. 73. New York, NY: National Bureau of Economic Research, pp. 173-96, reprinted in Zvi Griliches, Technology, Education, and Productivity, Oxford: Basil Blackwell, 1988, pp. 76-104.
13. Griliches, Zvi (1991), "Hedonic Price Indexes and the Measurement of Capital and Productivity: Some Historical References", in: Ernst R. Berndt and Jack E. Triplett (eds.), Fifty Years of Economic Measurement: The Jubilee of the Conference on Research in Income and Wealth, National Bureau of Economic Research Studies in Income and Wealth, Vol. 54. Chicago: University of Chicago Press, pp. 185-202.
14. J. Wright, P. Marsden (2010), Handbook of Survey Research (2d ed.).
15. Krosnick, Jon and Duane Alwin (1987), "An evaluation of a cognitive theory of response order effects in survey measurement," Oxford Journals Social Sciences Public Opinion Quarterly Volume 51, Issue 2, pp. 201-219.
16. Kuhfeld, W. F. et al (2006). Construction of Efficient Designs for Discrete Choice Experiments, The Handbook of Marketing Research: Uses, Misuses, and Future Advances, Sage Publ., Thousand Oaks, Calif, pp. 312-363.
17. Lancaster, Kelvin J. (1966), "A New Approach to Consumer Theory," Journal of Political Economy 74 (2), pp. 132-157.
18. Lisa Cameron, Michael Cragg, & Daniel McFadden, "The Role of Conjoint Surveys in Reasonable Royalty Cases," LAW360 (Oct. 16, 2013), https://www.law360.com/articles/475390/the-role-of-conjoint-surveys-in-reasonable-royalty-cases, last visited January 15, 2019.
19. Orme, B., & Chrzan, K. (2017). Becoming an Expert in Conjoint Analysis: Choice Modeling for Pros, Orem, UT: Sawtooth Software, Page 183.
20. Orme, Bryan K (2014), Getting Started with Conjoint Analysis: Strategies for Pricing Research (3d ed.), Madison: Research Publishers.
21. Orme, Bryan K. (2002), Formulating Attributes and Levels in Conjoint Analysis, Sawtooth Software Research Paper Series.
22. Rao, Vithala (2014), Applied Conjoint Analysis, Springer-Verlag.
23. Robert M. Groves, Floyd J. Fowler Jr., Mick P. Couper, James M. Lepkowski, Eleanor Singer, Roger Tourangeau (2009), Survey Methodology (2d ed.), Wiley Series in Survey Methodology).