LIVIA M. KISER (SBN 285411)
*lkiser@kslaw.com*
MICHAEL B. SHORTNACY (SBN 277035)
*mshortnacy@kslaw*.com
King & Spalding LLP
633 West 5th Street, Suite 1600
Los Angeles, CA 90071
Telephone:   (213) 443-4355
Facsimile:    (213) 443-4310

Attorneys for Defendants
AMERICAN HONDA MOTOR CO., INC.
and HONDA NORTH AMERICA, INC.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
SANTA ANA DIVISION

| | |
|---|---|
| DENNIS MACDOUGALL, RAY SEOW, PRABHANJAN KAVURI, RICHARD FRICK, JOSEPH RYAN PARKER, and BRYAN LENTZ, individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> AMERICAN HONDA MOTOR CO., INC., and HONDA NORTH AMERICA, INC., <br><br> Defendants. | Case No. 8:17-cv-01079-AG (DFMx) <br><br> **AMERICAN HONDA MOTOR CO., INC. AND HONDA NORTH AMERICA, INC.'S MOTION TO STRIKE THE TESTIMONY OF ROBERT PARKER AND MEMORANDUM OF LAW IN SUPPORT** <br><br> Filed Concurrently Herewith: <br> 1) Notice of Motion and Motion; State of Uncontroverted Facts and Conclusions of Law; <br> 2) Declaration of Livia M. Kiser and Exhibits; <br> 3) [Proposed] Order <br><br> Date:        August 5, 2019 <br> Time:        10:00 a.m. <br> Location:   Santa Ana Division, 10D <br> Judge:       Hon. A. Guilford |

MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES

## NOTICE OF MOTION AND MOTION TO STRIKE THE TESTIMONY OF ROBERT PARKER

**TO PLAINTIFFS AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE THAT on August 5, 2019, at 10:00 am or as soon thereafter as the matter may be heard, in the United States District Court for the Central District of California, Southern Division, before the Hon. Andrew J. Guilford, Defendants American Honda Motor Co. and Honda North America, Inc. will, and hereby do, move the Court for an order striking and excluding the written and oral testimony of Robert Parker on the grounds that the testimony he has provided does not meet Federal Rule of Evidence 702's standards for admissibility of expert testimony.

This Motion is based on this Notice of Motion and Motion and the accompanying Memorandum of Points and Authorities.

DATED:     June 3, 2019

By: _/s/ Livia M. Kiser_
Attorneys for Defendants
AMERICAN HONDA MOTOR CO., INC. and
HONDA NORTH AMERICA, INC.

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................... iv

INTRODUCTION ........................................................................................ 1

LEGAL STANDARD ................................................................................... 2

ARGUMENT ............................................................................................... 3

I.  Dr. Parker Offers Nothing Relevant to the Merits of Plaintiffs' Case or to Mr. Arst's Substantive Findings; He Offers Only Speculation ................ 5

II.  Dr. Parker's Testimony About The "Sufficiency" Of Mr. Arst's Testing Is Likewise Pure Speculation ................................................................. 15

III.  Dr. Parker's Testimony About The Testing Data is Not Based on Sufficient Facts or Reliable Methodology. ............................................... 18

IV.  Dr. Parker Does Not Differentiate Between TSBs Applicable To Plaintiffs' Vehicles Versus Those applicable to other model years ........ 18

CONCLUSION ........................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Beech Aircraft Corp. v. U.S.*,
  51 F.3d 834 (2nd Cir. 1995) ...................................................................... 10

*Daubert v. Merrell Dow Pharm., Inc.*,
  509 U.S. 579 (1993).................................................................................... 1

*Estate of Gonzales v. Hickman*,
  No. 05-660 MMM (RCX), 2007 WL 3237727 (C.D. Cal. May 30,
  2007) ......................................................................................................... 10

*Lust By & Through Lust v. Merrell Dow Pharm., Inc.*,
  89 F.3d 594 (9th Cir. 1996) ....................................................................... 2

*Ollier v. Sweetwater Union High Sch. Dist.*,
  768 F.3d 843 (9th Cir. 2014) .................................................... 1, 3, 4, 13

*In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales
  Practices, & Prod. Liab. Litig.*,
  978 F. Supp. 2d 1053 (C.D. Cal. 2013).......................................... 2, 9, 13

**Other Authorities**

Federal Rule of Evidence 702.................................................................*passim*

MEMORANDUM OF POINTS AND AUTHORITIES

# INTRODUCTION

Plaintiffs have proffered written and oral testimony from Dr. Robert Parker to attempt to provide substantiation for the allegations set forth in their pleading. Dr. Parker is a professor of mechanical engineering who might otherwise have been qualified to opine on the transmissions in Plaintiffs' vehicles had he offered any opinions.[1] But he did not, and that speaks volumes to the lack of merit of Plaintiffs' claims.

Dr. Parker claims to have a background in studying mechanical systems and vibration problems in power transmission systems. His credentials suggest that if anyone could isolate and identify a vibration problem in Plaintiffs' transmissions, it would be Dr. Parker. But his "opinion" in this case boil down to this: there is *no test* that can be conducted on Plaintiffs' vehicles to conclusively confirm either the existence of an alleged vibration in Plaintiffs' transmissions or the efficacy of the countermeasure. Dr. Parker's "opinion" is simply cover for the fact that he was not able to identify or replicate the so-called "judder" that Plaintiffs allege in their pleading. That Dr. Parker was unable to identify any transmission problem in any of Plaintiffs' vehicles speaks volumes, because it certainly could not have been for lack of trying.

And in point of fact, we know Dr. Parker's claim to be objectively false. The judder, when it exists, *can* be replicated: Honda quality engineers were able to identify its existence and develop an efficacious countermeasure in the rare instances in which it manifests. Moreover, each and every technical service bulletin ("TSB") prepared by American Honda Motor Co., Inc. ("AHM") that Plaintiffs are trying to make an issue of involves Honda engineers doing just that: isolating issues that only infrequently manifest in a small number of vehicles, and then developing appropriate – and different

---

[1] Plaintiffs have submitted a Declaration of Robert G. Parker, Ph.D. ("Parker Decl." Ex. 1 hereto) as well as a Declaration of Robert G. Parker, Ph.D. in Reply to Report Submitted by Mr. Jason Arst ("Parker Repl." Ex. 2 hereto) responding to the report issued by Honda's automotive engineering expert. Dr. Parker also testified in a deposition following the submissions of these two declarations ("Parker Dep." (relevant excerpts attached hereto as Ex. 3)).

1   – countermeasures for the particular vehicles to which the TSBs apply. Dr. Parker,

2   however, makes no differentiation between and among the different makes and model

3   years and expressly excludes from his opinions model year 2011-early 2012 Honda

4   Odyssey vehicles without comment. *See* Parker Decl.; Parker Repl. at *passim*.

5          What Dr. Parker offers here does not meet the standards for expert testimony as

6   provided by the Federal Rules of Evidence and this Court. Specifically, it does not rely

7   on technical or specialized knowledge, it is not based on facts or data, it is not the

8   product of any principles or methods applied to the facts of this case, and, lastly, it does

9   not in any manner assist the finder of fact in analyzing the evidence in the case. For

10  these reasons, as explained in more detail herein, Defendants AHM and Honda North

11  America, Inc. (collectively "Honda") request that Dr. Parker's opinions and testimony

12  be excluded.

13

14                          **LEGAL STANDARD**

15         Expert evidence is admissible only if it meets the three rigorous hurdles set out

16  by Federal Rule of Evidence 702.

17         *First*, the expert must use his "scientific, technical, or other specialized

18  knowledge" to "help the trier of fact to understand the evidence or to determine a fact

19  in issue." Fed. R. Evid. 702(a). This means that an expert may not offer lay testimony

20  or idle speculation—he must be applying his specialized technical knowledge, and that

21  knowledge must push the ball forward for a material fact in the case. *See Daubert v.*

22  *Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993) ("[T]he word 'knowledge' [in

23  Rule 702] connotes more than subjective belief or unsupported speculation.").

24         *Second*, the testimony must be "based on sufficient facts or data." Fed. R. Evid.

25  702(b). An expert cannot simply declare that it is his opinion that a material fact exists—

26  he must provide facts and data to support his opinion before the court gives it any

27  weight. *Daubert*, 509 U.S. at 589 ("Proposed testimony must be supported by

28  appropriate validation.").

*Third*, the testimony must be "the product of reliable principles and methods." Fed. R. Evid. 702(c). And those methods must be "reliably applied . . . to the facts of the case." Fed. R. Evid. 702(d). The expert may not merely point to isolated facts and offer an opinion; he must explain to the court what reliable principles and methods he used – indeed, it is the "soundness of [an expert's] methodology" that determines whether the expert's testimony is admissible. *Ollier v. Sweetwater Union High Sch. Dist.*, 768 F.3d 843, 860 (9th Cir. 2014) (internal citation omitted).

Courts are "gatekeep[ers]" tasked with ensuring that expert opinions can pass these three hurdles. *Daubert*, 509 U.S. at 589. The Supreme Court has repeatedly cautioned that "[e]xpert evidence can be both powerful and quite misleading because of the difficulty in evaluating it." *Id.* at 595. This Court agrees, noting that the "aura of authority experts often exude . . . can lead juries to give more weight to their testimony" than they deserve. *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Prod. Liab. Litig.*, 978 F. Supp. 2d 1053, 1064 (C.D. Cal. 2013).

While the gatekeeping role lies with the courts, the burden is ultimately on the party seeking to introduce expert testimony to prove that it satisfies the requirements of Rule 702. *Lust By & Through Lust v. Merrell Dow Pharm., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996) ("It is the proponent of the expert who has the burden of proving admissibility.") When the proponent of expert testimony has failed to show that it meets those requirements, the testimony is excluded. *Id.*

**ARGUMENT**

Dr. Parker's opinions do not meet any of Rule 702's trio of requirements. Dr. Parker's opinions boil down to speculation that Mr. Arst should have done more testing on the Plaintiffs' vehicles because the transmission issue is supposedly "intermittent."[2] But Dr. Parker uses the word "intermittent" as a smokescreen.

---

[2] Another problem with Dr. Parker's entire premise is that some of the Plaintiffs claim that the vibration issue happens much more frequently than Dr. Parker suggests. *See,*

3

Dr. Parker offers the Court no facts, no data, and no expert methodology. He merely states that because the Plaintiffs claim that the issue they sue over is "intermittent," Mr. Arst's testing was insufficient to confirm or deny its existence. But that the issue allegedly happened "intermittently" says nothing about whether Mr. Arst's expert testing protocol—developed based on his decades of expertise and knowledge testing and evaluating vehicle transmission systems—would reveal the so-called judder if it were present in any of the vehicles. Nor does Dr. Parker address the elephant in the room: namely, that Honda engineers were able to successfully replicate the alleged issue – notwithstanding the fact that it may manifest "intermittently" (*i.e.*, not continuously) – and develop an efficacious countermeasure.

Dr. Parker does not offer any opinions grounded in specialized or technical knowledge, nor does he base his opinions on observable facts or reliable methods. Indeed, Dr. Parker does not identify *any method* used in reaching his opinion. And his declarations point to *no relevant facts* to prop up his speculation. For Dr. Parker's *expert* testimony to be admissible, he would need to offer *expert* reasoning. He would need to explain to the Court why the irregular nature of the alleged transmission issue in each Plaintiff's vehicle would not be captured by the multifactor testing protocol implemented by Mr. Arst – even though at least one plaintiff testified it occurs "frequently," and Dr. Parker himself admitted he tried to make it happen when he was driving one of the cars.

The fact is that before this case was even filed, Honda developed protocols to detect the transmission judder if present in a vehicle. As Honda Senior Staff Engineer Michael Gibson testified, Honda engineers did that very successfully in the past. Gibson Dep. 67:9-17, 194:13-22; 214:11-17, Ex. 4 to ECF 152. Then Mr. Arst took what Honda's research team had already developed and used his decades of transmission

*e.g.,* D. MacDougall Dep. 147:20-148:2, Ex. 1 to ECF 152 (claiming that the vibration issue occurs frequently, at least "100 times" on one trip); J. Parker Dep. 240:14-16, Ex. 14 to ECF 152 ("I could duplicate it once it was a frequency of every five minutes or so, an easily duplicated interval.")

4

MEMORANDUM OF POINTS AND AUTHORITIES

expertise and careful review of the Plaintiffs' allegations to create an even more robust, multifactor testing protocol—designed specifically to replicate the various driving conditions needed to induce atypical judder (had it actually affected Plaintiffs' vehicles), but also included laboratory testing of the automatic transmission fluid ("ATF"), and more. (Arst. Report, Ex. 3 to ECF 152, at pp. 10-11.) Dr. Parker himself admitted during his deposition that, when he tested the Plaintiff's vehicles, he attempted to replicate the particular conditions that trigger the transmission issue when it is present in a vehicle (but was unsuccessful).

Dr. Parker stood by, observed all of Mr. Arst's testing, and even participated in the driving. Never once did he or the Plaintiffs dispute the efficacy of the process while Honda spent months developing, preparing, and implementing the agreed-upon testing protocol on all of the Plaintiffs' vehicles. Only now – when the results are in and conclusively show that the Plaintiffs' vehicles tested negative for atypical transmission judder – does Dr. Parker offer an empty opinion that the testing was never, and could never be, good enough. The Court should see through Dr. Parker's opinion for what it is and strike it in its entirety.

## I.    Dr. Parker Offers Nothing Relevant to the Merits of Plaintiffs' Case or to Mr. Arst's Substantive Findings; He Offers Only Speculation

"It is well settled that bare qualifications alone cannot establish the admissibility of expert testimony." *Ollier*, 768 F.3d at 860 (citing *United States v. Hermanek*, 289 F.3d 1076, 1093 (9th Cir. 2002)). Instead, the Court must look to the particular opinion that the expert offers and test it against Rule 702's rigors. *Id.* In *Ollier*, for example, the district court excluded the testimony of two experts because—while personally qualified—their proffered testimony was "based on personal opinions and speculation rather than on a systematic assessment" and their "methodology was not at all clear." *Id*. at 852. The experts conducted inspections that were "cursory" and "superficial" and thus could not support an expert opinion. *Id*. at 860-861. The Ninth Circuit affirmed, holding that the district court had "properly exercised its 'gatekeeping role' in excluding

expert testimony based on insufficient inspections and personal opinions and speculation," because "personal opinion testimony is inadmissible as a matter of law under Rule 702." *Id*. at 861 (citing *Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1319 (9th Cir. 1995).

Here, Dr. Parker offers personal opinions, speculation, and nothing more. He admittedly did not conduct any type of systematic assessment of the alleged transmission judder in the subject vehicles (or more likely, he did, but was never able to identify any problems himself). He did not offer any technical or expert analysis of Mr. Arst's testing protocol (or offer any alternatives). Dr. Parker mentions his credentials and qualifications and prior experience "studying and troubleshooting vibration issues in mechanical systems" (Parker Decl. ¶¶ 1-3)—but he did not then use that experience or knowledge to offer a relevant expert opinion. Dr. Parker's opinions fail to offer any evidence relevant to this case for several reasons.

***First***, Dr. Parker either chose not to conduct his own independent testing or he secretly did and found no trouble. The opinion he offers here, though, is nothing more than just passively observing and cursorily participating in the testing developed and led by Mr. Arst, and as a result he offers no relevant findings or conclusions regarding that testing. Dr. Parker admitted in his deposition that, while he had access and opportunity to inspect, drive, and test Plaintiffs' vehicles and to provide input into the testing protocol that was developed and utilized by Honda's expert, he opted not to perform any additional independent testing of the Plaintiffs' vehicles, did not record any objective data from the testing that Mr. Arst did, and did not provide any advance feedback regarding the testing protocol. According to his own testimony, he performed only a cursory inspection of the vehicles absent any methodology or protocol, did not even take any notes during those inspections, and never reviewed any of the photos of the vehicles that he took:

> Q: [D]id you follow any protocol to visually inspect the vehicles, the Lentz and Seow vehicles?

A: Protocol? I looked at the engine compartment. I looked at the underside of the car. (Parker Dep. 74:13-18)

***

Q: Did you – was there any impediment to you visually inspecting the Lentz or Seow vehicles? . . . did you take all the time that you wanted to visually inspect those vehicles?

A: Yes, I had ample opportunity. (*Id.* 75:10-15)

***

Q: Did you take any contemporaneous notes of your observations of the condition of the vehicle at the Parker inspection?

A: I did not.

Q: … [D]id you take contemporaneous notes about the conditions of the [Macdougall and Kavuri] vehicles at the time of inspection?

A: I did not. (*Id.* 136:3-12)

***

Q. Do you know where those photographs are today?

A. Probably still on the camera, most likely.

Q. Did you review those photographs after you took them?

A. No. (*Id.* 116:5-11)

Additionally, while Dr. Parker had the opportunity (as an expert witness retained on their behalf) to speak with the Plaintiffs (and the primary drivers of their vehicles) prior to the inspections and test drives, he spoke to only some of the Plaintiffs and did not take any notes as to the conditions in which the drivers contended they experienced unusual judder:

Q: And so in that two or so minute time period from speaking with Mr. Lentz, what conditions did he say or convey to you were present in the car when he claims he experienced the judder?

A: I – I really – I don't recall.

Q: Did you make note of that at the time?

MEMORANDUM OF POINTS AND AUTHORITIES

A: I did not make note of that. (*Id*. 100:15-23)

\*\*\*

Q: Did you make notes contemporaneously of [speaking with Mrs. Kavuri]?

A: I did not. (*Id*. 111:9-11)

\*\*\*

Q: [D]id you speak to Mrs. MacDougall at any point in time prior to the inspection about the conditions that were present or should be present?

A: No, I did not. (*Id*. 129:9-14)

Then, when it came time to actually drive the vehicles pursuant to the testing protocol developed by Mr. Arst, Dr. Parker did not offer any feedback to the testing protocol, provide any testing equipment, capture any testing data, or document the drives in any way:

Q. Did you participate in setting up that equipment for the Kavuri inspection?
A. No, Mr. Peritz did that.

Q. Did you have any input or direction as to how or what systems would be monitored by that equipment during the inspection?
… [A] did I direct it? I did not direct it.

Q. Did you have any involvement in setting it up, in other words, were you asked your opinion about Mr. Peritz about how it should be set up?

A. I won't say I was asked my opinion, but it's not right -- there was -- there was conversation. (*Id*. 117:4-21)

\*\*\*

Q: And did you on the Seow or Lentz inspection . . . come to the inspection with any equipment that would have monitored the route that you drove in the vehicle?

A: I did not have any such equipment. (*Id*. 79:3-8)

\*\*\*

8

Q: [D]id you come to the inspection with equipment that would monitor the vehicle speed driven while you were behind the wheel during the portions of the test drive you completed?

A: I did not.

Q: . . . [A]part from the notes you took about the mileage at the various points in time when you were driving the vehicles in this test drive and the photographs, did you take any other objective data points to your observations of the vehicles at the inspection? . . .

A: I did not collect such data. (*Id.* 80:3-21)

\*\*\*

Q: And just so I'm clear, you had no equipment with you to monitor the performance of the engine at that time for the Lentz inspection, correct?

A: That's correct.

Q: And that's true for the Seow inspection as well?

A: That's right. (*Id.* 103:7-14)

\*\*\*

Q: And you have no such data for the drives that you took for Mr. Seow's vehicle; is that correct?

A: That's right. I don't have that data. (*Id.* 105:24-106:3)

\*\*\*

Q: Why was it 10 to 25 minutes and not 30 to 35 minutes or some other time?

A: The – I felt I had – in that period, I – I had a chance to drive the car and I felt I had a chance to see how the car was driving. As I said, I was not under pressure to conclude the test drive. If I had wanted to drive 15 or 20 more minutes I'm sure that would have been fine. (81:10-16)

\*\*\*

Q: [H]ave you inspected those vehicles at any other point in time?

A: The vehicles owned by Mr. Lentz and Mr. Seow?

Q: Correct.

MEMORANDUM OF POINTS AND AUTHORITIES

A: I have not. (*Id*. 103:17-22)

Dr. Parker was also present for Mr. Arst's collection of ATF from each of the vehicles, but instead of performing any independent testing on the fluid, he just handed it off to Plaintiffs' counsel:

> Q: And with respect to the Lentz and Seow [vehicles], did you check any fluids in either of those vehicles?
>
> A: I was present while those were checked. (*Id*. 85:21-24)
>
> ***
>
> Q: Did you visually inspect it to notice the color or smell of the engine oil?
>
> A: I recall looking at it, and it – I don't recall smelling it. It – but it – it looked like what engine oil looks like.
>
> Q: And how about transmission fluid? Same questions.
>
> A: Same answers. (*Id*. 88:16-24)
>
> ***
>
> Q: Did you visually inspect it to note the color or smell?
>
> A: To note the color, same thing. I did not pull the dipstick on it, but I was – able to observe that process.
>
> Q: And how about the transmission fluid? Same questions.
>
> A: Again, I didn't perform the act but I was present while they were performed.
>
> Q: Was the transmission fluid pulled from the vehicle and then provided to you as a sample for you to do with what you needed to?
>
> A: Yes, it was.
>
> Q: Okay. And did [you], in fact, have any testing performed on transmission fluid that was given to you at the inspections of the Lentz and Seow vehicles?
>
> A: Any testing of that oil wasn't under my direction. (*Id*. 89:18-90:11)
>
> ***

10

Q: Did you feel at the time that the quantities you were given were sufficient?

A: Yes.

Q: And you had every opportunity to ask for more if you felt it was not sufficient for testing?

A: That is correct. (*Id*. 91:1-8)

***

Q: And I believe you testified that ATF fluid samples were taken at each of those inspections from the vehicles, and a sample was provided to you. Is that correct?

A: That's right.

Q: And what did you do with those samples?

A: Provided them to the attorney. (*Id*. 97:13-20)

In sum, despite admittedly having full access to all the Plaintiffs' vehicles and the opportunity to provide input on the testing protocol (or develop his own), Dr. Parker opted to instead leave all the methodology and testing (aside from taking his turn driving the vehicles) to Honda's expert Mr. Arst and to Martin Peritz, a mechanic who was retained by Plaintiffs.

And if Dr. Parker *did* collect any relevant data or test results at any other time, presumably it confirmed that Plaintiffs' vehicles have no issue, because Dr. Parker did not share his data or testing results with Honda or this Court. Dr. Parker testified about his efforts to try to replicate Plaintiffs' alleged transmissions issue:

Q. Take a look at page 13 of the Arst report, which is Exhibit Number 6. Do you see at sub-bullet C the statement from Mr. Arst that says: "I observed during Dr. Parker's test drives that he appeared to be severely," quote, "gunning it or sharply accelerating or decelerating the vehicle repeatedly." Do you see that?

A. Yes, I see that.

Q. Do you agree with that statement?

11

A. I don't think I'll agree with gunning it since it's kind of hard to know what's meant by that. Sharp acceleration, deceleration, I recall doing that. Actually, I recall sharp acceleration; I don't recall a sharp deceleration.

Q: And for what reason were you doing the sharp accelerations?

A: Just trying to expose the vehicle to a wide range of driving conditions.

*Id.* 102:10-103:6. Yet, Dr. Parker has been unable to demonstrate the Plaintiffs' vehicles actually manifest the atypical transmission judder they sue over. And the only opinion he offers is the bald assertion that whatever testing Honda did was not enough.

**Second**, Dr. Parker's initial Declaration offers no relevant expert opinion but instead merely cherry-picks Honda's internal documents and draws unfounded conclusions from them. In his initial Declaration, which he submitted after all of Plaintiffs' vehicles had been inspected and test-driven pursuant to the methodologies developed by Mr. Arst, Dr. Parker did not reference or cite to any data collected by Mr. Arst or Plaintiffs' mechanic, Mr. Peritz, during the inspections and testing. In fact, in his 41-page Declaration, Dr. Parker does not reference the vehicle inspections, test drives, or subsequent laboratory testing of the vehicle's transmission fluid at all. *See generally* Parker Decl.

Instead, Dr. Parker provided a lengthy "technical background" of automotive drivetrains (using inapplicable illustrations from vehicles with different kinds of drive trains than Odyssey vehicles), torque converters, clutches, electronic control units, and potential causes of unusual judder. (*Id.* at pp. 4-14). He then offered his "opinions" as to the potential cause of the alleged vibration issue in "affected vehicles," and in doing so relied entirely on documents produced by Honda and testimony offered by Honda and the Plaintiffs. The opinions proffered by Dr. Parker, without any citation to supporting scholarly or technical authorities, include:

The lock-up clutch in the torque converter of the AFFECTED VEHICLES suffers from design deficiencies that cause judder. (*Id.* at 14) Occurrences of judder are likely under-recorded. (*Id.* at ¶ 67)

12

Judder is an intermittent problem in Odysseys that cannot usually be replicated on demand. (*Id*.)

Confusion about warranty coverage may also have led to under-recording of the number of consumers that actually experience symptoms of judder. (*Id*. at ¶ 68)

If customers believed their vehicle was not covered under warranty, they may have opted not to take their car to a dealer for repair. (*Id*.)

Clearly the torque converter-related vibration and judder problems present in the Odyssey remain. (*Id*. at ¶ 70)

The lack of a core solution likely makes it unsatisfactory to most vehicle owners. (*Id*. at ¶ 78)

ATF degradation can occur after only 25,000 miles. A well-maintained transmission can easily last for 200,000 miles or more. (*Id*.)

Mechanical components can be damaged from high temperatures. (*Id*. at ¶ 79)

Other undesirable effects of the damaged transmission fluid or potentially damaged mechanical components may involve long-term reliability and durability. (*Id*.)

The torque converter and its lock-up clutch are where damage is likely. (*Id*. at ¶ 89)

These are non-exclusive examples of conclusory "opinion" statements Dr. Parker includes in his testimony without citing to *any* supporting authority or facts. In fact, Dr. Parker does not cite to any testing, a single treatise, white paper, scholarly article, or any scientific data in support of any of his opinions in his initial Declaration. Nor does he at any point describe any "methodology" he used in developing his opinions or how he applied his expertise or any reliable principles and methods to the facts of this case.

Nor do the internal Honda documents he purports to interpret support any of the conclusory statements he makes.

*Third*, nothing in Dr. Parker's Reply Declaration acts to counter the *substance* of Mr. Arst's report and findings forming the bases for Arst's opinions. Despite omitting any references in his initial Declaration to the testing of the Plaintiffs' vehicles (although he actively participated in that testing), Dr. Parker submitted a Reply Declaration to Mr. Arst's report that does not even attempt to contradict Mr. Arst's opinion on the merits that there is nothing wrong with the transmissions or torque converters in Plaintiffs' vehicles. Parker Repl. at *passim*. Absent any independent testing data, documentation, or authoritative sources to challenge Mr. Arst's substantive conclusions regarding the vehicles, all that Dr. Parker can offer is an unsupported opinion that Mr. Arst's data-based conclusions are "based on vehicle inspections that were too short to obtain sufficient evidence." *Id*. at ¶ 5.

*Fourth*, Dr. Parker's conjecture that atypical transmission judder may be present in certain vehicles is not only based on zero facts but amounts to nothing more than unsubstantiated speculation. *See Toyota*, 978 F. Supp. 2d at 1064 (excluding testimony amounting to nothing more than *ipse dixit* and citing a Fed. R. Evid. 702 advisory committee note for the proposition that "[a]n expert who relies solely or primarily on his experience 'must explain how that experience leads to the conclusions reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts.'").

Dr. Parker has not explained how his experience "studying and troubleshooting vibration issues in mechanical systems" and "solv[ing] significant vibration problems in automotive, helicopter, wind turbine, and aircraft transmission systems" led to his conclusions that alleged transmission judder may yet exist, what customers believe, whether or not vehicle owners are satisfied, etc. Nor has he detailed how he applied that experience to the facts of this case. Because Dr. Parker's opinions about the merits of Plaintiffs' claims are not founded on any facts or data, because they do not reveal any

14

reliable methodology, and because they offer no affirmative evidence to rebut Mr. Arst's reports, Dr. Parker's opinions are properly stricken.

## II.   Dr. Parker's Testimony About The "Sufficiency" Of Mr. Arst's Testing Is Likewise Pure Speculation

Instead of offering any expert opinions in support of the merits of Plaintiffs' case or legitimately challenging the substantive results of Mr. Arst's testing, Dr. Parker's Reply Declaration almost entirely relies on the contention that Mr. Arst's conclusions are "based on insufficient testing." Parker Repl. at 1. But Dr. Parker's opinion on this point is devoid of any supporting facts, data, methodology, or any specialized knowledge or expertise. *See generally* Parker Repl. Plaintiffs are attempting to inject their speculative attack on the testing protocol by using Mr. Parker as a mouthpiece.

Courts have widely held that sham "expert testimony," which merely repackages conclusions any lay person could say about evidence, is properly excluded. *See, e.g., Beech Aircraft Corp. v. U.S.*, 51 F.3d 834, 842 (2nd Cir. 1995). In *Beech*, the court affirmed the exclusion of testimony provided by two experts who were retained to enhance and analyze tape recordings of allegedly faulty transmissions. (*Id*. at 841). The court held that the experts' proffered testimony analyzing the tape recordings "did not concern a proper subject for expert testimony" because the trier of fact was capable of listening to and analyzing the recordings. (*Id*. at 842). This Court has also held that lay testimony parroted through the mouth of an expert is inadmissible. *See Estate of Gonzales v. Hickman*, No. 05-660 MMM (RCX), 2007 WL 3237727, at *3 (C.D. Cal. May 30, 2007) ("Proffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments") (citing *United States v. Frazier*, 387 F.3d 1244, 1262-63 (11th Cir. 2004)).

Dr. Parker does not cite to any authority for his opinion that the vehicle inspections were "insufficient." He offers no methodology to support his conclusion. Nor does he propose any alternate protocols for testing the vehicles that would have been, in his opinion, "sufficient." He does not explain how many miles, or what driving

15

conditions, or what technical devices are required to "sufficiently" test for the alleged unusual transmission "judder" that forms the basis of this litigation. He offers only the lay opinion that "[f]or a problem that is known to be highly intermittent according to the contents of all the plaintiffs and Honda's own engineer … Mr. Arst's opinion above is based on vehicle inspections that were too short to obtain sufficient evidence to support his conclusion." (Parker Repl. at ¶ 5). Tellingly, however, Dr. Parker cherry-picks and takes out of context a remark from Honda Senior Staff Engineer Michael Gibson regarding the intermittent nature of judder in 2011-2012 vehicles (with a different kind of torque converter[3]) without considering the rest of Mr. Gibson's testimony, testimony that establishes that Honda engineers: (1) proactively identified the cause of the judder in the normal course of their quality improvement activities (unusual heavy use leading to faster-than-typical ATF degradation, a wear item in the vehicle); and (2) developed an efficacious countermeasure for the vehicles manifesting it. Gibson Dep. 67:9-17, 71:8-17, 119:18-120:8, 188:6-17, Ex. 4 to ECF 152.

Indeed, the only "data" that Dr. Parker offers to support his opinion about the insufficiency of Mr. Arst's testing based on "intermittency" is triple and quadruple hearsay: an anecdote reported in a customer service call center record about another Honda employee's report of a Honda dealer employee that allegedly performed more than one inspection on a vehicle before identifying atypical judder in that vehicle, a random Odyssey vehicle did not belong to any of the Plaintiffs. (Parker Repl. at ¶ 9). Of course, this dealer was not Mr. Arst, and the dealer was not using Mr. Arst's protocol. Indeed, Dr. Parker has no facts about what methods and processes the dealer employee used to try to identify atypical vibration. Dr. Parker's opinion on this point thus is nothing more than idle speculation, and certainly says nothing about the efficacy of Mr. Arst's testing. If anything, Dr. Parker's anecdote just confirms that *an automotive mechanic can test for and replicate atypical judder when it exists*.

---

[3] See Gibson Dep. 96:9-100:24, Ex. 4 to ECF 152 (discussing TSB 16-052, applicable to model year 2011-2012 (within a certain VIN range) Odyssey vehicles with different torque converters than those in 2014 Odyssey vehicles.)

MEMORANDUM OF POINTS AND AUTHORITIES

1        Unable to rebut Mr. Arst's conclusions, Dr. Parker criticizes the duration of the

2    test drives and the amount of data they generated (after failing to conduct his own data

3    collection, raise any prior objection to the protocols, or request more driving time). But

4    again, Dr. Parker does not cite to any authority or supporting facts for his contention

5    that the data was "too limited" or the tests were "too short," and does not propose any

6    alternate data set or testing duration that would solve those alleged inadequacies. Mr.

7    Arst explained in his report why the data he collected was more than enough to diagnose

8    any transmission issues if they existed in Plaintiffs' vehicles. Arst Rep. at pp. 1, 10-11,

9    13-14, 16-17, 19-20, 22-23, 26, Ex. 3 to ECF 152; Arst Rebuttal at pp. 4-5, Ex. 3 to

10   ECF 152.

11       At bottom, the word "intermittent" is not a talisman that, once uttered, voids the

12   expert testing done by Mr. Arst. The dictionary definition of "intermittent" – occurring

13   at irregular intervals; not continuous or steady – says precisely zero about whether

14   Mr. Arst and Honda's extensively-designed multifactor testing protocol accurately

15   identifies transmission judder in vehicles *when it exists*. At the least, for the Court to

16   give any credence to Dr. Parker's opinions, he needed to explain, in careful detail and

17   with factual support, why the atypical transmission judder that Plaintiffs allege here

18   would not likely be captured during the multiple different tests Mr. Arst performed. He

19   needed to explain to the Court why such a judder would remain hidden when Mr. Arst

20   and Dr. Parker put the vehicles through extreme conditions meant to replicate the

21   driving conditions alleged by Plaintiffs. But Dr. Parker did none of that.

22       Nor does Dr. Parker offer any valid opinions concerning the efficacy of the

23   countermeasure. Honda engineers testified extensively concerning the efficacy of the

24   countermeasure installed in Plaintiffs' vehicles. Gibson Dep. at 59:2-5, 71:8-17,

25   119:18-120:8, 188:6-17, Ex. 4 to ECF 152. In contrast to Mr. Arst's report detailing his

26   methodology for inspecting and testing, the resulting data, and the testimony offered by

27   Honda's representatives about how infrequently and under what conditions the

28   transmission issue occurs, Dr. Parker's speculation about "intermittency," supported by

MEMORANDUM OF POINTS AND AUTHORITIES

zero facts or specialized expertise, offers nothing to the conversation. Dr. Parker's failure to support his attack on the testing or the countermeasure with any facts, data, expertise, or methodology warrants striking his opinions. Fed. R. Evid. 702.

### III.   Dr. Parker's Testimony About The Testing Data is Not Based on Sufficient Facts or Reliable Methodology.

Dr. Parker notes what he dubs "anomalies" in the data captured by Mr. Arst and suggests that those "anomalies" invalidate all the data showing a lack of judder in the Plaintiffs' vehicles. (Parker Repl. at pp. 17-18). But again, Dr. Parker fails to cite to any scientific authority or to explain how his experience or specialized knowledge permits him to offer this opinion. Nor does Dr. Parker explain how some isolated data anomalies (assuming that is even what they are) would invalidate the hundreds of other snapshots and vehicle performance data that Mr. Arst collected and relied on in developing his conclusions. Dr. Parker's statements that "[s]ome snapshots, however, show anomalous behavior that raise doubt about the accuracy of the data" and "[t]his is abnormal behavior of the vehicle and/or data error" are thus nothing more than speculation and should therefore be excluded. *See Ollier*, 768 F.3d at 861 (citing *Daubert*, 509 U.S. at 590); *Toyota*, 978 F. Supp. 2d at 1064.

### IV.   Dr. Parker Does Not Differentiate Between TSBs Applicable To Plaintiffs' Vehicles Versus Those Applicable To Other Model Years

Finally, Dr. Parker does not differentiate between Plaintiffs' vehicles – model year 2014 Honda Odyssey vehicles – and the other vehicles in Plaintiffs' proposed class (which include 2011, 2012, 2013, 2015 and 2016 Honda Odyssey vehicles), yet another fatal flaw that renders his opinions unreliable. The torque converters in 2011 and early 2012 Honda Odyssey vehicles were made of different materials than the torque converters from mid-2012 on ("Post-GSN"). Gibson Dep. Ex. 181 (TSB 12-064), Ex. 36 to ECF 152; Gibson Dep. 54:9-10; 55:10-13 Ex. 4 to ECF 152; Hall Dep. 105:6-19, Ex. 8 to ECF 152. Perhaps this is why Dr. Parker intentionally excludes those vehicles from his opinions entirely. Parker Decl. at ¶ 14.

18

Dr. Parker defines "AFFECTED VEHICLES" differently from Plaintiffs' proposed class. *Id*. Without explanation, he includes in the definition all 2012-2017 Post-GSN Honda Odyssey vehicles regardless of the differences between and among the vehicles (*e.g*., different components, power control modules (PCMs) and software). Gibson Dep. 222:6-24, Ex. 4 to ECF 152, Hall Dep. 177:23-178:3 Ex. 8 to ECF 152, 235:6-25, Shepard Dep. 25:25-26:6, Ex. 6 to ECF 152. To the extent Dr. Parker purports to generalize his "opinions" regarding Plaintiffs' specific vehicles to all of the vehicles he defines as "AFFECTED VEHICLES," then, his opinions are even more groundless.

In sum, Dr. Parker offers no valid opinions regarding the protocol developed by Honda engineers, which was expanded and made even more robust by Honda's expert, Mr. Arst. Dr. Parker offers no valid opinions regarding the actual testing of Plaintiffs' vehicles, testing in which he participated, and which found no trouble. Although Dr. Parker offers the view that Mr. Arst's testing was somehow insufficient, notwithstanding his stated expertise, Dr. Parker is conspicuously circumspect about the kinds of testing that could have revealed intermittent judder, thereby tacitly admitting he was unable to replicate it himself. Dr. Parker does not challenge the efficacy of the countermeasure, which was installed in every one of Plaintiffs' vehicles, and failed to rebut the testimony and evidence proffered by Honda that the countermeasures identified in the TSBs applicable to Plaintiffs' vehicles are, in fact, efficacious. Nor does Dr. Parker identify any valid grounds to generalize his speculations regarding Plaintiffs' vehicles to the other model year vehicles he includes in his definition of "AFFECTED VEHICLES."

Dr. Parker's largely argumentative testimony and opinions are not based on technical or specialized knowledge, are devoid of facts or data, are not the product of any principles or methods he actually applied to the facts of this case, and, lastly, do not in any manner assist the finder of fact in analyzing the evidence in the case. They are therefore properly excluded. *Hickman*, No. 05-660 MMM (RCX), 2007 WL 3237727, at *3.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CONCLUSION

For the foregoing reasons, Defendants respectfully request the Court exclude all of Dr. Parker's written and oral testimony. Defendants respectfully request such other, further relief this Court deems just.

DATED:      June 3, 2019

By:   */s/ Livia M. Kiser*
Attorneys for Defendants
AMERICAN HONDA MOTOR CO., INC. and
HONDA NORTH AMERICA, INC.

MEMORANDUM OF POINTS AND AUTHORITIES

**Certificate of Service**

On, June 3, 2019, I caused this document to be filed and served on all ECF-registered counsel of record using the Court's CM/ECF system.

/s/ Livia M. Kiser

MEMORANDUM OF POINTS AND AUTHORITIES

34367197.v8