1    Shimon Yiftach (SBN 277387)
     shimony@bgandg.com
2    Bronstein Gewirtz & Grossman
     1925 Century Park East, Suite 1990
3    Los Angeles, CA 90067
     T: (424) 322-0322
4    F: (212) 697-7296

5    *Attorneys for Plaintiffs*

6    [Additional counsel appear on signature
     page]

7              **UNITED STATES DISTRICT COURT**

8              **CENTRAL DISTRICT OF CALIFORNIA**

9                   **SOUTHERN DIVISION**

10   DENNIS MACDOUGALL, *et al*.,              Case No. 8:17-cv-01079-AG (DFMx)

11

12                                             <u>CLASS ACTION</u>

13              Plaintiffs,

14        v.                                   **PLAINTIFFS' MEMORANDUM IN
                                               OPPOSITION TO DEFENDANTS'**
15                                             **MOTION TO STRIKE TESTIMONY
                                               OF DR. ROBERT PARKER**
16   AMERICAN HONDA MOTOR CO.,
17   INC., *et al*.,                           Hearing Date: August 5, 2019
                                               Time: 10:00 a.m.
18                                             Location: Santa Ana Division, 10D
                                               Judge: Hon. A. Guilford
19              Defendants.

20

21

22

23

24

25

26

27

28

# <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS ......................................................................... I

TABLE OF AUTHORITIES ............................................................... III

MEMORANDUM OF POINTS AND AUTHORITIES ........................... 1

I.     INTRODUCTION ...................................................................... 1

II.    FACTUAL BACKGROUND........................................................ 2

    A.    Dr. Parker is an Authority on Car Vibration Problems. ................... 2

    B.    Dr. Parker Relies Upon His Knowledge, Expertise, and Analysis of
        Honda's Engineering Records. ......................................................... 4

    C.    Dr. Parker's Initial Report Explains There is a Common Defect That
        Causes Judder in Post-GSN 2012-2016 Odysseys. ........................... 5

    D.    Dr. Parker's Rebuttal Report Explains Why Arst's Limited Data
        Doesn't Support Arst's Sweeping Conclusions.................................. 7

    E.    Honda Misrepresents the Facts Surrounding the Discovery-
        Mandated Inspections. ..................................................................... 10

III.  LEGAL STANDARD ................................................................ 11

IV.  ARGUMENT............................................................................. 13

    A.    Dr. Parker's Initial Report Has Sufficient Factual Support............. 13

    B.    Dr. Parker's    Rebuttal Report Relies Upon Sufficient Facts and
        Data. ............................................................................................... 18

    C.    Dr. Parker's Testimony About Anomalies in Testing Data are
        Relevant and Appropriate. .............................................................. 22

D.    Dr. Parker's Report Discusses Every TSB Separately to Show That

All Post-GSN 2012-2016 Odysseys Share the Same Defect..........................**23**

**V.    CONCLUSION** ...................................................................................**25**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

PLAINTIFFS' MEMORANDUM IN OPPOSITION TO
DEFENDANTS' MOTION TO STRIKE TESTIMONY OF DR. ROBERT PARKER

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## TABLE OF AUTHORITIES

**Cases**

*Aguirre v. Home Depot U.S.A., Inc.*, 1:10-cv-00311-LJO-GSA,
    2012 U.S. Dist. LEXIS 119984 (E.D. Cal. 2012).................................................**2, 20**

*Beech Aircraft Corp. v. U.S.*, 51 F.3d 834 (9th Cir. 1995).....................................**21, 22**

*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993)................................**12, 14**

*Hartley v. Dillard's, Inc.*, 310 F.3d 1054 (8th Cir. 2002).............................................**19**

*In re Bard Ivc Filters Prods. Liab. Litig.*, No. MDL 15-02641-PHX DGC,
    2017 U.S. Dist. LEXIS 211400 (D. Ariz. Dec. 22, 2017)..................................**11, 12**

*In re Bard IVC Filters Prods. Liab. Litig.*, No. MDL 15-02641-PHX, 2018
    U.S. Dist. LEXIS 22322 (D. Ariz. Feb. 12, 2018) .............................................**12, 16**

*In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d 164 (S.D.N.Y. 2009) ............**12, 16**

*In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices &*
    *Prods. Liab. Litig.*, 978 F. Supp. 2d 1053 (C.D. Cal. 2013). ..........................**passim**

*Jinro Am. Inc. v. Secure Invests., Inc.*, 266 F.3d 993 (9th Cir. 2001) ..........................**11**

*Kimberly C. v. Berryhill*, 3:17-CV-00853-PK, 2018 U.S. Dist. LEXIS
    131760 (D. Or. May 31, 2018) .........................................................................**20**

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999)..................................................**12**

*Primiano v. Cook*, 598 F.3d 558 (9th Cir. 2010)...........................................................**12**

*Sementilli v. Trinidad Corp.*, 155 F.3d 1130 (9th Cir. 1998) .......................................**11**

*United States v. 4.0 Acres of Land*, 175 F.3d 1133 (9th Cir. 1999). ...........................**18**

*Waldrup v. Countrywide Fin. Corp.*, 2:13-cv-08833-CAS, 2018 U.S. Dist.
    LEXIS 23060, 2018 WL 799156 (C.D. Cal. Feb. 6, 2018)..............................**11, 15**

*Williams v. Daszko*, No. 2:14-cv-1248 KJM, 2018 U.S. Dist. LEXIS 94597,
    2018 WL 2684314 (E.D. Cal. June 5, 2018). .....................................................**1, 14**

*Williams v. Shalala*, No. 92-55753, 1994 U.S. App. LEXIS 25481 (9th Cir.
    Sept. 13, 1994) ................................................................................................**20**

**Statutes**

Fed. R. Evid. 702. ............................................................................................**11, 15**

Fed. R. Evid. 703. ........................................................................................**11, 15, 21**

PLAINTIFFS' MEMORANDUM IN OPPOSITION TO
DEFENDANTS' MOTION TO STRIKE TESTIMONY OF DR. ROBERT PARKER

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## <u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

## I.  INTRODUCTION

Honda's motion to strike Dr. Parker's two expert reports is meritless. As Honda admits, Dr. Parker is a highly qualified expert on car vibration issues, with distinguished academic and field experience. He is a mechanical engineer and professor whose published work has been widely cited. In fact, large car companies have hired him to diagnose and solve vibration-related issues in cars.

Honda also acknowledges that in stating his opinions, Dr. Parker relied upon an extensive list of Honda's engineering records, customer reports, and deposition testimony from Honda engineers and all Plaintiffs. *See* Honda Br. 12:23-25, ECF No. 151 (Dr. Parker "relied entirely on documents produced by Honda and testimony offered by Honda and the Plaintiffs."); *see also* Dr. Parker's Decl. and Initial Report ("Initial Rep.") Ex. 2, Jan. 15, 2019, ECF No. 151-1 (four-page long list of documents that Dr. Parker relied upon and cited in his report). Thus, Dr. Parker's reports are based on sufficient facts and data.

Despite this, Honda argues that Dr. Parker's Initial Report cannot be admitted because he didn't independently test the Plaintiffs' Odysseys, although he did personally examine them. But Dr. Parker's Initial Report opines that there is a common defect in post-GSN 2012-2016 Odysseys that causes judder and describes Honda's failure to timely fix the defect. Testing Plaintiffs' specific Odysseys was certainly not necessary to support these facts and opinions. In addition, the law does not require Dr. Parker to personally test Plaintiffs' Odysseys, and his review of relevant documents alone is sufficient for his expert opinion to be admitted. *Williams v. Daszko*, No. 2:14-cv-1248 KJM, 2018 U.S. Dist. LEXIS 94597, at *14-15, 2018 WL 2684314 (E.D. Cal. June 5, 2018) (refusing to exclude expert report on the ground that he did not physically examine the plaintiff: "Dr. Gilbert's specialized expertise and thorough review of plaintiff's medical records render his opinions both admissible

PLAINTIFFS' MEMORANDUM IN OPPOSITION TO
DEFENDANTS' MOTION TO STRIKE TESTIMONY OF DR. ROBERT PARKER

and probative….”). This is particularly true where Dr. Parker opines—based on his expertise and analysis of documents and deposition testimony—that it is difficult to replicate judder, an issue that manifests intermittently according to all parties’ testimony and documentary evidence. *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices & Prods. Liab. Litig.*, 978 F. Supp. 2d 1053, 1089 (C.D. Cal. 2013) (expert testimony without testing admitted where expert opined “that intermittent software failure is not amenable to testing.”).

In fact, this is the basis for Dr. Parker’s critique of Jason Arst’s (Honda’s expert) methodology, data, and sweeping conclusions. Mr. Arst believes that a 30-minute test drive and 11 minutes of random data from that test drive **conclusively** prove that the Odyssey in question does not and has **never** experienced intermittent judder over a more than three-year period, as Plaintiffs have alleged and testified. Dr. Parker has provided a detailed rebuttal that this limited amount of data cannot conclusively disprove a long history of intermittent judder. And his position is supported by logic and legal authority. *Aguirre v. Home Depot U.S.A., Inc.*, 1:10-cv-00311-LJO-GSA, 2012 U.S. Dist. LEXIS 119984, at *14 (E.D. Cal. 2012) (“the problem could be intermittent in nature…which would explain how the boom lift could have malfunctioned previously but worked properly when inspected by the experts.”).

In short, the experts disagree and there is a “battle of the experts, the resolution of which is properly left to the jury.” *In re Toyota*, 978 F. Supp. 2d at 1070. Honda can challenge Dr. Parker’s opinions at the proper time (cross-examination), but as long as there is a factual basis for the opinions, “to be admissible, Dr. [Parker] need not prove that his opinions are correct.” *Id.* at 1071.

## II.    FACTUAL BACKGROUND

### A.    Dr. Parker is an Authority on Car Vibration Problems.

As Honda concedes in its moving brief, Dr. Robert G. Parker is a preeminent expert on car vibration issues, with distinguished academic and field experience. He is

2

a mechanical engineer and the L.S. Randolph Professor at Virginia Tech's Department of Mechanical Engineering, long ago earning bachelors, masters, and doctorate degrees in Mechanical engineering. Initial Rep. ¶ 1. He has dedicated much of his professional career to studying, diagnosing, and solving vibration related issues in car (and other machine) transmission systems. *Id.* at ¶ 3. In fact, some of the largest car companies in the world—Ford, Volvo, General Motors, Chrysler, and others—have hired him to help solve significant vibration problems in automotive drivetrains and transmissions. *Id.* at ¶¶ 3-5. He has made presentations to major corporations and published numerous articles on transmission system vibrations, with his work being cited over 6,800 times. *Id.* at ¶¶ 6-7.

In addition, Dr. Parker has delivered over 80 keynote and invited lectures, including plenary lectures at the three largest vibration conferences in the US, UK, and Europe. He has served on the Editorial Boards of the *Journal of Sound and Vibration and Mechanism and Machine Theory* and served seven years as Associate Editor for the *ASME Journal of Vibration and Acoustics*. *Id.* at ¶ 8. He is a Fellow of the American Society of Mechanical Engineers (ASME) and the American Association for the Advancement of Science. *Id.* at ¶ 9.

Numerous academic, corporate, and government entities have presented awards to Dr. Parker in recognition of both his research and actual problem solving of specific major vibration issues (*Id.* at ¶¶ 5, 11):

- Ford Chief Engineer Award;
- ASME N. O. Mykelstad Award for "major innovation in vibration research and engineering;"
- US Presidential Early Career Award for Scientists and Engineers ("…the highest honor bestowed by the U.S. government on outstanding scientists and engineers beginning their independent careers");
- US Army Young Investigator Awards;
- National Science Foundation CAREER;

3

- ASME Gustus Larson Award;
- French government Poste Rouge Award;
- SAE Ralph Teetor Educational Award;
- ASEE's Global Engineering Educator and Outstanding Faculty Awards;
- five separate research awards from Ohio State University.

A more extensive description of Dr. Parker's distinguished career, including his work at the NASA Glenn Research Center, appears in Ex. 1 to the Initial Report.

### B.   Dr. Parker Relies Upon His Knowledge, Expertise, and Analysis of Honda's Engineering Records.

Dr. Parker's expert opinions are based upon his extensive and distinguished "training, knowledge, experience, and background, and on the information and documents" that he reviewed relating to the Plaintiffs' Odysseys and the judder issue in Honda Odysseys. *Id.* at ¶¶ 5, 11. Dr. Parker reviewed and considered a long list of documents produced in this case, which includes engineering documents produced by Honda (and non-party Honda affiliates), documents produced by Plaintiffs, and many deposition transcripts (and exhibits thereto) of Honda's engineers and Plaintiffs. *Id.* at ¶ 13 & Ex. 2 thereto (four-page list of documents relied upon). In contrast to Jason Arst's (Honda's expert) vague description of "Documents Produced by Plaintiffs" and "Documents Produced by Honda Entities," as documents he reviewed (Arst Decl. and Initial Report ("Arst Rep.") ¶¶ 11-12, Jan. 15, 2019, ECF No. 166-8), Dr. Parker's Initial Report is transparent and identifies a four-page long list of specific Bates-stamped documents he reviewed and relied upon to form his opinions. Initial Rep. Ex. 2. He quotes and cites these documents throughout his report.

The documents listed there (which include deposition transcripts) cover a wide range of issues relevant to this case, including the service histories of the Plaintiffs' Odysseys, Plaintiffs' driving histories, the Plaintiffs' experience with intermittent judder (including detailed information regarding frequency of the judder), many technical internal Honda documents regarding Odysseys and judder, Honda's TSBs

4

relevant to Odyssey judder, and Honda documents reflecting Honda technicians'/mechanics' difficulty in replicating judder in customers' Odysseys that were known to or later proved to exhibit judder. *Id*. As explained in Plaintiffs' submissions in support of their motion for class certification and in opposition to Honda's motion for summary judgment, Honda engineers and technicians had significant difficulty in replicating judder, diagnosing the underlying problem, and creating an effective countermeasure, as evidenced by the need for numerous TSBs spanning several years. Initial Rep. ¶¶ 52-91. This is true even when Honda engineers had years to troubleshoot and diagnose issues.

## C. Dr. Parker's Initial Report Explains There is a Common Defect That Causes Judder in Post-GSN 2012-2016 Odysseys.

Relying upon his background and the numerous technical documents mentioned above—including Honda's engineering documents—Dr. Parker's Initial Report provides a full explanation of how transmissions and related car parts work, and what judder is and how it manifests in cars in general, and in the Odyssey in particular. Initial Rep. ¶¶ 16-51. He provides several illustrative graphics to assist the reader along the way. Mr. Arst discusses the same subject matter without a single citation to any documentary evidence, authority, or scholarly work for support. Arst Rep. 3-8.

After establishing the technical context and background for judder, Dr. Parker proceeds to discuss his opinions on pages 14-41 (¶¶ 52-91). Even a cursory inspection reveals that these pages are replete with citations to many Bates-stamped documents to support the factual basis for Dr. Parker's statements and opinions. *Id*. In addition to the many citations, Dr. Parker provides numerous quotes and even full-page replications from these documents. *Id*.

Dr. Parker provides two opinions, each with abundant factual basis in the engineering documents cited. On pages 14-15, he states:

**Opinion 1:** The lock-up clutch in the torque converter of the AFFECTED VEHICLES suffers from design deficiencies that cause judder (also known as

shudder and hesitation). In addition:

- Honda failed to rectify the judder in the AFFECTED VEHICLES and other Honda models until at least June 2017, and September 2018 for some AFFECTED VEHICLES, despite being aware of the problem since 2011 or earlier.

- Honda's multiple attempted countermeasures to rectify the judder problem did not do so, despite the problem being a major focus within Honda.

Dr. Parker defines "AFFECTED VEHICLES" as post-GSN 2012-2017 Odysseys. *Id.* at ¶ 14. Dr. Parker proceeds to discuss this opinion, and the detailed factual basis for it (with citations), on pages 15-38. *Id.* at ¶¶ 52-90. Dr. Parker explains, based on Honda's engineering documents, that these models share a root cause and that Honda did not distinguish the judder problem between these models. *Id.* at ¶¶ 80-84. "The common thread remains that these vehicles use a 6AT transmission and mating torque converter." *Id.* at ¶ 81. "Because the ECU software is specific to each vehicle, the ECU software updates must be developed separately for the various vehicle models. This does not change that judder and its cause as determined by Honda (i.e., excessive transmission fluid temperatures from high heat generation in the torque converter lock-up clutch) is common among" post-GSN 2012-2017 Odysseys. *Id.* He also explains at length that because the judder is intermittent, it is difficult to replicate in test drives and diagnostic testing. *Id.* at ¶¶ 67, 78, 85c, 85e, 85f, 85g; R. Parker Dep. 95:17-21, ECF No. 174-40 ("that intermittency takes place over days, weeks, or sometimes months."), 173:16-25 (Plaintiffs discussed intermittent nature of judder with Dr. Parker); *see also generally,* Parker Rebuttal Report ("Parker Rebuttal"), ECF No. 151-2, and, *specifically*, Parker Rebuttal ¶ 9; AHM Customer Service Files at AHM_ODYT_000001729, ECF No. 174-15, (Honda technicians replicated judder only on customer's fourth visit for this purpose). Each Plaintiff testified about the intermittent nature of his Odyssey's judder—as stated above, Dr. Parker reviewed and relied upon these depositions. B. Lentz Dep. 142:17-

6

143:17, ECF No. 174-18 (1-3 times a week); Kavuri Dep. 236:1-237:4, ECF No. 174-17 (once a week); Seow Dep. 22:1-5, 39:1-40:11, 75:1-11, 139:1-10, 191:1-21, ECF No. 174-28 (rarely drives the Odyssey and mostly for long family trips, not stop-and-go traffic, so months between judder); D. MacDougall Dep. 145:1-147:19, ECF No. 174-21 (it's sporadic, sometimes it occurs and sometimes not)[1]; J. Parker Dep. 157:14-25, ECF No. 174-29 (it's sporadic: "I might go 200 miles and it do it once. I might go 20 miles and it do it ten times. At will it does it, just whenever it feels like it.").[2]

His second opinion appears on page 38:

**Opinion 2**: Long before the Named Plaintiffs purchased their Honda Odysseys in 2014, Honda knew, but failed to rectify, that its Odyssey vehicles (and a broad range of other models with 6AT transmissions) suffered from judder and vibration caused by lock-up clutch in the torque converter.

Dr. Parker explains the detailed factual basis for this opinion on pages 39-41, with many citations and quotes that support the opinion, and he also relies upon his detailed explanation for Opinion 1 as support. Initial Rep. at 38-41 & ¶ 91. Dr. Parker relied upon and explained many Honda engineering documents to form both opinions and demonstrate their factual bases. *Id.* at 14-41, ¶¶ 52-91.

## D.    Dr. Parker's Rebuttal Report Explains Why Arst's Limited Data Doesn't Support Arst's Sweeping Conclusions.

Dr. Parker relies upon the same expertise, background, and documents mentioned above, in addition to his personal experience at the test drives, in reviewing

---

[1] MacDougall testified that in all of 2018, "I have no idea, but it was probably close to a hundred or more." D. MacDougall Dep. 147:10-148:2. Honda incorrectly wrote (Honda Br. 3-4, fn. 1) that it was 100 times in one trip.
[2] In that same footnote (Honda Br. 3-4, fn. 1), Honda mischaracterizes Plaintiff Parker's testimony to mean that his judder occurred every five minutes, but this is false. Parker testified that judder occurred sporadically with no pattern whatsoever, and he explained that his judder does NOT occur every five minutes. He stated only that every five minutes would hypothetically be "an easily duplicated interval." J. Parker Dep. 229:8-20, 157:14-25, 240:7-16.

PLAINTIFFS' MEMORANDUM IN OPPOSITION TO
DEFENDANTS' MOTION TO STRIKE TESTIMONY OF DR. ROBERT PARKER

and analyzing Mr. Arst's data and report. In addition—and as already discussed above with citations to Plaintiffs' depositions—Dr. Parker explains in detail that the judder issue, by all accounts (according to both Honda and Plaintiffs), is intermittent by nature. Parker Rebuttal at ¶¶ 6-15 (Honda engineer's deposition testimony that judder is intermittent in nature), ¶ 9c (Honda document discussing "intermittently AT surging/shudder"). He cites and quotes documents and deposition testimony that support this fact and points out that even Mr. Arst's report acknowledges the issue is intermittent. *Id.* Dr. Parker's rebuttal report analyzes and discusses Mr. Arst's data, charts, and methodology in detail. *Id.* at ¶¶ 16-50.

Mr. Arst collected data during the test drives by using Honda Diagnostic System ("HDS"), which is software on a laptop plugged into the Odyssey. *Id.* at ¶ 16. "The HDS collects information from sensors in the vehicles while the vehicle is driven. Mr. Arst's data consists of 30-second "snapshots" recorded at various times selected by Mr. Jongkind [who assisted Arst] during the test drives." *Id.* Honda requires dealership mechanics to take the same snapshots when customers arrive with complaints of judder, and Honda authorizes TSB service under warranty only if the snapshots conform to Honda's criteria for identifying judder. Initial Rep. at ¶¶ 67, 74, 78, 85c, 85e, 85f, 85g; TSB 16-060, ECF No. 167-6; TSB 17-043, ECF No. 153-6; TSB 17-044, ECF No. 174-39; TSB 17-052, ECF No. 174-14; TSB 18-017, ECF No. 174-15. Thus, Mr. Arst followed a similar procedure as a Honda dealership mechanic. Significantly, Mr. Arst admitted in deposition that he has ***never*** experienced torque converter judder in ***any*** Odyssey (not just Plaintiffs'). Arst Dep. 49:7-13, 65:8-19, ECF No. 174-35.

As Honda acknowledges, Dr. Parker inspected Plaintiffs' Odysseys, drove them, photographed them, and took notes during Honda's discovery-mandated inspections. R. Parker Dep. 73:9-14, 74:2-25, 75:16-20, 77:6-10, 78:5-9, 115:18-20. His physical inspections did not reveal any alternative source or cause of judder that could disprove torque converter judder. R. Parker Dep. 74:19-25, 84:17-19. Dr. Parker

1  reviewed the Plaintiffs' filed Complaint ahead of the inspections to better understand
2  the conditions under which Plaintiffs experienced judder. R. Parker Dep. 34:2-12. He
3  spoke with each Plaintiff (or a spouse who drives the Odyssey), except for Seow, right
4  before the inspections for the same purpose. R. Parker Dep. 99:2-100:1-11 (B. Lentz),
5  109:24-110:1-8 (Mrs. Kavuri), 124:8-16 (D. MacDougall), 131:12-132:5 (J. Parker),
6  160:10-13, 173:16-18. As mentioned above, Dr. Parker also reviewed each Plaintiff's
7  deposition regarding their driving experiences before forming his opinions.

8      Mr. Arst describes his test drives of Plaintiffs' Odysseys before Honda's
9  countermeasure (ATF flush and software update) was applied as being approximately
10  30 minutes for the Odysseys of Kavuri, MacDougall (each 12 miles), and Parker (22
11  miles) and approximately one hour for the Odysseys of Lentz (28 miles) and Seow (26
12  miles). Arst. Rep. ¶¶ 12, 15, 18, 21, 24. Dr. Parker studied Mr. Arst's snapshot data
13  from the test drives and explains that there is only an average of approximately 11
14  minutes of recorded data per Odyssey's pre-countermeasure test drive. Parker
15  Rebuttal ¶¶ 17-20 (Lentz: 9.5 mins.; Seow: 10.5 mins; Kavuri: 18 mins. or likely less;
16  MacDougall: 11 mins.; Parker: 8 mins.).

17      Based on the brief test drives and this extremely limited amount of data, Mr.
18  Arst's report concludes for each Plaintiff's Odyssey that whatever issues Plaintiffs
19  "believe they are experiencing are not, and cannot be, the result of torque converter
20  judder…." Arst. Rep. ¶¶ 14, 17, 20, 23, 26. Significantly, Arst later admitted in
21  deposition that his limited testing could ***not*** conclusively disprove judder in Plaintiffs'
22  Odysseys. Arst Dep. 81:13-21.

23      Because the test drives were brief, the amount of data is limited, and the judder
24  is intermittent, Dr. Parker opines that Mr. Arst's opinion is overreaching and cannot
25  conclusively disprove a long history of intermittent judder, which Plaintiffs testified
26  they experienced over a more than three-year period. Parker Rebuttal ¶¶ 22-47.
27  Plaintiffs each visited Honda dealerships multiple times complaining of judder, and
28  dealers were sometimes able to replicate the judder and sometimes not. ECF No. 17-

9

29 at PARKER000010 ("Torque converter lock up clutch being felt."); B. Lentz Dep. 127:16-128:10 (manager felt judder during drive but could not later replicate and get a snapshot during testing); ECF No. 174-28 at SEOW000005 ("Verified concern. Felt transmission shifting hard"); Seow Dep. 101:2-14 (same); ECF No. 174-28 at SEOW000006 ("Technician confirmed harsh shifting."); D. MacDougall Dep. 86:9-87:10 (MacDougall felt two judders during test drive and technician felt one of them). In fact, over the past few years Honda dealers have performed a transmission fluid ("ATF") flush—a TSB service for judder—for all of the Plaintiffs (multiples times for some Plaintiffs). ECF No. 174-25 at KAVURI000008; ECF No. 174-26 at LENTZ0000032; ECF No. 174-30 at MACDOUGALL000017; ECF No. 174-29 at PARKER000010; ECF No. 174-28 at SEOW000044; A. Parker Dep. 79:17-80:6, ECF No. 174-24; J. Parker Dep. 156:14-23, 202:12-22; B. Lentz Dep. 187:19-190:20; Seow Dep. 183:8-19; P. Kavuri Dep. 185:2-187:6, D. MacDougall Dep. 44:8-146:3; L. MacDougall Dep. 57:10-58:16, ECF No. 174-22. Each Plaintiff testified that this relieved judder symptoms for a few months, after which the symptoms returned, confirming that the issue was and is judder; Plaintiffs' Odysseys still experience judder. *Id.* (deposition testimony cited). Moreover, Dr. Parker relied on Honda's internal documents that illustrate the difficulty Honda technicians had in trying to replicate customers' judder during test drives where they used the same snapshot tool that Mr. Arst used here. Parker Rebuttal ¶ 9. And Dr. Parker cited one such document that discussed how it took four separate visits for one customer before Honda technicians could replicate the judder, at which point a snapshot confirming judder was also obtained for the first time. *Id.*; ECF No. 174-15 at AHM_ODYT_000001729.

### E.   Honda Misrepresents the Facts Surrounding the Discovery-Mandated Inspections.

In its brief, Honda states regarding its inspections of Plaintiffs' Odysseys: "Never once did he or the Plaintiffs dispute the efficacy of the process while Honda

spent months developing, preparing, and implementing the agreed-upon testing protocol on all of the Plaintiffs' vehicles." Honda Br. 5:10-12. Honda cites nothing to support this statement. And in fact, there was no "agreed-upon testing protocol." It was not Plaintiffs' place to question the "efficacy of the process" because the test drives were done at Honda's request and Plaintiffs fulfilled their discovery obligations by making their Odysseys available for inspection. Honda was free to use whatever diagnostic tools and protocol it wished during the test drive and Plaintiffs are free to point out how Honda's testing methodology and conclusions are faulty. For Honda to frame this as some sort of jointly desired and designed venture is untrue.

## III. LEGAL STANDARD

"In determining whether expert testimony is admissible under Rule 702, the district court must keep in mind [the rule's] broad parameters of reliability, relevancy, and assistance to the trier of fact." *Sementilli v. Trinidad Corp.*, 155 F.3d 1130, 1134 (9th Cir. 1998) (internal quotation marks omitted). "Rule 702 is applied consistent with the 'liberal thrust' of the Federal Rules and their general approach of relaxing the traditional barriers to opinion testimony." *Jinro Am. Inc. v. Secure Invests., Inc.*, 266 F.3d 993, 1004 (9th Cir. 2001) (internal quotation marks omitted).

Under Rule 702, an expert may testify on the basis of "scientific, technical, or other specialized knowledge" if it "will assist the trier of fact to understand the evidence or to determine a fact in issue," provided the testimony rests on "sufficient facts or data" and "reliable principles and methods." Fed. R. Evid. 702(a)-(d).

Rule 703 explains that an "expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed." Fed. R. Evid. 703. These facts and data "need not be admissible for the opinion to be admitted." *Id*. This Court has already explained, "As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination." *Waldrup v. Countrywide Fin. Corp.*, 2:13-cv-08833-CAS, 2018 U.S. Dist. LEXIS

PLAINTIFFS' MEMORANDUM IN OPPOSITION TO
DEFENDANTS' MOTION TO STRIKE TESTIMONY OF DR. ROBERT PARKER

23060, *14, 2018 WL 799156 (C.D. Cal. Feb. 6, 2018) (quoting *In re Toyota,* 978 F.
Supp. 2d at 1069. It's also appropriate for experts to rely upon and discuss documents
"that will provide a contextual and factual foundation for their opinions." *In re Bard
Ivc Filters Prods. Liab. Litig.*, No. MDL 15-02641-PHX DGC, 2017 U.S. Dist.
LEXIS 211400, at *283-284 (D. Ariz. Dec. 22, 2017).

  "The trial court has 'broad latitude' in deciding how to determine the reliability
of an expert's testimony and whether the testimony is in fact reliable." *In re Toyota,*
978 F. Supp. 2d at 1066 (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152
(1999)). "The test of reliability is flexible, and <u>Daubert's</u> list of specific factors neither
necessarily nor exclusively applies to all experts or in every case." *Id.* (citing *Kumho).*
"Under Rule 702 and *Daubert*, expert testimony is reliable if the knowledge
underlying it has a reliable basis in the knowledge and experience of the relevant
discipline." *In re Bard Ivc Filters Prods. Liab. Litig.*, 2017 U.S. Dist. LEXIS 211400,
at *287 ("The Court finds that the doctors' knowledge and experience in the field of
interventional radiology and the use of IVC filters in patients form a sufficient
foundation for their opinions.") (citing *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir.
2010)).

  For this reason, an expert need not cite professional standards or scholarly
papers if the expert is "highly educated and experienced" in the relevant subject
matter. *In re Toyota,* 978 F. Supp. 2d at 1075 (citing *In re Fosamax Prods. Liab.
Litig.*, 645 F. Supp. 2d 164, 179 (S.D.N.Y. 2009) ("the more qualified the expert, the
more likely that expert is using reliable methods in a reliable manner."); *In re Bard
IVC Filters Prods. Liab. Litig.*, No. MDL 15-02641-PHX, 2018 U.S. Dist. LEXIS
22322, at *133-135 (D. Ariz. Feb. 12, 2018) (admitting expert report even though it
"identifies no medical literature" in support of its opinions).

  In addition, "[s]haky but admissible evidence is to be attacked by cross
examination, contrary evidence, and attention to the burden of proof, not
exclusion." *In re Toyota,* 978 F. Supp. 2d at 1064-1065 (internal quotation marks

1  omitted) (citing *Primiano*, 598 F.3d at 564). "Importantly, the Court's gatekeeper role

2  under *Daubert* is not intended to supplant the adversary system or the role of the

3  jury." *Id*. (internal quotation marks omitted). "In other words, the Court is not

4  supposed to make ultimate conclusions as to the persuasiveness of the proffered

5  evidence." *Id*. (internal quotation marks omitted).

6      As long as there is a factual basis for Dr. Parker's expert opinions, "to be

7  admissible, Dr. [Parker] need not prove that his opinions are correct." *In re Toyota,*

8  978 F. Supp. 2d 1053, 1071. And as is relevant here, conflicting expert testimony

9  creates a "battle of the experts, the resolution of which is properly left to the jury." *Id*.

10  at 1070 (C.D. Cal. 2013).

11  **IV.   ARGUMENT**

12      **A.    Dr. Parker's Initial Report Has Sufficient Factual Support.**

13      As discussed in the facts section above, Dr. Parker is a preeminent authority

14  who relied upon his expertise and numerous documents and deposition transcripts in

15  forming his opinions. He cites, quotes, and provides full-page replications of

16  numerous Honda engineering documents to support his statements. And his opinions

17  are relevant to the core issues in this case: whether there is a defect in Odysseys that

18  causes judder and whether Honda failed to timely fix this defect. Ignoring all this,

19  Honda argues generally that this Court should strike Dr. Parker's entire report because

20  it "Offers Nothing Relevant" and "Offers Only Speculation." Honda Br., p. 5.

21  Honda's specific arguments are addressed below. This Court should admit Dr.

22  Parker's reports and allow the jury to play its role.

23      ***First***, Honda argues that Dr. Parker's report is deficient because he didn't

24  "conduct his own independent testing" of Plaintiffs' Odysseys. Honda Br., p. 6. But in

25  his Initial Report Dr. Parker opines that there is a defect common to post-GSN 2012-

26  2016 Odysseys and describes what that defect is, how and how often it manifests,

27  when and whether Honda knew of the defect long ago, and whether and for how long

28  Honda failed to fix the defect. Testing of Plaintiffs' specific Odysseys was certainly

1   not necessary to support these facts and opinions, although he did personally inspect
2   each Plaintiffs' Odyssey here. Dr. Parker relied upon his expertise and review of
3   relevant engineering documents and deposition testimony to support the opinions in
4   his Initial Report.

5       In any event, an expert need not personally examine the subject, whether a car
6   or medical patient, for the expert's opinion to be admitted. *Daszko*, 2018 U.S. Dist.
7   LEXIS 94597, at *14-15 (refusing to exclude expert report on the ground that he did
8   not physically examine the plaintiff: "Dr. Gilbert's specialized expertise and thorough
9   review of plaintiff's medical records render his opinions both admissible and
10  probative because [they are] based on 'scientifically valid principles' and 'rest[ing] on
11  a reliable foundation . . . relevant to the task at hand.'") (citing *Daubert v. Merrell*
12  *Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993)); *In re Toyota,* 978 F. Supp. 2d at 1073
13  (C.D. Cal. 2013)(expert opinions that do not include the expert's physical examination
14  of the patient remain "based on sufficient facts and data;" expert's reliance on medical
15  records, deposition transcripts, and extensive experience in the subject matter is
16  sufficient).

17      This is particularly true where an expert opines that testing for an intermittent
18  issue would be difficult or inconclusive. *In re Toyota,* 978 F. Supp. 2d at 1089 (expert
19  need not perform testing and this Court allowed testimony where expert opined "that
20  intermittent software failure is not amenable to testing."). Here, relying upon his
21  expertise and the numerous documents he cites and quotes, Dr. Parker explains that
22  judder is an intermittent issue that is not easily replicated on demand. Initial Rep. ¶¶
23  67, 78, 85c, 85e, 85f, 85g; *See generally*, Parker Rebuttal, and, *specifically*, Parker
24  Rebuttal ¶¶ 6-15, 9c.

25      Honda acknowledges that Dr. Parker visually inspected the Odysseys (including
26  the engine and transmission), took photographs, and drove them at Honda's
27  discovery-mandated test drives, in addition to reviewing Plaintiffs' allegations and
28  testimony, and even speaking with Plaintiffs about their experience with their

14

Odysseys. Dr. Parker's visual inspections and test drives did not affect his analysis or opinions because visual inspections did not reveal any physical damage or alternative cause of judder, and a brief test drive cannot conclusively disprove judder. As Honda acknowledges, Dr. Parker's Rebuttal Report analyzes Mr. Arst's data in depth, explaining why it's difficult to replicate judder in limited test drives.

**Second**, Honda argues that "Dr. Parker's initial Declaration offers no relevant expert opinion but instead merely cherry-picks Honda's internal documents" to support his opinions. Honda Br. 12:10-11. This relevance challenge is unfounded because, as discussed above, Dr. Parker discusses matters that are at the heart of this case—namely, judder, the defect that causes judder, and Honda's failure to timely fix the defect.  Honda provides no further explanation as to why it believes Dr. Parker's expert opinions are irrelevant to this case. And beyond Honda's single sentence stating, "Nor do the internal Honda documents he purports to interpret support any of the conclusory statements he makes", Honda Br. 14:1-2, Honda provides absolutely no further discussion on why the documents lend no support to Dr. Parker's opinions. In fact, as illustrated further below, Honda did not even bother to read these cited documents to determine whether they support Dr. Parker's statements.

"As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination." *Waldrup,* 2018 U.S. Dist. LEXIS 23060, at *14 (quoting *In re Toyota,* 978 F. Supp. 2d at 1069).

As Honda acknowledges, Dr. Parker relies upon numerous internal Honda documents—in addition to his expertise and other documentary sources—to support his statements. Honda Br. 12:23-25 (Dr. Parker "relied entirely on documents produced by Honda and testimony offered by Honda and the Plaintiffs."). That is precisely what Rule 702 and 703 instruct an expert to do.  Dr. Parker reviewed and considered a long list of documents produced in this case, which includes engineering documents produced by Honda (and non-party Honda affiliates), documents produced

by Plaintiffs, and deposition transcripts (and exhibits thereto) of Honda's engineers and Plaintiffs. Initial Rep. ¶ 13 & Ex. 2 thereto. In contrast to Mr. Arst's vague description of "Documents Produced by Plaintiffs" and "Documents Produced by Honda Entities," as documents he reviewed (Arst Rep. Ex. 4 at 11-12), Dr. Parker's report is transparent and identifies a four-page long list of specific Bates-stamped documents he relied upon and cited to form his opinions. Initial Rep. Ex. 2. He often quotes these documents and sometimes inserts full-page replications in the report. *Id.* at 14-41, ¶¶ 52-91. Here, Honda merely repeats its previous meritless argument that Dr. Parker should have discussed the test drives and Mr. Arst's data.

Honda then argues that a few of Dr. Parker's statements (cherry-picked by Honda) are unreliable because, despite Dr. Parker's numerous quotes and citations to documentary evidence in support of these statements, they are "without any citation to supporting scholarly or technical authorities." Honda Br. 12. As a preliminary matter, "arguments about other sources that Dr. [Parker] could have consulted and alternative explanations he could have considered go to weight, not admissibility." *In re Toyota,* 978 F. Supp. 2d at 1070 (internal citations omitted). Intriguingly, Mr. Arst does not cite even one supporting scholarly or technical authority in his entire expert report, much or all of which covers the same subject matter (cars, engines, transmissions, judder, etc.) as Dr. Parker's report—Honda would like this Court to hold Plaintiffs' expert to a much higher standard than its own expert. Dr. Parker's reliance on his expertise, documentary evidence, and deposition testimony is sufficient.

Moreover, an expert need not cite scholarly papers if the expert is "highly educated and experienced" in the relevant subject matter. *Id.* at 1075 (citing *In re Fosamax,* 645 F. Supp. 2d at 179 ("the more qualified the expert, the more likely that expert is using reliable methods in a reliable manner.")); *In re Bard,* 2018 U.S. Dist. LEXIS 22322, at *133-135 (admitting expert report even though it "identifies no medical literature" in support of its opinions). Dr. Parker is a preeminent expert in the subject at hand, allowing him to rely on his training, knowledge, and expertise. In fact,

PLAINTIFFS' MEMORANDUM IN OPPOSITION TO
DEFENDANTS' MOTION TO STRIKE TESTIMONY OF DR. ROBERT PARKER

1  Dr. Parker is a recognized authority who authored numerous scholarly works that

2  others cite for support in their reports; his works have been cited over 6,800 times.

3  For example, Honda cherry-picked the following statements to challenge: "…

4  ATF degradation can occur after only 25,000 miles. A well-maintained transmission

5  can easily last for 200,000 miles or more." Honda Br. 13:12-13; Initial Rep. ¶ 78. But

6  the challenged "25,000 miles" is directly from Honda's engineering documents, cited

7  by Dr. Parker there as HRA_ODYT_00000294 —in fact, Dr. Parker cites the same

8  fact and document again in ¶ 90. That document states, "By applying C/M spec, post-

9  replacement maintenance mileage reaches 25kmile." ECF No. 174-38 at

10  HRA_ODYT_00000294. Following a shoot first ask later approach, Honda reveals

11  that it has not even bothered to properly read Dr. Parker's report or review the

12  documents he cited. And regarding the 200,000-mile lifespan of a transmission, this is

13  precisely the type of expert knowledge that Dr. Parker may share due to his

14  background and experience. *In re Toyota,* 978 F. Supp. 2d at 1066 ("a surgeon's

15  experience with prosthetic elbow replacements rendered him qualified 'by knowledge,

16  skill, experience, training, or education' to render an opinion based on the expected

17  minimum lifespan of an implanted prosthetic elbow.") (citing *Primiano,* 598 F.3d at

18  566-67). Indeed, Dr. Parker cites to Honda's internal documents and relies upon his

19  expert knowledge for all the challenged statements. Honda has failed to present any

20  evidence to show how these or any of the other challenged statements are false or not

21  supported by the factual record.

22  ***Third***, Honda argues in a few sentences that "nothing in Dr. Parker's Reply

23  Declaration acts to counter the *substance* of Mr. Arst's report." Honda Br. 14:3-4

24  (emphasis in original). This argument is meritless and undeveloped, and Plaintiffs

25  address it further below, *infra,* Section II, in a separate discussion of Dr. Parker's

26  Rebuttal Report.

27  ***Fourth***, in a rather confusing sentence, Honda argues that Dr. Parker's

28  statement that "judder may be present in certain vehicles is…. nothing more than

17

1   unsubstantiated speculation." Honda Br. 14:14-16. It's difficult to understand what
2   Honda is saying here because they don't cite to any particular statement in Dr.
3   Parker's report. It is undisputed fact that some Odysseys experience judder, including
4   even after TSB service. Initial Rep. ¶¶ 66, 69-71, 73-74 (citing and quoting Honda's
5   internal documents). And Plaintiffs have testified that their Odysseys still experience
6   judder after Honda's TSB service.

7           **B.     Dr. Parker's Rebuttal Report Relies Upon Sufficient Facts and**
8                    **Data.**

9           Next Honda argues that Dr. Parker's Rebuttal Report should be stricken
10  because, Honda claims, it is speculation not based on "any supporting facts, data,
11  methodology, or any specialized knowledge or expertise." Honda Br. 15:9-10. This is
12  false because Dr. Parker reviewed numerous technical documents, reviewed and
13  analyzed Mr. Arst's inadequate methodology and data, and has specialized knowledge
14  and expertise in the subject matter, which is a highly technical field. Laypersons do
15  not know how engines and transmissions work and cannot examine and interpret Mr.
16  Arst's testing and technical data or Honda's engineering documents. Thus, Dr.
17  Parker's testimony will assist the jury.

18          To summarize the dispute here, Mr. Arst opines that a 30-minute test drive and
19  11 minutes of random data from that test drive ***conclusively*** prove that the Odyssey in
20  question does not and has ***never*** experienced intermittent judder over a more than
21  three year period, as Plaintiffs have alleged and testified. Dr. Parker has provided a
22  detailed rebuttal that this limited amount of data cannot conclusively disprove a long
23  history of intermittent judder. There's a battle of experts here. Instead of challenging
24  Dr. Parker in cross examination, as appropriate, Honda is trying to pre-emptively
25  knock him out so that Mr. Arst's faulty report remains the sole expert testimony. And
26  in doing so, Honda ignores the legal standard.

27          This Court, following Ninth Circuit authority, has already addressed and
28  rejected similar attacks that call rebuttal witness reports speculative:

> Dr. Burton's opinions are not impermissibly speculative. As a rebuttal
> witness, he may rely largely on other expert reports, as he does, and point
> out flaws in their methodologies or conclusions. *See United States v. 4.0
> Acres of Land*, 175 F.3d 1133, 1141 (9th Cir. 1999). Dr. Burton also
> reviewed other materials to form his opinions, including, *inter alia*, Mrs.
> St. John's medical records and the collision report. (Burton Rebuttal
> Report at 1-2.) Thus, there is a sufficient factual basis for Dr. Burton's
> opinions…. Toyota may challenge Dr. Burton's opinions, and their
> factual bases, in cross-examination. *See Hartley v. Dillard's, Inc.*, 310
> F.3d 1054, 1061 (8th Cir. 2002) ("As a general rule, the factual basis of
> an expert opinion goes to the credibility of the testimony, not the
> admissibility, and it is up to the opposing party to examine the factual
> basis for the opinion in cross-examination.")

*In re Toyota,* 978 F. Supp. 2d at 1069.

Similarly, here Dr. Parker has analyzed Arst's data and explained why his methodology and conclusions are faulty. In addition, as in *In Re Toyota*, Dr. Parker reviewed other documents to help form his expert opinions—obviously the same documents relied upon in his previously drafted Initial Report. He reviewed the history of each plaintiff's Odyssey, in documents and deposition testimony, to opine on the intermittent nature of the judder. Dr. Parker has also reviewed numerous Honda documents reflecting the intermittent nature of the problem and Honda mechanics' difficulty in replicating this intermittent judder in test drives (and capturing judder in snapshots). Dr. Parker cited one such document as illustrative of the problem at large—the document discusses how Honda technicians needed four different visits and test drives to finally replicate the judder of one Odyssey. Based on this extensive review and analysis, and Dr. Parker's extensive experience with vibration-based issues in transmission systems, Dr. Parker explained how Mr. Arst's brief test drives cannot conclusively prove that Plaintiffs' Odysseys do not and have not ever intermittently juddered over the course of over three years. "Thus, there is sufficient factual basis for Dr. [Parker's] opinions." *Id*. As long as there is a factual basis for Dr. Parker's expert opinions, "to be admissible, Dr. [Parker] need not prove that his

PLAINTIFFS' MEMORANDUM IN OPPOSITION TO
DEFENDANTS' MOTION TO STRIKE TESTIMONY OF DR. ROBERT PARKER

1    opinions are correct." *Id.* at 1071.

2         In fact, Mr. Arst admitted in deposition that his testing does not disprove that

3    Plaintiffs experienced torque converter judder in the past:

4        Q: Is it possible that each of the five Plaintiffs had torque converter issues in the
5        past even though it didn't manifest on the day that you tested?

6        A:  I don't know, because I haven't been provided enough information to come
7        to that conclusion.

8    Arst Dep. 81:13-21.

9         Common sense and Ninth Circuit precedent also support Dr. Parker's expert

10   opinions regarding Mr. Arst's brief tests for intermittent issues and his overreaching

11   conclusions. *In re Toyota,* 978 F. Supp. 2d at 1089 (expert need not perform testing

12   and this Court allowed testimony where expert opined "that intermittent software

13   failure is not amenable to testing."); *Aguirre,* 2012 U.S. Dist. LEXIS 119984, at *14

14   ("the problem could be intermittent in nature, … which would explain how the boom

15   lift could have malfunctioned previously but worked properly when inspected by

16   the experts…. Thus, simply because the boom lift operated properly when inspected

17   by the experts does not show that the main boom cable harness was repaired prior to

18   the experts' inspections."); *Williams v. Shalala*, No. 92-55753, 1994 U.S. App. LEXIS

19   25481, at *33 (9th Cir. Sept. 13, 1994) ("Also, Williams complains of intermittent

20   rather than constant pain. Therefore, the fact that he was able to sit in repose through

21   the hearing does not warrant the conclusion that his complaints of pain were not

22   credible or exaggerated."); *Kimberly C. v. Berryhill*, 3:17-CV-00853-PK, 2018 U.S.

23   Dist. LEXIS 131760, at *11 (D. Or. May 31, 2018) ("Plaintiff argues that her

24   endorsement of intermittent chest pain is consistent with occasional clinical visits at

25   which she does not report chest pain. The Court agrees; because Plaintiff testified to

26   only intermittent chest pain, it is not reasonable to impugn her credibility because she

27   does not always endorse chest pain on examination.").

28        The  rest  of  Honda's  stray  single-sentence  arguments  simply  recycle  their

                                          20

undeveloped arguments addressed in Section I., which need not be discussed again here. Honda Br. 15 (for example, "Dr. Parker does not cite any authority…" even though Mr. Arst cites no authority in his report either). Honda also argues, without citation to authority, that one of the many documents cited by Dr. Parker is hearsay. Even if this were true, an expert's facts and data "need not be admissible for the opinion to be admitted." Fed. R. Evid. 703. In any event, Dr. Parker can rely on his training, knowledge, and expertise to opine that an intermittent judder is not easily replicated during a brief test drive.

Honda argues that because Honda engineers were able to replicate the judder during the process of *allegedly* diagnosing the issue and creating an effective countermeasure after several years of trying, this means that Mr. Arst can replicate the intermittent judder on demand during a 30 minute test drive and 11 minutes of data. But Honda's army of engineers' efforts to replicate the judder in some unknown location at unknown dates for an unknown duration of time is irrelevant to the analysis here. First, it is in *dispute* whether Honda has finally properly diagnosed the issue and created an effective countermeasure. Second, even if Honda engineers were able to replicate the judder, Honda and its expert have offered no evidence to show how long that took and whether it was during a test drive or through some other means in the lab (specialized equipment or apparatus). With unlimited time (at least several years) at Honda's disposal, then yes, it makes sense that they were able to replicate a judder. As Plaintiffs testified here, judder occurs a few times a week or less frequently.  In short, Honda and its expert have offered no evidence to prove that an Odyssey ***must*** manifest judder during a brief test drive and 11 minutes of data.

Surprisingly, Honda argues that Dr. Parker's analysis and expert opinions regarding Arst's methodology and data are lay testimony. Honda's reliance on *Beech Aircraft Corp. v. U.S.*, 51 F.3d 834, 842 (9th Cir. 1995), is misplaced because experts

1    there were trying "to testify as to what could be heard in a tape recorded conversation,

2    yet hearing is within the ability and experience of the trier of fact."[3] Honda

3    misleadingly writes that the experts there were trying to "enhance and analyze tape

4    recordings of allegedly faulty transmissions," without explaining that these are not car

5    transmissions. Honda Br. 15. The "transmissions" Honda mentions is actually a

6    reference to transmissions (i.e., communications) between an airport communications

7    tower and a pilot—in other words, it was simply a recorded conversation ("faulty tape

8    of the Baron-to-tower transmissions"). *Beech*, at 837-842.

9        But juries do not know how engines, transmissions, and judders work. They

10   cannot examine and interpret Mr. Arst's testing protocol, methodology, and technical

11   data. Nor can they understand and evaluate the numerous relevant Honda engineering

12   documents. This is a technical field and Dr. Parker's Rebuttal Report discusses

13   technical data and methodology. As Honda acknowledges, Dr. Parker's report even

14   discusses technical charts reflecting data from sensors in the Odysseys.

15        **C.    Dr. Parker's Testimony About Anomalies in Testing Data are**

16                **Relevant and Appropriate.**

17        In addition to explaining how Mr. Arst's limited data does not support his

18   sweeping conclusions, Dr. Parker's Rebuttal Report explains that "Some

19   snapshots…show anomalous behavior that raise doubt about the accuracy of the data."

20   Parker Rebuttal ¶¶ 48-50. Honda repeats its above argument that Dr. Parker does not

21   cite scholarly works. Plaintiffs have already addressed this point at length above.

22   Honda also questions—in just a few words and without further elaboration—whether

23   Dr. Parker is qualified to analyze Mr. Arst's data. As discussed above, *see* Factual

24   Background, *supra*, at 2-10, Dr. Parker is a preeminent authority in the subject matter,

25   with both academic and in-the-field experience, and he is qualified to analyze and

26   discuss Mr. Arst's data.

27   ---

[3] Honda miscites *Beech* as a 2nd Cir. case. Honda Br. 15.

28

PLAINTIFFS' MEMORANDUM IN OPPOSITION TO
DEFENDANTS' MOTION TO STRIKE TESTIMONY OF DR. ROBERT PARKER

1    Dr. Parker presents, analyzes, and discusses a technical chart from one of Mr.

2    Arst's snapshots to illustrate several "possible data error" issues present in many of

3    the other snapshots that he reviewed. *Id.* at ¶¶ 50, 50a. ("Numerous other snapshots

4    recorded by Honda show similar discontinuous jumps up in speed"); ¶ 50c.

5    ("Numerous other snapshots recorded by Honda show similar discontinuous jumps

6    down in speed."); ¶ 50d. ("Similar behavior occurs in numerous other Honda

7    snapshots from the plaintiffs' vehicles."). This snapshot includes measurements of

8    engine speed (which precedes the torque converter), transmission input shaft speed

9    (which follows the torque converter), transmission output shaft speed, throttle position

10   sensor, and gear shift control. *Id.* "According to Honda's documents and the examples

11   shown in Mr. Arst's report (p. 8), these are the key quantities to examine." *Id.* at ¶ 49.

12   As a result, Dr. Parker's discussion of "possible data errors" is relevant and

13   appropriate when assessing the reliability of Mr. Arst's data.  Honda is free to dispute

14   the weight of Dr. Parker's testimony but not its admission.

15          D.     **Dr. Parker's Report Discusses Every TSB Separately to Show**

16                 **That All Post-GSN 2012-2016 Odysseys Share the Same Defect.**

17          In a separate section that cites no legal authority and misrepresents Dr. Parker's

18   Initial Report, Honda complains that Dr. Parker does "not differentiate between

19   Plaintiffs' vehicles…and the other vehicles in Plaintiffs' proposed class." Honda Br.,

20   p. 18:20-21. It's clear that this is merely Honda's repackaged argument that Plaintiffs

21   may represent only a class of owners of 2014 Odysseys and not any other model year.

22   Honda has made this argument in other motion papers and Plaintiffs have responded.

23          As discussed above, it's Dr. Parker's opinion, based on Honda's engineering

24   documents relied upon in his report, that there is a common defect in post-GSN 2012-

25   2016 Odysseys that causes judder. Initial Rep. ¶¶ 52-91. Dr. Parker explains, based on

26   Honda's engineering documents, that these models share a root cause and that Honda

27   did not distinguish the judder problem between these models. *Id.* at ¶¶ 80-84. "The

28   common thread remains that these vehicles use a 6AT transmission and mating torque

converter." *Id.* at ¶ 81. "Because the ECU software is specific to each vehicle, the ECU software updates must be developed separately for the various vehicle models. This does not change that judder and its cause as determined by Honda (i.e., excessive transmission fluid temperatures from high heat generation in the torque converter lock-up clutch) is common among" post-GSN 2012-2016 Odysseys. *Id.*

To bolster its argument that Dr. Parker didn't differentiate between different model years, Honda states that pre-GSN 2011-2012 models are different; but in the next sentence Honda admits that Dr. Parker excluded these pre-GSN 2011-2012 Odysseys from the common defect definition because he concluded that the relevant parts were different enough from the post-GSN 2012-2016 Odysseys. Honda Br. 18:23-28. This only proves that Dr. Parker took great care to assess each model year and exclude any that did not share the common defect. In fact, while Plaintiffs' complaint alleged a common defect across all 2011-2016 Odysseys, Plaintiffs honed the class definition in their motion for class certification to include only post-GSN 2012-2016 Odysseys. They did this to reflect Dr. Parker's analysis of the facts and data revealed in discovery. So, Dr. Parker's discussion of post-GSN 2012-2016 Odysseys is consistent with Plaintiffs' class definition.

Dr. Parker's report discusses a TSB (and common defect) for 2017 Odysseys as well, but Plaintiffs did not add 2017 Odysseys to their class definition because the focus in discovery was through 2016 model years. His report discusses pre-GSN 2011-2012 Odysseys to explain the history and context of the Odyssey's judder and illustrate how Honda knew that a judder issue existed long before the post-GSN (and Plaintiffs' 2014) Odysseys were even sold.

Dr. Parker's report discusses in detail each model year Odyssey (from 2011 through 2017) and each TSB (and other Honda engineering documents) that relates to those model years. Initial Rep. 14-41, ¶¶ 52-91. Dr. Parker even provides a brief summary timeline of TSBs and other events at the end of his report. *Id.* at ¶ 91. Honda cannot simply ignore dozens of pages of detailed facts and data in Dr. Parker's

24

1    report wherein he discusses the different model years and explains which ones share a
2    common defect.

3         **V.    CONCLUSION**

4         For the forgoing reasons, this Court should deny Defendants' motion to strike
5    Dr. Parker's testimony.

6

7    DATED: July 8, 2019                    **WHITFIELD BRYSON & MASON, LLP**

8

9                                          By:   /s/ Gary E. Mason
                                           Gary E. Mason*
10                                         5101 Wisconsin Ave., NW, Suite 305
11                                         Washington, D.C. 20016
                                           T: (202) 429-2290
12                                         F: (202) 429-2294
13                                         gmason@wbmllp.com

14                                         Shimon Yiftach (SBN 277387)
15                                         Peretz Bronstein*
                                           **BRONSTEIN GEWIRTZ & GROSSMAN**
16                                         1925 Century Park East, Suite 1990
17                                         Los Angeles, CA 90067
                                           T: (424) 322-0322
18                                         shimony@bgandg.com
19
                                           Lawrence Deutsch*
20                                         Jeffrey Osterwise*
21                                         **BERGER MONTAGUE**
                                           1818 Market Street
22                                         Philadelphia, PA 19103
23                                         T: (215) 875-3062
                                           F: (215) 875-4604
24                                         ldeutsch@bm.net
25                                         josterwise@bm.net

26   * Admitted *pro hac vice*               *Attorneys for Plaintiffs*
27

28
PLAINTIFFS' MEMORANDUM IN OPPOSITION TO
DEFENDANTS' MOTION TO STRIKE TESTIMONY OF DR. ROBERT PARKER

1

## CERTIFICATE OF SERVICE

2

3

On July 8, 2019, I caused this document to be filed and served on all ECF-
registered counsel of record using the Court's CM/ECF system.

4

5

6

By:  /s/ Gary E. Mason

7

Gary E. Mason

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' MEMORANDUM IN OPPOSITION TO
DEFENDANTS' MOTION TO STRIKE TESTIMONY OF DR. ROBERT PARKER