# EXHIBIT A

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

DENNIS MACDOUGALL,
RAY SEOW, PRABHANJAN
KAVURI, RICHARD FRICK,
JOSEPH RYAN PARKER AND
BRYAN LENTS, individually
an on behalf of all other
similarly situated,

       Plaintiffs,

v.

AMERICAN HONDA
MOTOR CO., INC., and
HONDA NORTH AMERICA,
INC.,

       Defendants
       .

Case No. 8:17-cv-01079-AG

**DECLARATION OF STEFAN BOEDEKER IN OPPOSITION TO DEFENDANTS'**

**MOTION**

**TO STRIKE TESTIMONY OF STEFAN BOEDEKER**

July 15, 2019

# 1   Introduction

1.  Since I filed my report in the Honda matter on January 15, 2019 , Defendants filed a rebuttal report by Dr. Wilcox on April 15, 2019 (the "Wilcox Report") and a Motion to Strike on June 21, 2019 (the "Motion"), which references Dr. Wilcox's rebuttal report to incorrectly claim among other things  that: (1) I lack experience with conjoint analysis and that my methodology is the same as that used by other experts who have been excluded by other courts, (2)  my conjoint survey is improperly designed and executed, and (3) my methodology delivers unrealistic results. In this declaration, I correct Honda's misrepresentations about my experience conducting conjoint studies; I also present a detailed description of how conjoint analysis works and then address each of Honda's incorrect claims regarding my work in this case.

# 2   Misrepresentation of My Experience Conducting Conjoint Studies

2.  I hold a masters in economics and a masters in statistics, which is the spring board of a long and distinguished economic career.  I have been at the partner and/or managing director level in several economic consulting firms including Price Waterhouse, Navigant Consulting, and now the Berkeley Research Group. Prior to this case, I have conducted over 50 conjoint studies in the litigation and non-litigation context and I have testified as an economic, statistical, and survey expert in depositions and trials in connection with conjoint studies more than 20 times.

3.  Honda falsely claims that I testified in my deposition taken on April 23, 2019 that I conducted only three conjoint studies in the past. It is a mischaracterization based on blatantly taking a statement from my deposition transcript out of context.  I testified that *between the time of submission of my expert report in this action on January 15, 2019 and my deposition date on April 23, 2019*, I was deposed in two cases involving conjoint studies and in five other cases where I testified as a statistical expert.  My CV submitted with the report in January 2019, however, lists 84 deposition testimonies since 1996 and 44 trial or hearing testimonies since 2001.

4.  Besides the misrepresentation of my deposition testimony, Defendants' also ignore that in my career as an economist and statistician I have conducted well over 100 consumer surveys, over 40 of which were conjoint studies in the litigation or non-litigation contexts.

5.  My conjoint analysis has been approved by courts as a measure that can quantify economic losses to consumers to a reasonable degree of economic certainty in multiple litigation cases, including:

    - *In Re: Dial Complete Marketing and Sales Practice Litig*., 320 F.R.D. 326, 329 (D.N.H. 2017) ("Boedeker's proffered means of calculating class wide damages is sufficient to demonstrate that a price premium for the allegedly falsely-claimed feature(s) exists.") ;

    - *Theodore Broomfield, et al. v. Craft Brew Alliance, Inc*., No. 5:17-cv-01027-BLF, 2018 WL 4952519, at *26 (N.D. Cal., Sept. 25, 2018) ("The Court finds

Plaintiffs' damages model is sufficient for calculating restitution damages under the consumer-protection laws.");

- *Manemeit v. Gerber Products Co.*, No. 15-cv-2995MKBRER, 2019 WL 1434263 (E.D.N.Y. Mar. 31, 2019) ("At this initial stage of class certification, Plaintiffs proffered models are sufficient to meet the *Comcast* test.");

- *In re MyFord Touch Consumer Litig.*, 291 F. Supp. 3d 936 (N.D. Cal. 2018); ("The methodologies set forth in Plaintiffs' expert declarations are sufficiently sound and capable of practicable application to the class without unreasonable difficulty. Thus, claims seeking these damages may be certified."); and

- *Brendan C. Haney v. Costa Del Mar Inc.*, In The Circuit Court, Fourth Judicial Circuit, in and for Duval County, Florida, No. 16-2017-CA-004797-XXXX-MA. ("The Court finds that both of Plaintiffs proffered theories are appropriate and reasonable methodologies for calculating class-wide damages.").

6. The following Table 1 lists 29 litigation cases where I was retained as testifying expert, and applied conjoint analysis. In none of these cases was my testimony stricken due to a successful *Daubert* motion:

## Table 1: Litigation Matters

| | Case |
|---|---|
| 1 | *In re MyFord Touch Consumer Litigation*, Whalen, et al. vs. Ford Motor Company, United States District Court Northern District of California San Francisco Division, Case No. 13-cv-3072-EMC. |
| 2 | *In Re Dial Complete Marketing and Sales Practices Litigation*, United States District Court, District of New Hampshire, Case No. 11-md-2263-SM (MDL Docket No. 2263). |
| 3 | *The People of the State of California, acting by and through Orange County District Attorney Tony Rackauckas v. General Motors LLC*, Superior Court of the State of California in and for the County of Orange Complex Litigation Division, Case No. 30-2014-00731038-CU-BT-CX. |
| 4 | *In Re: Motors Liquidation Company, et al., f/k/a General Motors Corp., et al.*, United States Bankruptcy Court Southern District of New York, Case No. 09-50026 (MG). |
| 5 | *In Re: General Motors LLC Ignition Switch Litigation*, United States District Court Southern District of New York, Case No. 14-MD-2543 (JMF). |
| 6 | *In Re: Emerson Electric Co. Wet/Dry Vac Marketing and Sales Litigation*, United States District Court for the Eastern District of Missouri, MDL No. 2382, Civil Action No. 4:12-md-2382-HEA. |
| 7 | *Matthew Townsend, et al. v. Monster Beverage Corporation and Monster Energy Company*, United States District Court Central District of California, Case No. 5:12-cv-02188 VAP (KKx). |

| | Case |
|---|---|
| 8 | *In Re Seagate Technology LLC Litigation*, United States District Court, Northern District of California San Jose Division, Case No. 5:16-cv00523-RMW. |
| 9 | *Thomas Davidson, et al v. Apple Inc.*, United States District Court Northern District of California San Jose Division, Case No. 5:16-cv-04942-LHK. |
| 10 | *Wendy Manemeit, et al. v. Gerber Products Co.*, The United States District Court for the Eastern District of New York, No. 2:17-cv00093. |
| 11 | *Theodore Broomfield, et al., v. Craft Brew Alliance, Inc., et al.*, United Stated District Court, Northern District of California, San Jose Division, Case No. 5:17-cv-01027-BLF. |
| 12 | *Brendan C. Haney v. Costa Del Mar Inc.*, In The Circuit Court, Fourth Judicial Circuit, in and for Duval County, Florida, Case No. 16-2017-CA-004797-XXXX-MA. |
| 13 | *Patricia Weeks, et al. v. Google LLC*, United States District Court Northern District of California San Jose Division, Case No. 5:18-cv-00801-NC. |
| 14 | *Frederick Sharp v. Wolf Appliance, Inc.*, The United States District court for the Eastern District of New York, Civil Action No. 1:18-CV-01723-JS-GRB. |
| 15 | *Kellie Loeb, et al. v. Champion Petfoods USA Inc. and Champion Petfoods LP*, United States District Court Eastern District of Wisconsin Milwaukee Division, Case No. 2:18-cv-00484-JPS. |
| 16 | *Jeff Young v. Cree, Inc.*, United States District Court Northern District of California Oakland Division, Case No. 4:17-cv-06252-YGR. |
| 17 | *In Re: Lumber Liquidators Chinese-Manufactured Flooring Products Marketing, Sales Practices and Products Liability Litigation*, The United States District Court Eastern District Of Virginia Alexandria Division, MDL No. 1:15-md-02627 (AJT/TRJ). |
| 18 | *In Re: Takata Airbag Product Liability Litigation*, United States District Court Southern District of Florida Miami Division, MDL No. 2599. |
| 19 | *D&B II Enterprises, LLC d/b/a Bain Accounting/Tax v. Universal Tax Systems, Inc., d/b/a CCH Small Firm Services*, a Virginia corporation, United States District Court Northern District of Illinois Eastern Division, Case No. 12 C 5702. |
| 20 | *Khristie Reed, Paul Benesch, Rebecca Brandel, Diane Canutt, Ros Canutt, Crystal Lewis, Rene Lucht, Diane Ortman, Debra Porwoll and Kris Vosburgh v. Dynamic Pet Products and Frick's Meat Products, Inc.*, United States District Court Southern District of California, Case No. 3:15-cv-00987-WQH-DHB. |
| 21 | *Adrian Fox, William McMullen, Jr., and Scott Winkler v. Nissan North America, Inc.*, Superior Court of The State of California In and For The County of San Francisco, Civil Case No. CGC-09-490470. |
| 22 | *Elaine Rice and Alex Kukich v. Electrolux home Products, Inc.*, United States District Court for The Middle District of Pennsylvania, Civil No. 15-cv-00371. |

| | Case |
|---|---|
| 23 | *Angerlia Martin and Chistopher Rhinesmith v. Tradewinds Beverage Company*, United States District Court Central District of California, Case No. 2:16-cv-09249. |
| 24 | *Richard Ferrari v. Vitamin Shoppe, Inc.*, United States District Court For The District of Massachusetts, Case No. 1:17-cv-10475-GAO. |
| 25 | *Tim Pozar and Scott Nalick v. Seagate Technology LLC and Does 1-50*, Superior Court of The State of California For The City and County of San Francisco, Case No. CGC-15-547787. |
| 26 | *Yan Mei Zheng-Lawson, Yuanteng Pel, and Joanne E. Ferrara v. Toyota Motor Corporation, Toyota Motor North America, Inc., and Toyota Motor Sales U.S.A., Inc.*, United States District Court Northern District of California, Case No. 5:17-cv-06591-BLF. |
| 27 | *Shaya Eidelman v. The Sun Products Corporation and Costco Wholesale Corporation*, United States District Court for the Southern District of New York, Case No. 7:16-cv-03914-NSR. |
| 28 | *Kieran O'Hara v. Diageo Beer Company USA & Diageo North America, Inc.*, United States District Court District of Massachusetts, Case No. 1:15-cv-14139-MLW. |
| 29 | *James Seaman v. Costa Del Mar, Inc.*, United States District Court For The Middle District of Florida Jacksonville Division, Case No.3:19-cv-00373-BJD-JRK |

7.    I have also applied conjoint analysis in the non-litigation context. The following Table 2 gives selected examples of such studies:

## Table 2: Selected Non-Litigation Projects

| | Project |
|---|---|
| 1 | Software Manufacturer – Determine prices for new product launches and product bundles |
| 2 | Hotel Chain – Conduct frequent traveler program analysis to optimize loyalty and enhance revenue. |
| 3 | Hotel Chain – Consulting project to merge time share program and individual frequent traveler program to develop joint reward program. |
| 4 | Hotel Chain – Developed customer acquisition models, customer attrition models, and customer retention models. |
| 5 | Banking - Developed customer acquisition models, customer attrition models, and customer retention models. |
| 6 | Grocery Store Chain – Perform various studies in the process of introducing a frequent shopper program. |
| 7 | Grocery Store Chain – Perform various studies in the process of enhancing an existing frequent shopper program. |
| 8 | Grocery Store Chain – Perform various studies to quantify effectiveness of coupon and other sales initiatives. |
| 9 | Food Product Company – Perform various studies in branding exercise of instant breakfast products. |

| | Project |
|---|---|
| 10 | Food Product Company – Perform various studies to measure price premiums in spice products. |
| 11 | Humanitarian Aid Organization – Perform study to optimize marketing spending to raise donations. |
| 12 | Automotive – Perform study of demand for after-market enhancements. |
| 13 | Banking – Perform studies to develop cross- and upselling strategies. |
| 14 | Environmental – Assess the willingness to pay among users and non-users of natural resources for cleanup costs related to pollution. |
| 15 | Consumer Products - Perform studies to develop cross- and upselling strategies across different product categories. |

8.  Furthermore, my conjoint studies have been frequently cited by courts certifying classes of consumers in cases that I have not been involved in. For example, in *Hadley v. Kellogg Sales Co*, Case No. 16-CV-04955-LHK, Aug 17, 2018 the Court makes the following references to my conjoint studies:

    a.  "Courts have also found that conjoint analyses can adequately account for supply-side factors. For example, in *In re Dial Complete Marketing and Sales Practices Litigation*, 320 F.R.D. 326 (D.N.H. 2017), the court approved a proposed conjoint analysis."

    b.  "[S]ee also *In re MyFord Touch Consumer Litig.*, 291 F.Supp.3d 936, 969–71 (N.D. Cal. 2018) (" MyFord Touch II ") (approving a nearly identical proposed conjoint analysis from the same expert and finding that the conjoint analysis adequately accounted for supply side factors "by assuming that the supply—the quantity—was fixed");"

    c.  "*Davidson v. Apple, Inc.*, 2018 WL 2325426, at *22 (N.D. Cal. May 8, 2018) (finding that a proposed conjoint analysis from the same expert adequately "account[ed] for the supply side of the equation" by holding supply (and therefore quantity) constant)."

9.  Defendants also try to establish a link between my conjoint study and conjoint studies that have been excluded in other court cases, claiming: "Courts have excluded similarly-defective conjoint studies … Dr. Wilcox testified, he has never seen a conjoint study that actually validly reflected supply side considerations."[1]

10. This criticism is without merit because my report in this case, besides being an application of conjoint analysis, has nothing in common with those other studies quoted in the Motion. My approach to compute economic losses as described in my report[2] shows the demand in

---

[1]  American Honda Motor Co., Inc. and Honda North America, Inc.'s Notice of Motion and Motion to Strike the Testimony of Mr. Stefan Boedeker and Memorandum of Law in Support, Dennis MacDougall v. American Honda Motor Co., Inc., and Honda North America, Inc. (Jun. 21, 2019) ("Motion"), at 15:14-16.

[2]  *See* Boedeker Report, Figure 8 at p.17 for the theory; Figure 24, p.60 for the empirically established actual and "full disclosure" demand for the product with and without the defect or claim.

the "not disclosed" (buyer is not aware of the defect) and the "full disclosure" world (if the buyers knew of the defect) for class Honda Odysseys. My study shows that in the full disclosure world consumers would have paid $3,041 less[3] for the product than they actually did for the Honda's with the transmission defect. This study is unique in that economic loss in my methodology is derived from the comparison of demand curves for the product with and without disclosure of the defect. The demand curves in my approach were computed from the conjoint responses over the entire range of the prices in the conjoint study.  In other studies, economists do not look at this demand curve calculation.

11.   Courts have accepted my methodology that addresses supply-side considerations. For example, Judge Koh in *Davidson v. Apple* wrote:

> Apple argues Boedeker based his analysis solely on survey respondents' subjective willingness to pay, or demand, without considering the supply side of the equation. Apple contends that this merely measures consumers' subjective valuation of a defective iPhone, whereas the "[t]he ultimate price of a product is a combination of market demand and market supply." *Apple, Inc. v. Samsung Elecs. Co*., 2014 WL 976898, at *2 (N.D. Cal. Mar. 6, 2014); *see In re NJOY*, 120 F. Supp. 3d at 1119 (discussing same issue). Apple's premise is flawed; Boedeker accounts for the supply side of the equation. Boedeker's report discusses the role of supply in conjoint analysis at length. Underscoring the point, this section of Boedeker's report is actually titled "Note on the Consideration of the Supply Side in the Economic Damages Model."[4]

My methodology in this case accounts for supply-side considerations the same way that I did in the *Apple* case.

12.   Ignoring Judge Koh's comments regarding an almost identical conjoint study that I have considered the supply side appropriately in my conjoint analysis, Defendants incorrectly claim "Mr. Boedeker's analysis is similarly doomed for failure to consider 'market realities and prices' – i.e., the supply side."[5]

## 3  How does Conjoint Work?

13.   In the following I provide a brief description of how conjoint analysis works. After a general introduction I describe best practices in choosing attributes and levels and then discuss the statistical estimation techniques applied here.

---

[3]   This is the economic loss amount for the scenario where the occurrence rate of the defect is 8% and the defect has not been fixed after 18 months. See Figure 26 in my Report for the economic loss calculations for five other scenarios.

[4]   *Davidson v. Apple*, No. 16-cv-04942-LHK (VKD) (N.D. Cal. Mar. 15, 2019), at 37:6-15.

[5]   Motion, at 15:8-10.

### 3.1  Conjoint Analysis as a Method to Quantify Consumers' Preferences

14.   As I described in my report, at pages 19-21, conjoint analysis is widely used in market research and is discussed in depth in  market research literature.[6] For example, Vithala Rao's book, *Applied Conjoint Analysis*, provides numerous examples of the widespread use of Conjoint Analysis including, but not limited to, several high-profile applications by large corporations and large public agencies such as (i) Microsoft for pricing newly released software products, (ii) Proctor & Gamble for consumer-goods pricing and new product development, (iii) Marriott Corporation for the development of the Courtyard hotel brand, and (iv) T-Mobile for developing optimal cellular plans. Conjoint analysis was also integral to the development of the EZPass electronic toll collection system by regional transit agencies in New York and New Jersey in the 1990s.[7]

15.   Bryan Orme, the founder of Sawtooth software for conjoint analysis, estimates that over 18,000 commercial applications of conjoint analysis take place each year.[8] In Orme's book, ten individuals from corporate research and marketing departments, academics, and governmental agencies including among others Bing, General Motors, Lifetime Products, Microsoft, Proctor and Gamble, Yale University, University of Michigan, and a branch of the Canadian Department of Fisheries and Oceans contributed their experiences in applying Conjoint Analysis to answer a diverse range of questions including interaction of product attributes, product pricing, new product development, strategic market planning, choice of complex medical treatments, pricing of product bundles, and how changes in attributes affect prices.[9]

16.   In addition to simply reporting the use of conjoint analysis, the contributors to the Orme book also praise the success of applying conjoint analysis: "… the vast majority of conjoint conclusions have proven correct over time…"[10], "In the fall of 2004, McMaster University introduced the new Compass Curriculum – an approach to medical education consistent with the results of this conjoint experiment."[11], and "[c]onjoint has helped the company to maintain growth in mature markets and provide better products at the best possible prices. We look forward to expanding our use of conjoint analysis as an effective management-information tool."[12]

---

[6]   *See, e.g.,* Rao, V. (2014). Applied Conjoint Analysis. Springer-Verlag, 2014.
[7]   *Ibid.,* Chapters 6.4 and 6.5.
[8]   Orme, B. K. (2014). Getting Started with Conjoint Analysis: Strategies for Pricing Research (3rd ed., p. 143). Madison: Research Publishers.
[9]   *Ibid.,* Chapter 14.
[10]  *Ibid.,* p. 146.
[11]  *Ibid.,* p. 150.
[12]  *Ibid.,* p. 157.

17.  The most frequently used form of conjoint analysis is known as Choice-Based Conjoint Analysis ("CBC").[13] CBC survey methods closely mimic real-world purchase processes.[14] The general idea behind conjoint analysis is that consumers' preferences for a particular product are driven by attributes of the product. Using survey data, conjoint analysis is a set of econometric and statistical techniques that have been developed to study consumers' decision-making processes, determining trade-offs between products 'features, and price, as well as quantifying consumers' gains and/or losses of utility when choosing between alternatives. By simulating choices between product features and prices ,[15] conjoint analysis is ideally suited to model the impact of changes in product features on market price.

18.  The data required for a conjoint analysis are collected where survey participants are shown several product profiles with different attributes. The survey participants are consumers for the product in this case, Honda Odysseys. After reviewing menus of product attributes, including price, survey participants then indicate their preferences for those profiles. The product profiles include options for prices for each set of features on the menu.

19.  After the completion of the survey, I applied advanced statistical models –Mixed Logit Models, Hierarchical Bayesian Estimation, and Market Simulations[16] –to the survey data to determine consumers' preferences, how these preferences impact the likelihood to purchase a product, and how they impact the prices consumers are willing to pay for different product attributes (here, an Odyssey with or without a defective transmission).

20.  The application of these statistical techniques enable the calculations of the price reduction needed to compensate the consumer, if a feature of a product is not present, or the additional price customers would pay for the inclusion of a feature. A variety of trade-offs between choices can be modeled and the impact of preferences on prices can be quantified. The precision, and thus the reliability, of the resulting price estimations depends on the number of survey participants. The more respondents that take part in the survey, the more precise the resulting predictions are. For this reason, we used a large sample size of 500, which was ample to the task.

21.  Before arriving at an estimate of the price for product feature/attribute that is the target of the analysis, conjoint analysis quantifies consumers' preferences for each attribute by computing "part-worths" (i.e. the respondents' desire for individual attributes).[17] Based on the part-worths of each attribute, including the attribute for price, it is then possible to quantify how changes in attributes will affect the overall price. In this case, CBC enabled us

---

[13]  My economic loss methodology utilizes CBC as described in the my report in Section 4.4.

[14]  Orme, B. K. (2014). Getting Started with Conjoint Analysis: Strategies for Pricing Research (3rd ed.). Madison: Research Publishers.

[15]  *Ibid*., p. 54; Ibid., at Chapter 14, for examples of actual application in industries; Rao, V. (2014). Applied Conjoint Analysis. Springer-Verlag, p. 8.

[16]  *See* Boedeker Report for a detailed description of these methods and how they were applied to compute economic losses.

[17]  Allenby, G. M. & Rossi, P. E. (2006). "Hierarchical Bayes Models," in Grover, R. & Vriens, M. eds., The Handbook of Marketing Research. Thousand Oaks: Sage Publications, Inc.

to determine the difference in purchase price that customers would pay for an automobile without the "Transmission Defect"[18] compared to an identical automobile with the Transmission Defect. The steps in the process of moving from consumer survey results to a determination about the value consumers place on the Transmission Defect attribute are described in more detail below.

## 3.2   Choosing Attributes and Levels in Conjoint Analysis

22. The choice of attributes and their respective option levels (how expensive, which style, etc.) is an important aspect of proper conjoint study design. An attribute is a characteristic of a product which then is ascribed different levels of the attribute. There must be at least two levels (e.g., an automobile may have power seats or not). Based on Lancaster's theory of utility,[19] the utility a consumer derives from a product and, therefore, the price a consumer will pay for the product is aggregated from the values for each of the product's attributes - products that are composed of various attributes (an attribute is a feature like Blind Spot Warning) and levels (the levels for Blind Spot Warning are Yes – the vehicle has it and No – the vehicle doesn't have it).

23. The literature[20] recommends that Choice Based Conjoint studies involve six or fewer attributes, each comprised of two to five levels, to avoid respondent fatigue when taking the survey due to information overload. For instance, whether the Honda has no defect ever or various risks level of defect and various lengths of time to repair.

24. It is further recommended practice to conduct a pre-test survey to elicit consumers' preferences of attributes and their relative importance in the choice of which attributes consumer cares about. The results from the pre-test survey will then guide the choice of attributes for the conjoint study. I followed this recommendation by first conducting a pre-test survey to identify attributes and appropriate participants for the conjoint study.[21] Here, I ran the pre-survey with non-Odyssey, non-class Odyssey and class Odyssey owners. The pre-survey data showed that Odyssey owners had relatively similar preferences, while non-Odyssey owners had statistically different preferences. Thus, I limited the conjoint survey to Odyssey owners.

## 3.3   Statistical Estimation Techniques were properly Applied in My Conjoint Analysis

25. The underlying econometric and statistical estimation techniques of the conjoint analysis are based on Mixed Logit models and Hierarchical Bayesian Estimation techniques. Both tools

---

[18]   Expert Report of Stefan Boedeker In Support of Plaintiffs' Motion for Class Certification, Dennis MacDougall v. American Honda Motor Co., Inc., and Honda North America, Inc. (Jan. 15, 2019) ("Boedeker Report"), pp. 2 - 3.

[19]   Lancaster, Kelvin J. (1966), "A New Approach to Consumer Theory," Journal of Political Economy 74 (2): Pages 132-157.

[20]   Rao, Vithala, Applied Conjoint Analysis, Springer-Verlag, 2014, Pages 132-133.

[21]   The pre-test survey conducted in my conjoint study is discussed in detail in Section 4.3, at pp. 32-43 of my report.

are widely employed in economics and marketing research to analyze preferences over a set of choices.[22]

26. Mixed Logit models are based on the idea that each consumer assigns a "utility" (i.e. preference) to each choice, and this utility measures the attractiveness of each choice. These utility values are correlated with the attributes of the actual choice (for example, a properly working transmission in an automobile) and the price associated with that choice. The utilities can be correlated with observable characteristics of the consumers making the choice (such as their age, income and demographics, as well as product features, and market conditions).[23]

27. Once shown a menu of choices of different levels of attributes each with different price alternatives, the consumer then chooses the one choice in the menu that yields that consumer's highest utility. Observing consumers' choices from various choice menus enables one to estimate the relative value consumers place on one attribute over another. With the inclusion of market price as an attribute, the part-worths of all attributes can be expressed as monetary values (for example, the price consumers place on an automobile with a properly working transmission compared to an automobile with the Transmission Defect).

28. In conducting the conjoint analysis here, I used the Sawtooth software specifically developed to perform these calculations for CBC studies. Sawtooth is considered an industry standard for calculating conjoint analyses. I input the survey results into Sawtooth and the software runs calculations in repeated iterations thousands of times whereby, in each iteration, a price estimate is made for each product attribute at each attribute level. This price reflects how much a consumer is willing to pay for the specific levels of an attribute---- in this case an Odyssey with and without transmission judder.

29. These attribute levels can be analyzed to assess how the respondents react at different price points to construct demand curves which shows what price consumers will pay at each level.[24]

30. A comparison of the demand curve for when the Transmission Defect is not known to the consumers versus the demand curve for when the Transmission Defect is known to the consumers will reveal if there is a downward shift in the demand curve. In other words, because consumers have a lower preference for a vehicle with the Transmission Defect, they will pay less for such a defective Odyssey than for an Odyssey without the Transmission Defect, when the same number of vehicles are offered for sale. Sawtooth quantifies that price difference.

---

[22] Underlying the Mixed Logit is a model of random utility. University of California, Berkeley, economics professor Daniel McFadden developed the random utility model in the 1970s while working as a consultant on the design of the Bay Area Rapid Transit (BART) system in California. This work won McFadden the Nobel Prize in 2000. *See* Varian, H. (2010). Intermediate Microeconomics (8th ed., p. 68) Springer-Verlag.

[23] *See*, for example: Rao, V. (2014). Applied Conjoint Analysis. Springer-Verlag, Chapter 4, for a detailed discussion of the use of mixed multinomial logit models in choice based conjoint studies.

[24] Orme, B. K. (2014). Getting Started with Conjoint Analysis: Strategies for Pricing Research (3rd ed.). Madison: Research Publishers, Chapter 10: Market Simulators for Conjoint Analysis, p. 93.

31.   By using the individual part-worths (consumer preference for each attribute) as measure of consumer preferences it is possible to determine the price that consumers would pay in order for Honda to sell the same number of vehicles had Honda disclosed the Transmission Defect. The economic loss is the difference in price that was paid by consumers without knowing about the Transmission Defect when they bought the vehicle compared to the price that they would have paid, if Honda had disclosed the Transmission Defect.

## 4  Defendants Misrepresented Aspects of My Report

### 4.1   Defendants' Misrepresentation That My Conjoint Study is Improperly Designed and Executed

#### 4.1.1   Defendants' Misrepresentation of the Pre-Test Survey and Attribute Selection

32.   Defendants claim that the pre-test survey was not properly conducted and that therefore the attributes included in the conjoint analysis are not the most important attributes to consumers.

33.   I designed the pre-test survey to determine which survey population to use for the conjoint study.  As described above, the pre-test survey showed that the conjoint survey should include only Odyssey owners.

34.   In responding to the Defendants' claim of an inappropriate pre-test survey, I did exactly what Honda suggests, but simply used different nomenclature.  First, the pre-test survey was designed to experiment with various attributes and survey takers.  The pre-test included different attributes – such as heated and ventilated front seats, blind spot warning system, and fuel injection --– other than the defect attribute later included in the conjoint survey itself.  The goal was to find attributes that are important to Honda consumers.  These attributes were designed to distract from the defect, thereby providing a realistic purchasing environment that included other attributes. Such attribute selection for a pre-survey does not require that they be the most important attributes to consumers (even Dr. Wilcox does not cite any evidence to the contrary from his work in "hundreds" of conjoint studies). In fact, it is sufficient to have attributes of **some importance** to consumers that provide an interesting and engaging purchasing experience to survey respondents.

35.   Then, at the beginning of the conjoint survey itself, we looked at the first 100 responses, along the lines Honda suggests, to make sure that respondents understood the survey choices. My survey gave participants the opportunity to comment on their understanding of the conjoint questions and give general comments on the entire survey.  Indeed, overall 96% of respondents indicated that they understood the survey instructions and questions.[25]

36.   In general, the particular attributes chosen in a CBC study can vary from the pre-test without affecting the resulting economic loss estimates. The attributes (aside from the target attribute) are intended to prevent "strategic" answers, where the respondent knowingly "aims" her

---

[25]   *See* Paragraphs 53 and 54 below for more detail which shows that my Report appropriately addressed the issues that Honda misrepresented in its Motion to Strike.

response at the price difference due to the disclosure of the Transmission Defect. Strategic responses are not sincere, nor do they produce reliable results. For the purpose of this study, the other attributes are simply "decoys" to distract the study participants from understanding that the survey is really about the Transmission Defect.[26] The inclusion or exclusion of any particular "decoy" attribute had no ill effect on the ultimate damages calculated, especially since all attributes chosen for the conjoint analysis were within the top 8 most important attributes from the pre-test survey.[27]

37.  In my CBC conjoint study, I chose attributes such as lane departure warning system and leather seats to engage respondents in a meaningful trade-off exercise where they can choose among different attributes at varying prices such that respondents' preferences can be determined. Therefore, it was unimportant to use the same attributes in the survey and in the pre-test survey. The pre-test survey merely provided a list of possible attributes from which to select the attributes from which were chosen the eventual attributes included in the conjoint study. The literature on performing conjoint analyses further discusses that attributes may include hypothetical choices which are not necessarily available in the market.[28] Allenby et al. states that the inclusion of certain features of a product "[d]oes not mean that we have to include all features of the product, a typical criticism of conjoint methods."[29] We are interested only in the change in demand due to the disclosure of the defect and this change in demand will not be affected by the value of other attributes.

38.  Honda also argues that one of my survey attributes ("fuel injection system") is hypothetical and therefore invalid. This is unfounded. As discussed above, the attributes other than Transmission Defect are all simply decoys to avoid strategic answers. So it is of no importance whether or not a decoy attribute is hypothetical or really available in the market.

39.  Defendants' arguments indicate their confusion between the relative importance of attributes and the price premium. The importance of other included attributes is minimal because the price premium is calculated as the difference of the price for a vehicle without the defect and an identical vehicle where the consumers are told at the point of purchase that the vehicle has the defect, while all the other attributes are held constant.

40.  Honda makes much out of the fact that its automobiles come with a warranty and therefore erroneously concludes that purchasers don't expect a defect free automobile just because there is a warranty. Honda provides no data or other evidence to support the assertion that its customers are indifferent to defects even if these defects may be covered by a warranty. On

---

[26]  For example, for the use of those "decoy" attributes in a conjoint study, *See* Orme, B. K., & Heft, M. A. (1999). Predicting Actual Sales with CBC: How Capturing Heterogeneity Improves Results. Sawtooth Software Research Paper Series.

[27]  *See* Boedeker Report, page 43. It is further noteworthy that "Automatic Transmission" was the third most important attribute in the pre-test survey.

[28]  *Ibid.*, p. 54; Ibid., Chapter 14, for examples of actual application in industries; Rao, V. (2014). Applied Conjoint Analysis. Springer-Verlag, p. 8.

[29]  Allenby, G. M., Brazell, J. D., Howell, J. R., & Rossi, P. E. (2014). Economic valuation of product features. *Quantitative Marketing and Economics, 12*(4), pp. 421 - 456.

the contrary, the results in my report indicate that consumers react negatively and will pay a lower price due to an undisclosed defect.

### 4.1.2   Defendants Misrepresent that the Survey Population Does Not Reflect Actual Purchasers of Honda Odysseys

41.   According to Defendants, Boedeker took no care to ensure that his Conjoint Survey respondents accurately reflect the population who actually purchased Class Vehicles (citing figures for the percentage of female participants in Boedeker's sample versus evidence concerning the smaller percentage of female Honda Odyssey purchasers). Hence, Mr. Boedeker's sample is not representative of the population of the proposed classes of Honda Odyssey purchasers."[30]

42.   Honda's focus on who signed the purchase contract (man or woman) is not a reliable indicator of who was involved in the decision making process to buy an Odyssey. While the documents cited by Honda indicate that most individuals who sign a contract to purchase an Odyssey are men, there is no evidence that women are not purchase decision makers.

43.   My report describes that the survey population was selected as individuals who indicated that they were involved in the purchase decision process. This survey population reflects all potential drivers of the vehicles. In contrast, Dr. Wilcox uses Honda's data that simply relies upon who signed the purchase agreement --- not who is driving the vehicle.

44.   In reporting shares by gender, Dr. Wilcox omits that Honda's data lacks gender information for a significant portion of purchasers, so the true gender figures are unknown. Hence, the true share of females in the data used by Dr. Wilcox could be much higher.

45.   Honda markets the Honda Odyssey as a "family minivan."[31] Many families include two parents and most couples are a man and a woman.  That only one person signs the purchase or leasing contract does not exclude the spouse from influencing the purchase decision and from driving the vehicle. Hence, the difference between the share of women in Honda's analysis and the conjoint survey says more about likely gender roles – the male signing purchasing documents but women making the purchase decision – than about the representativeness of my Honda Odyssey conjoint study.

46.   In the tables attached to his report, Dr. Wilcox confuses "confidence" and statistical "significance" when he announces that his analysis is significant at the 99% level. Statistical significance measures the likelihood that an observed difference (i.e., the gender of individuals who signed an Odyssey purchase agreement compared to the gender of the individuals who made the decision to purchase) is due to chance.  Dr. Wilcox' statement that there is a 99% statistical significance of the observed difference in gender percentages between signers of purchase agreements vs. the participants in my study means that there is a 99% likelihood that the distinction is irrelevant.

---

[30]   Motion, pp. 6 - 7.
[31]   Automobiles Honda (n.d.). Retrieved July 8, 2019, from https://automobiles.honda.com/odyssey.

### 4.1.3  Defendants wrongly claim my Analysis Contains Focalism Bias

47.    Honda argues that the term "Transmission Defect" with seven attribute choices (as opposed to two) causes respondents to give inflated weight to the Transmission Defect.  First of all, no respondent sees all seven defect attributes at once.  The defect attributes are randomly distributed among 12 different survey choice menus.  As to the length of the defect description in the instructions, I am not of the view that the length of the instructions are significant and Dr. Wilcox has presented no contrary empirical data.

48.    However, the conjoint survey was "double blind," i.e. neither the survey vendor nor the respondent knew whether a like or dislike for the Transmission Defect was sought.  A "double blind" survey thereby prevents focalism bias, because participants have no idea what answers are sought.

49.    Honda and Dr. Wilcox ignore that the CBC employed in my report randomly assigned survey choices from all possible choice permutations[32] with equal likelihood and with uniform frequency of each level of each attribute and each pair of attribute/level permutations to each study participant. That is, the CBC design utilized in my report follows recommendations from the literature for optimally designed CBC studies.[33]

50.    In addition, Sawtooth chooses and assigns to each participant a set of survey choices in a random, yet balanced, manner to prevent participants from "gaming the system" and thereby giving strategic answers.  Furthermore, not every study participant sees all levels of all attributes in the choice sets that are randomly assigned and no study participant sees all possible combinations of choice menus. This design feature further minimizes the risk of focalism.

## 4.2  Defendants' Misrepresentations of "Confused" Respondents and Survey Instructions

51.    Defendants quote respondents who might have been confused or critical of the survey but Defendants ignore the many individuals who were not confused and who provided positive feedback.

52.    Honda suggests that the survey instructions advise that the Transmission Defect will be permanent, so the survey question about taking the vehicle to the dealer for repairs, makes no sense, repair being impossible.  Honda misreads the survey instructions.  I reviewed the Survey description of Transmission Defect and nowhere does it say that the defect cannot be repaired.  Rather, the description describes that the "manufacturer is currently unable to provide a repair . . . for all vehicles."  Then the menu choices offer various periods of time

---

[32]   There are three attributes with two levels, one attribute with 7 levels, and 5 levels for the price. This yields 2x2x2x7x5 (or 280) different possibilities of combining the different levels of the attributes in the study.

[33]   Bakken, D. & Frazier, C. L. (2006). "Conjoint Analysis: Understanding Consumer Decision Making," in Grover, Rajiv & Marco Vriens, eds., The Handbook of Marketing Research, Thousand Oaks: Sage Publications, Inc., Chapter 15.

in the future until the vehicle is repaired.  So there is no confusion or inconsistency.  Honda's criticism is based upon a misreading of the description of Transmission Defect.

53.   While Honda pointed out some survey takers' confusion as to the instructions and questions, the **vast majority (about 96%)** answered the questions without problem. Typical of any survey are some "outliers" that don't understand the instructions or questions. This is also true in the actual world where individual consumers make seemingly irrational purchase decisions or don't read all the instructions or don't understand all product features.  But here, the irrational "outliers" were de minimis.

54.   Out of 500 respondents, 480 (96%) answered the question "did you have a clear understanding of the questions": "Yes." Only 20 respondents (4%) said no. Defendants' expert speculates that respondents with critical comments may have skewed the results but did not conduct any empirical analysis to test his assertion.

### 4.3   Defendants' Misrepresentation of the Use of Market Price Data

55.   Honda complains that I did not use actual market price data in my analysis.  Ironically, at the same time, Honda posits that no market price data for a Honda with disclosed Transmission Defect exists. This criticism ignores that I based my pricing questions in the survey on feature prices listed on Honda's website for analogous feature packages, such as a car with a rearview camera or leather seats.

56.   I performed research to create the price range in the CBC study based upon the available Honda feature prices online.  For the price of a vehicle with the Transmission Defect, I used Honda's own 2019 feature prices and raised and/or lowered them to derive the best possible hypothetical price. We created a price range between the lowest and highest feature package prices.[34]  While not necessarily using the exact price for any particular attribute, the price range of the option packages included in the survey was derived from actual feature pricing on Honda's website.  This method is the best possible surrogate for market prices for a defective Odyssey.

57.   In a subsequent step of my analysis, I then computed demand curves for estimation of price differences for options with and without the Transmission Defect for each price point within the range defined in the conjoint study. The use of hypothetical prices within a reasonable price range is a feature of conjoint studies that makes them a great tool to obtain prices for new products and/or product attributes. My report cites supportive literature that discusses the widespread use of conjoint analysis relying upon feature pricing derived from estimates based upon available market prices for similar features.

58.   Honda argues here that a conjoint survey cannot account for supply side data, and therefore, no accurate economic loss estimates can be derived. However, the conjoint study does not seek to calculate what the equilibrium supply and demand derived market price would be were the transmission defect disclosed at the time of purchase. Rather, the study estimates

---

[34]     Because we used a wide range – including the lowest and highest 2019 Honda feature prices – the range was appropriate for all class model years between 2012 and 2016.

the price that a class member would have paid had the Transmission Defect been disclosed when each class member purchased their Odyssey. The "but for" (if there was no concealment) price assumes the supply is constant; that is, the CBC study determines what the price difference would be – assuming the same number of Odysseys had been sold but with the defect disclosed. So "supply" is held constant, and only demand is adjusted for disclosure of the defect.

59.  The reason supply need not be addressed in my study is because disclosure of the defect has no effect on Honda's cost structure and marginal cost to manufacture, so the supply curve remains constant notwithstanding the disclosure of the Transmission Defect. Only "demand" is affected by disclosure of the defect, and the "disclosed defect" price difference is arrived at by survey respondents' choices among variously priced features (estimated based upon Honda's Odyssey feature pricing listed on its website).

60.  If the Court allowed Honda to adjust the supply side in the fully disclosed defect world to a level where they would have sold the defective vehicles at the price that would have covered Honda's marginal cost of disclosing the defect prior to sale the transmission defect, then Honda would be rewarded for not having disclosed the defect and would be further incentivized to not disclose defects in the future.

## 4.4  Defendants' Misrepresentation of Individual-Level Analysis and "Irrational Results"

61.  The methodology I have applied in this case has been accepted by courts in at least six other cases. Nevertheless, Defendants claim that my approach is inconsistent with academic practice and literature on the subject of conjoint analysis. Based on Dr. Wilcox's rebuttal report, Defendants make two claims in this regard: First, the damage model when applied at the individual level delivers irrational results, and second, survey respondents have unrealistic preferences. In the following, I discuss both claims.

### 4.4.1  Defendants' Misguided Claim on Irrational Damage Estimates

62.  Honda questions the reliability of my study claiming that individual survey results show individuals with absurd responses, such as a person that would agree to pay $3 million for the "privilege" of having the Transmission Defect and another respondent that would require compensation of $10 million before knowingly purchasing an Odyssey with the Transmission Defect. However, Honda's claim that there were such individual survey responses is false. No survey respondent provided either of these grossly irrational responses.

63.  Rather, these irrational individual results are hypothetical individual results that Sawtooth predicts for each of the 500 respondents, based upon each respondent's answers, and the thousands of answers provided by other respondents. As I describe in my report[35] the five attributes used in the conjoint study (including price) result in 280 possible combinations of attribute levels, as for example, a package with improved fuel efficiency, heated and ventilated seats, blind spot warning system, and no defect at $2,500. Respondents saw 12

---

[35]  Boedeker Report, p. 48.

screens with five options on each. Aggregated across all respondents, this provides 30,000 data points. The data points for each individual respondent, however, are limited in number and each individual respondent has not seen many of the universe of feature configurations of the vehicle package (with and without the defect).

64. Therefore, the data available for any individual does not provide enough information to reliably estimate the probability of purchase for a given individual to a given attribute combination. Instead, the algorithm infers from the responses of all respondents what each individual respondent would choose. I loaded all 500 survey responses into the Sawtooth analysis software which produced 500 both average and individual hypothetical results. Sawtooth takes the 60 data points drawn from each actual respondent and extrapolates theoretical responses were the group of 500 to have responded with respect to the total of 1600 possible attributes.  Thus, when Honda refers to "individual" responses, it is not referring to the actual responses of survey takers.  Rather, it is referring to Sawtooth's calculation of what each individual respondent would have likely responded to questions about the entire universe of attribute combinations.

65. These individual responses are hypothetical because each participant answered only twelve screens with five options each (60 choices). No respondent saw all combinations. But in the aggregate, this survey had 500*60= 30,000 responses across study participants. **There was no response from a survey participant that he or she would pay $3 million for a transmission with the Transmission Defect**. This figure was computed by Dr. Wilcox by incorrectly applying the market simulation approach from my report to an individual survey participant's estimates. The sample size of my data is way too small at the individual level to obtain reliable predictions for an individual study participant.  For that reason, and because my sample size is optimal for Sawtooth to calculate average market results, I do not present individual level results in my report.

66. The "confidence interval" (margin of error) for the individual responses referred to by Dr. Wilcox is huge and too large to be reliable.  While the Sawtooth software which I utilized allows for the calculations of individual part-worths which are an approximation of study participants' preferences, the sample size I chose was calibrated to obtain statistically reliable estimates at the composite, not the individual, level.

67. In fact, all aggregated figures calculated by my model are statistically reliable as indicated by 95% confidence intervals reported (estimated to be accurate up to a 95% degree of certainty). The way to evaluate the "irrational results" Honda criticizes is to perform statistical significance tests or to calculate a confidence interval to assess the significance of the unusual individual Sawtooth results (e.g., $3 million) which Dr. Wilcox failed to do. In fact, these individual results are highly unreliable with very wide confidence intervals (margins of error).  On the other hand, the aggregated average results I rely upon are statistically reliable as indicated by tight 95% confidence intervals.

68. Instead of performing proper statistical work, Dr. Wilcox points to a meaningless estimate of $3 million. If he had done what a trained statistician would have done, he would have found that all the examples that he cited as "bad results" are numbers that are statistically

speaking not significantly different from zero with confidence intervals ranging from minus several millions to plus several millions. Dr. Wilcox also fails to mention that the vast majority of study participants produced normal predictions. In order to estimate predicted market behavior, I followed the industry standard--- indeed, recommended by Dr. Wilcox in his book--- and relied upon averages aggregated across all study participants, rather than individual responses.

69. Several authors argue against reliance on samples of size of one as Dr. Wilcox used here, to assert that my conjoint model has illogical results. For example, B. K. Orme, is the creator of Sawtooth, the software I used to estimate the conjoint model. He differentiates between the lower or individual-level model and the upper or aggregate-level model:

> But to compute individual-level models, HB uses information from many respondents to refine the utility estimates for each individual. Therefore, one usually does not calculate utilities using a sample size of one . . .[36]

> Leading academics and practitioners recommend that if it is very important to obtain proper estimates of precision (such as in litigation), then one should simulate shares of preference from the upper-level [average] model (one that includes useful and significant covariates). The draws for shares of preference from the upper-level model simulations then can be enumerated to obtain confidence intervals and for statistical testing (such as for testing whether a product that contains a superior feature is better than another product without that feature).[37]

70. Drs. Allenby and Rossi, who both published extensively on conjoint analysis, add to this in multiple publications:

> In conducting such analysis, it is important to keep in mind that the individual-level part-worth estimates are not precisely estimated, and the use of point-estimates without acknowledging the amount of uncertainty will lead to over-confidence predictions of effect-sizes. This over-confidence can be avoided by using all the draws […]  to make marketplace predictions, not just point estimates.[38] Instead of focusing on individual estimates and exposing the attendant problems with these estimates, economic valuation forces the investigator to estimate the [market-wide, average] distribution of tastes which is then used to compute market demand.[39]

---

[36]  Orme, B. K. (2014). Getting Started with Conjoint Analysis: Strategies for Pricing Research (3rd ed., p. 68). Madison: Research Publishers.

[37]  *Id.*, pp. 187 - 188.

[38]  Allenby, G., Rossi, P. E., Cameron, L., Verlinda, J., & Li, Y. (2017). Calculating Reasonable Royalty Damages Using Conjoint Analysis. *AIPLA QJ, 45*(25).

[39]  Allenby, G., Brazell, J., Howell, J., & Rossi, P. (2014). Economic valuation of product features. *Quantitative Marketing and Economics*, 12, 421–456.

71.   Summarizing these authors, individual-level analyses are possible but they are likely to be very imprecise. Individual-level analyses without providing a confidence interval around the point estimate are likely to lead to over-confident predictions of the size of an effect. In his analysis, Dr. Wilcox provided only individual estimates but no confidence intervals to test accuracy as suggested by Drs. Allenby and Rossi.  So we have no way to determine whether these individual level Sawtooth results are at all meaningful or reliable.

72.   For example, Dr. Wilcox claims that Respondent #350 valued the defect at minus $3 million. When I estimated confidence intervals around the point estimates for Respondent #350, I found that the "individual loss" for a defect that occurs at a probability of 5% and is repaired after 18 months had a point estimate of $3,093,998 with a confidence interval ranging from minus $102,542,600 to minus $150. For Respondent #350 the confidence interval for all other five defects ranges from double digit negative millions to positive single digit millions. Hence, for those scenarios and despite the high point estimates, we cannot exclude that the results are not statistically different from zero.  Thus, the $3 million "irrational" willingness to pay for the Transmission Defect pointed to by Wilcox is really just a reflection of the unreliable individual-level that are not relevant to determining the average market price of the composite survey. On the other hand, my aggregate results, with a 95% confidence level, are statistically reliable.

73.   Dr. Wilcox's approach of calculating point estimates for survey respondents on an individual level is akin to estimating market prices based on a sample size of one, which is incorrect, and therefore, never done in empirical research.

74.   In comparison, the confidence interval around the point estimate for the entire survey population for the configuration for a defect that occurs at a probability of 5% and is repaired after 18 months ranges from $1,652 to $2,629 – by orders of magnitude greater than the confidence interval for respondent #350. The difference in the range of confidence intervals at the individual and at the aggregate level, together with the recommendations of leading authors in the field of conjoint analysis, demonstrates that hypothetical individual results here are irrelevant. Therefore, Defendants' claim that the survey results are irrational is incorrect. Instead as shown above, it is the analysis at the individual level rather than the aggregate level, while not providing the confidence interval, (conducted by Dr. Wilcox) that is fundamentally flawed and therefore invalid.

### 4.4.2  Defendants' Misguided Claim of Irrational Preferences

75.   Similarly, Honda's allegation that 55.4% of the survey takers are indifferent to the presence of the Transmission Defect is based upon a distortion. For the hypothetical individual Sawtooth responses Honda refers to, each has preference for Class Vehicle with or without the Transmission Defect, each response carrying a wide margin of error. Honda considered any hypothetical respondent whose preference range included zero (i.e. was estimated to either prefer or not prefer the Transmission Defect) as having zero preference. But, as discussed above, this 55.4% average is based upon the choices of hypothetical survey takers, whose choices are subject to a wide range of error, making these results highly unreliable.

On the other hand, computing average results for the much larger sample size of 500 respondents – as I did -- decreases the margin of error which yields reliable results.

76. Dr. Wilcox uses the dataset without price constraints (i.e., blocking irrational results, such as a preference for paying more money) available in Sawtooth, which enabled him to make his claims about irrational preferences and illogical economic loss computations.  I, in contrast, applied to the survey results a "price monotonicity constraint." "Price monotonicity constraint" blocks irrational responses where a respondent "prefers" higher prices.  Thus, only rational responses were actually included in my survey's work.

77. To ensure the validity of my survey and analysis, I calculated 95% confidence intervals. The use of 95% confidence intervals and price monotonicity constraint have been accepted by Courts as a valid method to protect against irrational results. For example, in *Apple v. Samsung*, No. 12-CV-00630-LHK (N.D. Cal. Jul. 18, 2012), the court dismissed the defendants' claim that plaintiff's expert's conjoint survey contains irrational results  because the expert utilized a price monotonicity constraint in Sawtooth software and used a 95% confidence interval to protect against irrational result.  Had Dr. Wilcox used the same approach I used, he would not have found any irrational results to criticize.  This is just another example of Dr. Wilcox's confusing statistical principles or performing calculations that I neither endorsed nor applied. In summary, Honda's and Dr. Wilcox's criticism of allegedly illogical choices and irrational preferences of study participants are unfounded because they draw conclusions based on consumer samples of a size of one which are inappropriate for predicting market prices; in contrast, my survey sample of 500 is a proper sample size for this analysis to predict market prices. As I have discussed in my report, the economic losses suffered by the members of the  class must be properly evaluated at the aggregate level to measure price differences rather than focusing on individual willingness to pay.[40]

Dated: July 15, 2019

Stefan Boedeker, declaring under penalties of perjury that the foregoing is true and correct.

_____

Stefan Boedeker

---

[40]   Boedeker Report, Chapter 2.