Livia M. Kiser (SBN 285411)
*lkiser@kslaw.com*
Michael B. Shortnacy (SBN 277035)
*mshortnacy@kslaw.com*
KING & SPALDING LLP
633 West Fifth Street, Suite 1600
Los Angeles, CA 90071
T: (213) 443-4355
F: (213) 443-4310

Attorneys for Defendants
AMERICAN HONDA MOTOR CO., INC.
and HONDA NORTH AMERICA, INC.,

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
## SOUTHERN DIVISION

| | |
|---|---|
| DENNIS MACDOUGALL, RAY SEOW, PRABHANJAN KAVURI, RICHARD FRICK, JOSEPH RYAN PARKER, and BRYAN LENTZ, individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> AMERICAN HONDA MOTOR CO., INC., and HONDA NORTH AMERICA, INC., <br><br> Defendants. | Case No. 8:17-cv-01079-AG (DFMx) <br><br> **AMERICAN HONDA MOTOR CO., INC.'S REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT OR IN THE ALTERNATIVE PARTIAL SUMMARY JUDGMENT** <br><br> Filed Concurrently Herewith: <br><br> 1) Declaration of Michael B. Shortnacy and Exhibits <br><br> Date:  August 5, 2019 <br> Time:  10:00 a.m. <br> Location:  Santa Ana Division, 10D <br> Judge:  Hon. A. Guilford |

1

2

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................... 1

ARGUMENT ............................................................................................. 6

I.     Plaintiffs Have Zero Evidence To Prop Up Their Claims Of A Transmission Defect And, In Any Event, AHM's Evidence Outright Disproves That Their Vehicles Are Defective. ................................... 6

     A.     Plaintiffs' Lay Testimony Offers Nothing Helpful Here. ......................... 6

     B.     Plaintiffs' Other Supposed "Defect Evidence" Is Not Evidence At All. ........................................................................................... 11

     C.     Plaintiffs' Attempts To Discredit Mr. Arst's Detailed Expert Testing And Opinions Fall Flat—This Evidence Confirms Plaintiffs' Vehicles Have No Transmission Defect. ............................... 13

II.     Plaintiffs' Other Last-Ditch Theories Fail. ....................................... 18

     A.     Plaintiffs Cannot Sue Over Their Experience Of "Vibrations." .............. 19

     B.     Plaintiffs Cannot Sue For "Latent Defects" That Have Never Affected The Normal Operation Of Their Vehicles. ................................ 20

     C.     Plaintiffs Cannot Proceed On A Repair-Delay Theory Because They Have No Evidence That Their Vehicles Ever Had Atypical Vibration, And In Any Event, Their Vehicles Demonstrably Do Not Have It. ...................................................................... 22

CONCLUSION .......................................................................................... 25

# <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                                **Page(s)**

*Ainsworth v. KLI, Inc.,*
  967 So. 2d 296 (Fla. Dist. Ct. App. 2007) .......................................................... 8, 9

*In re Apple Inc. Device Performance Litig.,*
  Case No. 18-md-02827-EJD (N.D. Cal. Apr. 22, 2019) ....................................... 22

*Browning v. Unilever United States, Inc.,*
  No. SACV1602210AGKESX, 2018 WL 6615064 (C.D. Cal. Dec. 17,
  2018) ............................................................................................................ 3, 4, 10, 11

*Cahen v. Toyota Motor Corp.,*
  147 F. Supp. 3d 955 (N.D. Cal. 2015) ................................................................. 21

*Christelles v. Nissan Motor Corp., U.S.A.,*
  305 N.J. Super. 222, 701 A.2d 1317 (App. Div. 1997) .......................................... 9

*Chuck Olsen Co. v. FPD, Inc.,*
  No. CV 13-5062 DMG (EX), 2015 WL 12791409 (C.D. Cal. Aug. 11,
  2015) ..................................................................................................................... 12

*Decker v. Mazda Motor of Am., Inc.,*
  No. SACV110873AGRNBX, 2014 WL 12584387 (C.D. Cal. Mar. 17,
  2014) ................................................................................................................. 9, 10

*In re Ford Motor Co. E-350 Van Prod. Liab. Litig. (No. II),*
  No. CIV. A. 03-4558, 2010 WL 2813788 (D.N.J. July 9, 2010) .......................... 22

*Gen. Motors Acceptance Corp. v. Jankowitz,*
  216 N.J. Super. 313, 523 A.2d 695 (App. Div. 1987) ........................................... 25

*In re: Gen. Motors LLC Ignition Switch Litig.,*
  No. 14-MC-2543 (JMF), 2016 WL 3920353 (S.D.N.Y. July 15, 2016) ................ 23

*Lang v. Kohl's Food Stores, Inc.,*
  217 F.3d 919 (7th Cir. 2000) ........................................................................... 25, 26

*Laroe v. FCA United States, LLC,*
  Case No. 17-2487-DDC-JPO (D. Kan. Jun. 25, 2018) ......................................... 22

*Lee v. Toyota Motor Sales, U.S., Inc.*,
  992 F. Supp. 2d 962 (C.D. Cal. 2014) ............................................................ 21, 24

*Manoukian v. PennyMac Loan Servs.*,
  No. CV 11-7551-GHK (EX), 2012 WL 13012695 (C.D. Cal. May 7,
  2012) ........................................................................................................................ 14

*McMillan v. Johnson & Johnson*,
  No. CIV. 04-1180(RBK), 2005 WL 2000203 (D.N.J. Aug. 19, 2005) ..................... 9

*Mendelson v. Country Coach, Inc.*,
  2007 WL 4811927 (C.D. Cal. Nov. 19, 2007) .......................................................... 6

*In re MyFord Touch Consumer Litig.*,
  291 F. Supp. 3d 936 (N.D. Cal. 2018) .................................................................... 24

*Richter v. Monaco Coach Corp.*,
  No. 508-CV-207-OC-10GRJ, 2009 WL 1537894 (M.D. Fla. June 2,
  2009) ........................................................................................................................ 25

*Seaman v. Pyramid Techs., Inc.*,
  No. SACV 10-00070 DOC, 2011 WL 5508971 (C.D. Cal. Nov. 7,
  2011) .................................................................................................................. 14, 18

*Stanley v. Novartis Pharm. Corp.*,
  No. CV1103191JGBOPX, 2014 WL 12573393 (C.D. Cal. May 6,
  2014) ........................................................................................................................ 26

*Stein v. Pac. Bell*,
  No. C00-2915 SI, 2007 WL 831750 (N.D. Cal. Mar. 19, 2007) ........................ 25, 26

*Sumer v. Carrier Corp.*,
  No. 14-CV-04271-VC, 2015 WL 758314 (N.D. Cal. Feb. 20, 2015) ..................... 24

*Thiedemann v. Mercedes-Benz USA, LLC*,
  872 A.2d 783 (N.J. 2005) ........................................................................................ 24

*In re Toyota Motor Corp.*,
  790 F. Supp. 2d 1152 (C.D. Cal. 2011) .................................................................. 21

*In re Toyota Motor Corp. Hybrid Brake Litig.*,
  915 F. Supp. 2d 1151 (C.D. Cal. 2013) .............................................................. 21, 22

*In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Prod. Liab. Litig.*,
   978 F. Supp. 2d 1053 (C.D. Cal. 2013) ..................................................... 10

*Villiarimo v. Aloha Island Air, Inc.*,
   281 F.3d 1054 (9th Cir. 2002) ................................................................... 11

**Other Authorities**

Fed. R. Evid. § 407 ...................................................................................... 12

Fed. R. Evid. § 702

Fed. R. Evid. § 703 ...................................................................................... 13

L.R. 7–12 ...................................................................................................... 14

REPLY ISO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

**INTRODUCTION**

Plaintiffs have tried to avoid summary judgment by dumping on the Court extraneous and irrelevant materials that are not evidence and that have no impact on the outcome of Defendants' motion.[1] *See* Plaintiffs' Statement of Additional Material Facts ECF No. 174-1 ¶¶ 52-87. Fortunately, however, this case is straightforward, and the Court need not spend valuable time wading through the morass of snippets of documents (and Plaintiffs' gratuitous characterizations thereof) to grant summary judgment for American Honda Motor Co., Inc. ("AHM"), the only remaining defendant.

Plaintiffs' admissions operate to defeat their claims, and nothing they add to the mix changes the result. They admit the following material facts to be undisputed:

- Technical Service Bulletins (TSBs) are technical documents that AHM creates in consult with engineers that provide instructions to dealers when a customer presents with a condition that the TSB was designed to address. AHM's Statement of Undisputed Facts, ECF 158-1 at pg. id# 3945-3963 (hereinafter "SUF") ¶ 2.

- Customers who come in to an authorized dealer or repair shop for service can obtain TSB repairs pursuant to the terms of a vehicle's limited, written warranty. SUF ¶ 3.

- All of the Plaintiffs in this case own model year 2014 Honda Odyssey vehicles with six-speed transmissions. SUF ¶ 4. The software and program control modules (PCMs, a.k.a. ECUs) in 2011, 2012, 2013, 2014, 2015, and 2016 Odyssey vehicles vary from model year to model year as well as from engine to engine, and components are provided by multiple suppliers. SUF ¶ 27. The transmission in 2014 Honda Odyssey vehicles is different from prior model years, featuring several material changes to the hardware. SUF ¶ 40.

- AHM issued TSBs to address and remedy the different causes of occasional vibration emanating from the transmission or torque converter, including TSB 17-043. SUF ¶¶ 41-44; 47, 48.

- Automatic Transmission Fluid (ATF) can degrade more quickly when

---

[1] Plaintiffs concede in their Opposition that Honda North America, Inc. is not a proper defendant in this case and agree to dismiss them. Opp. at 37.

exposed to intermittent high head loads.  SUF ¶ 7. ATF deteriorates at differing rates depending on individual driving behaviors such as driving patterns, vehicle use, daily mileage, wear, hard driving, and other factors unique to each driver.  SUF ¶ 39.

- Occasional vibrations can be caused by a host of factors that have nothing to do with the transmission or torque converter.  SUF ¶ 11.

- Both parties used testing protocols to test for the Atypical Vibrations that Plaintiffs allege. SUF ¶¶ 14, 15.  The ATF samples taken from Plaintiffs' vehicles *prior to implementing the countermeasures* tested normal as against a virgin (*i.e.*, brand new) sample. SUF ¶ 24; *see also* Arst Report p. 11, 26-27, ECF 153-2, pg. id# 3458.

- Plaintiffs' own expert does not opine that Plaintiffs' vehicles manifest Atypical Vibrations and did no other testing of Plaintiffs' vehicles.  SUF ¶¶ 16, 17.

- All of Plaintiffs' vehicles were inspected and tested using a multifactor protocol and had the countermeasures set forth in TSB 17-043 performed at no cost to them.  SUF ¶¶ 18, 19, 20, 21, 22, 23; *see also* Arst Report p. 11, ECF 153-2, pg. id# 3458.

- Both before and after receiving the countermeasures in TSB 17-043, Plaintiffs drove extensive distances despite alleging their vehicles are "unsafe," often with children in the vehicle.  SUF ¶¶ 29-34.

- Not a single Plaintiff has brought in his or her vehicle to be repaired or serviced after receiving the countermeasures in TSB 17-043 during their vehicle inspections.  SUF ¶ 35.

The upshot of all this is Plaintiffs admit that they have *zero relevant evidence* of the "transmission defect" they allege in their Complaint, a "defect" that (Plaintiffs claim) causes: (1) "sudden, unexpected shaking and violent jerking … when drivers attempt to accelerate … and shift into 2nd, 3rd or 4th gear [sic]"; (2) hesitation "before responding to a drivers' input on the accelerator pedal, which prevents [vehicles] from accelerating as intended by the driver, especially from a complete stop"; (3) "surge while driving"; and (4) "a hard downshift or clunk when drivers either slow down or accelerate at low speeds."  Compl., ECF 1 at ¶ 5. This Court's prior decisions leave no

doubt that Plaintiffs' utter lack of evidence in support of these allegations dooms their claims, warranting summary judgment in Defendant AHM's favor.[2] *Browning v. Unilever United States, Inc.*, No. SACV1602210AGKESX, 2018 WL 6615064, at *2 (C.D. Cal. Dec. 17, 2018) ("At this stage, Plaintiffs must offer 'significant probative evidence *tending to support the complaint*,' so the Court considers whether Plaintiffs' [alleged] theory has real factual support." (emphasis added)).

Plaintiffs try to manufacture relevant evidence by arguing that their own lay testimony should get them to trial, even though none of them have any expertise with vehicles, and in fact, several of them expressly disclaim knowing anything about cars. But the sum of their testimony is that Plaintiffs claim to have experienced some sort of vibration in their vehicles at some point in the past. And that is *not* evidence of the *transmission* defect Plaintiffs allege in their complaint. Indeed, Plaintiffs freely admit that occasional vibration is caused by a whole host of factors that have nothing to do with the transmission or torque converter, including things like:

> disruptions in the engine, unbalanced tires, brake rotors, wheels, driveline, suspension issues, the driver's unique driving habits (e.g., hard braking), vehicle maintenance habits (or lack thereof), frequent starting and stopping, excessive speeds, engine revving, extreme hot and cold temperatures, climate, humidity, air quality (e.g., dusty or dirty air conditions, or smog), roadway conditions (e.g., the berm, potholes, poorly or unpaved roads), roadway slopes/grades, mountainous terrain, hills and valleys, roads with numerous curves, snowy or icy roadways, and more…

SUF ¶ 11. Put simply: No rational jury could make the leap in logic that because Plaintiffs say they experienced some sort of vibration sensation at some point in time in their vehicles, it is more likely than not their vehicles have the transmission defect they aver in their pleading. The Court need go no further than that.

But if there was any doubt that Plaintiffs failed to meet their burden—AHM has not only pointed out the lack of Plaintiffs' evidence, it also submitted unrefuted *affirmative* evidence that the Plaintiffs' vehicles have no transmission defect. AHM's

---

[2] Plaintiffs concede in their Opposition that Honda North America, Inc. is not a proper defendant in this case and agree to dismiss them.

expert, Mr. Arst, conducted multiple tests on each of Plaintiffs' vehicles, and the results were conclusive. The vehicles have no Atypical Vibration.[3] Plaintiffs have done nothing to meaningfully call this evidence into question (save submit counsel's personal opinions on matters).  Plaintiffs even admit their own expert does not opine that their vehicles suffer from the condition, claiming that they can "prove the defect in their vehicles from their own Plaintiffs' own [sic] testimony, there [sic] service records, and Honda's internal documents."  ECF 174-1 at ¶ 17.  The heart of Plaintiffs case—that their transmissions have a defect—is thus doubly undermined.

Recognizing that actual evidence forecloses the claims they allege, Plaintiffs attempt an eleventh-hour pivot and offer the Court several new theories, none of which are supported by either fact or law. For one example, Plaintiffs now argue that because various independent Honda dealerships performed free automatic transmission ("ATF") flushes in their vehicles when they presented their cars for service, that somehow constitutes evidence that there is a transmission safety defect in their vehicles. Put differently, Plaintiffs seek to manufacture claims based on having been provided free warranty service (except for one plaintiff, Kavuri, whose maintenance minder triggered the ATF service, ATF being a wear item). SUF ¶ 23. Setting aside the notion that free warranty service could morph into proof of a safety defect—a repudiation of well-settled law that creates perverse incentives—Plaintiffs offer no authority to back it up.

For another example, Plaintiffs suggest that Mr. Arst's opinion is faulty because (they claim) all of his opinions are based on the 11 or so minutes of monitoring data that he manually captured while testing each vehicle. But the record reveals that Plaintiffs' underlying premise is not true: Mr. Arst testified that *another* monitor was recording data *constantly throughout the entire drive tests*. Declaration of Michael B. Shortnacy ("Shortnacy MSJ Decl.") Ex. 1 (Arst Dep. 41:25-42:20; *id*. 64:9-65:7). And Mr. Arst also conducted lab testing of the Plaintiffs' automatic transmission fluid

---

[3] For consistency's sake, Defendants refer to "Atypical Vibration" as shorthand for the allegations in Plaintiffs' complaint. *See*, *e.g*., SUF at ¶ 6.

("ATF"), which the Plaintiffs fail to address entirely. Plaintiffs concede that the transmission issue they sue over causes degraded ATF, and the lab tests confirmed that their ATF—prior to receiving the countermeasures in TSB 17-043—was *not degraded*. It was, instead, like new. SUF ¶ 24. Plaintiffs' hyperfocus on one aspect of the testing thus misses the mark.

For yet another example, Plaintiffs now argue that even if their vehicles are fixed (or never experienced a transmission issue in the first place), their claims of defect may still proceed. Because, according to Plaintiffs, every Honda Odyssey from 2012 to 2016 with a six-speed transmission has a latent defect. This supposed "defect" is that these vehicles had a "risk" of developing a transmission issue at some point in the future. But that theory fails as a matter of law, and even a cursory read of Plaintiffs' Complaint makes clear that they are suing over *actual* (and what they aver to be serious) conditions: "sudden, unexpected shaking and violent jerking … when drivers attempt to accelerate," hesitation "which prevents [vehicles] from accelerating as intended by the driver," "surge while driving," and "a hard downshift or clunk when drivers either slow down or accelerate at low speeds." Compl. ECF No. 1 at ¶ 5. Plaintiffs aver in the complaint that this so-called "transmission defect" renders vehicles unsafe to drive. *Id*.

That they are now trying to flee from those unproven claims to some latent risk that has never manifested in their vehicles is not surprising, but it is unavailing. Plaintiffs also offer no authority (or analysis) explaining how the so-called "risk" of a vehicle developing an issue sometime in the future could be actionable. Not to mention that the evidence now confirms the transmission issue has been addressed through countermeasures, so Plaintiffs' "future risk" theory has now gone from wholly speculative to never happening. And as Plaintiffs' own cited authority makes clear: fixed issues do not give rise to the warranty and other claims they press here.

In the end, the crack running throughout the Opposition is that Plaintiffs confuse AHM's burden of *production* with Plaintiffs' ultimate burden of *proof*. Summary judgment is when the Plaintiffs "must show what evidence [] would convince a trier of

fact." *Mendelson v. Country Coach, Inc.*, 2007 WL 4811927, at *2 n.1 (C.D. Cal. Nov. 19, 2007) ("[S]ummary judgment is the 'put up or shut up' moment in a lawsuit…"). After AHM pointed out the absence of evidence supporting Plaintiffs' claims, the burden shifted to Plaintiffs to create an issue of fact—which they have not done. Plaintiffs characterize AHM's Motion as "a plea to this Court to do exactly what it's not supposed to do on summary judgment—weigh the evidence . . ." Opp. at 2. But as explained below, there is no evidence on Plaintiffs' side of the scale.  The undisputed evidence demonstrates that Plaintiffs do not have a "transmission defect" in their vehicles.  Summary judgment should be granted in favor of AHM.

## ARGUMENT

**I.  Plaintiffs Have Zero Evidence To Prop Up Their Claims Of A Transmission Defect And, In Any Event, AHM's Evidence Outright Disproves That Their Vehicles Are Defective.**

### A.  Plaintiffs' Lay Testimony Offers Nothing Helpful Here.

Plaintiff cannot meaningfully dispute that their individual claims rise or fall depending on whether they can actually prove there is an existing transmission defect in their vehicles (and their proposed class claims can only proceed if they can demonstrate that it is a "common" one).[4] So Plaintiffs try to dodge Mr. Arsts' case-ending opinions and evidence that no transmission defect in their vehicles exists–opinions which are not disputed by their own proposed expert–by arguing that Plaintiffs' lay testimony should get them to trial. But their position suffers from several fatal flaws. First, Plaintiffs fail to point to any of their own testimony that even professes to offer evidence about the *transmission defect they sue over*. Their lay testimony is thus a moot point. Second, Plaintiffs offer no authority to suggest that their lay testimony could be competent evidence of the highly-technical engineering defect they allege in the Complaint. Indeed, the authority Plaintiffs cite on this topic cuts against

---

[4] Plaintiffs try to dispute this fact, but as explained below in Section II-C, their efforts fall flat.

them at every corner. Third, Plaintiffs' own contradictory and confused testimony is not credible evidence a jury could reasonably rely on even if it were relevant. None of the Plaintiffs works in the automotive industry or testified they know anything about transmissions.  In point of fact, Plaintiffs testified the opposite:

- In his testimony, Plaintiff Parker admitted to not knowing what a torque converter does or how it works and on more than one occasion conceded that he is not an expert on mechanical issues. Shortnacy MSJ Decl. Ex. 2 (J. Parker Dep. 113:4-13; id. 243:3-244:8).

- Plaintiff Parker's wife, Mrs. Parker, testified to never having taken any vehicle for a repair, leaving those matters to others, illustrating her lack of familiarity with any type of repairs, let alone transmission issues. Shortnacy MSJ Decl. Ex. 3 (A. Parker Dep. 63:3-20).

- Similarly, Mrs. MacDougall testified that she is not an expert on automobiles and never even looking under the hood of her vehicle to see how things work. Shortnacy MSJ Decl. Ex. 4 (L. MacDougall Dep. 53:22-54:13). She freely admits that she has no knowledge as to what is causing the sensations she alleges to have experienced. Id.

- Mr. MacDougall also admitted to not being an expert when it comes to transmissions and that he wasn't even aware of the existence of a torque converter previously. Shortnacy MSJ Decl. Ex. 5 (D. MacDougall Dep. 199:13-200:20).

As AHM argued in its moving papers, Plaintiffs do not even try to testify that they know what a transmission-related vibration feels like. Mot. at 5. And no wonder: as Mr. Arst and Honda witnesses testified (and as Plaintiffs admit), occasional vibration has many causes, and the only way to tell whether it is emanating from the transmission or torque converter is to plug special equipment (a Honda Diagnostic System computer) into a vehicle.  Nor do any of them say they have experience or knowledge enabling them to offer testimony about transmission issues.[5] And their own proposed expert does

---

[5] Plaintiffs make an offhand comment that their testimony should be considered in light of the fact that some Odyssey vehicles have suffered from a transmission-related vibration in the past. But every shred of evidence confirms that those various (and different) issues were addressed, so that even if a small percentage of vehicles manifested Atypical Vibration in the past is not relevant. Plaintiffs admit that vibrations

not opine they have Atypical Vibration. So their lay testimony is irrelevant.

AHM's Motion also explains at length why, even if Plaintiffs *had* offered relevant testimony about their claim, though they did not, lay witnesses cannot testify about the presence of a highly technical engineering problem in their transmission. Mot. at 20-23. Plaintiffs largely ignore AHM's authority on this point.[6] Instead, Plaintiffs cite authority that directly contradicts their positions and supports AHM in all respects.

Take Plaintiffs' first supporting case, which is illustrative of much of the authority cited throughout their brief: *Ainsworth v. KLI, Inc.*, 967 So. 2d 296, 301 (Fla. Dist. Ct. App. 2007). Plaintiffs quote this case as holding that a "plaintiff's testimony regarding a malfunction is sufficient circumstantial evidence, without expert corroboration . . . to reach the jury." Opp at 16. When the omitted parts of this quote are put back in, a quite different ruling is revealed. The court was actually referring to a doctrine in strict liability and negligence cases that applies when evidence is destroyed (which has nothing to do with Plaintiffs' claims here), and then proceeded to hold that this doctrine *did not apply to the plaintiffs there*: "**In order for a *Cassisi* inference to arise**, the plaintiff's testimony regarding a malfunction is sufficient circumstantial evidence, without expert corroboration (**which necessarily must be the case**

_____

are often caused by various factors having nothing to do with a transmission or any other defect. Indeed, Mr. Parker's vehicle was vibrating because of worn tires when his car was tested. Plaintiffs cannot hold AHM up to a trial because they offer testimony that they experienced a sensation that happens to be similar to an Atypical Vibration, particularly when they admit that sensation is equally consistent with a laundry list of other causes. Plaintiffs – all of whom are admitted lay persons who have no technical training in automobiles or automotive engineering – cannot come forward and claim they are entitled to be compensation because they claimed to have felt a "vibration" at some point in time while driving their vehicles.

[6] Plaintiffs attempt to distinguish *Milton Greene v. CMG Worldwide Inc.* and *Spangler v. City of Ventura* are not meaningful. Those cases are on point and stand for the proposition that lay witnesses cannot offer speculation or testimony on technical matters they have no experience with. And any testimony from the Plaintiffs about transmission defects would be both speculative and unqualified technical opinions.

1   **considering that some products which malfunction are destroyed and are not**

2   **available for testing as a result**) . . .” *Ainsworth*, 967 So. 2d at 302. The court

3   concluded the rule did not apply because the products sued over were not destroyed. *Id.*

4   The story is the same for each other case Plaintiffs cite on this point. Plaintiffs

5   next rely on *McMillan v. Johnson & Johnson*, No. CIV. 04-1180(RBK), 2005 WL

6   2000203, at *3 (D.N.J. Aug. 19, 2005), suggesting that expert evidence was not needed

7   to prove a defect when a steering wheel locked up. Opp. at 16. What the court actually

8   held was that expert testimony *was required* because the jury’s “common sense” was

9   not enough to understand the technical knee-replacement defect being sued over. *Id.* In

10  other words, this case directly supports AHM. The court’s reference to a “locked

11  steering wheel” that Plaintiffs cherry-picked from the decision was a quote from a

12  personal injury case concerning whether a vehicle’s steering wheel had caused a car

13  accident. *Id.* It had nothing to do with the law governing the claims Plaintiffs assert.[7]

14  Plaintiffs try to skirt around *Decker v. Mazda Motor of Am., Inc.,* by rehashing

15  irrelevant facts from the opinion. *Decker v. Mazda Motor of Am., Inc.,* No.

16  SACV110873AGRNBX, 2014 WL 12584387, at *1 (C.D. Cal. Mar. 17, 2014); Opp. at

17  15. Plaintiffs suggest it makes a difference that, there, the plaintiff’s allegation was

18  limited to a “specific” warranty extension for a “specific” engine condition. Opp. at 15.

19  But as in *Decker*, Plaintiffs here sue over a “specific” transmission condition—the one

20  they put in their Complaint. Plaintiffs say that *Decker* is also distinguishable because

21  _____

22  [7] *See also Christelles v. Nissan Motor Corp., U.S.A.*, 305 N.J. Super. 222, 701 A.2d
    1317 (App. Div. 1997), which Plaintiffs cite as holding that “the plaintiffs’ testimony
23  that their vehicle bucked and stalled ‘established objective facts”; expert testimony was
    not required to prove the automobile defect.” Opp at 16. What the court actually said
24  was that the plaintiffs’ testimony about a vehicle bucking was an “objective fact” not a
    “subjective fact.” *Id.* That has nothing to do with expert testimony. And in any event,
25  the plaintiffs were suing under New Jersey’s lemon law, which merely required the
26  plaintiff to prove *any “impairment” or “condition” that caused a “nonconformity.”*
    And so the plaintiffs’ testimony there about an objective “nonconformity” was enough.
27  Of course, that is not what Plaintiffs sue for in this case. They sue for a *specific
28  transmission defect described at length in the Complaint.*

the evidence there showed that a particular "incident" was not caused by a particular "defect." Opp. at 15. Exactly right. And just so here. Plaintiffs cannot show that the vibrations they say they felt were caused by the transmission defect they sue over.[8]

Plaintiffs next claim that because the transmission defect is "untestable," no expert evidence is needed to support their claims. Of course, that misses the point that Plaintiffs have *no other relevant evidence* of a transmission defect—whether it be expert or otherwise. And Plaintiffs miss another point: They have submitted no credible evidence that the transmission issue is "untestable" in the first place. Plaintiffs inexplicably cite to *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Prod. Liab. Litig.*, 978 F. Supp. 2d 1053, 1089 (C.D. Cal. 2013)—but there, an expert provided extensive *reasoning* and *basis* for opining that a software issue was "untestable." *Id.* The court specifically cited the expert's opinion walking through the "more than 16 million possible" "combinations" in the problematic software that made testing impossible, as well as the problem that the software was not designed to "record" information to conduct a test. *Id.* at 1089. It is exactly that sort of factual detail, expert reasoning, and expert opinion that Dr. Parker provides none of. There is no credible evidence that the transmission issue cannot be tested here; there is unrefuted evidence from Mr. Arst that it absolutely can be. Shortnacy MSJ Decl. Ex. 1 (Arst 52:4-56:22*, id.* 158:22-159:25), Arst Reb. Rep't at 5, ECF 153-2, pg. id # 3487.

Not to mention that even if Plaintiffs' testimony were somehow relevant to their claimed transmission defect, their testimony is not only "uncorroborated" and "self-serving," which would undermine its usefulness to a jury—but it is contradictory and confused, making it impossible for any reasonable jury to rely on it for any use.[9] *See,*

---

[8] Plaintiffs likewise fail to distinguish *Browning v. Unilever United States, Inc.,* No. SACV1602210AGKESX, 2018 WL 6615064, at *4 (C.D. Cal. Dec. 17, 2018). *Browning* is also on all fours here. That case again stands for the simple proposition that Plaintiffs must put up evidence at summary judgment that the specific defect they sue over is present. *Id.* Plaintiffs have not done that.

[9] Plaintiffs criticize AHM for pointing out the contradiction between Plaintiffs alleging

*e.g., Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002) ("[T]his court has refused to find a 'genuine issue' where the only evidence presented is 'uncorroborated and self-serving" testimony'"). Further undermining their testimony, not a single Plaintiff has brought in his or her car to be repaired after receiving the Countermeasures in TSB 17-043. The Plaintiffs continue to drive their vehicles for thousands of miles and many even admit they know their vehicles are safe. SUF ¶ 35.[10]

As this Court has held, even if evidence "is merely colorable, or is not significantly probative, summary judgment may [still] be granted." *Browning v. Unilever United States, Inc.*, No. SACV1602210AGKESX, 2018 WL 6615064, at *1 (C.D. Cal. Dec. 17, 2018). Plaintiffs cannot manufacture relevant evidence about a technical transmission defect out of their flimsy lay testimony especially where, as here, the condition must be diagnosed through the use of special equipment.

**B.    Plaintiffs' Other Supposed "Defect Evidence" Is Not Evidence At All.**

Plaintiffs make several other half-hearted attempts to drum up "evidence" to support their claims, now that their expert failed to offer any. But none of it creates a triable issue of fact. Plaintiffs first contend that because dealers agreed as a courtesy to

---

their vehicles are "undriveable" while continuing to drive their vehicles for thousands and thousands of miles. Opp. at 18. Whether Plaintiffs were required to prove their cars were undriveable is of no matter: the point is: (1) the contradiction undermines the Plaintiffs' credibility, and (2) Plaintiffs claim they are entitled to replacement of their vehicles because their cars are undriveable and "unsafe," all the while admitting they have "driven extensive distances … often with children in the vehicle." SUF ¶ 29.

[10] Plaintiffs attempt to distinguish *Browning v. Unilever United States, Inc.,* No. SACV1602210AGKESX, 2018 WL 6615064, at *4 (C.D. Cal. Dec. 17, 2018) by pointing out that, there, the plaintiffs relied on "uncontrolled" consumer complaints that were mere "conjecture," not their own personal experiences. But the point is that Plaintiffs' testimony is equally as "uncontrolled" and "conjecture" when it comes to any potential transmission issue in their vehicles. Put simply: They know nothing about whether a vibration is caused by a transmission or a tire or driving conditions. Nor are their experiences "controlled" in the sense that they cannot replicate them—indeed, if they could, no doubt Plaintiffs' would have provided that evidence and this would be a moot point.

give them a free ATF when they brought their vehicles in, that alone proves Plaintiffs'
vehicles actually have the defect they sue over. *E.g.,* Opp. at 15. Plaintiffs ignore that,
when they received the flush, dealers were not instructed to capture technical data to
confirm whether any transmission issue was present. (See Defendants' Response to
Plaintiffs' Statement of Genuine Disputed Facts at SUF ¶3).[11] Indeed, and to the
contrary, some of the Plaintiffs' records confirm the transmission issue *was not
replicated* in their vehicles. Osterwise Decl. Ex. 27 (MacDougal000008), ECF 174-29
pg. id #6684. So that dealers offered customers free ATF is probative of nothing.

Plaintiffs also offer zero authority to support this outlandish theory, most likely
because such a rule would discourage companies from providing free warranty repairs
for fear that so doing would form the basis for liability. It's the same reason why
remedial measures are inadmissible under the Federal Rules of Evidence. *Chuck Olsen
Co. v. FPD, Inc.*, No. CV 13-5062 DMG (EX), 2015 WL 12791409, at *1 (C.D. Cal.
Aug. 11, 2015) (efforts to remediate are not admissible to prove culpability). That AHM
did the right thing in trying to identify as part of its ongoing market quality efforts
different countermeasures to address various (non-related) transmission or torque
converter issues (*e.g.*, timing hydraulic circuit involved in switching gears, which
Plaintiffs admit had nothing to do with ATF or the torque converter–SUF ¶ 42) is not
evidence of a "defect" that Plaintiffs can use as a sword to hold AHM liable. *Am. Honda
Motor Co. v. Super. Ct.,* 199 Cal. App. 4th 1367, 1378 (2011); *see* also Mot. at 14.

---

[11] Plaintiffs call AHM out for stating that Amy Parker testified about "throwing up"
when, in fact, she stated that her head was "thrown" into her seat (as Plaintiffs knows
very well from the cited exhibit). AHM meant the latter, and in any event, the difference
is immaterial. Moreover, Mr. MacDougall did testify as follows concerning his vehicle:
"…The worst that would happen with this vehicle is it would just stop functioning, and
they would roll off the road to, you know, a breakdown lane or something." Shortnacy
MSJ Decl. Ex. 4 (MacDougall Dep. 195:1-5). Whereas Mrs. Dougall acknowledges
that she does not feel unsafe. L. MacDougall Dep. 63:24- 64:10, Kiser Decl. Ex. 1, ECF
153-1 pg. id # 3392-3393. Plaintiffs have forgotten that they *all* allege their vehicles
hesitate "before responding to a drivers' input on the accelerator pedal, which prevents
[vehicles] from accelerating as intended by the driver, especially from a complete stop."
ECF No. 1 ¶ 5.

Plaintiffs also now argue that because the countermeasure may have cured any alleged defect, they should not be required to provide evidence of a current defect. Opp. at 17. If Plaintiffs wish to concede that their vehicles do not suffer from the defect they sue over and that the countermeasure was effective (as it was), that would simplify the case. Such claims would quickly fail for the reasons explained in Section II.

### C.   Plaintiffs' Attempts To Discredit Mr. Arst's Detailed Expert Testing And Opinions Fall Flat—This Evidence Confirms Plaintiffs' Vehicles Have No Transmission Defect.

Plaintiffs double down on their theory that describing the transmission defect "intermittent" immunizes them from having to actually rebut Mr. Arst's detailed opinion and findings. Opp. at 16-17. But as AHM explained at length in its Motion, that an issue is "intermittent" in everyday driving has no bearing on whether Mr. Arst's testing protocol—designed to capture this particular "intermittent" issue—was efficacious. "Intermittent" only means "not happening regularly or continuously; stopping and starting repeatedly or with long periods in between."[12]  It does not mean "rare" or "hardly ever." Indeed, Plaintiffs ignore that one test Mr. Arst performed was of the Plaintiffs' ATF fluid, which was no different in quality than brand-new ATF even before the countermeasures in TSB 17-043 were performed (as Plaintiffs admit–SUF ¶24). Plainly, the state of this fluid is not "intermittent," and Plaintiffs ignore that fact.

AHM has already explained *ad nauseum* why Dr. Parker's rebuttal opinion— consisting of nothing more than speculation that Mr. Arst's testing was not good enough—fails to satisfy the *Daubert* standard and Fed. R. Evid. §§ 702 and 703. Mr. Arst's thorough opinions explain: (1) the multi-factored testing protocol designed to detect any transmission issues in the Plaintiffs' vehicles, and (2) how each of the distinct aspects of the testing resulted in a "negative" result for any transmission issue in these vehicles. Plaintiffs now offer more detailed (if irrelevant) attacks on Mr. Arst's testing,

---

[12] *See* Cambridge Dictionary 2019 https://dictionary.cambridge.org/us/dictionary/english/intermittent (Jul. 22, 2019).

1   seemingly based on counsel's opinions—because Dr. Parker did not offer them.[13]

2       But they, too, fail. *First*, Plaintiffs contend that Mr. Arst's test results should be

3   ignored because he relied "only" on about "11 minutes" of snapshot testing data (data

4   collected when Mr. Arst or his assistant would trigger a monitoring devices). Opp. at 2.

5   That is false. Mr. Arst explained that he relied *not only* on this triggered snapshot data—

6   but also on a second device that was *always recording*. SUF ¶15; Shortnacy MSJ Decl.

7   Ex. 1 (Arst Dep. 58:12-59:8). Not to mention that Mr. Arst conducted physical

8   examinations based on his nearly three decades of field expertise.  Arst Report at 1,

9   ECF 153-2, pg. id# 3458.

10      More importantly, Mr. Arst conducted separate lab testing of Plaintiffs' ATF, and

11  Plaintiffs outright ignore that testing and those results. *See Manoukian v. PennyMac*

12  *Loan Servs.,* No. CV 11-7551-GHK (EX), 2012 WL 13012695, at *3 (C.D. Cal. May

13  7, 2012) ("Plaintiffs' failure to respond" constitutes "consent to the granting of the relief

14  sought."); *see also* L.R. 7–12. As Plaintiffs concede, when the transmission issue is

15  actually present, it necessarily manifests alongside degraded ATF (which ultimately

16  caused the vibration in a small number of vehicles before the countermeasure).  Mr.

17  Arst designed the testing protocol to capture intermittent issues by employing multiple

18  types of testing. The results are conclusive and admitted by Plaintiffs. SUF ¶ 15.

19      But even if Mr. Arst had solely relied on the snapshot data (though he did not),

20  Plaintiffs' criticisms are belied by the facts. The snapshots simply revealed additional

21  details about the vehicle's operation, and Mr. Arst explained that he triggered them

22  using his expertise in an effort to reveal any possible transmission issue. The "limited"

23  data is simply a result of Mr. Arst homing in on certain periods to provide extra detail

24  _____

25  [13]What Plaintiffs actually rely on is their counsel's rhetoric, but that is not evidence.
    Opp. at 15 ("The gaps in Mr. Arst's data and analysis show that Honda hasn't proven

26  that Plaintiffs…"); *id.* ("Mr. Arst's data tells us very little about Plaintiffs vehicles").

27  *See Seaman v. Pyramid Techs., Inc.*, No. SACV 10-00070 DOC, 2011 WL 5508971,
    at *2 (C.D. Cal. Nov. 7, 2011) ("A party cannot create a genuine issue of material fact

28  simply by making assertions in its legal papers.")

1   on the vehicles' operation. It is no way evidence of faulty testing.

2         Plaintiffs also suggest that the Court cannot "trust" these snapshots because

3   Mr. Arst had every incentive to *intentionally* not trigger them at the right times.[14] Opp.

4   at 13. Setting aside that Plaintiffs seem to be accusing a professional and certified expert

5   of intentionally falsifying data *without an ounce of evidence*—Plaintiffs ignore that their

6   own expert was hooked into *the same device* during the tests and had the *same ability*

7   *to trigger snapshots*.[15] Dr. Parker had every incentive to trigger snapshots at the

8   "appropriate" times – *i.e.*, times at which *he* perceived vibration. That Dr. Parker found

9   zero evidence of any issue using the *same feed* reveals the absurdity of Plaintiffs'

10  unfounded accusations. And, again, the snapshot data was but one independent test

11  being done—Plaintiffs effectively concede that Mr. Arst can properly rely on the other

12  testing he did to reach the same conclusion that no transmission defect was present.[16]

13        Relatedly, Plaintiffs argue that the Court should ignore that Honda was able to

14  develop protocols to diagnose the transmission issue and roll out countermeasures using

15  these same snapshot tests, which just adds more corroboration to the fact that the

16  transmission issue can be readily diagnosed. But the unrefuted evidence shows that

17  Honda did effectively diagnose the transmission issue when it was present in vehicles.[17]

18  ———————————————

19  [14] Plaintiffs state (without basis in fact) that "While Mr. Arst claims he was trying to
    cause and capture data showing torque converter judder in Plaintiffs' vehicles, doing so
20  would not be in his clients' interest." Opp. at 13.

21  [15] Dr. Parker did not even bother to bring any testing equipment to the first inspections.

22  [16] Plaintiffs also imply that Mr. Arst had the impossible task of triggering the snapshots
    within a tiny window of a second or two. Opp. at 13. They fail to point the Court to
23  Mr. Arst's testimony where he explains that his equipment is always recording, and that
24  when Mr. Arst's triggers a snapshot—the device saves *data before and after the*
    *snapshot.* Shortnacy MSJ Decl. Ex. 1 (Arst Dep. 63:9-64:20). Plaintiffs are either
25  attempting to mislead the court by suggesting Mr. Arst had only a couple seconds to
26  capture the data, or they did not read the transcript they attached to their brief.

27  [17] Plaintiffs repeat Dr. Parker's absurd reliance on a single record that one owner out of
28  136,793 2014 Odyssey owners had to bring his vehicle in four times for a diagnosis.
    *See* SUF ¶10; *see also* Parker Reb. Rep't ¶9, ECF 151-2, pg. id #3273. First, this is based

Indeed, even service technicians did so. Mr. Arst simply designed an even more thorough and airtight testing protocol to remove any doubt in this case. Arst Report at 10-11 ECF 153-2, pg. id# 3458.

*Second*, Plaintiffs contend that Mr. Arst himself admitted that the vibration was too "intermittent" to test for properly. Even a cursory read of his report and testimony reveals the opposite. Shortnacy MSJ Decl. Ex. 1 (Arst 121:7-22, *id.* 161:10-17; *id.* 164:19-167:9). Because the vibration is intermittent, Mr. Arst designed a testing protocol that would replicate it—including lab testing of fluids, extensive inspections, and driving tests that would duplicate any relevant vibrations. SUF ¶15. Plaintiffs also suggest that Mr. Arst admitted Plaintiffs' vehicles could have had a transmission issue in the past or develop one in the future. But in fact, all he said was that he was not asked to address that question in his opinion. And if Plaintiffs mean to move forward on a case based on the claim that their vehicles could theoretically develop a transmission problem someday or had one at some time in the past—without any actual evidence of either—that speculation cannot defeat summary judgment.

*Third*, Plaintiffs suggest that, because their vehicles may have received ATF flushes recently, that could have interfered with Mr. Arst's testing. But most of the Plaintiffs' records reveal that they had not had a flush for *years*. Osterwise Decl. Ex. 23 -(Kavuri000008), ECF 174-25 pg. id. #56-57; Osterwise Decl. Ex. 24 -Lentz0000032), ECF 174-26 pd. id 66-67; Osterwise Decl. Ex. 25 (Seow000044), ECF 174-27 pg. id # 66-72; Osterwise Decl. Ex. 26 (Parker000010), ECF 174-28 pg. id. # 66-78; Osterwise Decl. Ex. 27 (MacDougall000017), ECF 174-29 pg. id. 66-83. And as for the two that did: that only further confirms the efficacy of the ATF flush, which was the remedy provided to vehicle owners during the period that the third-party PCM vendors (Keihin

---

on a customer service representative's summary of a customer call, so it's at best triple hearsay. Second, a single dealer's struggle to diagnose an issue in a different consumer's vehicle is the definition of tangential. It sheds no light on Mr. Arst's testing protocol, and it sheds no light on Honda's general ability to diagnose the issue.

and Continental) were developing the different software updates to roll out into the market.  Shortnacy MSJ Decl. Ex. 6 (Hall Dep. 232:11-233:13).  And as the warranty data makes clear, few vehicles presented for this condition, but when they did, they obtained the benefit of free service for fluid replacement that a vehicle owner would otherwise have had to pay for given ATF is a wear item, as Plaintiffs agree.  SUF ¶ 51.

*Fourth*, Plaintiffs vaguely allude to Dr. Parker's rebuttal opinion. If the Court strikes Dr. Parker's opinions, this is a moot point. But even if it does not, Dr. Parker never offers an *expert* opinion about why Mr. Arst's testing protocol—the physical inspection, the ATF lab testing, or the other data collected—was not good enough. All Dr. Parker offers is the conclusion—devoid of any supporting technical opinion—that the testing was not good enough because the symptoms are "intermittent." Again, Dr. Parker had every opportunity to offer an actual opinion as to what Mr. Arst would have had to do differently to capture the "transmission defect" in Plaintiffs' vehicles. Not only did he not do so, he didn't even perform separate testing on Plaintiffs' cars. Dr. Parker is a nullity for Plaintiffs – as they concede, because they expressly state they do not intend to rely on him for evidence that their vehicles have the defect of which they complain. That is why AHM hired a top expert to design a testing protocol that would reveal even "intermittent" Atypical Vibrations in Plaintiffs' vehicles.[18]

*Finally*, Plaintiffs say that AHM's failure to come up with a better testing protocol is a "failure of . . . imagination." Opp. at 14. For the first time—raised after AHM spent extensive resources having Mr. Arst design the testing protocol and carry it out over days—Plaintiffs' *counsel* offers unsupported attorney commentary that

---

[18] Plaintiffs make much out of Mr. Arst never experiencing a transmission judder in Odysseys. But Mr. Arst explained that he has experience with this issue across many vehicles and years. Plaintiffs' suggestion that experts can only test a vehicle if they have personal experience belies the notion of an expert and does not comport with the law. It's also ironic given Plaintiffs' own expert elected to do absolutely no testing whatsoever of Plaintiffs' vehicles, yet still purports to opine that all model year 2012-2017 six-speed Honda Odyssey vehicles suffer from a systemic transmission defect.

Mr. Arst (the expert) should have "captured more . . . applicable [snapshot] data . . . And [] should have tested the cars on more than one occasion." *Id.*  Counsel's opinions about the proper testing protocol is not admissible or considerable. *Seaman*, No. SACV 10-00070 DOC, 2011 WL 5508971, at *2. *Second*, as noted above, counsel's arguments are based on a false narrative: a backup recorder was always recording data. Shortnacy MSJ Decl. Ex. 1 (Arst Dep. 41:25-42:20; *id*. 64:9-65:7).

Even if the Court were inclined to credit counsel's opinions, though it should not, they do not move the needle. This gotcha tactic of poking holes in the expert protocol after the dust settles is transparent. Neither Dr. Parker nor Plaintiffs' counsel objected to the protocol. And as explained above, the data did not just include snapshots—it included other testing as well which did not depend on vibration "intermittency," which Plaintiffs simply fail to address.  Plaintiffs' vehicles do not have a "transmission defect."

## II.  Plaintiffs' Other Last-Ditch Theories Fail.

Plaintiffs contend that AHM generally failed to explain why the absence of a transmission defect in their vehicles would undermine all their claims, raising novel theories to suggest that *no transmission defect is required* for them to proceed to trial. Plaintiffs, not AHM, chose to expressly plead a "transmission defect" that renders their vehicles undrivable and unsafe, and which they allege manifests as:

- "sudden, unexpected **shaking and violent jerking** … **when drivers attempt to accelerate** … and shift into 2nd, 3rd or 4th gear [sic]";

- hesitation "before responding to a drivers' input on the accelerator pedal, which **prevents [vehicles] from accelerating as intended by the driver**, especially from a complete stop";

- "**surge while driving**"; and

- "**a hard downshift or clunk when drivers either slow down or accelerate** at low speeds."  ECF No. 1 at ¶ 5.

Plaintiffs cannot now claim they are confused about how their claims hinge on their vehicles having a transmission defect. ECF No. 1 at ¶ 5. Plaintiffs' attempt to

circumvent the theory they presented in the Complaint and that the parties litigated for years is disingenuous (and unavailing). And AHM already pointed the Court to its own past decisions that require Plaintiffs to stick to the factual theory they allege. Mot. at 16. But even if the Court is inclined to look further, Plaintiffs novel theories all fail.

### A.      Plaintiffs Cannot Sue Over Their Experience Of "Vibrations."

Tacitly acknowledging that they have no evidence of the *transmission* defect they sue over, Plaintiffs now claim that the occasional vibration they have complained about is itself an actionable claim. First, as explained above, Plaintiffs hitched their case to a transmission defect, so they cannot proceed with a new theory now. ECF 1, pg. id #1 at ¶¶ 5, 27, 28, 63-93. Second, also as explained above, Plaintiffs testimony is not credible enough to go to a jury in any event. *See supra* Section I-A.

Third, even if Plaintiffs have experienced a vibration in their vehicles—they expressly admit that vehicle vibrations are equally consistent with *many other causes that have nothing to do with a vehicle defect.* SUF ¶ 11. Disruptions in the engine, brake rotors, wheels, driveline, or suspension may produce unwanted vibrations that are not evidence of a transmission defect. SUF 11. The Plaintiffs' habits may also cause vibrations over time, like failing to maintain their vehicles, frequent starting and stopping, excessive speeds, engine revving, extreme hot and cold temperatures, climate, humidity, air quality, roadway conditions, roadway grades, terrain, roads with numerous curves, snowy or icy roadways, and more. SUF ¶ 11. Indeed, Plaintiff Parker's vehicle proves why vibrations alone cannot state any theoretical claim of a defect:  his vehicle's tires were unbalanced and caused a vibration during the testing.[19]

Plaintiffs' have no path forward for a claim about bare vibrations. The Court should thus outright reject this theory.

---

[19] And if Plaintiffs are successful in this theory, their class claims are facially infirm and necessarily fail. Because a proposed class of people who felt some sort of vibration in their vehicles would be the epitome of an individualized question.

## B.    Plaintiffs Cannot Sue For "Latent Defects" That Have Never Affected The Normal Operation Of Their Vehicles.

Plaintiffs next confusingly argue that their vehicles may be "defective" even if their vehicle operates, and always has operated, normally. Opp. at 12. Of course, that claim appears nowhere in the Complaint. Plaintiffs sued for an actual "transmission defect," not a "tiny and hypothetical risk of some vibration happening sometime in the future." This is an effort to avoid Mr. Arst's evidence that Plaintiffs' vehicles have no transmission defect. Plaintiffs are arguing that in any case where a few consumers claim to have experienced a problem with a product, all the other consumers who bought the same product—*but experienced no problem*—get to sue, too, and recover upwards of *$1.6 billion*. Plaintiffs' attempts to manufacture this new claim fails for many reasons.

*First*, there is no credible evidence that all–or even many–2012, 2013, 2014, 2015 or 2016 Honda Odyssey vehicles have a "latent" risk of developing judder. The truth is that the only evidence in the record confirms that a small fraction of Honda Odyssey vehicles (from any proposed class year) have ever received warranty repairs for any transmission or torque converter issue (they are not the same thing).  *See* Kiser Decl. ¶ 4 ECF 157-1, pg. id. # 3375. The evidence reveals that the different countermeasures actually work (as Plaintiffs now appear to concede). Plaintiffs point to Dr. Parker's generic conclusion that post-GSN Honda Odyssey vehicles have some sort of universal "defect" because they are have six-speed transmissions that are mated with torque converters. ECF 175, pg. id # 6930-6931. But that is fanciful given the ubiquitous nature of that design, and even Plaintiffs could not continue to assert class claims based on that theory. (Compare class definition at ECF 1 ¶ 95, pg. id # 21 with definition at ECF 147, pg. id. # 2412-2413.)  The point here is that Dr. Parker does not opine that Plaintiffs' vehicles ever manifested the so-called "transmission defect," and admits he did not affirmatively test for it ECF 175 pg. id# 6930-6931, even though transmission vibration can only be diagnosed through diagnostic computers, a point Plaintiffs acknowledge.

*Second*, in any event, the theoretical and small possibility of an operational issue

developing *in the future* is not actionable. Plaintiffs cite no authority suggesting that this risk-increase theory is a lawful claim. Nor do Plaintiffs offer a scintilla of evidence that any alleged risk-of-a-future-defect has affected the value of their vehicles. And courts both within this circuit and without agree that a mere risk of harm developing in the future does not support the warranty and other claims Plaintiffs bring here. *See, e.g., Cahen v. Toyota Motor Corp.*, 147 F. Supp. 3d 955, 968 (N.D. Cal. 2015) (rejecting claims because no "consumer, outside the realm of controlled experiments, has ever been a victim of [the harm that might be caused by the alleged defect]"); *Lee v. Toyota Motor Sales, U.S., Inc.*, 992 F. Supp. 2d 962, 972 (C.D. Cal. 2014) ("There can be no serious dispute that a purchaser of a product who receives the benefit of his bargain" has no claim); *In re Toyota Motor Corp. Hybrid Brake Litig.*, 915 F. Supp. 2d 1151, 1159 (C.D. Cal. 2013) (summary judgment on benefit of the bargain claim where plaintiff received "safe and operable" anti-lock braking system, regardless of plaintiffs' claim that perceived problem would have affected her decision to make the purchase); *In re Toyota Motor Corp.*, 790 F. Supp. 2d 1152, 1166 n. 11 (C.D. Cal. 2011) (claims of "diminished value" only permitted for plaintiffs who prove "something more").

Courts agree that theoretical risk-of-future-problems claims are simply not actionable. *Laroe v. FCA United States, LLC*, Case No. 17-2487-DDC-JPO, at \*15-16 (D. Kan. Jun. 25, 2018) (holding it was not enough for "plaintiff [to] merely allege[] that 'the defect places him at increased risk of possible future injury' but only offer evidence that the "defect materialized in a small percent of persons who bought the automobile in question" (citation and quotations omitted)); *In re Apple Inc. Device Performance Litig.*, Case No. 18-md-02827-EJD, at \*19 (N.D. Cal. Apr. 22, 2019) ("Plaintiffs plead that their devices functioned exactly as expected at the time of purchase. Thus, Plaintiffs' injury theory . . . is that they overpaid due to concealment of what they label as a defect . . . Because Plaintiffs fail to adequately plead the presence of any defect, their theory of economic harm similarly collapses.").

*In re Toyota Motor Corp. Hybrid Brake Mktg.*, is instructive. 915 F. Supp. 2d

1151, 1158 (C.D. Cal. 2013). The Court made clear that the same "benefit-of-the-bargain argument" Plaintiffs raise here is not available merely because "others encounter[] problems" with their vehicles. *Id.* "It is simply not enough for a plaintiff to allege that a product defect suffered by others renders his or her use of that same product unsafe; the plaintiff must instead allege an actual manifestation of the defect that results in some injury in order to state a cognizable claim for breach of warranty, unfair trade practices, or unjust enrichment." *Id.* (quotations and citations omitted).

Plaintiffs' own authority requires them to show at least that much. *See In re Ford Motor Co. E-350 Van Prod. Liab. Litig. (No. II)*, No. CIV. A. 03-4558, 2010 WL 2813788, at *48 (D.N.J. July 9, 2010) (requiring that a plaintiff must prove a deception or fraud led to diminution in value to state a claim for unfair practices under Florida law); *In re: Gen. Motors LLC Ignition Switch Litig.*, No. 14-MC-2543 (JMF), 2016 WL 3920353, at *26 (S.D.N.Y. July 15, 2016) (same). The truth is that no company can promise that every product will be perfect and remain perfect for all time. That is the reason for warranties–and the warranty applicable to Plaintiffs' vehicles here is generous: five years, sixty thousand miles. Compl. ¶ 3 at ECF 1. But perfection is what Plaintiffs are arguing for. But that is not the law. Instead, companies like AHM are required to develop warranty repairs when operational issues manifest. And that is precisely what happened in this case.[20]  Plaintiffs' unpled future-risk-of-harm theory fails as a matter of law.

### C.    Plaintiffs Cannot Proceed On A Repair-Delay Theory Because They Have No Evidence That Their Vehicles Ever Had Atypical Vibration, And In Any Event, Their Vehicles Demonstrably Do Not Have It.

Plaintiffs next take the tack that perhaps AHM's countermeasures do work, yet even so, Plaintiffs should be able to recover for the period of time before the fix. Opp.

---

[20] Plaintiffs confusingly also contend that by issuing the TSBs, AHM has "admitted" that all the proposed Class Vehicles have a transmission defect. Opp. at 21. But that is false. TSBs are not evidence of a "defect." AHM provided countermeasures for the small number of vehicles that manifest Atypical Vibration. SUF ¶¶ 3, 5.

at 17. This theory, like Plaintiffs' others, also fails. *First*, this allegation is found nowhere in their Complaint, so the issue is not actually before the Court.  Even if it were, Plaintiffs do not even attempt to explain how any so-called "delay" as to each of their individual vehicles was unreasonable. Plaintiffs cannot oppose summary judgment by raising a legal theory for which they have submitted zero evidence in support. For example, AHM cannot have a duty to "timely" repair until Plaintiffs brought their vehicles in.  And if this is their theory, there is no way that this theory could be amenable to class treatment, (further) dooming their class claims as a matter of law.

*Second*, there is simply no evidence that Plaintiffs vehicles ever had a "transmission defect." The only evidence in the record (if Plaintiffs' testimony is credited), is that Plaintiffs' experienced a vibration in the past about which they complained. As explained above, that evidence is consistent with a host of causes that have nothing to do with a transmission or torque converter. And as also explained above, that some independent dealers gave Plaintiffs fresh ATF as a courtesy is not probative of anything. So, Plaintiffs have thus not created a triable issue of fact that any of their vehicles actually experienced the "transmission defect" they sue over—at any time in the past, particularly where, as here, so much of their testimony is at odds with what they plead in the Complaint.   (See testimony from Mrs. MacDougall acknowledging that her car is not unsafe. Kiser Decl. Ex. 1 at 24-24, ECF 153-1, pg. id# 3375 (L. MacDougall Dep. 63:24- 64:10)

*Third*, this is simply not an actionable theory because AHM undisputedly *released a countermeasure into the market that fully addresses the so-called "defect." See Lee v. Toyota Motor Sales, U.S., Inc*., 992 F. Supp. 2d at 970 (no claim when defendant admittedly fixed the alleged defect); *Thiedemann v. Mercedes-Benz USA, LLC,* 872 A.2d 783, 794 (N.J. 2005) (interpreting New Jersey law and finding that "defects that arise and are addressed by warranty, at no cost to the consumer, do not provide the predicate 'loss'"); *Kommer v. Ford Motor Co.,* 1:17-CV-296 (LEK/DJS), at *11 (N.D.N.Y. Jul. 28, 2017) ("[I]f the defendant provides an adequate remedy for

1  the problem, the plaintiff has not suffered an injury.")

2          Plaintiffs' cited authority for this claim all confirms that a company that fixes a

3  defect should not be held liable. Each of Plaintiffs' cases stand for the unremarkable

4  proposition that "numerous" and "repeated" failed attempts to repair a vehicle can give

5  rise to a claim. Not a single one stands for the theory the Plaintiffs push on the Court

6  here: That a *successful fix* can give rise to a claim after the fact.

7          For example, *In re MyFord Touch Consumer Litig.*, 291 F. Supp. 3d 936, 958

8  (N.D. Cal. 2018), held that plaintiffs must show, among other things, that they brought

9  their vehicles in for repairs multiple times and *failed to receive an effective fix. Id.; see*

10  *also In Sumer v. Carrier Corp.*, No. 14-CV-04271-VC, 2015 WL 758314, at *1 (N.D.

11  Cal. Feb. 20, 2015) (holding that plaintiffs could not show an unreasonable repair claim

12  because the fix worked for at least a few years); *Gen. Motors Acceptance Corp. v.*

13  *Jankowitz*, 216 N.J. Super. 313, 329, 523 A.2d 695, 703 (App. Div. 1987) (holding that

14  only if "numerous attempts to repair" were unsuccessful could a repair or replace claim

15  be successful); *Richter v. Monaco Coach Corp.*, No. 508-CV-207-OC-10GRJ, 2009

16  WL 1537894, at *4 (M.D. Fla. June 2, 2009) (plaintiff *lost as a matter of law on its*

17  *repair or replace claim* because the repair worked, even though it was the third try).

18          *Fourth*, to the extent Plaintiffs' theory fails for lack of evidence. Plaintiffs ignore

19  (as they do throughout their briefing) that AHM was investigating various vehicle years,

20  various components made by various manufactures, and rolled out various (and

21  different) fixes for different model years.  SUF ¶¶ 40, 41, 42, 43 (TSBs). In short:

22  AHM's efforts at any given time to address transmission or torque converter issues after

23  Plaintiffs' vehicles were put into the market is not evidence of AHM sitting on its hands

24  with respect to Plaintiffs' vehicles. Plaintiffs and Dr. Parker's attempts to lump all these

25  vehicles into one massive defect is belied by the record and the evidence, which AHM

26  extensively explained in its Motion. Motion at 23.

27          Dr. Parker's opinion on this point should be stricken for the many reasons

28  articulated in AHM's Motion to Strike. But most obviously, Dr. Parker's reaches his

conclusion that all the vehicles have some latent defect based on nothing more than a summary of AHM's own documents and the fact that all of these vehicles happen to have six-speed automatic transmissions mated with torque converters, even though Plaintiffs do not dispute that the components in the proposed class vehicles – software, PCMs, hardware – are completely different. SUF ¶¶ 40, 41, 42, 43.  This Court has made clear that experts may not offer opinions that effectively parrot the documents they reviewed. *See Stein v. Pac. Bell*, No. C00-2915 SI, 2007 WL 831750, at *11 (N.D. Cal. Mar. 19, 2007); *Lang v. Kohl's Food Stores, Inc.*, 217 F.3d 919, 924 (7th Cir. 2000) (excluding expert testimony because expert merely provided a "list" and "bald assertion[s]," doing little more than "parrot[ting]"). Not only is that unhelpful to the jury, but it places the expert's imprimatur on what is otherwise documentary evidence.

In *Stein v. Pac Bell*, the expert offered an opinion based merely on a review of "various documents" and then "restated as his 'opinions' the findings or allegations in those materials." *Id.* The court held that "merely summarize[ing]" these documents was not a proper basis for expert opinion, and thus the expert must be excluded. In any event, Dr. Parker cannot opine on AHM's state of mind for purposes of Plaintiffs' claim anyway. *See Stanley v. Novartis Pharm. Corp.*, No. CV1103191JGBOPX, 2014 WL 12573393, at *6 (C.D. Cal. May 6, 2014) ("the opinions of [expert] witnesses on the intent, motives, or states of mind of corporations . . . have no basis in any relevant body of knowledge or expertise.") (quotation omitted).

In sum, with the evidence against them, Plaintiffs threw a handful of novel theories at the wall – and a whole bunch of additional, irrelevant "facts" – and none of them stuck. The Court should reject Plaintiffs' attempt to avoid the conclusive evidence barring their claims and grant summary judgment in AHM's favor.

## CONCLUSION

For the foregoing reasons, summary judgment should be entered in favor of AHM. AHM requests such other relief this Court deems just and appropriate.

1      DATED:      July 22, 2019

2
                                    By:   /s/Livia M. Kiser
3                                         Attorneys for Defendants
4                                         AMERICAN HONDA MOTOR CO., INC. and
                                          HONDA NORTH AMERICA, INC.
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

REPLY ISO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT