LIVIA M. KISER (SBN 285411)
*lkiser@kslaw.com*
MICHAEL B. SHORTNACY (SBN 277035)
*mshortnacy@kslaw*.com
King & Spalding LLP
633 West 5th Street, Suite 1600
Los Angeles, CA 90071
Telephone: (213) 443-4355
Facsimile: (213) 443-4310

Attorneys for Defendants
AMERICAN HONDA MOTOR CO., INC.
and HONDA NORTH AMERICA, INC.

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
## SOUTHERN DIVISION

| | |
|---|---|
| DENNIS MACDOUGALL, RAY SEOW, PRABHANJAN KAVURI, RICHARD FRICK, JOSEPH RYAN PARKER, and BRYAN LENTZ, individually and on behalf of all others similarly situated,<br><br>        Plaintiffs,<br><br>   v.<br><br>AMERICAN HONDA MOTOR CO., INC., and HONDA NORTH AMERICA, INC.,<br><br>        Defendants. | Case No. 8:17-cv-01079-AG (DFMx)<br><br>**AMERICAN HONDA MOTOR CO., INC. AND HONDA NORTH AMERICA, INC.'S REPLY IN FURTHER SUPPORT OF MOTION TO STRIKE THE TESTIMONY OF MR. STEFAN BOEDEKER**<br><br>Filed Concurrently Herewith:<br>  1) Declaration of Livia M. Kiser and Exhibits<br><br>Date:     August 5, 2019<br>Time:    10:00 a.m.<br>Location:  Santa Ana Division, 10D<br>Judge:   Hon. A. Guilford |

# TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................................... 1

ARGUMENT ...................................................................................................... 2

I.     Plaintiffs Should Not Be Allowed to Submit a New Expert Opinion Days Before Briefing is Closed In Violation of the Federal Rules and this Court's Orders. ....................................................... 2

II.    That Any Analysis By Boedeker May Have Been Accepted By A Different Court In Different Circumstances Is Probative Of Nothing In This Case. .................................................................................. 6

III.   AHM Does Not Argue Conjoint Analysis Is Per Se Reliable:  It Must Be Properly Executed In the Proper Context To Be Valid. .............. 9

     A.    In re Lenovo Adware Litigation Highlights The Problems With Boedeker's Conjoint Study ....................................................... 9

     B.    Dr. Wilcox's Calculations Showing Irrational Preferences Remain Unchallenged And Themselves Are Evidence Of Unreliability. ........................................................... 15

     C.    Mr. Boedeker's Survey Design Contains Flaws And Admittedly Fabricated Part-Worth Values, Which Plaintiffs Do Not Refute. ........................................................... 19

IV.   AHM's Objections Go Directly To Admissibility, Not Weight ............. 20

     A.    Plaintiffs' Cited Authority Merely Confirms that Mr. Boedeker's Opinions Fall Far Short of Rule 702's Requirements. ........................................................................ 21

     B.    The Court Should Exclude Mr. Boedeker's Report Because It Is Unreliable and Based on Flawed Methodology and Data ............................................................ 23

DEFENDANTS' MOTION TO STRIKE THE TESTIMONY OF MR. STEFAN BOEDEKER

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Abedi v. Mercedes-Benz USA, LLC*,
No. SACV0800398JVSANX, 2010 WL 11515361 (C.D. Cal. Jan. 11,
2010) ....................................................................................................... 1

*Apple, Inc. v. Samsung Elecs. Co.*,
2014 WL 976898 (N.D. Cal. Mar. 6, 2014) ...................................... *passim*

*Ballard v. United States*,
No. EDCV06-715-VAP(OPX), 2007 WL 4794101 (C.D. Cal. Aug.
28, 2007) ................................................................................................. 1

*Beecham v. Roseville City Sch. Dist.*,
No. 215CV01022KJMEFB, 2017 WL 4038360 (E.D. Cal. Sept. 13,
2017) ....................................................................................................... 2

*Broomfield v. Craft Brew All., Inc.*,
No. 17-CV-01027-BLF, 2018 WL 4952519 (N.D. Cal. Sept. 25, 2018).................. 8

*Carolina Cas. Ins. Co. v. Ortiz*,
No. CV F-08-0691 LJO SMS, 2009 WL 3627921 (E.D. Cal. Oct. 28,
2009) ....................................................................................................... 3

*In re ConAgra Foods, Inc.*,
302 F.R.D. 537 (C.D. Cal. 2014)................................................... 22, 23

*In re ConAgra Foods, Inc.*,
90 F. Supp. 3d 919 (C.D. Cal. 2015) ................................................. 22

*Cummings v. Starbucks Corp.*,
No. CV1206345MWFFFMX, 2013 WL 12131281 (C.D. Cal. Aug.
30, 2013) ................................................................................................. 1

*In re Dial Complete Mktg. & Sales Practices Litig.*,
320 F.R.D. 326 (D.N.H. 2017) ............................................................. 8

*ErgoCare, Inc. v. D.T. Davis Enterprises, Ltd.*,
No. CV1202106DMGSPX, 2012 WL 13012733 (C.D. Cal. Nov. 20,
2012) ....................................................................................................... 1

---

*Hasemann v. Gerber Prod. Co.*,
  No. 15CV2995MKBRER, 2019 WL 1434263 (E.D.N.Y. Mar. 31,
  2019) ..................................................................................................... 8, 9

*In re Ingan*,
  No. 9:10-BK-10138-RR, 2012 WL 3930328 (Bankr. C.D. Cal. Sept.
  10, 2012) ................................................................................................ 3, 4

*Jarrow Formulas, Inc. v. Now Health Grp., Inc.*,
  No. CV 10-8301 PSG JCX, 2012 WL 3186576 (C.D. Cal. Aug. 2,
  2012) ...................................................................................................... 3, 4

*Klein v. TAP Pharm. Prod., Inc.*,
  518 F. App'x 583 (9th Cir. 2013) .............................................................. 3

*Lance, Inc. v. Dewco Servs., Inc.*,
  422 F.2d 778 (9th Cir. 1970) ..................................................................... 1

*In re Lenovo Adware Litig.*,
  Case No. 15-md-02624-RMW, 2016 WL 6277245 (N.D. Cal. 2016).
  ECF No. 178 ..................................................................................*passim*

*Luke v. Family Care & Urgent Med. Clinics*,
  323 F. App'x 496 (9th Cir. 2009) ............................................................. 3

*In re Myford Touch Consumer Litig.*,
  No. 13-CV-03072-EMC, 2016 WL 7734558 (N.D. Cal. Sept. 14,
  2016) ........................................................................................................ 9

*In re NJOY, Inc. Consumer Class Litigation II*,
  2016 WL 787415 (C.D. Cal. Feb. 2, 2016) ........................................ 21, 23

*Oracle Am., Inc. v. Google Inc.*,
  No. C 10-03561 WHA, 2012 WL 850705 (N.D. Cal. Mar. 13, 2012)................... 21

*Pooshs v. Philip Morris USA, Inc.*,
  904 F. Supp. 2d 1009 (N.D. Cal. 2012) ..................................................... 7

*Saavedra v. Eli Lilly & Co.*,
  2014 WL 7338930 (C.D. Cal. Dec. 18, 2014).................................... 21, 23

*Salazar v. A & J Const. of Montana, Inc.*,
  No. CV 11-16-BLG-CSO, 2012 WL 4092421 (D. Mont. Sept. 17,
  2012) ........................................................................................................ 4

DEFENDANTS' MOTION TO STRIKE THE TESTIMONY OF MR. STEFAN BOEDEKER

*Southland Sod Farms v. Stover Seed Co.*,
   108 F.3d 1134 (9th Cir. 1997) .......................................................... 21

*Stoddard-Nunez v. City of Hayward*,
   No. 13-CV-04490-KAW, 2018 WL 3159619 (N.D. Cal. June 28,
   2018) .................................................................................................. 7

*TV Interactive Data Corp. v. Sony Corp.*,
   929 F. Supp. 2d 1006 (N.D. Cal. 2013) ....................................... 21, 22

*Wendt v. Host Int'l, Inc.*,
   125 F.3d 806 (9th Cir. 1997) ...................................................... 20, 21

*Wolf v. Hewlett Packard Co.*,
   No. CV1501221BROGJSX, 2016 WL 7743692 (C.D. Cal. Sept. 1,
   2016) ................................................................................................ 23

*Zakaria v. Gerber Prod. Co.*,
   No. LACV1500200JAKEX, 2017 WL 9512587 (C.D. Cal. Aug. 9,
   2017) ................................................................................................ 20

**Other Authorities**

Fed. R. Evid. 702. .................................................................................... 23

Fed. R. Evid. 703 ..................................................................................... 23

L. R. 7-3 ..................................................................................................... 1

## INTRODUCTION

Plaintiffs' opposition to the motion to strike Stefan Boedeker ("Boedeker") is grounded in three points, each of which is easily disposed of. *First*, Plaintiffs inexplicably contend the parties did not meet and confer about the motion.  The parties assuredly did, as Plaintiffs well know given that their counsel participated. Declaration of Livia M. Kiser ("Kiser MTS Decl.") and Ex. A thereto (May 7, 2019 thread re: L. R. 7-3).  In fact, the parties discussed at length during the telephone call they had on May 7, 2019 that AHM was moving to strike Mr. Boedeker – and likely Mr. Parker as well, as well as the grounds for both motions. *Id*. at ¶ 5. Thus, it is disappointing to see Plaintiffs now try to contend the parties never met and conferred simply due to a scrivener's error by Defendants, a mistake for which Defendants sincerely apologize to all concerned but which has caused no prejudice.  To the extent Plaintiffs are arguing that not including a statement of compliance itself warrants some sort of relief, courts in this district routinely reject such technical arguments. *See*, *e.g.*, *Ballard v. United States*, No. EDCV06-715-VAP(OPX), 2007 WL 4794101, at *2 (C.D. Cal. Aug. 28, 2007) (finding meet-and-confer requirement satisfied even though the party did not technically comply with the letter of the rule). Here, AHM actually *did* comply with the rule; it just forgot to mention it in its moving papers.  Kiser MTS Decl. ¶ 5.[1]

---

[1] The Local Rules are a flexible tool meant to promote efficiency. *Lance, Inc. v. Dewco Servs., Inc.*, 422 F.2d 778, 784 (9th Cir. 1970). Plaintiffs' attempt to use the meet-and-confer rule to gain leverage—when their counsel actually participated in the parties' meet and confer—is disingenuous at best. That is especially true given that courts generally hold that substantial compliance with the meet-and-confer rule is enough, and AHM did much more than substantially comply – it actually *did* comply: the parties met and conferred. *See*, *e.g.*, *ErgoCare, Inc. v. D.T. Davis Enterprises, Ltd.*, No. CV1202106DMGSPX, 2012 WL 13012733, at *2 (C.D. Cal. Nov. 20, 2012) (defendant substantially complied by sending letter requesting consent to file—even though no attempt at actual conference was made); *Cummings v. Starbucks Corp.*, No. CV1206345MWFFFMX, 2013 WL 12131281, at *2 (C.D. Cal. Aug. 30, 2013) (discarding meet-and-confer argument offhandedly because there was "substantial compliance"); *Abedi v. Mercedes-Benz USA, LLC*, No. SACV0800398JVSANX, 2010 WL 11515361, at *1 (C.D. Cal. Jan. 11, 2010) (party substantially complied with rule by requesting a meeting).  It is unclear what point Plaintiffs are trying to make by raising this hyper-technical argument, but it's clearly ironic in light of their attempt to affirmatively prejudice AHM as discussed in detail herein.  *See* disc. *infra* at pp. 2-6.

*Second*, Plaintiffs improperly attempt to submit additional expert opinions from Boedeker long after the deadline for expert discovery passed, and after Boedeker swore on the record he had no more opinions to offer (the "Untimely Opinion"), attached as Exhibit A to Plaintiffs' filing (ECF No. 178-1). This is blatantly improper, and it would be prejudicial to Defendant American Honda Motor Co., Inc. ("AHM") – the only remaining defendant in this case – were Boedeker to be allowed to issue these new opinions, but courts in this district and circuit have expressly disallowed such gamesmanship, and there is no basis to permit it now.

Finally, with or without Boedeker's "new" expert opinions, which are properly disregarded, Plaintiffs don't have much to go on, and the authority on which they rely is distinguishable and inapplicable. AHM is not saying, and has never said, a conjoint analysis can *never* be done in any situation. AHM *is* saying that Boedeker's conjoint analysis in this case is inherently flawed and unreliable, so much so that it should properly be stricken. Nothing in Plaintiffs' opposition changes that result.

## ARGUMENT

### I.    Plaintiffs Should Not Be Allowed to Submit a New Expert Opinion Days Before Briefing is Closed In Violation of the Federal Rules and this Court's Orders.

Along with their Opposition to AHM's Motion to Strike Plaintiffs' expert Stefan Boedeker, Plaintiffs filed a 20-page declaration from Boedeker in an effort to back-door a new supplemental expert opinion into this case (the "Untimely Opinion"). ECF No. 178-1. Plaintiffs submit the Untimely Opinion after expert discovery has closed and after the parties have submitted all the expert opinions permitted by the Federal Rules and this Court's scheduling orders. *See Beecham v. Roseville City Sch. Dist.*, No. 215CV01022KJMEFB, 2017 WL 4038360, at *1 (E.D. Cal. Sept. 13, 2017) ("A party must make [all expert] disclosures at the times and in the sequence that the court orders.").

Worst of all, Plaintiffs filed the Untimely Opinion on July 15, 2019—giving AHM less than a week to respond and making it impossible for AHM to seek a rebuttal

opinion or test Boedeker's new opinions by deposition as the Federal Rules contemplate.[2] This is prejudicial *per se*. Nothing in the Untimely Opinion could not have been submitted long ago. Plaintiffs supplemental expert report smacks of nothing more than gamesmanship. Plaintiffs offer new substantive expert opinions in blatant disregard of the discovery schedule, and the Court thus need not even read the first page before striking the Untimely Opinion entirely. *See Luke v. Family Care & Urgent Med. Clinics,* 323 F. App'x 496, 499 (9th Cir. 2009) (affirming district court's decision to exclude untimely expert declaration submitted to oppose motion for summary judgment); *Klein v. TAP Pharm. Prod., Inc.*, 518 F. App'x 583, 584 (9th Cir. 2013) (same).

The Federal Rules only permit supplementation of expert opinions "to prevent unfair surprise" by allowing the opposing party ample time "to prepare rebuttal reports, to depose the expert, and to prepare for depositions and cross-examination at trial." *In re Ingan*, No. 9:10-BK-10138-RR, 2012 WL 3930328, at *4 (Bankr. C.D. Cal. Sept. 10, 2012). Plaintiffs do the precise opposite here, sandbagging AHM with new opinions while ensuring that AHM cannot possibly seek to test Boedeker's opinions through discovery, deposition, or rebuttal expert testimony. *Jarrow Formulas, Inc. v. Now Health Grp., Inc.*, No. CV 10-8301 PSG JCX, 2012 WL 3186576, at *15 (C.D. Cal. Aug. 2, 2012) (recounting Ninth Circuit cases permitting exclusive of untimely expert opinions and noting that the Federal Rules do not give parties "license to sandbag one's opponent with claims and issues which should have been included in the expert witness' report"). In fact, Plaintiffs unabashedly crow that "[d]espite Honda's critiques being insufficient on their face to justify exclusion of Boedeker's analysis, Boedeker ably explains, based on the economic and statistical literature, why each of Honda's arguments is flawed. *See generally* Declaration of Stefan Boedeker, July 15, 2019, ECF 178-1 (Exhibit A, "Boedeker Decl."),'" freely admitting that they are putting new

---

[2] Parties have been sanctioned for failing to timely disclose expert opinions. *See, e.g., Carolina Cas. Ins. Co. v. Ortiz,* No. CV F-08-0691 LJO SMS, 2009 WL 3627921, at *4 (E.D. Cal. Oct. 28, 2009) (sanctioning party for, among other things, failing to timely submit expert report).

DEFENDANTS' REPLY ISO MOTION TO STRIKE THE TESTIMONY OF MR. STEFAN BOEDEKER

opinions into the case, even though Mr. Boedeker expressly told AHM's counsel during his deposition that he was expressly not retained to rebut the opinions of Dr. Wilcox (and Defendants' motion to strike is, predictably, primarily based on the opinions of Dr. Wilcox, as Plaintiffs well know). Kiser MTS Decl., Ex. B (Boedeker Dep. 312:13-22) (Q: Is it fair to say that all the opinions that are contained in this report are the sum total of your opinions with respect to the matters for which you were engaged to provide opinions? A. The report here is at the point when it was issued that is the sum of all my opinions. At the moment I know that Professor Wilcox's report is out and I started to review it *but I have not been asked to opine on his report*."). Apparently, Plaintiffs did not think it necessary to have Boedeker respond to Dr. Wilcox – until now that is, but now is simply too late.

Courts have made clear that parties are not permitted to "lie[] in wait to express new opinions at the last minute, thereby denying the opposing party the opportunity to depose the expert on the new information or closely examine the expert's new testimony." *In re Ingan*, No. 9:10-BK-10138-RR, 2012 WL 3930328, at *4. Indeed, "the very purpose of the rule is nullified" when an expert "supplements" his report by addressing a new matter after discovery has ended." *Jarrow Formulas, Inc.,* No. CV 10-8301 PSG JCX, 2012 WL 3186576, at *15; *see also Salazar v. A & J Const. of Montana, Inc.,* No. CV 11-16-BLG-CSO, 2012 WL 4092421, at *11 (D. Mont. Sept. 17, 2012) (The duty to supplement a disclosure in a timely manner is intended to prevent unfair and prejudicial surprise, not to facilitate last-minute production of evidence." (quotations omitted).

Boedeker's 20 pages (single spaced!) of new opinions add extensive new details and technical matters at the 11th hour. In Boedeker's Untimely Opinion he purports to explain his "methodology," including "design" and "execution," and a "detailed description of how conjoint analysis works." Untimely Opinion (ECF No. 178-1) at 1. A cursory review of a handful of Boedeker's new opinions leaves no doubt that Plaintiffs are blatantly violating the Federal Rules by attempting to force in an additional

4

untimely expert opinion to prejudice AHM:

- **Expert opinion about Boedeker's overall analysis**. *See, e.g.,* Untimely Opinion, ECF 178-1 at pp. 10-11 ("This study is unique in that economic loss in my methodology is derived from the comparison of demand curves for the product with and without disclosure of the defect," "My methodology in this case accounts for supply-side considerations the same way that I did in the *Apple* case.").

- **Paragraphs of technical expert opinion about conjoint analysis, offering extensive opinions about this methodology.** *See id.* 14-24 (offering expert opinion like that conjoint analysis involves "simulating choices between product features and prices," "conjoint analysis quantifies consumers' preferences for each attribute by computing 'part-worths' (i.e. the respondents' desire for individual attributes)," "it is [] possible to quantify how changes in attributes will affect the overall price," [t]he choice of attributes and their respective option levels (how expensive, which style, etc.) is an important aspect of proper conjoint study design," and much more).

- **Paragraphs about the technical details underlying Boedeker's analysis.** *Id.* at 25-31 (for just a few examples: "The underlying econometric and statistical estimation techniques of the conjoint analysis are based on Mixed Logit models and Hierarchical Bayesian Estimation techniques . . . [which] are widely employed in economics and marketing research," "I used the Sawtooth software specifically developed to perform these calculations for CBC studies. Sawtooth is considered an industry standard for calculating conjoint analyses," "A comparison of the demand curve for when the Transmission Defect is not known to the consumers versus the demand curve for when the Transmission Defect is known to the consumers will reveal if there is a downward shift in the demand curve.").

- **Various technical attacks on Dr. Wilcox's opinions.** *See, e.g., id.* at 68 ("Instead of performing proper statistical work, Dr. Wilcox points to a meaningless estimate of $3 million. If he had done what a trained statistician would have done, he would have found that all the examples that he cited as "bad results" are numbers that are statistically speaking not significantly different from zero with confidence intervals ranging from minus several millions to plus several millions. Dr. Wilcox also fails to mention that the vast majority of study participants produced normal predictions," "Several authors argue against reliance on samples of size of one as Dr. Wilcox used here, to assert that my conjoint model has illogical results.").

Put simply: AHM has no meaningful opportunity to challenge any of this expert testimony at this point in the game, and it doesn't belong before the Court anyway. Whether any of Boedeker's statements about conjoint analysis or the other technical matters he opines about here are worth crediting is impossible for the Court to know

without AHM having the chance to conduct meaningful discovery and expert rebuttal—
which, of course, Plaintiffs have prevented from happening through their
gamesmanship.

But Plaintiffs do not stop at attempting to add in new expert opinion generally—
they also have their expert respond *substantively* to AHM's various arguments in the
motion. (As if adding untimely expert opinion testimony was not improper enough).
But Boedeker already submitted a report. And he was deposed.  That report and his
deposition testimony speak for themselves. AHM has the right to hold Boedeker to his
prior statements. Experts cannot simply significant additional opinions via a declaration
after the fact because their original opinions and testimony during deposition are
demonstrably flawed.  And Plaintiffs' addition of all this new analysis is particularly
egregious given that Boedeker already testified that *he had nothing to supplement*. Kiser
MTS Decl., Ex. B (Boedeker Dep. at 313:10-13) (Boedeker: "… I don't have to change
anything. Q. Okay. And you continue to feel that way even today sitting here? A. Yes,
I do feel that way.").

In addition to offering new technical analysis, the Untimely Opinion attempts to
shoehorn details about Boedeker's past experience to impermissibly bolster his prior
opinions. *See* Untimely Opinion, (ECF No. 178-1) at *passim*. The only place for these
"facts" was in Boedeker's CV, his previously-submitted report, or his deposition
testimony. To the extent any of these facts are in those places—those materials speak
for themselves. Otherwise, Boedeker and Plaintiffs had their chance. That they failed to
introduce the bolstering facts they wanted to in the lawful time and place does not allow
them to violate the Federal Rules. Untimely Opinion (ECF No. 178-1) p. 1-5.
Boedeker's Untimely Opinion should be stricken and not considered by the Court.

## II.   That Any Analysis By Boedeker May Have Been Accepted By A Different Court In Different Circumstances Is Probative Of Nothing In This Case.

Dr. Wilcox's unrefuted testimony is that he doesn't "think a conjoint analysis can
be reflective of real market demand circumstances in this particular market" (*i.e.*,

6

1    automobile purchases). Kiser MTS Decl. Ex. C (Wilcox Dep. 75:11-16, 76:17-21).  This
2    is because

> there are aspects of the purchase process that are not quantifiable as
> attributes. For example, I believe that, in real product markets for
> automobiles, that sometimes people purchase automobiles because they
> are brand loyal or they just like the way it looks or they just think it's cool.
> And that's not well represented in a conjoint analysis. … We teach cases
> about automobiles at, you know, the Darden school. ***There are well-known
> things that influence the purchase process of automobiles that are not
> well quantified by a conjoint analysis***.

8    (emphasis supplied).   Boedeker does not (and cannot) rebut this legitimate expert
9    testimony.  And even if it were possible to do a conjoint analysis that was reliable in the
10   context of automotive purchases (though there is not) Boedeker's conjoint analysis was
11   done improperly and the results are completely scientifically unreliable, for reasons
12   discussed in Defendants' motion to strike and herein.

13         Plaintiffs make much out of the fact that (different) Boedeker opinions have been
14   admitted in a few other cases before (although none were in this district). As a
15   preliminary note, that an expert's testimony has been admitted in other, different cases
16   says nothing about whether it should be admitted here—whether any given expert
17   opinion is relevant and proper depends on the particular facts of each matter. *See
18   Stoddard-Nunez v. City of Hayward*, No. 13-CV-04490-KAW, 2018 WL 3159619, at
19   *7 (N.D. Cal. June 28, 2018) (rejecting plaintiffs' argument that expert testimony
20   should be admitted because his "opinions [were] admitted as expert testimony in other
21   cases"); *Pooshs v. Philip Morris USA, Inc.,* 904 F. Supp. 2d 1009, 1020 (N.D. Cal.
22   2012) (same).

23          But in any event, a review of the cases in which Boedeker's testimony has been
24   admitted just underscores why his opinions should not be admitted here. Each is not
25   only materially different than this case, those cases involved much more thorough
26   expert opinions than Plaintiffs attempt to admit now. *First*, all but one of these cases
27   involved alleged affirmative representations that were easier to isolate and assess, not
28   alleged defect concealment claims in the context of automotive purchasing decisions.

DEFENDANTS' REPLY ISO MOTION TO STRIKE THE TESTIMONY OF MR. STEFAN BOEDEKER

1   *See, e.g., In re Dial Complete Mktg. & Sales Practices Litig.,* 320 F.R.D. 326, 329

2   (D.N.H. 2017). But more importantly, Boedeker's opinions and the relevant claims

3   were qualitatively different in each of his prior cases.

4          In *In re Dial*, the court distinguished other cases that had rejected conjoint

5   analysis because the market was unstable and varied, noting that the market in that case

6   (for hand soap) was "relatively stable" and presented no "complications or anomalies."

7   *Id.* But as Dr. Wilcox explained, the same cannot be said of the automotive purchasing

8   market. The court also emphasized the importance of Boedeker's focus on the "*actual*

9   market" and the "*actual. . .* supply" in that case—one of the key problems with his

10  opinion here. *Id.* (emphasis added). Boedeker's process and underlying reasoning was

11  also markedly better than it is here: He used 2,000 survey respondents, not just the 500

12  he used in this case; he analyzed the actual purchasers, not various irrelevant purchasers

13  of vehicles not even within the class definition; he tested the actual feature at issue in

14  Plaintiffs' claims; and the survey questions were less confusing and more accurate. *Id.*

15         *Broomfield v. Craft Brew All., Inc.,* No. 17-CV-01027-BLF, 2018 WL 4952519,

16  at *4 (N.D. Cal. Sept. 25, 2018), is the same story. *First*, this case involved the "long-

17  established and efficient" beer market. *Id.* Second, the court emphasized the detailed

18  reasoning and process Boedeker used there to render that conjoint analysis—including

19  extensive supply-side data and real-market analysis. *Id.* Most important, Boedeker

20  tested the precisely same attribute at issue in the plaintiffs' claim—a specific

21  misrepresentation about where the beer was brewed—which was much easier to isolate

22  and test for than the alleged concealment at issue here. *Id.*

23         *Hasemann v. Gerber Prod. Co.,* No. 15CV2995MKBRER, 2019 WL 1434263,

24  at *2 (E.D.N.Y. Mar. 31, 2019) is not helpful because there, Boedeker's expert analysis

25  ***was never completed***—nor was he even challenged as an expert in the first place.

26  Boedeker did not complete a survey or an expert report and his opinions were never

27  tested. *Id.* Not to mention that the court said little about the reliability of Boedeker's

28  opinions. *Id.* The plaintiffs there merely identified five different damages models, one

8

of which happened to be conjoint analysis. *Id.* The court ultimately held that, "several of the proffered damages models are consistent with the theory of liability. . ." *Id.* And even so, Boedeker's proposed method for carrying out a conjoint analysis was more robust than what he did here—tying directly to the marketing claim at issue. *Id.*[3]

The few cases in which courts did not strike Boedeker's testimony in the past just underscore why the Court should not accept his testimony here: Those cases involved markets and products that lent themselves to conjoint analysis and Boedeker provided a much more reliable and reasoned opinion.

### III. AHM Does Not Argue Conjoint Analysis Is *Per Se* Reliable: It Must Be Properly Executed In the Proper Context To Be Valid.

#### A. *In re Lenovo Adware Litigation* Highlights The Problems With Boedeker's Conjoint Study.

Without actually refuting any of Defendants' substantive arguments directly, Plaintiffs argue that caselaw somehow mandates a finding that Mr. Boedeker adequately accounts for "supply side," citing to *In re Lenovo Adware Litig.*, Case No. 15-md-02624-RMW, 2016 WL 6277245, at *21 (N.D. Cal. 2016). ECF No. 178, MTS Opp. at 7.

*Lenovo*, however, is distinguishable and inapplicable. In *Lenovo*, Plaintiffs alleged the Defendant Lenovo entered into a secret agreement with a software development company called "Superfish" whereby Lenovo secretly installed software onto new laptops that collected information about purchasers' browsing habits and imitated the trusted digital certificates of other websites, potentially compromising security. *Lenovo* 2016 WL 6277245, at *2. The undisclosed software also increased CPU usage, which increased power consumption (among other things). *Id.*

---

[3] *In re Myford Touch Consumer Litig.*, No. 13-CV-03072-EMC, 2016 WL 7734558, at *2 (N.D. Cal. Sept. 14, 2016), is similarly unhelpful. The defendants there did not challenge Boedeker's opinions on the same reliability, reasoning, and relevancy grounds. The court simply upheld the general theory that conjoint analysis could be properly relied on (when done right) because it "measures damages according to the benefit of Plaintiffs' bargain." *Id.* The court was simply not faced with the same (or even similar) faults in Boedeker's underlying premises as the Court is presented with here.

9

1
2
3
4
5
6
7

Plaintiffs sought certification of three classes:  a direct purchaser class, an indirect purchaser class and a California-only class.  *Id*. at *1.  The court denied plaintiffs' motion to certify a direct purchaser class because the plaintiffs failed to state any valid claims under applicable law.  *Id*. at 22.  The court provisionally granted plaintiffs' motion to certify an indirect purchaser class based on potential national application of California law (the application of which was still in dispute), and also granted their motion to certify a California-only class of indirect purchasers.  *Id*.

8
9
10
11
12
13
14
15

Although the court did not reject the plaintiffs' proposed conjoint study outright, it acknowledged that in many situations such a study is not reliable.  *Id*. at 21.  For example, the court noted conjoint studies are properly rejected when they only address "the demand side of the market equation, converting what is properly an objective evaluation of relative fair market values into a seemingly subjective inquiry of what an average consumer wants."  The court further acknowledged that a conjoint study is not appropriate when "complicating factors" in a market sever the relationship between "price and value."  *Id*.

16
17
18
19
20
21
22

It is important to note that the economist in the *Lenovo* case ("Gaskin") did not actually perform a conjoint study. Rather, Gaskin proposed a methodology for a conjoint study.  And had Plaintiffs bothered to actually look at the *Lenovo* proposed conjoint study (which is attached hereto as Kiser MTS Decl. Ex. D), they would have realized why the *Lenovo* court (at least at that stage of the proceedings) accepted Gaskin's methodology, and why this Court should reject Boedeker's. By way of example:

23
24
25
26
27
28

| Gaskin Proposed Study | Boedeker's Actual Study |
|---|---|
| For his proposed conjoint study pertaining to laptop computers, Gaskin provided "***realistic choices among hypothetical products that vary on*** | For his actual (flawed) conjoint study pertaining to automotive vehicles, Boedeker provided **unrealistic and wholly fabricated features that do not** |

10

| Gaskin Proposed Study | Boedeker's Actual Study |
|---|---|
| *multiple feature categories*" such as hard drive storage capacity, camera, and screen size. Kiser MTS Decl., Ex. D, (Gaskin Decl. at 5, 7). | *exist in the real world*, such as "New Fuel injection system with 10% improvement in fuel efficiency" and "Eight out of 100 vehicles impacted by defect. Attempts at repairs remain unsuccessful after 18 months." ECF No. 166-2 page id.#4295 (Bodeker Rep't. at ¶ 116, Fig. 19). *Dr. Wilcox properly found Boedeker failed to present actual products as choices and failed to represent the market environment in which actual consumers purchase vehicles*. ECF No. 166-3 page id.#4359, 4369 (Wilcox Rep't ¶¶ 42, 68) (finding the scenarios "unrealistic and illogical because the survey suggests to the respondent that a repair will never be available; hence, a rational respondent would not make *any* trip to the dealer to 'attempt' a repair as he or she knows that such repair does not exist."). |
| Gaskin showed survey respondents *three choice sets*, noting that "[i]f too many questions are asked of a respondent, then the respondent will 'wear out,' that is, response errors will increase as the | Boedeker, by contrast offered *five choice sets* to respondents, which were confusing and not reflective of realistic choices. ECF No. 166-2 page id.#4295 (Bodeker Rep't. at ¶ 116, Fig. 19); ECF |

11

| Gaskin Proposed Study | Boedeker's Actual Study |
|---|---|
| respondent tires. Kiser MTS Decl. Ex. D (Gaskin Decl. ¶ 14). | No. 166-3 page id.#4361 (Wilcox Rep't at ¶ 44) (*"Automobiles have hundreds of individual attributes and features, and learning about each of these attributes and features individually is not how consumers typically make automobile purchase decisions."*) |
| "Not only do I limit the number of questions in the choice task to minimize wear out, *but I also pretest the questionnaire to assure that respondents do not experience wear out*." Gaskin Decl. ¶ 14 n.10. Gaskin tested his actual conjoint survey with 24 respondents, who then provided a verbal debrief to "highly trained" interviewers who ensured the respondents understood the survey and who specifically tested for "demand artifacts." Gaskin includes an exhibit to his proposal that identifies the changes he made to the laptop study as a result of the pretest survey. Kiser MTS Decl. Ex. D (Gaskin Decl. at Ex. E). | By contrast, Boedeker *failed to do a valid pretest study of his actual conjoint survey instrument, and because this market cannot be studied via a conjoint analysis, Boedeker's conjoint analysis is scientifically invalid*. Kiser Decl., Ex. C (Wilcox Dep. 170:11-173:25); ECF No. 166-3 page id.#4370 (Wilcox Rep't ¶ 69) (explaining that in valid pretests "*respondents complete the [actual conjoint] survey while articulating their thought processes and have a chance to point to any confusing questions or passages*"). |
| The price range for Gaskin's proposed conjoint analysis "*was chosen based upon our exploratory interviews [with* | *Boedeker literally <u>made up</u> the price ranges for features that had he (also) <u>made up</u>*. ECF No. 166-2 page id.#4293 |

| Gaskin Proposed Study | Boedeker's Actual Study |
|---|---|
| *twelve consumers], and after consulting several websites containing PC laptop pricing information, to examine the range for the models of Lenovo laptops discussed in the" complaint*. Kiser MTS Decl. Ex. D (Gaskin Decl. ¶¶ 19, 21). | (Boedeker Rep't at ¶ 111-112, Table 3); Kiser MTS Decl., Ex. B (Boedeker Dep. 161:1-10) (admitting he did no empirical research whatsoever on attribute pricing, and that $500-$2500 increments were "*based on my subjective judgment of the prices of [2019 Honda Odysseys, vehicles <u>not</u> in the lawsuit].   I also made the judgment to do that in equidistant steps, which means that the difference between successive price points is equal to $500 in this case*."). |
| Gaskin explains why *it is important to calculate and analyze individual part worths to ensure the reliability of his results*.  Kiser MTS Decl. Ex. D (Gaskin Decl. ¶¶ 44-45). | *Boedeker admits he only analyzed "aggregate average results" and "composite answers"* ECF No. 178 (MTS Opp. at 13) which affirmatively concealed the irrational results actually obtained by survey respondents on an individual part-worth basis.   ECF No. 166-3 page id.#4351-4357 (Wilcox Rep't at ¶¶ 24-38); Kiser MTS Decl., Ex. C (Wilcox Dep. 95:22-96:8) (testifying that "individual part-worths can reveal, for example, that someone didn't take the conjoint analysis very seriously, right, because they exhibit preferences that |

13

| Gaskin Proposed Study | Boedeker's Actual Study |
|---|---|
| | would never occur in real market, in real world situations. ***That's kind of standard to look at in individual level output. It's something that, if you do a conjoint analysis as a profession, you would generally check your data for that sort of thing***.") |
| ***Gaskin performed follow-up pilot tests after the pre-test survey to further ensure respondents understood the questions and had the opportunity to express the reasons they believed they had been asked to participate in the survey***. Kiser MTS Decl. Ex. D (Gaskin Decl. Ex. F). | Because Boedeker failed to conduct an actual pretest of his (flawed) conjoint instrument, ***he did not receive any feedback about his actual instrument until after the conjoint study was completed, and the results yielded irrational preferences***. ECF No. 166-3 page id.#4354 (Wilcox Rep't ¶ 30). |

As is evident from the chart, the following facts are not reasonably in dispute: (1) Boedeker used unreliable processes and reasoning to render his opinion; and (2) he relied upon arbitrary and irrelevant data, which makes his conclusions unreliable too. A central flaw in Boedeker's process is his indisputable failure to pretest the actual conjoint survey he administered to obtain the data he relied upon for his analysis. ECF No. 166 page id.#4220 (Mot. at 11). Boedeker' failure to do so rendered his results unreliable and invalid.[4] By contrast, Gaskin did an exhaustive pretest of his proposed conjoint survey and even interviewed respondents for feedback, and AHM's expert, Dr.

---

[4] As to the "presurvey" Boedeker did undertake, he completely disregarded the results of that presurvey as to what respondents found most important and instead substituted his own arbitrary made-up options. ECF No. 166 page id.#4220 (Mot. at 11). Likewise, Boedeker's pre-test survey targeted a materially different population than his conjoint survey, and the conjoint survey didn't even track actual purchasers in Plaintiffs' proposed classes. *Id.*

14

1  Wilcox, verified the necessity of this approach in order to ensure the scientific validity

2  of the instrument.

3      Thus, it's not that AHM believes additional attributes or factors should be

4  included; it's that Boedeker's invalid and unscientific methods wholly undermine any

5  conclusions Boedeker attempts to draw. Boedker frankly admits he did not calculate or

6  rely on individual part-worths (as both Gaskin and Dr. Wilcox said is essential).

7  Plaintiffs likewise ignore that Boedeker *invented* the price options in the conjoint survey

8  instrument, unlike Gaskin who did affirmative research to identify values for (actual)

9  features that exist in the actual market for laptop computers. Boedker admits he used no

10  reasoned process when he arbitrarily chose the price options.  Kiser MTS Decl., Ex. B

11  (Boedeker Dep. 161:1-10).

12      Moreover, Gaskin developed a process and methodology for his conjoint study

13  that mimicked the way in which a consumer purchases a laptop online, where the

14  consumer actually "chose" a specific laptop to purchase, whereas Boedeker's survey

15  methodology did not remotely resemble what it's like to purchase an automobile – and

16  indeed, consumers were confusingly told to assume they had *already* purchased the car

17  and were only selecting additional add-on features (some of which Boedeker also made

18  up) but  that (in the real world) would have been *included* in trim level packages and

19  which could not be purchased separately. Similarly, Boedker ignores the fact that all

20  new vehicles come with a warranty providing for free repairs—which even common

21  sense confirms would be relevant to any analysis of "diminution in value." ECF No.

22  178 (MTS Opp. at 20). In short, and as compared to the proposed expert provisionally

23  accepted in *Lenovo*, Boedeker fails in multiple ways to develop a scientifically-valid

24  process and methodology for the conjoint study he purported to construct, which Courts

25  have consistently held makes the conclusions derived therefrom "irrelevant."

26      **B.    Dr. Wilcox's Calculations Showing Irrational Preferences Remain
          Unchallenged And Themselves Are Evidence Of Unreliability.**

27      Plaintiffs completely misstate AHM's argument as to how and why Boedeker's

28  survey results show irrational preferences and is therefore unreliable. AHM never says,

15

as Plaintiffs claim, that there were any actual survey responses stating the absurdity that the respondents would pay $3 million (on the low end) and $10 million (on the high end) for a car without and without the alleged, nonexistent defect. ECF No. 178 (MTS Opp. at 12). That's a frank misstatement. The point is that when Dr. Wilcox analyzed Boedeker's actual survey response data on a respondent-by-respondent basis, using the same Sawtooth software Boedeker used, he was able to show with a 95% confidence interval that Boedeker's supposed methodology allows for these extreme and obviously unrealistic results, illustrating that Boedeker's methodology itself is fatally flawed. ECF 166-3 page id.#4351, 4354 (Wilcox Rep't ¶¶ 25, 30), ECF No. 170-2 page id.#5157 (Wilcox Ex. 2 (filed under seal)); Kiser MTS Decl., Ex. C (Wilcox Dep. 119:12-120-13) (Dr. Wilcox testifying that he determined "55.4 percent" of respondents to Boedeker's conjoint survey "exhibit irrational preferences, preferences that are plainly nonsensical," based on Boedeker's "output [of] individual level utility estimates. He just chose not to report those, but he had them.  So I'm doing no calculation or independent analysis of my own.  I am simply taking the results of his own work.").

And Dr. Wilcox pointed to other actual examples of wildly irrational results from Boedeker's survey participants.  Exhibit 3 of the Wilcox Report shows one of the 14 choice sets that was presented to Respondent 488 in Mr. Boedeker's sample. ECF No. 170-2 page id.#5158 (Ex. 3 to Wilcox Rep't (filed under seal)). The only difference between the options packages presented to this respondent is the price – Option 3 is $1,000 cheaper than Option 4. *Id*. A rational consumer would choose the cheaper option package, all things being equal. However, Respondent 488 ***chose the more expensive option*** package. *Id*. In another example, Respondent 131 irrationally chose a vehicle with a potential defect and a higher price when an identical vehicle with no defect and a lower price was available.  *Id*. These egregious analytical and empirical flaws are unchallenged by Boedeker and show on two fronts why Boedeker's methodology is flawed and spins off unreliable results when examined closely (and on the individual part-worth level, which both Dr. Wilcox – and Gaskin in *Lenovo* – explained are

16

1   necessary).

2         Plaintiffs try to mask these methodological flaws by touting the fact that

3   Boedeker is merely presenting "aggregate average results" and "composite answers."

4   ECF No. 178 (MTS Opp. at 13). But Dr. Wilcox explains *why* this approach produces

5   bad results: because it papers over irrational individual part-worth results which, in turn,

6   reveal methodological flaws. Dr. Wilcox further illustrates how averaging poor and

7   extreme results obscures unreliable results through a very simple example of two

8   people, one outside in extremely cold weather, while the other is experiencing

9   extremely hot temperatures. If an observer knew only the *average* temperature to which

10  the two people are exposed, they might reasonably conclude that both people are

11  comfortable. ECF No. 166-3 page id.#4353 (Wilcox Rep't ¶ 28).  The reality is of course

12  very different: one person is very cold while the other is very hot. *Id*. Because Boedeker

13  reports average estimates of "willingness to pay" (WTP) across his respondents he hides

14  the unreliability of the individual data that makes up the fanciful average, and also

15  conceals the fact that **that the majority of Mr. Boedeker's sample (58.4%) either**

16  **experience no statistically significant drop in WTP due to the alleged transmission**

17  **defect, or have irrational preferences, or both.** *Id*. ¶ 38. The extreme results are

18  themselves evidence of unreliability and invalidity as Dr. Wilcox testified (emphasis

19  supplied):

20      Q:    Okay. Well, you're saying that respondents are exhibiting irrational
                preferences. How do you know what their preferences are?

21      A.    We used the output from the very same conjoint analysis that he did.
22              So he had in his output the individual level of utility estimates. ***He***
                ***just chose not to report those, but he had them***. So I'm doing no
23              calculation or independent analysis of preferences on my own. ***I am***
                ***simply taking the results of his own work***.
24              …

25      Q.    By "choices," do you mean an individual survey participant's
                response to a specific survey question?

26      A.    Yes. So every individual in the conjoint analysis would have
27              engaged in multiple choices, and those choices are encoded in a data
                file, which is then fed into the estimation procedure in order to
28              estimate the preferences.

17

| | |
|---|---|
| Q. | Okay. So if you're looking at the survey choices in any given survey and you see that there are some nonsensical choices, do you throw out the survey and start over? |
| A. | ***Often the way that is handled is: In an actual pretest, which Mr. Boedeker did not do, where you pretest your particular survey, you check for irrational responses***. If you see irrational responses, that gives you an indication you might need to change the way the survey is designed, and then you make those kind of adjustments prior to launching the main survey itself. That's generally the way that that occurs. … |
| Q. | Okay. And then towards the end of that paragraph, you comment on survey comments from the respondents that indicate respondents found the survey confusing, and then go on to opine that the survey's results are inherently suspect and unreliable Do you see that? |
| A. | Yes. |
| Q. | How many comments indicating confusion are needed to determine that survey results are inherently suspect and unreliable? |
| A. | To answer that question, I'm going to have to back up just a little bit … In general, in the main conjoint survey, you will not see any comments like that, because these are comments that individuals typically write in a pretest. ***Why he did not do a pretest is beyond me. He appears to have taken people in his sample who were confused and continued to use them in the estimation procedure I've never seen that done before***. I've seen these kind of things show up in a pretest, and then you adjust based on the pretest results. But I've never seen this kind of thing show up in the main body of the data, where you're actually using it for estimation. |
| Q. | Okay. So would you recommend that Mr. Boedeker exclude these respondents from his analysis? … |
| A. | Frankly, ***I would recommend that he did this in a pretest. That would have been the scientifically valid way to do something like this***. |

Kiser Decl., Ex. C (Wilcox Dep. 119:20-120:7; 121:4-25; 123:8-124:7). ECF No. 166-3 page id.#4357 (Wilcox Rep't ¶ 38). Plaintiffs' incorrectly try to draw parallel to *Apple, Inc. v Samsung Elecs. Co*., wrongly suggesting the court there found that the expert of the party opposing the conjoint created the irrational results in question, leading the court to disregard the criticism of the model. ECF No. 178 (MTS Opp. at 13, n 3). Not so. In fact, in *Apple*, *both* of the competing experts ran the same data in the same way, using the same software, reaching different results, leading the court there to find a

battle of the experts best left to a jury. Our case could not be more different. Here, Dr.
Wilcox performed *individual analysis of Boedeker's own data* (as is appropriate when
utilizing conjoint methodology), exposing the invalidity of Boedeker's results, while
Boedeker improperly averaged his responses to mask his irrational results.[5]

### C. Mr. Boedeker's Survey Design Contains Flaws And Admittedly Fabricated Part-Worth Values, Which Plaintiffs Do Not Refute.

Boedeker freely admits that he fabricated the values that form the basis of his
"part worth" (*i.e.*, WTP) estimates:

Q:   Where is the empirical research that you considered when you were
setting those prices? … Okay, let's look at paragraph 112. You say
based on the data in table three, A, 500. How did you compute 500
from the data in table three?

A:   [BOEDEKER]: I chose 500, not computed. … *So I basically, by
visual inspection of this table, I convinced myself that prices
within $500 and $2500 for the different attributes that I have in
my conjoint is a sufficient range to be included as the input in the
conjoint*.

Q:   Are you an expert on the valuation of the automotive components?

A:   *I'm not an expert in the valuation of automotive components*.

Kiser MTS Decl. Ex. B, (Boedeker Dep. 157:15-17; 159:6, 11-15; 161:15-18)
(discussing ECF No. 166-2 page id.#4293 (Boedeker Rep't at ¶ 111-112, Table 3)))
(emphasis supplied).

Moreover, Boedeker's "hypothetical purchase situation" fails to represent the
market environment in which actual consumers purchase vehicles.  In contrast to
Gaskin, for example, who mimicked how consumers purchase laptop computers online
by selecting various attributed (*e.g.*, camera, RAM, screen size, etc.), in this case,
Boedeker failed to present survey respondents with actual product options. ECF No.
166-3 page id.#4359 (Wilcox Rep't ¶ 41).  Rather, he tells the survey respondents (a
survey that was not pre-tested, mind you) to assume they have *already chosen* an

---

[5] Moreover, in *Apple*, unlike here, both parties had full and fair opportunity to depose
each expert on all of their opinions, whereas here, because of the untimeliness of
Boedeker's Untimely Opinion (which should not be considered) AHM would be
foreclosed from taking.

DEFENDANTS' REPLY ISO MOTION TO STRIKE THE TESTIMONY OF MR. STEFAN BOEDEKER

imaginary vehicle to buy and are now deciding which additional features they would like to purchase. *Id*. ¶ 42. In the real-world, however, consumers don't select individual options, but rather choose vehicles with trim levels that have certain features already included, as Boedeker implicitly acknowledges.

## IV.   AHM's Objections Go Directly To Admissibility, Not Weight

Notwithstanding the many problems with Boedeker's conjoint survey (including his failure to do a pre-test of the actual survey instrument, his blatant fabrication of individual part-worth values, the irrationality inherent in the individual part-worth calculations in his conjoint survey data, not to mention the "garbage in, garbage out" nature of Boedeker's analysis), Plaintiffs urge the Court simply to accept Boedeker's conjoint study and report at face value and leave the (many) reliability problems for a "jury" to handle. *See*, *e.g*., ECF No. 178 (MTS Opp. at 11) ("Criticisms of survey design are 'more appropriate for consideration by a jury, rather than the Court on a Daubert motion.'"). What Plaintiffs seek is directly contrary to law. Courts routinely exclude so-called expert opinions when they are demonstrably unreliable and scientifically invalid. Indeed, Plaintiffs' own cases all support AHM on this point and call for exclusion of when a party's conjoint analysis is propped up by unreliable process and reasoning. *See*, *e.g*., *Wendt v. Host Int'l, Inc*., 125 F.3d 806, 814 (9th Cir. 1997). Not to mention that, because Boedeker includes many irrelevant factors and facts in applying his conjoint analysis, the resulting opinion is irrelevant to Plaintiffs' claims anyway. *See Zakaria v. Gerber Prod. Co*., No. LACV1500200JAKEX, 2017 WL 9512587, at *20 (C.D. Cal. Aug. 9, 2017) (rejecting conjoint analysis because it did not offer relevant opinions about the specific market conditions at issue). Cases admitting proper conjoint analysis say nothing about what Boedeker offers here.

For example, Plaintiffs quote *Wendt v, Host*, suggesting that "[c]hallenges to survey methodology go to the weight given the survey, not its admissibility." ECF No. 178 (MTS Opp. at 11). Setting aside that *Wendt* (like many of Plaintiffs' other cited cases) is about trademark surveys and offers little precedential value, Plaintiffs

conspicuously omit the opinion's prior sentence where the panel explains that surveys should go to the jury *only if* they "are conducted according to accepted principles and are relevant"—a critical inquiry that only a court can make. *Wendt*, 125 F.3d at 814. As explained below, Plaintiffs' authority dodges the underlying problems highlighted in AHM's moving papers: Boedeker does not use reliable reasoning and methods to form his opinions, and his testimony is ultimately irrelevant because it is not reflective of the market and products on which he purports to opine. This case thus fits squarely into the camp of cases that have rejected conjoint experts on the same grounds. *See, e.g.*, *In re NJOY, Inc. Consumer Class Litigation II*, 2016 WL 787415, at *5-9 (C.D. Cal. Feb. 2, 2016) (conjoint expert focused on irrelevant factors and offered an opinion disconnected from the relevant market); *Oracle Am., Inc. v. Google Inc.*, No. C 10-03561 WHA, 2012 WL 850705, at *4 (N.D. Cal. Mar. 13, 2012) (same); *Apple, Inc. v. Samsung Elecs. Co.*, 2014 WL 976898, at *12 (N.D. Cal. Mar. 6, 2014) (same); *Saavedra v. Eli Lilly & Co.*, 2014 WL 7338930 (C.D. Cal. Dec. 18, 2014) (same).

### A.   Plaintiffs' Cited Authority Merely Confirms that Mr. Boedeker's Opinions Fall Far Short of Rule 702's Requirements.

Plaintiffs' authority unanimously supports AHM and cuts against Plaintiffs' positions. Each case Plaintiffs cite stands for the unremarkable proposition that conjoint analysis is admissible *if*, like any opinion, it is (1) properly reasoned and reliable and (2) sufficiently tied to the relevant product and market. But none of Plaintiffs' cases hold an opinion riddled with arbitrary and unreasoned premises and irrelevant data should be given any shrift—much less get to a jury. *See, e.g.*, *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1143 (9th Cir. 1997) (Plaintiffs heavily rely on this case for their contention that courts "routinely" admit surveys in conjoint cases—but this case makes no mention of conjoint analysis and merely repeats the rule that surveys must be "conducted according to accepted principles"); *TV Interactive Data Corp. v. Sony Corp.*, 929 F. Supp. 2d 1006, 1010 (N.D. Cal. 2013) (also heavily relied on by Plaintiffs, and expressly states that expert testimony must be the "product of reliable principles and methods" and  that the expert must have "reliably applied the principles

and methods to the facts of the case"). This is something Boedeker himself concedes Kiser MTS Decl., Ex B (Boedeker Dep. 38:11-18 ("Q. So you agree with what I just said; you agree that if the surveys are flawed, then the conjoint analysis will not be sound because the data is derived from the survey results? THE WITNESS [Boedeker]: In general terms, yes, if the input is incorrect, then the output could be anything.")).

Many of Plaintiffs' cases provide a road map for proper conjoint analysis—highlighting precisely why Boedeker's opinions are so far afield here. That is readily apparent from *Lenovo* (disc. *supra*) but also Plaintiffs' other authority as well. For example, in *TV Interactive Data Corp. v. Sony Corp.*, the plaintiffs' expert painstakingly explained the underlying rationale for the various decisions he made in rendering his conjoint analysis including, among other things, why he analyzed certain features over other ones. *Id.* (for example, plaintiffs' expert explained why price discounts were applicable to the particular product in question). Indeed, the court in TV Interactive specifically distinguished *Oracle America Inc. v. Google* (a case right on point here where conjoint analysis was rejected), because, there, the plaintiffs' expert offered "no principle[d] basis for selecting" several of the product features used in his conjoint analysis. *Id.* Of course, that is precisely what happened here, as AHM explained at length in its moving papers (and above).

For another example, Plaintiffs heavily rely on *In re ConAgra Foods, Inc.*, 90 F. Supp. 3d 919, 946 (C.D. Cal. 2015). But Plaintiffs fail to mention that the Court there ***rejected*** expert conjoint analysis related to the plaintiffs first motion for class certification, admitting it only a year later in relation to an amended motion because the expert had substantially bolstered the reliability of his opinion. *Id.* Plaintiffs there had opposed exclusion by arguing that their conjoin expert's "methodology go[es] only to the merits of his final damages calculation and are not properly considered at the class certification stage." *In re ConAgra Foods, Inc.*, 302 F.R.D. 537, 552 (C.D. Cal. 2014). But the court rejected that argument, holding that "shortcomings" in the methodology warranted exclusion, regardless of whether other courts had accepted conjoint analysis

22

1   in the past. *Id.*  The same story goes for Plaintiffs' other equally-unhelpful cases.

2       In this case, Plaintiffs would have the Court skip over the initial reliability,

3   validity and relevance determinations simply because other courts in connection with

4   their gatekeeping functions cases have allowed in other (scientifically valid) conjoint

5   studies. But that is not this case.  To allow unreliable and unreasonable expert opinion

6   to the jury will circumvent the entire purpose of Rule 703—which is meant to insulate

7   the jury from unreliable and speculative so-called "expert" testimony that is not based

8   on reliable, scientific methodology. Fed. R. Evid. 702 and cmts.; *In re NJOY, Inc.*

9   *Consumer Class Litigation II*, 2016 WL 787415, at **5-9.

10      **B.    The Court Should Exclude Mr. Boedeker's Report Because It Is Unreliable and Based on Flawed Methodology and Data.**

11      Defendants' moving papers explain at length the many procedural and reasoning

12   problems running throughout Boedeker's opinions. And courts have made clear that

13   when the data going in is faulty, the output is equally so. *See*, *e.g.*, *Wolf v. Hewlett*

14   *Packard Co.*, No. CV1501221BROGJSX, 2016 WL 7743692, at *7 (C.D. Cal. Sept. 1,

15   2016) (conjoint expert did not apply reliable and accepted methods in offering his

16   opinion). Aside from the reliability problems, what Plaintiffs miss in their Opposition

17   is that their conjoint analysis must be *directly tied* to the specific damages they are trying

18   to prove. If their expert does not address the particular market and product factors

19   relevant to the product they are suing over, the expert's conclusions are simply

20   irrelevant to Plaintiffs' claims.  Even more so when the "expert" fabricates prices and

21   features that do not exist in the real world. When experts insert their own subjective

22   criteria to measure only a piece of the true market value of a feature, the opinion is

23   unhelpful and inadmissible. *See In re NJOY, Inc. Consumer Class Litigation II*, 2016

24   WL 787415, at **5-9; *Apple, Inc. v. Samsung Elecs. Co.*, 2014 WL 976898, at *12;

25   *Saavedra*, 2014 WL 7338930.

26   //

27   //

28   //

DEFENDANTS' REPLY ISO MOTION TO STRIKE THE TESTIMONY OF MR. STEFAN BOEDEKER

1    DATED:      July 22, 2019          KING & SPALDING LLP

2

3

4                                      By:  _/s/ Livia M. Kiser_
                                       Attorneys for Defendants
5                                      AMERICAN HONDA MOTOR CO., INC. and
                                       HONDA NORTH AMERICA, INC.
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Certificate of Service**

On, July 22, 2019, I caused this document to be filed and served on all ECF-registered counsel of record using the Court's CM/ECF system.


_/s/ Livia M. Kiser_

Livia M. Kiser

---

DEFENDANTS' REPLY ISO MOTION TO STRIKE THE TESTIMONY OF MR. STEFAN BOEDEKER